# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LAWRENCE ZUCKER, on Behalf of Himself and all Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case Number: 05-11831 NMG |
| v. | ) ) ) | |
| FEDERATED SHAREHOLDER SERVICES COMPANY, JOHN F. DONAHUE, J. CHRISTOPHER DONAHUE, LAWRENCE D. ELLIS, THOMAS G. BIGLEY, JOHN T. CONROY, JR., NICHOLAS P. CONSTANTAKIS, JOHN F. CUNNINGHAM, PETER E. MADDEN, CHARLES F. MANSFIELD, JR., JOHN E. MURRAY, JR., MARJORIE P. SMUTS, JOHN S. WALSH and FEDERATED SECURITIES CORP., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

---

## APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE TO THE U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

Exhibit A: *Reaves v. Federated Investors, Inc., et al.*, No. 05-cv-00201-DSC, Amended Complaint, (pending in W.D. Pa.)

Exhibit B: *Reaves*, Order Granting Motion of Defendants to Transfer (Feb. 14, 2005) (W.D. Tenn.)

Exhibit C: Order of W.D. Pa. dated March 31, 2005, consolidating *Spahn*, *Fetzer*, *Bauer*, *Brever*, and *Reaves* cases

Exhibit D:    *Brever, et al. v. Federated Equity Management Co. of Pennsylvania*, No. 04-cv-00855, Second Amended Complaint (pending in W.D. Pa.)

Exhibit E:    *Spahn v. Federated Investors, Inc., et al.*, No. 04-0352 (W.D. Pa.), Complaint

Exhibit F:    *Bauer v. Federated Equity Management Company of Pennsylvania, et al.*, No. 04-cv-00702-DSC (W.D. Pa.), Complaint

Exhibit G:    *Reebok Internat'l Ltd. v. Dunkadelic, Inc.*, No. Civ.A. 03-CV-11471-G, 2004 WL 413266 (D. Mass. Mar. 2, 2004)

Exhibit H:    *Nelson v. AIM Advisors, Inc.*, No. 01-CV-0282-MJR, 2002 WL 442189 (Mar. 8, 2002)

Exhibit I:    *In re Eaton Vance Mutual Funds Fee Litig.*, 380 F. Supp.2d 222 (S.D.N.Y. 2005)

　　　　　　　　　　　　　　　 /s/ Stuart M. Glass
　　　　　　　　　　　　　　James S. Dittmar (BBO# 126320)
　　　　　　　　　　　　　　Stuart M. Glass (BBO# 641466)
　　　　　　　　　　　　　　GOODWIN PROCTER LLP
　　　　　　　　　　　　　　Exchange Place
　　　　　　　　　　　　　　53 State Street
　　　　　　　　　　　　　　Boston, MA 02109
　　　　　　　　　　　　　　*Attorneys for Defendants*

OF COUNSEL:
Thomas L. Allen
Perry A. Napolitano
David J. Bird
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
*Attorneys for Defendants*
*Federated Securities Corp.*
*Federated Shareholder Services Co.*

Robert J. Higgins
Eric A. Bensky
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
2101 L Street, N.W.
Washington D.C. 20037-1526
*Attorneys for Defendants other than*
*Federated Securities Corp.*
*Federated Shareholder Services Co.*

Dated:  December 2, 2005

LIBA/1652880.1

# EXHIBIT A

# Part 1 of 3

# EXHIBIT A

FILED BY _____ D.C.

04 NOV 12 AM 8: 40

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT
W.D. OF TN, MEMPHIS

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

GRETCHEN W. REAVES, on behalf of and
for the benefit of FEDERATED
KAUFMANN FUND,

     Plaintiff,

FEDERATED INVESTORS, INC.,
FEDERATED EQUITY MANAGEMENT
COMPANY OF PENNSYLVANIA,
FEDERATED SECURITIES CORP.,
FEDERATED GLOBAL INVESTMENT
MANAGEMENT CORP., FEDERATED
INVESTMENT MANAGEMENT
COMPANY, FEDERATED SERVICES
COMPANY, AND FEDERATED
SHAREHOLDER SERVICES
COMPANY

     Defendants.

Case No. - 04-2475 D An

## AMENDED COMPLAINT

Plaintiff, Gretchen W. Reaves, on behalf of and for the benefit of Federated Kaufmann

Fund, one of a Series or separate portfolios that comprise Federated Equity Funds, an investment

company registered under the Investment Company Act of 1940 (the "Investment Company

Act"), sues defendants, Federated Investors, Inc., a company having shares listed on the New

York Stock Exchange, and its wholly owned subsidiaries or affiliates, Federated Equity

Management Company of Pennsylvania, Federated Securities Corp., Federated Global

Investment Management Corp., Federated Investment Management Company, Federated

Services Company, and Federated Shareholder Services Company, and alleges:

## I. JURISDICTION AND VENUE

1.     This action is brought by Plaintiff for the benefit of and on behalf of Federated

Kaufmann Fund pursuant to Sec. 36(b) of the Investment Company Act of 1940, as amended, 15

U.S.C. Sec. 80a-35(b).

2.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. Sec. 80a-43, 15

U.S.C. Sec. 80a-35(b)(5), and 28 U.S.C. Sec. 1331.

3.     Venue is proper in this judicial district pursuant to 15 U.S.C. Sec. 80a-43 and 28

U.S.C. Sec. 1391(b)(2)-(3). A substantial part of the events and omissions that give rise to

Plaintiff's claims occurred in this district and Defendants may be found in this district. Among

other contacts, Federated Kaufmann Fund, on whose behalf this action is brought, is

domesticated in Tennessee, having made notice filings with the Commissioner of Commerce and

Insurance of the State of Tennessee pursuant to Sections 48-2-102(8)(D) and 48-2-125 of the

Tennessee Code Annotated. Defendants are inhabitants of or transact business in this district by,

among other things, causing Federated Equity Funds as the registered investment company and

one or more of its Series, including Federated Kaufmann Fund, to invest in shares of companies

domiciled and headquartered in this district, including FedEx Corporation and AutoZone, Inc.,

and otherwise performing a wide spectrum of investment advisory and general management

services for Federated Kaufmann Fund, on whose behalf this action is brought and which is

domesticated in this district.

4.     No pre-suit demand on the Board of Trustees of Federated Kaufmann Fund is required,

as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply

to actions brought under Sec. 36(b) of the Investment Company Act of 1940. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).

## II. NATURE OF THE ACTION

5.        The Investment Company Act of 1940, 15 U.S.C. Sections 80a-1 *et seq.*, was initially enacted by the U.S. Congress in 1940 to regulate abuses in the investment company or mutual fund industry through creating a system of registration and regulation for investment companies and establishing standards of conduct by entities and individuals providing services to such registered investment companies. In a major amendment of the Investment Company Act in 1970, Congress added Sec. 36(b), 15 U.S.C. Sec. 80a-35(b) (hereafter "Sec. 36(b)"), which established a fiduciary duty with respect to compensation or payments paid by the investment company, or by its security holders, to the investment adviser or to an affiliated person of such adviser. Sec. 36(b) also created a judicial remedy for breach of such fiduciary duty by authorizing suit against such investment adviser, its affiliates, and certain others by the Commission or by a security holder of the investment company on behalf of the investment company with respect to payments made to such entities or persons by the investment company or by the security holders thereof.  Sec. 36(b) states in pertinent part:

> "For purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in the respect of such compensation or payments paid by such registered investment company or the security holders thereof to such investment adviser or person. …".

Such an action may be brought only against the recipient of the compensation challenged, no reward for damages may be recovered for any period prior to one year before the action was instituted, and any award for damages shall be limited to the actual damages resulting from the breach of fiduciary duty and shall not exceed the amounts of compensation or payments received from the investment company or the security holders by the recipient. Sec. 36(b)(3) of the Investment Company Act, 15 USC 80a-35(b)(3). The action may be brought in an appropriate district court of the United States. Sec. 36(b)(5) of the Investment Company Act, 15 USC 80a-35(b)(5). The action is deemed to be equitable in nature, and there is no right to a jury trial. *Kalish v. Franklin Advisers, Inc.,* (C.A. 2, 1991), 928 F. 2d 590, *cert. denied*, 502 U.S. 818.

### III. Parties

6.    Plaintiff Gretchen W. Reaves is a resident of Memphis and Shelby County, Tennessee. She has been a Class K Shareholder of Federated Kaufmann Fund since its inception, and was a shareholder of Kaufmann Fund, Inc. ("Old Kaufmann") before the reorganization in 2001 pursuant to which it became Federated Kaufmann Fund. The shares owned by Plaintiff were purchased directly from Old Kaufmann. Plaintiff's allegations as set forth hereafter are predicated on the public disclosure materials as filed with the Securities and Exchange Commission ("SEC" or the "Commission") by Federated Equity Funds and its various Series, including Federated Kaufmann Fund, Federated Investors, Inc. (the "Federated Disclosure Materials"), the public disclosure materials filed with the SEC by Old Kaufmann, and on information and belief.

7.    Federated Kaufmann Fund, the mutual fund on whose behalf this action is brought, is a Series or portfolio of Federated Equity Funds, a common law business trust

organized in the Commonwealth of Massachusetts and having multiple Series. Federated Equity Funds, referred to herein as the "umbrella entity") is a single legal entity organized under a single Declaration of Trust with numerous amendments. Federated Equity Funds has a single Board of Trustees that oversees all of the multiple Series that are components of the Trust or umbrella entity, including Federated Kaufmann Fund. Federated Equity Funds is registered under a single registration statement on Form N-1A with the SEC as an open-end investment company under Sec. 8 of the Investment Company Act, 15 U.S.C. Sec. 80a-8 (technically, a "management company" as defined in Sec. 4(3), 15 USC Sec. 80a-4(3) that is sub-classified as an "Open-end company" under Sec. 5(a)(1), 15 USC Sec. 80a-5(a)(1) which issues redeemable shares). This single registration statement (Securities Act of 1933 File No. 2-91090 and Investment Company Act of 1940 File No. 811-4017) has numerous Post-Effective Amendments and financial statement filings relating to its multiple Series that include filings for Federated Kaufmann Fund as well as filings for all of the other Series that comprise Federated Equity Funds. The investment objective of Federated Kaufmann Fund is capital appreciation, and it invests principally in common stocks or equity securities and is generally classified as an equity investment company or mutual fund.

8.    The Class K Shareholders of Federated Kaufmann Fund are a class of security holders comprised of those shareholders of Old Kaufmann who participated in the reorganization pursuant to which Old Kaufmann became Federated Kaufmann Fund.

9.    Defendant Federated Investors, Inc. is a public corporation organized under the laws of the State of Pennsylvania which has a class of shares listed on the New York Stock Exchange. The New York Stock Exchange ticker symbol for Federated Investors is FII, and hereinafter Federated Investors, Inc. will be referred to as "FII". FII has numerous subsidiaries

5

and affiliates that perform a variety of investment management, administrative, and operational services for a large number of investment companies or mutual funds and managed accounts (the "Federated Fund Complex"). The Federated Fund Complex has total assets under management exceeding $198 billion, ranking it as one of the larger mutual fund complexes in the United States. Many of the directors and/or key officers of FII are directors and/or key executives of FII's operating subsidiaries. FII, through these directors, key executives and stock ownership, controls the boards of directors and management of these operating subsidiaries, which are under its common control, and FII is an active participant in the wrongful conduct alleged herein. Hereinafter, "Federated Management" will be used to refer collectively to the multiple management and operating entities that comprise FII's mutual fund management organization.

10.    Defendant Federated Equity Management Company of Pennsylvania ("FEMCO"), a Delaware statutory trust, is registered as an investment adviser under the Investment Advisers Act of 1940 ("the Investment Advisers Act"). FEMCO is currently the investment adviser to Federated Kaufmann Fund.

11.    Defendant Federated Investment Management Company ("FIMCO)", a Delaware statutory trust, is registered as an investment adviser under the Investment Advisers Act. FIMCO was the investment adviser to Federated Kaufmann Fund until December 31, 2003.

12.    Defendant Federated Global Investment Management Corp. ("FGIMCO"), a Delaware corporation, is registered as an investment adviser under the Investment Advisers Act. FGIMCO is the sub-adviser to Federated Kaufmann Fund. FEMCO, presently the primary investment adviser, and FIMCO, the primary investment adviser prior to December 31, 2003, have each delegated daily investment management of Federated Kaufmann Fund's securities portfolio to FGIMCO, and FGIMCO is paid a portion of the investment advisory fee currently

6

received by FEMCO and was paid a portion of the investment advisory fee previously received by FIMCO prior to December 31, 2003.

13.     Defendant Federated Securities Corp. ("FSecC"), a Pennsylvania corporation, is registered as a broker/dealer under the Securities Exchange Act of 1934. FSC is the principal underwriter and distributor of Federated Kaufmann Fund.

14.     Defendant Federated Shareholder Services Company "(FSSC"), a Delaware statutory trust and a transfer agent registered under the Securities Exchange Act of 1934, provides transfer agent services for and maintains shareholder records for Federated Equity Funds, including Federated Kaufmann Fund.

15.     Defendant Federated Services Company ("FSC"), a Delaware statutory trust, is the immediate parent of Defendant Federated Shareholders Services Company, and provides transfer agent services and maintains account records for Federated Equity Funds, including Federated Kaufmann Fund, through its subsidiary, FSSC.

16.     Defendant FII as a holding company is the ultimate parent of FEMCO, FIMCO, FSecC, FGIMCO, FSC, and FSSC, all of which are under its common control and all of which accordingly are "affiliated persons" of FII and for the same reasons are also "affiliated persons" of each other as defined in Sec. 2(a)(3) of the Investment Company Act, 15 USC Sec. 80a-2(a)(3). The financial statements of FII's subsidiaries are consolidated with the financial statements of FII for public financial reporting purposes, and FII is therefore the ultimate recipient and beneficiary of fees received by its numerous subsidiaries and affiliates for providing services to the Federated Fund Complex that includes Federated Kaufmann Fund.

### IV. Background on Organization of Federated Kaufmann Fund

17.    An SEC registered investment company such as Federated Kaufmann Fund generally has a Board of Directors or Board of Trustees, a majority of the members of which must be independent or "disinterested" as defined in Sec. 2(a)(19) of the Investment Company Act, 15 USC Sec. 80a-2(a)(19).  Generally, such an investment company has no employees and all operational functions such as investment management, fund administration, fund accounting and other fund operational functions and services are provided under contract by or through the investment manager or are provided directly by other outside service providers.

18.  From about 1986 to April of 2001, Kaufmann Fund, Inc.  ("Old Kaufmann") was an investment company or mutual fund based in New York City and managed by Edgemont Asset Management, Inc. ("Edgemont"), a privately held investment adviser with no other mutual funds under its management. With respect to Old Kaufmann, Edgemont served as investment adviser and, either directly or through subsidiaries, provided fund administration services. Other functions such as transfer agency and custodial services were provided directly by non-affiliated entities.

19. The primary sales distribution channel for Old Kaufmann was direct marketing to potential shareholders through its affiliated principal underwriter and distributor. Direct purchasers did not pay "front-end" sales charges or sales loads deducted from an investor's initial investment proceeds. Old Kaufmann was generally viewed as a "no-load" fund, although it had installed an asset based Rule 12b-1 Distribution Fee of more than 0.25% of assets per annum which prevented it from advertising itself as a "no-load" fund.

20. Shares in Old Kaufmann  were also sold through the so-called "no-load mutual fund supermarkets" such as Charles Schwab & Company, Inc. and National Financial Services Corp.,

8

and through a limited number of broker/dealers that sold shares of funds having asset-based Investment Company Act Rule 12b-1 Distribution Plans. Old Kaufmann had an asset-based Investment Company Act Rule 12b-1 Distribution Plan with a fee of up to 0.75% (75 basis points) per annum of fund assets ("12b-1 Distribution Fee"), which was used primarily to pay for extensive advertisements in the print and electronic media supporting the Fund's direct sales to the general public together with the necessary marketing materials. During the late 1980's and throughout most of the 1990's, Old Kaufmann was heavily advertised in the print and electronic media as the "best performing fund over the past 10 years", and these advertisements were financed by the Fund's Rule 12b-1 Distribution Fee. A portion of this Rule 12b-1 Distribution Fee was also used to pay the no-load fund supermarkets their required fees and costs for services to clients, and for selling fund shares.

21.     In October of 2000, Old Kaufmann and Edgemont announced that an FII subsidiary, FIMCO, would become the new investment adviser for Old Kaufmann through a corporate reorganization. Old Kaufmann, then a Maryland corporation, would sell its assets to a newly created Series of Federated Equity Funds, an existing Massachusetts business trust formed by FII or one of its subsidiaries, and the new Series would be named "Federated Kaufmann Fund". Old Kaufmann would receive "Class K Shares" of Federated Kaufmann Fund in exchange for its assets, and these Class K Shares would be distributed in a tax-free exchange to Old Kaufmann shareholders, who then would become Federated Kaufmann Fund's "Class K Shareholders."

22.     Edgemont charged Old Kaufmann a general management fee of 1.50% per annum of average net assets that combined the services of portfolio investment management and research together with the function of fund administration. There are no breakpoints reducing the

9

percentage-based management fee as assets increase. A management fee of 1.50% with no breakpoints is generally regarded in the mutual fund industry as being high for a domestic equity fund such as Old Kaufmann and its disclosure materials have so stated from time to time. This investment management fee covered the "day to day investment operations of the fund", which comprised all investment management and research as well as portfolio administration services. See Exhibit A.

23.     In connection with the reorganization of Old Kaufmann into Federated Kaufmann Fund (the "Federated Kaufmann Reorganization") Federated Management elected to retain an aggregate investment management fee of approximately 1.50%, even though the investment advisory fee charged most mutual funds in the Federated Fund Complex for equity fund portfolio management at that time was 0.75% per annum (75 basis points). Under the structure of the Federated Fund Complex, investment advisory fees are charged solely for the investment advisory function and such investment advisory fees do not include compensation for portfolio administration or accounting or other fund administrative services. In the Federated Fund Complex, each fund has a separate fund administration fee, designed to cover among other things portfolio accounting services with respect to the portfolio of securities and the preparation of fund financial statements. The fund administration fee is calculated by reference to the total assets of all mutual funds in the Federated Fund Complex, and has amounted to approximately 0.075% (7.5 basis points) of average fund assets of all funds in the Federated Fund Complex. In connection with the proposed reorganization, Federated Management separated the investment advisory fee and the fund administration fee for the new Federated Kaufmann Fund, and an investment advisory fee of 1.425% was assigned for the sole service of investment advice or portfolio management. Federated Kaufmann Fund was to be charged the standard fund

administration fee that was applicable to other mutual funds in the Federated Fund Complex that approximates 0.075% of assets per annum (7.5 basis points), resulting in a combined management fee of approximately 1.50% of assets per annum for the same investment advisory and administrative services as had been provided for Old Kaufmann for its management fee of 1.50% of assets.

24.    The disclosure materials filed with the Securities and Exchange Commission for Federated Kaufmann Fund (the "Federated Disclosure Materials") state that FIMCO, the Federated Investors subsidiary that served through December 31, 2003 as the primary investment adviser for Federated Kaufmann Fund, has delegated the "daily management" of the Fund's assets (a phrase substantially similar to the phrase "day to day investment operations" used in the disclosure materials for Old Kaufmann to include all investment management and investment research operations) through a sub-advisory agreement to another FII subsidiary, FGIMCO, for a fee of 1.175% per annum. See Exhibit B. No explanation for this delegation is given in the Federated Disclosure Materials. And no information is given as to the need to continue charging Federated Kaufmann Fund a total investment advisory fee of 1.425% after the "daily management" of the Fund's assets has been delegated to a sub-advisor. Further, there is no explanation or disclosure of any separate services performed by the primary manager for the incremental difference between the primary investment advisory fee of 1.425% of assets and the sub-advisory fee of 1.175% of assets. Most other equity funds managed by Federated Management do not pay a primary investment advisory fee of as much as Federated Kaufmann's sub-advisory fee of 1.175% for the sole function of investment advice or portfolio management. After December 31, 2003, FEMCO became the investment adviser to Federated Kaufmann Fund, but there has been no change in the investment advisory fees charged Federated Kaufmann Fund.

11

25.    Federated Management also modified other fees previously applicable to Old Kaufmann. Old Kaufmann had an Investment Company Act "Rule 12b-1 Distribution Fee." Such a fee is an asset-based fee, calculated as a percentage of fund assets that is collected from the mutual fund by its affiliated principal underwriter or affiliated distributor and then is used to pay for a variety of distribution and promotional expenses. Old Kaufmann's Rule 12b-1 Distribution Fee could be as much as 0.75% on total assets (75 basis points). Old Kaufmann's Rule 12b-1 Distribution Fee was used primarily by its affiliated principal underwriter or affiliated distributor to pay for extensive media advertising and attendant advertising and promotional expenses. Although this fee could have been as much as 0.75% or 75 basis points, the actual Rule 12b-1 Distribution Fee was generally less than 0.50% or 50 basis points and, during fiscal 1999 and 2000 amounted to approximately 0.36% of average assets or 36 basis points. Federated Management continued the 12b-1 Distribution Fee for Federated Kaufmann Fund Class K Shareholders but reduced the maximum fee that could be charged to 0.50% of assets or 50 basis points. Because Old Kaufmann's Rule 12b-1 Distribution expenses had generally been less than 0.50%, reduction in the maximum fee that could be charged did not cause a reduction in actual expenses.

26. Apparently as a functional substitute for the reduction in the maximum Rule 12b-1 Distribution Fee by 0.25%, Federated Management added a separate "Shareholder Services Fee" applicable to the Class K Shares to be paid by Federated Kaufmann Fund that could be as much as 0.25% per annum of assets (25 basis points) and that would be paid in addition to the Rule 12b-1 Distribution Fee of as much as 0.50%, thereby increasing the total expenses that could be payable by Federated Kaufmann Fund with respect to the Class K Shares. Such a Shareholder Services Fee is generally used to pay non-affiliated, retail broker/dealers that charge

12

commissions for selling mutual fund shares for special services provided to their clients who invest in a mutual fund as well as to cover the expenses of account record-keeping for the broker/dealer's clients. Also, a Shareholder Services Fee may be used as "revenue sharing" for purchasing "shelf space" to encourage the selling of a particular mutual fund by the non-affiliated broker/dealer's representatives. Generally such service fees are not necessary in situations where the shareholder group is composed primarily of investors who purchased directly from the fund organization, such as the overwhelming majority of shareholders of Old Kaufmann who became the Class K Shareholders of Federated Kaufmann Fund, because such shareholders did not purchase their shares through non-affiliated broker/dealers and accordingly did not receive services from non-affiliated broker/dealers. In addition, compensation to acquire shelf space from non-affiliated broker/dealers is not necessary because the overwhelming majority of Old Kaufmann's shares were not sold through such a distribution channel and Class K Shares presently are not sold through such a distribution channel.

27.    The Federated Kaufmann Reorganization proposal, with the fee structure described above, was duly submitted to Old Kaufmann shareholders in early 2001, and ultimately was approved by the requisite shareholder vote in April of 2001. The reorganization was promptly implemented thereafter. At that point, the shareholders of Old Kaufmann, who became the Class K Shareholders of Federated Kaufmann Fund, were the only shareholders of Federated Kaufmann Fund, then composed solely of approximately $3.4 billion in assets obtained from Old Kaufmann. At that time, the total assets under the jurisdiction of Federated Management exceeded $130 billion. The Old Kaufmann shareholders who became the Class K Shareholders of Federated Kaufmann Fund were thus the only shareholders of the newly formed Federated Kaufmann Fund at the outset and made its very existence possible.

13

28.    Pursuant to the Federated Kaufmann Reorganization, the Class K Shares of Federated Kaufmann Fund were distributed to Old Kaufmann shareholders in exchange for their shares of Old Kaufmann. Class K Shares were then closed to new direct investors after the Federated Kaufmann Reorganization. Federated Kaufmann Fund Class K Shareholders were permitted to add investments to their existing accounts without payment of any sales loads, and brokerage firms and consultants having pre-existing relationships with Old Kaufmann (such as the Charles Schwab & Co. Inc. and National  Financial Services Corp.'s no-load fund super markets) could invest additional funds for existing clients. It appears that such brokerage firms could also add new clients as Class K Shareholders on the same terms as before the Federated Kaufmann Reorganization, without payment of  sales charges deducted from investment proceeds.

29.    At the time of the Federated Kaufmann Reorganization, the Board of Trustees of Federated Equity Funds, the umbrella entity, created three new classes of shares having specified sales loads and 12b-1 Distribution Fees for Federated Kaufmann Fund. These three new classes of shares, Class A, Class B, and Class C Shares, corresponded to the class structure of other mutual funds in the Federated Fund Complex and would be distributed primarily through non-affiliated broker/dealers as are the shares of other mutual funds in the Federated Fund Complex, which also have the same Class A, Class B, and Class C structure. Shares in these classes can also be purchased directly from the Fund's affiliated distributor upon payment of the required sales charges. Although the assets attributable to the Class A, Class B, and Class C shares of Federated Kaufmann Fund have increased through new sales, the Old Kaufmann shareholders who became Federated Kaufmann Fund Class K Shareholders remain the largest class of shares of Federated Kaufmann Fund, constituting approximately 60% of Federated Kaufmann Fund's

assets at October 31, 2003, the close of the most recent fiscal year. Federated Kaufmann Fund Class K Shareholders constitute one of the largest if not the largest class of equity shareholders in the entire Federated Fund Complex and Federated Kaufmann is the largest equity fund in the Federated Fund Complex.

30. The Class K Shareholders have not enjoyed the benefits of economies of scale that should have been generated by the Federated Kaufmann Reorganization which changed the single, stand-alone Old Kaufmann Fund into the Federated Kaufmann Fund and made it a part of the much larger Federated Fund Complex. To the contrary, the overall structure of fees charged by Federated Management, most calculated as a percentage of assets with no breakpoint reductions as assets increase, coupled with certain higher operating expenses incurred by Federated Kaufmann Fund, have had the effect of increasing the total fees and operating expenses applicable to the Class K Shareholders of Federated Kaufmann Fund to an amount greater that the total fees and operating expenses that were applicable for the same class of shareholders when they were shareholders of Old Kaufmann.

31. FII through certain subsidiaries has "voluntarily" limited total operating expenses of the Federated Kaufmann Fund to 1.95% per annum of average net assets. This expense ratio cap is equal to the operating expense ratio experienced by Old Kaufmann for the fiscal year ended December 31, 1999, the last year that audited financial statements were available prior to issuance of the Proxy Statement with respect to the proposed reorganization, but is higher than the actual operating expense ratio of 1.89% per annum experienced by Old Kaufmann during its last full fiscal year ended December 31, 2000. Nevertheless, the formal fee structure and other expenses that have been imposed by Federated Management on the Class K Shareholders of Federated Kaufmann Fund can be as much as 2.40% and this fee structure is so high that the

15

combination of formal fees paid by Federated Kaufmann Fund to Federated Management and other higher operating expenses will always substantially exceed the voluntary 1.95% Expense Limitation Cap. For example, the total expense ratio in the absence of the voluntary 1.95% Limitation Cap applicable to Class K Shareholders for the fiscal year ended October 31, 2003 was approximately 2.46%. Consequently, the total operating expense ratio for Class K Shareholders of Federated Kaufmann Fund will never be less than the 1.95% "voluntary" expense limitation that was applicable to Old Kaufmann during 1999, regardless of any future growth in assets. Thus, Federated Kaufmann Fund's Class K Shareholders that made its very existence possible will never be able to realize any economies of scale that should result from increases in the Fund's assets or that should result from Federated Management's vastly greater corporate support structure that manages significantly larger combined assets. Yet other, smaller equity funds and/or classes of shareholders in the Federated Fund Complex enjoy investment advisory fees that are substantially less than 1.425% and/or expense ratios substantially below the voluntary 1.95% Expense Limitation Cap per annum and are able to participate in economies of scale as assets rise, primarily because they pay substantially lower investment advisory fees.

32.    FII and/or its various subsidiaries supplying management services to Federated Kaufmann Fund have also discriminated against the Class K Shareholders of Federated Kaufmann Fund, the core or nucleus class, and in favor of the Class A, Class B, and Class C shareholders of the same Fund by charging an excessive and discriminatory Redemption Fee applicable only to the Class K Shareholders that bears no reasonable relationship to the costs of the services provided, and by charging Shareholder Services Fees and Rule 12b-1 Distribution Fees that provide no substantial benefits to the now closed Class K Shares and the Class K Shareholders.

16

33.    FII and/or its subsidiaries have also discriminated against all classes of shareholders of Federated Kaufmann Fund and in favor of the other mutual funds that are part of Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, and numerous other mutual funds in the Federated Fund Complex by charging Federated Kaufmann Fund  excessive and discriminatory investment advisory fees and thereby failing to extend economies of scale to Federated Kaufmann Fund  that are realized by other, smaller  equity mutual funds that are part of Federated Equity Funds and also other mutual funds that are part of the Federated Fund Complex that are managed by Federated Management but that pay lower investment advisory fees and enjoy significant economies of scale.  In addition, Federated Kaufmann Fund has been used by Federated Management as a catalyst or vehicle to increase investment advisory fees charged other mutual funds within the Federated Fund Complex.

34.   The Federated Disclosure Materials indicate that the same Board of Trustees (or Board of Directors for mutual funds in the Federated Fund Complex organized as corporations), composed of the same twelve persons, nine of whom are identified as "independent" or "non-interested", oversees all of the approximately 138 mutual funds in the Federated Fund Complex. No public information is disclosed on the frequency or length of the meetings of these boards or trustees or boards of directors. But, for example, if the boards should meet six times a year in alternate months, and each meeting session lasts four full eight-hour days, a total of 24 eight-hour days annually, the Board would be able to spend on average less than 15 minutes on a particular mutual fund's issues per four-day session, and an average of less than 1 hour and 25 minutes on all of a particular mutual fund's issues for the entire year. Such issues would include the numerous corporate governance, portfolio management, portfolio pricing, audit and accounting issues that a Board must review annually under applicable statutes, rules and

17

regulations in overseeing or governing a particular mutual fund, and would also include the annual renewals of the investment advisory agreements and the Rule 12b-1 Distribution Fee arrangements. Should less time be spent in board meetings, the average time per mutual fund declines proportionately. For example, if the Boards meet quarterly for four full eight-hour days per quarterly session, a total of sixteen full eight-hour days, there would be on average only 56 minutes per fund per year to oversee a particular mutual fund's on-going operations and also review and negotiate its annual contract renewals. The independent or "non-interested" directors or trustees are supposed to be "watch dogs" charged with the responsibility of protecting the interests of the shareholders in contract and fee negotiations with the management organization. Regardless of the sophistication and the individual educational and business qualifications of the nine independent members of the Board of Trustees of Federated Equity Funds, many of whom are otherwise fully employed in demanding positions of responsibility, such average limited meeting time per fund per session and per fund per year is not sufficient to enable the Board of Trustees or Board of Directors of the mutual fund entities comprising the Federated Fund Complex to review and discuss meaningfully on behalf of a particular mutual fund the complex factual and legal issues that are involved in on-going operational matters or to engage in serious, arms-length bargaining in good faith on material fee issues related to a particular mutual fund, while contemporaneously for all 138 mutual funds completing the numerous other routine operating reviews and annual approvals required under the Investment Company Act of 1940 and its supporting rules and regulations. There is thus insufficient time available for and accordingly insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on any special fee issues specifically involving Federated Kaufmann Fund or its Class K Shareholders. Further, as set

18

forth in more detail in Paragraph 132 of this Complaint, incorporated, herein, Federated Management admits in public disclosure materials that the Federated Trustees do not as a matter of practice consider separately the specific circumstances of a particular mutual fund in annual contract renewals as though it were the only mutual fund in the Federated Fund Complex. Instead, the Federated Trustees consider the "totality" of a number of circumstances involving many other mutual funds and their relationships within the Federated Fund Complex in the deliberations on annual contract renewals. This admission arguably indicates that the overall cost structure and profitably of many funds may be considered in the aggregate and may take precedence over a specific consideration of whether the fees and profitability of a single, large mutual fund such as Federated Kaufmann Fund, or the fees applicable to the Class K Shareholders, could be excessive when considered separately or could be blatantly discriminatory when compared specifically with other similarly situated mutual funds within the same legal entity or within the overall Federal Fund Complex. Moreover, the greater revenue and greater profit contributions of a large mutual fund such as Federated Kaufmann could be viewed by Federated Management or the Federated Trustees as supplementing and therefore justifying the lower fees and/or lower profitability of smaller mutual funds within Federated Equity Funds or the Federated Fund Complex.

### COUNT I
### INVESTMENT COMPANY ACT Sec. 36(b)
### BREACH OF FIDUCIARY DUTY
#### Receipt of Excessive and Discriminatory Redemption Fees Charged To
#### Federated Kaufmann Fund Class K Shareholders

35.    Plaintiff repeats and re-alleges paragraphs 1 through 34, inclusive, of this Complaint.

36.    Old Kaufmann Fund or Edgemont charged all of its shareholders a redemption fee of 0.20% or 20 basis points on the value of shares redeemed, purportedly to cover the costs of processing redemptions. See Exhibit C.    That redemption fee was perpetual, was never eliminated, and never expired, regardless of the length of time shares were held. There is no indication in the disclosure documents of Old Kaufmann that Edgemont granted any waivers with respect to this redemption fee, and it appears that all redeeming shareholders without exception were charged the redemption fee.

37.    It is not clear from Old Kaufmann's disclosure materials whether the fee was withheld from the redeeming shareholders' redemption proceeds by the Fund, which then remitted the fee to Edgemont or the transfer agent, or whether Edgemont or the transfer agent withheld the fee after a redemption had been taken and the shareholder's redemption proceeds had been removed from the Fund. No specific information was given as to the application of the fee to particular expenses, or how the gross fees collected were used for the benefit of Old Kaufmann or its remaining shareholders.

38.    Even for the stated purpose of covering redemption expenses, the redemption fee charged Old Kaufmann shareholders who redeemed was manifestly excessive, and such excessiveness was admitted or conceded by Edgemont through its practice of routinely "returning" to the Fund a relatively large percentage of the gross redemption fees it had collected from redeeming shareholders. For example, for the fiscal year ended December 31, 1999, the last fiscal year for which audited financial statements were available prior to issuance of the Proxy Statement for the Federated Kaufmann Reorganization, redemption fees of $1,634,869 were allocated to cover the costs of redemption, but "excess fee proceeds" of $2,181,913 were added

to Fund assets. See Exhibit D.  No amounts were returned to redeeming shareholders from whose gross redemption proceeds the redemption fees had been taken.

39.    When Federated Kaufmann Fund acquired Old Kaufmann's assets, a similar 20 basis point redemption fee (the "Class K Redemption Fee") was made applicable to the new Class K Shares that were issued to Old Kaufmann's only class of shareholders and who constituted 100% of Federated Kaufmann Fund's shareholders at its inception in April of 2001. The Federated Disclosure Materials state that the purpose of the Class K Redemption Fee is to encourage long-term investment, to cover the costs of redemptions, and to facilitate portfolio management. See Exhibit E.

40.    Unlike the practice followed by Old Kaufmann, Federated Management has chosen to waive the Class K Redemption Fee otherwise assessed against all Federated Kaufmann Fund Class K shareholders in favor of and for the benefit of certain types of employer sponsored employee benefit plans, including "401(k)" plans that hold Federated Kaufmann Fund Class K shares. See Exhibit E.

41.    In many employer sponsored employee-benefit plans, including "401(k) plans", either the plan itself or plan participants are given the privilege of daily movement in and out separate plan investments, and many such plans or plan participants actively take advantage of this daily exchange privilege.

42.    The effect of a waiver of the Class K Redemption Fee for the favored employer sponsored employee plan participants while applying this same redemption fee to other Class K Shareholders is to eliminate the Class K Redemption Fee for the types of Class K shareholders most likely to engage in repetitive trading, the employer plans themselves or the individual plan participants, while enforcing the Class K Redemption Fee against the types of Class K

21

Shareholders least likely to engage in repetitive trading, those individual investors who have been long-term shareholders. This practice contravenes all three of the stated purposes of the Class K Redemption Fee as set forth in the Federated Disclosure Materials, stated to be encouraging long-term investment, facilitating portfolio management, and covering the costs of redemptions. Individual and non-employer plan Class K Shareholders are thus saddled with covering the costs of redemptions for the favored employer sponsored employee benefits plans that may trade more actively, as well as covering the costs of their own redemptions.

43.    The Federated Disclosure Materials contain no contractual agreement defining the administration of the Class K Redemption Fee and do not reveal whether the redeeming individual and non-employer benefit plan Class K Shareholders are bearing these favored employer plan redemption expenses through the redemption fees taken from their redemption proceeds or whether instead the costs of redemption for the favored employer sponsored employee benefit plans are being borne by the continuing non-redeeming Class K Shareholders through the allocation of higher transfer agent fees to this class. Because the fee is no longer charged uniformly, without exception, to all redeeming Class K Shareholders, the favored Class K Shareholder participants in the employer sponsored employee benefit plans are being given a continuing financial benefit that is not available to other non-favored Class K Shareholders and the costs of this benefit are being covered by the other, non-favored Class K Shareholders.

44.    This waiver of the Class K Redemption Fee for a particular set of shareholders within the same Class that is more likely to engage in repetitive trading while applying the redemption fee to others within the same Class who are less likely to engage in repetitive trading is a form of discrimination that is not related to cost savings and encourages repetitive trading on the part of the exempted shareholders with an accompanying increase in expenses to the Fund.

22

Moreover, such a practice violates the requirements of Investment Company Act Rule 11a-3, 17 CFR Sec. 270.11a-3, to the extent that it may be applicable, which governs exchange offers and requires that any redemption fee be applied uniformly to all shareholders of the class against which it is assessed unless the schedule variation is reasonably related to the costs to the fund of processing the type of redemptions for which the fee is charged. In addition, it arguably creates a senior security in contravention of Sec. 18(f)(1)of the Investment Company Act, 15 USC Sec. 80a-18(f)(1) through its disparate application by creating a preferred or senior set of shareholders within a single class of shares who receive the full net asset values of their shares upon redemption or exchange while others do not, and also because it prefers the shareholders of Classes A, B, and C of Federated Kaufmann Fund who do not pay a similar redemption fee and who receive the full net asset values of their shares upon redemption over the Class K Shareholders of Federated Kaufmann Fund who must pay the Class K Redemption Fee and who do not receive the full net asset values of their shares upon redemption.

45.    FII has admitted in various Federated Disclosure Materials that it has allowed certain shareholders of Federated Kaufmann Fund to engage in short-term, after hours trading after the close of the New York Stock Exchange that may not be legal under the provisions of the applicable rules of the SEC, and that such practice is now being reviewed by regulatory authorities. The Federated Disclosure Materials do not reveal whether such trading involved Class K Shares or, if so, whether the persons or entities involved in such trading were exempted from the Class K Redemption Fee. On information and belief, it is probable that such trading involved Class K Shares, because trading in and out of other classes of shares of Federated Kaufmann Fund would have triggered the application of various sales charges that are not applicable to Class K Shareholders.  If Class K Shares were utilized for these transactions, on

23

information and belief, it is highly probable that the Class K Redemption Fee was waived for these questionable transactions, because its applicability would have limited the profitability of such transactions. The waiver of the Class K Redemption Fee in these circumstances, if such occurred, constitutes an additional act of discrimination against the continuing, long-term Class K Shareholders who otherwise are subject to the Class K Redemption Fee, causing them to finance the processing of the questionable redemptions involved in these trades.

46.    A redemption fee is not charged to shareholders who redeem Class A, Class B, and Class C shares of Federated Kaufmann Fund, although certain redemptions may trigger the payment of a deferred sales charge designed to require current payment of sales charges that have been spread over a longer period than the particular shares have been held. For these classes of shareholders, the transactional expenses of redemption are included in the transfer agent transaction fees that Federated Kaufmann Fund pays on behalf of these three classes. This is a similar practice to that followed for other mutual funds within the Federated Fund Complex.

47.    Federated Management has merged three other, smaller funds into Federated Kaufmann Fund but the shareholders of these merged funds have received Class A shares in exchange for their shares. Such Class A shares are not subject to a redemption fee. Exempting these shareholders, who became shareholders in mergers similar to Federated Kaufmann Fund Class K Shareholders, from the Class K Redemption Fee is an additional act of discrimination against Federated Kaufmann Fund Class K Shareholders. Further, in 2003, Federated Management created several additional classes of "Class K" shares (other partially closed classes offered to a limited set of investors) in other mutual funds in the Federated Fund Complex, but did not saddle these new classes with perpetual redemption fees similar to the Class K Redemption Fee. Thus, even though Federated Management has added other groups of

shareholders to Federated Kaufmann Fund and has created other Class K Shares in other mutual funds, the individual and non-employer sponsored plan Class K Shareholders of Federated Kaufmann Fund remain the only set of shareholders in the entire Federated Fund Complex subject to a perpetual redemption fee taken from their redemption proceeds. The Class K Redemption Fee is therefore being applied in a discriminatory manner not only within Class K, within Federated Kaufmann Fund, but also as compared with other mutual funds within the Federated Fund Complex having Class K shares (classes that are partially or wholly closed to new investors).

48.    A Class K Shareholder redeeming $10,000 is charged $20. At the same time, a Class K Shareholder redeeming $1,000,000 in a single transaction is charged $2,000 for a single redemption. There is no cap on the total redemption fee for larger redemptions. Yet there is no cognizable difference in the costs of processing a $10,000 redemption and processing a $1,000,000 redemption, assuming the Fund has adequate cash available. The Federated Disclosure Materials indicate that Federated Kaufmann Fund usually has had cash equivalent reserves of 5% or more of its $3 billion to $5 billion in assets at the end of semi-annual reporting periods, indicating that there is generally more than sufficient cash available for redemptions in the absence of a "run" of redemptions. For example, at October 31, 2003, cash equivalents approximated $1.5 billion, more than 30% of the total portfolio of $5.8 billion. With respect to multiple redemptions, a shareholder redeeming $1,000,000 over a ten year period in 120 monthly installments, resulting in the processing of 120 different transactions, pays the same aggregate $2,000 redemption fee over time in 120 different monthly payments as is paid by the shareholder redeeming $1,000,000 in a single transaction, even though the expenses of processing 120 separate transactions greatly exceed the expenses of processing a single transaction. As a result

of these facts, the 0.20% (20 basis point) Class K Redemption Fee charged to redeeming Class K Shareholders is not reasonably related to the costs of the services provided.

49.    The Class K Redemption Fee is material to the Class K shareholders. To place this 20 basis point redemption fee in perspective, the Federated Disclosure Materials indicate that the "transfer and dividend disbursing agent" fees charged by FSSC, the FII affiliate that serves as the transfer agent for Federated Kaufmann Fund Class K Shareholders (or its immediate parent, FSC), as compensation for all account transactional records for an entire year, amounts to less than 20 basis points on total Class K assets. For example, for the fiscal year ended October 31, 2003, the total amount charged under the "transfer and dividend disbursing agent" fees by the transfer agent for all account maintenance functions for the entire year amounted to $4,981,654 or approximately 0.143% (14.3 basis points) of year-end Class K assets. This expense is paid by Federated Kaufmann Fund on behalf of all Class K Shareholders. Thus, a redeeming Class K Shareholder making a full redemption is being charged individually a fee of 0.20% (20 basis points) on redemption proceeds that is greater for the single redemption transaction than a continuing shareholder's proportionate part of the Fund's overall transfer and dividend disbursing agency charge made by FSSC for performing all account transactional maintenance for all account transactions of all shareholders for an entire year. Stated differently, the shareholder redeeming an entire account is being charged individually more for the single transaction of redemption than the same shareholder's proportionate part of the entire transfer and dividend disbursing agent fee charged for all Class K transactional account maintenance for all Class K Shareholders over the previous twelve months.

50.    On information and belief, a standard transfer agent transaction charge within the mutual fund industry under standard transfer agent contracts for a redemption is generally a flat

transaction fee, possibly in the range of $5 to $25, and if partially or wholly based on the size of the redemption, is generally capped at some level regardless of the amount of the redemption. A transaction fee of this nature for redemptions is paid by a fund as a fund expense on behalf of all shareholders and a fee of this nature is likely the type of transaction fee that FSSC charges other classes of shares of Federated Kaufmann Fund, none of which have redemption fees that are charged directly to redeeming shareholders. The Class K Redemption Fee, which has no cap for larger redemptions, is therefore manifestly excessive with respect to the services performed as well as being material and applied in a discriminatory manner among the classes and within the single Class K Shareholder group.

51.    The SEC has issued a series of no-action letters over the years discussing and allowing redemption fees of up to 2% of assets to discourage short-term trading. However, the redemption fees discussed in the SEC's series of no-action letters have been limited to a stated period, generally in the range of 6 to 9 months and never for more than one year. If the redemption fee is less than 2%, it is supposed to approximate the costs of processing redemptions. No SEC approved fee discussed in the various no-action letters has been perpetual. Even contingent deferred sales charges, which are designed to force a shareholder whose Investment Company Act Rule 12b-1 Distribution Fee sales charges that are prorated over a five or six year period to pay the full sales charge in the event of an early redemption, decline each year and are eliminated at the end of the five-year or six- year prorated period.

52.    In March of 2004, the SEC proposed a mandatory 2% of assets redemption fee to discourage short-term trading. This redemption fee would be applicable to certain types of registered investment companies, including Federated Kaufmann Fund, and would apply to those shareholders who redeem in 5 days or less, an obviously limited period. Under the proposed rule,

mutual funds may impose redemption fees for longer periods and possibly for greater amounts, but there is no indication that the SEC contemplates a perpetual redemption fee and the new SEC proposal specifically makes the fee applicable to all shareholders, without exception. The common thread in all of these SEC pronouncements is that the redemption fees are uniformly applied to all shareholders, are limited in duration, are realized by the mutual funds, and benefit the mutual funds by reducing operating expenses.

      53.     When a Class K Shareholder of Federated Kaufmann Fund requests a redemption, the redemption transaction is subdivided into two separate but contemporaneous processing transactions. The Class K Shareholder's Account is reduced by the number of shares necessary to equal 99.80% of the redemption amount being processed, using the share price applicable on the date of the transaction, and a check is issued to the Shareholder for that amount. The shareholder thus does not receive 100% of the amount of the redemption being processed. Contemporaneously, the Class K Shareholder's account is reduced by the number of shares necessary to equal 0.20% of the redemption amount, using the share price applicable on the date of the transaction. The confirmation statement sent to the Class K Shareholder discloses the two simultaneous transactions, but does not disclose the recipient of the Class K Redemption Fee. Because the Class K Redemption Fee transaction is not classified as a "transfer" to another Fund account, that amount presumably has been removed from Fund assets. On information and belief, the immediate recipient of the Class K Redemption Fee is FSSC, the Federated Investors affiliate that serves as transfer agent for Federated Kaufmann Fund and in that capacity processes redemptions and exchanges, or FSecC, the Distributor whose name appears on the confirmation statement, or another FII affiliate involved in processing redemptions and exchanges, because the

Federated Disclosure Materials indicate that the fee is applied to cover the costs of processing redemptions, including certain "personnel" costs. See Exhibit F.

54.    Regardless of the identity of the immediate recipient of the Class K Redemption Fee, the ultimate recipient of the financial benefits of the Class K Redemption Fee and therefore the true recipient is FIMCO, the FII affiliate that served as investment adviser prior to December 31, 2003, FEMCO, the FII affiliate that has served as investment adviser subsequent to December 31, 2003, or FII as the ultimate parent. The FII affiliate that serves as the investment adviser, FEMCO, FIMCO and/or another affiliate, voluntarily limits all operating expenses of Federated Kaufmann Fund to a maximum of 1.95% of average fund net assets by waiving a portion of Federated Kaufmann Fund's fees. This was the same expense ratio that was applicable to Old Kaufmann during 1999, the last fiscal year that audited financial statements were available before issuance of the Proxy Statement for the Federated Kaufmann Reorganization in early 2001, but is higher than the operating expense ratio of 1.89% actually experienced by Old Kaufmann during 2000, its last full fiscal year of operations. Because the gross redemption fees taken from redeeming Class K Shareholders are purportedly applied to offset the costs of processing redemptions on behalf of Class K Shareholders that Federated Kaufmann Fund would otherwise pay to its transfer agent, or for other operating expenses, these Class K Redemption Fee proceeds thereby reduce total Fund operating expenses by an equivalent amount. In so doing, Class K Redemption Fees taken from the redemption proceeds of redeeming Class K Shareholders thereby reduce dollar for dollar the amount of the fee waivers FIMCO, FEMCO, or another affiliate would otherwise incur to maintain total operating expenses at the voluntary maximum expense cap of 1.95% of assets. The following information illustrates this point. The Federated Disclosure Materials indicate that for the fiscal year ended October 31, 2003, total

29

operating expenses for Federated Kaufmann Fund applicable to its Class K Shares were $102,951,805, constituting 2.46% of assets. To reduce operating expenses from 2.46% to 1.95% and thereby achieve compliance with the 1.95% voluntary operating expense cap for Class K Shares for the fiscal year, it was necessary for Federated Management to reduce total operating expenses applicable to Class K Shares to $85,634,438 by waiving $17,317,367, or 0.522% of assets, such waiver including reductions of portions of the investment advisory fee and the transfer and dividend disbursing agent fee applicable to the entire Federated Kaufmann Fund, and a portion of the Rule 12b-1 Distribution Fee applicable to Class K Shareholders. For that fiscal year, Class K Redemption Fees amounting to $447,447 were taken from the redemption proceeds of redeeming Class K Shareholders and separately applied to cover certain costs of these redemptions, including certain personnel costs. If applied in this manner, as represented in the Federated Disclosure Materials, these Class K Redemption Fees thereby reduced transfer agent expenses and accordingly total operating expenses that otherwise would have been applicable to Class K Shares by the amount of $447,447. Had the Class K Redemption Fees not been taken from the redemption proceeds of redeeming Class K Shareholders and applied to cover certain costs of those redemptions, total operating expenses applicable to the Class K Shares would have been higher by the amount of $447,447, and Federated Management would have needed to waive an additional $447,447of its gross service fees applicable to the Class K Shares in order to achieve an operating expense ratio of 1.95% of assets for the Class K Shares.

55.    The Class K Redemption Fee collected from redeeming Class K shareholders benefits FIMCO, FEMCO, or FII by reducing the amount of fee waivers under the "voluntary" 1.95% expense cap, and is therefore a direct supplement to the total fees received by one or more of these entities. Thus, the FII affiliated investment adviser or FII, by virtue of the reduction in

fee waivers under the expense limitation program that are made possible by collecting redemption fees from redeeming Class K Shareholders and applying these fees as offsets to Fund operating or transfer agent expenses, becomes the ultimate "recipient" and direct beneficiary of these fees. Federated Kaufmann Fund and its continuing Class K Shareholders therefore do not receive any benefit from the Class K Redemption Fee confiscated from the redeeming Class K Shareholders.

56.    The Class K Redemption Fee is manifestly excessive when considered separately or when compared with the actual costs of processing  redemptions as demonstrated by the portion of the transfer agency fees charged for redemptions by other classes of shares of Federated Kaufmann Fund and other mutual funds in the Federated Fund Complex; it is not reasonably related to the actual costs of processing redemptions for the Class K Shareholders to which it applies; it has been applied within the Class K shareholder group in a discriminatory manner to the individual and non-employee plan Class K Shareholders who are the majority shareholders of Federated Kaufmann Fund; it has been applied in a discriminatory manner in comparison with the other classes of shares within Federated Kaufmann Fund and in comparison with other mutual funds in Federated Equity Funds and the Federated Fund complex; its application is perpetual, and the fee does not benefit the continuing Class K Shareholders or Federated Kaufmann Fund. Imposition of this fee accordingly constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of FII and/or its various affiliates.

57.    The Class K Redemption Fee is and continues to be disproportionate to the services rendered and is not within the range of what would have been negotiated through arms-length bargaining in good faith between the Board of Trustees of Federated Equity Funds, the

umbrella entity that includes Federated Kaufmann Fund, and FII and/or its various affiliated service providers in light of all of the surrounding circumstances. As previously alleged in Paragraph 34 herein, the Board of Trustees does not have sufficient time for and therefore does not sufficiently review and consider complex fee issues involving a particular mutual fund. Moreover, as alleged in Par. 132 of this Complaint, incorporated herein, Federated Management has admitted that the Federated Trustees do not consider the situation of a particular mutual fund separately, but instead the Board considers the "totality" of a variety of circumstances affecting many mutual funds and their relationships within the Federated Fund Complex. Accordingly, approval of imposition of this 20 basis point Redemption Fee on the Class K Shareholders without sufficient review or good faith bargaining on the part of the Board of Trustees of Federated Equity Funds with respect specifically to Federated Kaufmann Fund constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of the Board of Trustees of Federated Equity Funds, and its receipt of this fee constitutes a breach of fiduciary duty on the part of FII and/or its various affiliates.

58.    The application of the Federated Kaufmann Fund Class K Redemption Fee to Class K Shareholders only and not to any other class of shares of Federated Kaufmann Fund or in any other mutual fund in the Federated Fund Complex, coupled with the waiver of the Class K Redemption Fee for employer sponsored employee benefit plans using Class K Shares, results in discrimination that constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of FII and/or its various affiliates.

59.    In charging and continuing to charge the Class K Redemption Fee, which is inappropriate because it is excessive and/or is discriminatory against present and former Class K Shareholders of Federated Kaufmann Fund, Defendants have breached and continue to breach

32

their statutory fiduciary duty to Federated Kaufmann Fund and to the Class K Shareholders of

Federated Kaufmann Fund who have been forced to pay this fee, in violation of Investment

Company Act Sec. 36(b).

60.      According to the Federated Disclosure Materials, total Class K Redemption Fees

collected for the fiscal year ended October 31, 2003 were $447,447.  If all Class K Shareholders

were to redeem or were to convert their Class K Shares to Class A Shares within Federated

Kaufmann Fund, a conversion being actively encouraged by Federated Management, total Class

K Redemption Fees generated for the benefit of Federated Management would total

approximately $7,000,000 on Class K Share assets of approximately $3.5 Billion. Pursuant to

Sec. 36(b)(3) of the Investment Company Act, Plaintiff seeks on behalf of Federated Kaufmann

Fund the "actual damages resulting from their breach of fiduciary duty" by Defendants, up to and

including the amount of compensation or payments constituting Class K Redemption Fees

confiscated from redeeming Class K Shareholders for the period of time authorized by statute.

Such fees should thereupon be applied to benefit the continuing, non-redeeming shareholders of

Federated Kaufmann Fund as discussed by the SEC in its various applicable no-action letters and

other pronouncements. Recovery of these fees and payment over to the Fund should occur in

such a manner as to reduce Federated Kaufmann Fund's total operating expenses below the level

of the "voluntary" 1.95% Expense Limitation Cap.

**COUNT II**
**INVESTMENT COMPANY ACT  Sec. 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive and Inappropriate Class K Shareholder Services Fees)**

61.      Plaintiff repeats and re-alleges paragraphs 1 through 60, inclusive, of this

complaint.

33

62.    As previously alleged, Old Kaufmann before the Federated Kaufmann Reorganization was a mutual fund primarily sold directly to potential investors without payment of a front-end sales charge deducted from the proceeds to be invested, and was not sold primarily through non-affiliated broker-dealers. Its shareholders purchasing directly through Old Kaufmann Fund's internal or affiliated distribution channel owned more than 70% of fund assets. The Fund was also sold through the no-load fund supermarkets such as Charles Schwab & Co., Inc. and National Financial Services Corp., and through a few other non-affiliated broker/dealers, with shareholders purchasing through this channel of distribution owning less than 30% of assets.

63.    Old Kaufmann had a "Rule 12b-1 Distribution Fee", an asset based fee, of up to 0.75% per annum (75 basis points) that covered primarily extensive media advertising and materials used in responding to such media advertising as well as the fees and account maintenance charges for the combined or "omnibus" shareholder accounts maintained by the no-load fund supermarkets and other broker/dealers. For fiscal 1999, the last year in which the Old Kaufmann Disclosure Materials detailed the uses of the Rule 12b-1 Distribution Fees, total Rule 12b-1 Distribution Fees necessary to cover all distribution related expenses of Old Kaufmann were in the range of 0.36% per annum or 36 basis points, including the expenses associated with the extensive media advertising and responses to such advertising, as well as the expenses associated with the no-load fund supermarkets and other broker/dealer compensation. For fiscal 2000, total Rule 12b-1 Distribution Expenses also approximated 0.36% or 36 basis points, including all broker/dealer compensation, which was included in the total Rule 12b-1 Distribution Fee. The public disclosure materials of Old Kaufmann do not show the uses of the Rule 12b-1 Distribution Fees collected from the Fund for fiscal 2000.

34

64.    A "Shareholder Services Fee" is also an asset based fee somewhat similar to a Rule 12b-1 Distribution Fee that is collected from a mutual fund, usually by its affiliated principal underwriter or affiliated distributor and then paid by the affiliated principal underwriter or distributor to broker/dealers that are not affiliated with the mutual fund and that charge commissions for selling mutual fund shares. This fee would usually be paid in addition to sales loads and sales commissions drawn from front-end sales loads and in addition to a Rule 12b-1 Distribution Fee. A Shareholder Services Fee may cover the combined or omnibus shareholder account record-keeping and shareholder account maintenance expenses of such Fund non-affiliated broker/dealers and also may cover other special shareholder services provided by the non-affiliated broker/dealers to their own clients who buy mutual fund shares. Such fees may also constitute "revenue sharing" by the mutual fund's affiliated principal underwriter with the non-affiliated broker/dealers to obtain "shelf space" and thereby encourage the non-affiliated broker/dealers' registered representatives to sell the particular fund's shares to the broker/dealer's clients. Such a Shareholder Services Fee is separate from and in addition to a transfer and dividend disbursing agent fee that is charged by the affiliated transfer agent to cover the costs of maintaining shareholder transaction records for shareholders whose accounts are not maintained by non-affiliated broker/dealers.

65.    To the extent not used to finance distribution, a Shareholder Services Fee is not generally treated as a Rule 12b-1 Distribution Fee even though paid by the mutual fund's affiliated principal underwriter to non-affiliated broker/dealers. Such service fees are generally allowable under Investment Company Act Rule 18f-3, 17 CFR Sec. 270.18f-3, which prescribes the requirements of establishing various shareholder services plans, distribution plans, and other fees for mutual funds having a multi-class structure. The SEC release adopting Rule 18f-3

contemplates that each shareholder class paying such fees will receive benefits reasonably commensurate with the amount of the fees paid by the class.

66.     The Federated Fund Complex has a Shareholder Services Fee in effect for essentially all of its mutual funds and their multiple classes that is similar to the Shareholder Services Fee added as a new fee for Federated Kaufmann Fund with respect to its Class K Shares. When all classes of a mutual fund are sold primarily through non-affiliated retail broker/dealers that charge commissions for selling mutual fund shares, as is the case with essentially all mutual funds in the Federated Fund Complex, such shareholders are likely to receive some type of benefits from the non-affiliated retail broker/dealers through which they purchase as the result of the Fund's payment of a Shareholder Services Fee.

67.     Old Kaufmann shares were not sold primarily through non-affiliated broker/dealers that charge commissions for selling mutual fund shares, and at the time of the Federated Kaufmann Reorganization, Old Kaufmann's affiliated principal underwriter or distributor did not charge a separate "Shareholder Services Fee" of this nature. Under the Federated Kaufmann Reorganization, Federated Management designated the pre-existing Old Kaufmann shareholders, who then constituted 100% of Federated Kaufmann Fund, as Class K Shareholders. Existing Class K Shareholders could purchase more shares, but there could be no new, direct Class K Shareholders. The no-load fund supermarkets and other broker/dealers that had pre-existing agreements with Old Kaufmann's affiliated principal underwriter or distributor could, however, continue to add to existing accounts and apparently could add new Class K Shareholders. However, their broker/dealer compensation had been included in the Old Kaufmann Rule 12b-1 Distribution Fee that was in effect prior to the Federated Kaufmann Reorganization.

68.     Pursuant to the Federated Kaufmann Reorganization, the maximum Rule 12b-1 Distribution Fee of Old Kaufmann was dropped from 0.75% to 0.50% per annum for the Class K Shareholders. But, as previously alleged, the actual Rule 12b-1 Distribution Fees incurred by Old Kaufmann generally were less than 0.50% per annum and ran about 0.36% or 36 basis points during fiscal 1999 and 2000. As a result, reduction in the maximum Rule 12b-1 Distribution Fee that could be charged did not result in a reduction in actual fees incurred with respect to the Class K Shares. Rule 12b-1 Distribution fees of 0.50% or less apparently were sufficient to cover all broker/dealer compensation necessary for Old Kaufmann's shareholders who were clients of the no-load fund supermarkets and other broker/dealers selling Old Kaufmann's shares, and such a fee level also supported the extensive media advertising program engaged in by Old Kaufmann without the necessity of a separate Shareholders Services Fee.

69.     Federated Management created the Class A, B, and C shares for new shareholders of Federated Kaufmann Fund, as with its other funds, which were expected to be sold through non-affiliated broker/dealers that charge commissions for selling mutual fund shares and adopted a "Shareholder Services Fee" of 0.25% or 25 basis points for those classes similar to fees that then existed in other mutual funds in the Federated Fund Complex. This fee would be paid in addition to the Rule 12b-1 Distribution Fees applicable to these classes. The Class A, B, and C shareholders in Federated Kaufmann Fund and shareholders in other mutual funds in the Federated Fund Complex are presumably receiving a reasonable level of special client services from the non-affiliated broker/dealers that are financed by payments of these Shareholder Services Fees.

70.     Through the Federated Kaufmann Reorganization, Federated Management added a separate "Shareholder Services Fee" of 0.25% per annum of assets or 25 basis points for the

Class K Shareholders of Federated Kaufmann Fund that is in addition to the Rule 12b-1 Distribution Fee of 0.50% or 50 basis points for these Class K Shareholders. At the time of the Federated Kaufmann Reorganization, all broker/dealer compensation for all services was included within the Old Kaufmann Rule 12b-1 Distribution Fee. The separate Federated Kaufmann Fund Shareholder Services Fee for the Class K Shareholders thus apparently constitutes a functional substitute for the 0.25% or 25 basis point reduction in the maximum Rule 12b-1 Distribution Fee that could have been charged under the Old Kaufmann structure. On information and belief, this Shareholder Services Fee is collected from Federated Kaufmann Fund by FSecC, its principal underwriter and distributor, which therefore is the recipient, or another affiliate. The Class K Shareholders, most of whom are direct purchasers who did not purchase through non-affiliated broker/dealers that charge commissions for the sale of mutual fund shares, do not receive or do not utilize significant special shareholder services that would be commensurate with the total amount of the Shareholder Services Fee paid by Federated Kaufmann Fund with respect to the Class K Shares, amounting to $6,991,129 for the fiscal year ended October 31, 2003 or approximately 0.20% (20 basis points). Yet Federated Kaufmann Fund on behalf of Class K Shareholders nevertheless pays approximately 60%, of the total Shareholders Services Fee paid by all classes of shares of Federated Kaufmann Fund, which corresponds approximately to the proportion of Federated Kaufmann Fund's assets held by the Class K Shareholders. This fee, which provides Class K Shareholders with limited benefits but presumably provides reasonable benefits for the other classes of shares sold through non-affiliated brokers, should be far less than approximately 60% of the total Shareholder Services Fees collected for all classes of Federated Kaufmann Fund. In addition to this Class K Shareholder Services Fee of $6,991,129, constituting approximately 0.20% (20 basis points) of

38

Class K assets, Federated Management also charges a "transfer and dividend disbursing agent" fee with respect to the Class K Shares for maintaining shareholder transactional records that amounted to $4,981,654 or approximately 0.143% (14.3 basis points) on Class K year-end assets at October 31, 2003, indicating that the Shareholder Services Fee is not a fee designed to cover the costs of shareholder transactional account record-keeping for the Class K Shares.

71.    On information and belief, the majority of Class K Shareholders who originally purchased shares directly from Old Kaufmann rather than purchasing through non-affiliated broker/dealers that charge commissions for selling mutual fund shares are not receiving any services from broker/dealers not affiliated with Federated Kaufmann Fund, because such Class K Shareholders did not purchase through this channel of distribution. The Federated Disclosure Materials do not contain copies of agreements between Federated Kaufmann Fund and any non-affiliated broker/dealers authorizing or allowing direct payment by Federated Kaufmann Fund of Class K Shareholder Services Fees to any non-affiliated broker/dealers. On information and belief, the immediate recipient of the Class K Shareholder Services Fees is FSecC, the affiliated principal underwriter and distributor, or another affiliate. But the Class K Shareholders are not receiving significant additional shareholder services from FSecC that are commensurate with the Shareholder Services Fees attributable to Class K Shares that FSecC or another affiliate charges Federated Kaufmann Fund.

72.    For the fiscal year ended October 31, 2003, Federated Kaufmann Fund was charged a Shareholder Services Fee of $6,991,129 with respect to the now closed Class K Shares, while the combined Shareholder Services Fee applicable to the currently marketed Class A, Class B, and Class C Shares was $3,452,756 for the same fiscal year. The total Shareholder Services Fee charged with respect to all classes of Federated Kaufmann Fund for that fiscal year

39

was $10,443,885, although $178,520 of the fee applicable to the Class B Shares was waived. The Class K Shareholders do not receive a benefit commensurate with the $6,991,129 Shareholder Services Fee charged with respect to the Class K Shares. Accordingly that amount may be co-mingled with the Shareholder Services Fees charged with respect to the Class A, B, and C Shares, and a substantial portion of the entire $10,443,885 may be used primarily for the benefit of the currently marketed Class A, Class B, and C Shareholders who are clients of non-affiliated broker/dealers. In the alternative, the Class K Shareholder Services Fee is used for other purposes that do not benefit the Class K Shareholders in a manner commensurate with the total amount of the Class K Shareholder Services Fee of $6,991,129 being charged by Federated Kaufmann Fund with respect to the Class K Shares. Such treatment is contrary to the intent of various Investment Company Act provisions, including Rule 18f-3, 17 CFR Sec.270.18f-3, which authorizes payments of these types of fees in a multi-class structure but contemplates that separate classes will receive benefits that are commensurate with services performed for or on behalf of the particular class of shares to which the fee is attributable.

73.    Plans or programs implementing a Shareholder Services Fee must initially be adopted by a mutual fund's board of directors or board of trustees, which must first determine that the plan or program is beneficial to the mutual fund as a whole and secondly must then determine that the plan or program is beneficial to each separate class that is assessed the fee. The Federated Disclosure Materials contain no information as to the reasoning, if any, used by the Board of Federated Equity Funds in determining that the Shareholder Services Fee paid by Federated Kaufmann Fund with respect to the Class K Shares would be beneficial to the Class K Shareholders as a separate class, and on information and belief it is unlikely that the Board made an informed determination on the basis of proper information supplied by Federated

40

Management of the existence of significant, specific benefits of the Shareholder Services Fee attributable to the Class K Shares. As previously alleged in Par. 34, there is insufficient time for and therefore insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on this or any other fee issues specifically involving Federated Kaufmann Fund or its Class K Shares because of the limited amount of time available in board meetings for consideration of both the routine operating issues and other special issues involving the numerous, separate mutual funds in the Federated Mutual Fund Complex. Moreover, as set forth in more detail in Paragraph 132 of this Complaint, incorporated herein, Federated Management has admitted that the Federated Trustees do not necessarily consider the fees and charges of each mutual fund separately in their annual contract renewal deliberations. Accordingly, approval of imposition of this Shareholder Services Fee with respect to the closed Class K Shares without sufficient review or good faith bargaining on the part of the Board of Trustees of Federated Equity Funds constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the part of the Board of Trustees of Federated Equity Funds, and its receipt constitutes a breach of fiduciary duty on the part of FII and/or its various affiliates.

74.    For the reasons previously stated, the Class K Shareholder Services Fee of 0.25% or 25 basis points was made applicable to the Class K Shares without consideration by the Federated Trustees or Federated Management of providing specific benefits for the Class K Shares that would be commensurate with the amount of the fee allocable to the Class K Shares. Instead, the Class K Shareholder Services Fee of 0.25% was adopted as a separate fee that could be charged in addition to the maximum Rule 12b-1 Distribution Fee of 0.50% now applicable to the Class K Shares as a functional substitute for the reduction of 0.25% from the maximum Rule

41

12b-1 Distribution Fee of 0.75% under the Old Kaufmann structure. As previously alleged, Old Kaufmann's Rule 12b-1 Distribution Fees generally did not exceed 0.50% and were approximately 0.36% of 36 basis points during its last two fiscal years. During those years, the incremental Rule 12b-1 Distribution Fees fees between 0.50% and 0.75% of assets were not incurred or charged, and at the time of the Federated Kaufmann Reorganization, all broker/dealer compensation paid by Old Kaufmann was included in the Rule 12b-1 Distribution Fee.

75.    There has been no pronouncement by the SEC that all classes of shareholders can be charged a Shareholder Services Fee where one or more of these classes does not receive significant or commensurate benefits through the payment of such fees, based on the justification used for Rule 12b-1 Distribution Fees that such fees benefit the mutual fund as a whole through promoting an increase in assets resulting in an accompanying increase in economies of scale. In any event, Federated Kaufmann Fund's combined set of investment advisory fees, fund administration and accounting fees, Rule 12b-1 Distribution Fees, Shareholder Service Fees, and other current operating expenses that can total as much as 2.40% of assets are so high that total operating expenses will always exceed the "voluntary" maximum annual expense limitation cap of 1.95% of assets. Consequently, Class K Shareholders will never benefit from increased economies of scale through a growth in assets of Federated Kaufmann Fund.

76. The Shareholder Services Fee assessed with respect to the Class K Shares is an inappropriate charge against Federated Kaufmann Fund with respect to the closed Class K Shares because it provides this Class with no significant benefits commensurate with the total amount charged of $6,991,129, constituting approximately 0.20% (20 basis points) for the fiscal year ended October 31, 2003, and otherwise cannot be justified on the theory applicable to Rule 12b-1 Distribution Fees that such fees generate additional assets for Federated Kaufmann Fund

and therefore promote economies of scale that can then be passed on to Federated Kaufmann Fund for the benefit of the Class K Shareholders. Moreover, as previously alleged, there is an additional, material "transfer and dividend disbursing agent" fee of $ 4,981,654 charged with respect to the Class K Shares that covers the expenses and charges for shareholder transactional account record-keeping functions, indicating that the Shareholder Services Fee is a different, supplemental fee that is not designed to cover the expenses of the transfer and dividend disbursing agent functions.

77.     The Shareholder Services Fee charged Federated Kaufmann Fund with respect to the Class K Shares is and continues to be disproportionate to the services that may be rendered to Class K Shareholders through payment of this fee and the fee is not within the range of what would have been negotiated through arms-length bargaining in good faith between the Board of Trustees of Federated Kaufmann Fund and Federated Management in light of all of the surrounding circumstances, including the limited amount of time available for consideration of the particular, specialized issues affecting each separate mutual fund.

78.     In charging and continuing to charge Federated Kaufmann Fund this excessive and inappropriate Shareholder Services Fee with respect to the Class K Shares, Defendants FSecC and /or another affiliate have breached and continue to breach their statutory fiduciary duty to Federated Kaufmann Fund in violation of Sec. 36(b) of the Investment Company Act.

79.     According to the Federated Kaufmann Disclosure Materials, the total Shareholder Services Fee applicable to the Class K Shareholders for the fiscal year ended October 31, 2003 was $6,991,129, constituting approximately 0.20% of Class K assets at fiscal year-end, or approximately 20 basis points. No fee waivers under the voluntary 1.95% Expense Limitation Cap were applied to the Class K Shareholder Services Fees. Pursuant to Sec. 36(b)(3) of the

Investment Company Act, Plaintiff seeks on behalf of Federated Kaufmann Fund the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including the amount of compensation or payments constituting the Shareholder Services Fees charged to Federated Kaufmann Fund and received by FSecC or other FII affiliate with respect to the Class K Shares for the period of time authorized by statute.

## COUNT III
### INVESTMENT COMPANY ACT  Sec. 36(b)
### BREACH OF FIDUCIARY DUTY
### (Excessive and Inappropriate Class K Rule 12b-1 Distribution Fees)

80.    Plaintiff repeats and re-alleges paragraphs 1 through 79, inclusive, of this complaint.

81.    Old Kaufmann prior to the Kaufmann Fund Reorganization was a mutual fund primarily sold directly through Old Kaufmann Fund's internal distribution system to potential investors without a front-end sales load or sales charge deducted from the investment proceeds. It was also sold through the no-load fund supermarkets such as Charles Schwab & Company, Inc. and National Financial Services Corp., as well as through a few other broker/dealers without a front-end sales charge or sales load.    Immediately prior to the Federated Kaufmann Reorganization, Old Kaufmann had a "Rule 12b-1 Distribution Fee", an asset based fee used to finance distribution of fund shares, of up to 0.75% per annum of assets (75 basis points) that covered extensive media advertising and responses to such advertising as well as providing compensation for non-affiliated broker/dealers to sell fund shares, for accompanying services such as account record keeping, other account maintenance charges, and all other special shareholder services provided by the broker/dealer for its combined or omnibus accounts.

44

# EXHIBIT A

# Part 2 of 3

82.    Under the Federated Kaufmann Reorganization pursuant to which Federated Kaufmann Fund acquired the assets of Old Kaufmann, the maximum Rule 12b-1 distribution Fee applicable to Class K Shareholders was dropped from 0.75% to 0.50% of assets per annum. For Old Kaufmann, the Rule 12b-1 Distribution Fees actually incurred had generally been less than 0.50% of assets per annum and such fees approximated 0.36% or 36 basis points during fiscal 1999 and fiscal 2000, its last two years of separate operations. As a result, the reduction by 0.25% in the maximum fee that could be charged did not result in a corresponding decrease in expenses for the Class K Shares.

83.    Federated Kaufmann Fund Class K Shares are no longer being actively marketed by Federated Management and Class K is now closed to new, direct purchasers. Direct purchases of Class K Shares may now only be made by those continuing shareholders who acquired their shares directly from Old Kaufmann before the Federated Kaufmann Reorganization.  The no-load fund supermarkets, Charles Schwab & Co., Inc., and National Financial Services Corp. and other broker/dealers having prior selling arrangements with Old Kaufmann may continue to sell to existing shareholders and apparently are permitted to add new clients as shareholders. However, the number of Class K Shares outstanding at October 31, 2003, the end of the last fiscal year, was 712,942,929, compared with 760,933,767 outstanding shares of Old Kaufmann at December 31, 2000, the close of its last fiscal year. Thus, Class K Shares not only are a closed and relatively static class, but this Class as a closed class is slowly declining.

84.    According to Old Kaufmann's disclosure materials for the fiscal year ended December 31, 1999, the last full fiscal year for which the public Disclosure Materials provided information on the separate categories for which the Rule 12b-1 Distribution Fees were used, total Rule 12b-1 Distribution Fees were $12,215,138. See Exhibit G. Of this amount, only

45

$2,314,164 (about 18.9% of the total), constituting approximately 0.067% (6.7 basis points) of year-end assets, was allocated for payment to broker/dealers. Essentially all of the remainder of the Rule 12b-1 Distribution Fees were allocated to print media advertising, broadcast advertising, internet advertising, and related costs and expenses supportive of and responsive to such direct marketing efforts engaged in by Old Kaufmann's principal underwriter or distributor.  But because the Class K Shares of Federated Kaufmann Fund, the replacement shares for Old Kaufmann shares, are a closed class and cannot be sold directly to new shareholders as direct purchasers, there is no longer a need for extensive media advertising and FSecC or Federated Management accordingly is not engaging in extensive media advertising with respect to Federated Kaufmann Fund Class K Shares that otherwise would be financed by a Rule 12b-1 Distribution Fee.

85.    The disclosure materials of Old Kaufmann indicate that clients of the no-load mutual fund supermarket brokers Charles Schwab & Co. and National Financial Services owned in the aggregate approximately 23% of the outstanding shares of Old Kaufmann on March 31, 2000, and clients of such brokers owned approximately 21.6% at January 8, 2002. The disclosure materials of Federated Kaufmann Fund  indicate that as of December 1, 2003, clients of the no-load mutual fund supermarket brokers Charles Schwab & Co. and National Financial Services owned in the aggregate approximately 20.4% of the outstanding Class K Shares of Federated Kaufmann Fund , a slight decline from the levels of ownership of Old Kaufmann.

86.    In view of the fact that the ownership levels of Class K Shares sold through the primary, non-affiliated no-load fund supermarket broker/dealers has declined, there should have been no increase in the amount of broker/dealer Rule 12b-1 Distribution Fees necessary to provide the previously agreed upon services for Old Kaufmann Fund shareholder clients of these

broker/dealers who are now the Federated Kaufmann Fund Class K Shareholders. For Old Kaufmann, these Rule 12b-1 Distribution Fees for such non-affiliated, no-load broker/dealers amounted to $2,314,164 out of a total of $12,215,138 Rule 12b-1 Distribution Fees, or approximately 0.067% (6.7 basis points) on year-end assets for the fiscal year ended December 31, 1999. See Exhibit G.

87.    Despite the fact that extensive media advertising is no longer being conducted with respect to the closed Class K Shares of Federated Kaufmann Fund, at least 70% of which were held by direct purchasers through the internal Old Kaufmann distribution network, and despite the fact that Class K overall is a declining class and the number of shares held by clients of the no-load fund supermarket brokers Charles Schwab & Co. and National Financial Services have declined, total Rule 12b-1 Distribution Fees generated by the applicable formula with respect to the Class K Shares for the latest fiscal year ended October 31, 2003 actually increased both in total dollars and as a percentage of assets. Under the applicable formula, the total Rule 12b-1 Distribution Fee for Class K Shares was $13,982,257 for the latest fiscal year, constituting approximately 0.40% or 40 basis points on year-end Class K assets. For Old Kaufmann, total Rule 12b-1 Distribution fees had been $12,215,138 for fiscal 1999 and $13,062,000 for fiscal 2000, which amounted to approximately 0.36% or 36 basis points for both years for the class of shareholders who are now the Federated Kaufmann Class K Shareholders. A substantial majority of all of these fees were used for Old Kaufmann's extensive media direct marketing campaign. Given that the Federated Kaufmann Fund Class K Shares are closed to new, direct investors, resulting in a relative dearth of public media advertising and marketing activity with respect to the Class K Shares, and the total number of Class K Shares outstanding as well as the number of shares held by the non-affiliated, no-load fund supermarket broker/dealers have declined, the

47

Rule 12b-1 Distribution Fee assessed against Federated Kaufmann Fund under the current fee schedule with respect to the Class K Shares bears no reasonable relationship to the services provided and this fee schedule for the Rule 12b-1 Distribution Fee is therefore manifestly excessive.

88.    The SEC has indicated that all classes of shareholders, even shareholders of closed or partially closed mutual funds or share classes, can in the proper circumstances be charged Rule 12b-1 Distribution Fees if such fees have been adopted and approved by the mutual fund's Board of Directors or Board of Trustees in light of pertinent surrounding circumstances, even though these fees do not primarily benefit the particular shareholder class, on the justification that such fees benefit the mutual fund as a whole and benefit all classes by promoting an increase in assets and a concurrent accompanying increase in economies of scale. But as previously alleged, Federated Kaufmann Fund's combined set of investment advisory, fund administration, Shareholder Services Fees, Rule 12b-1 Distribution Fees, and other fees and current operating expenses that could total as much as 2.40% are so high in the aggregate that total fees paid to Federated Management and other operating expenses will always exceed the "voluntary" maximum 1.95% Operating Expense Limitation Cap. Accordingly, Class K Shareholders can never benefit from increased economies of scale through a growth in mutual fund assets. The Rule 12b-1 Distribution Fee attributable to Class K Shares that can be as much as 0.50% of Class K assets and amounted to approximately 0.40% of Class K assets under the applicable formula for the fiscal year ended October 31, 2003 is, therefore, inappropriate because a fee of this magnitude provides the Class K Shareholders who were direct purchasers of their shares from Old Kaufmann with no significant benefits that are commensurate with the amount of the fee generated, and the fee otherwise cannot be justified on the generally accepted theory

that Rule 12b-1 Distribution Fees promote the generation of additional assets that make possible increasing economies of scale for the benefit of the Fund as a whole and/or for the benefit of the Class K Shareholders who were direct purchasers of their shares from Old Kaufmann. Even after application of the waiver of a portion of this fee pursuant to the voluntary 1.95% Operating Expense Cap, the balance of the fee charged, $3,750,728, or approximately 0.107% or 10.7 basis points on year-end assets, is inappropriate for a closed class of shares because it does not provide these Class K Shareholders with benefits that are commensurate with the net amount of the Rule 12b-1 Distribution Fee being paid by Federated Kaufmann Fund with respect to the Class K Shares. Even if it is assumed that this payment is due to the non-affiliated, no-load fund supermarket broker/dealers that previously sold Old Kaufmann shares, the amount collected after the fee waiver, amounting to approximately 0.107% or 10.7 basis points, is excessive because the fee has risen in both absolute dollars and as a percentage of assets, while the number of shares attributable to these broker/dealers has declined. The amount paid these no-load fund supermarket broker/dealers by Old Kaufmann in fiscal 1999, the last year for which such information is available, was $2,314,164, or approximately 0.067% (6.7 basis points) of year-end assets. For fiscal 2003, when the number of shares held by such broker/dealers had declined, the net Rule 12b-1 Distribution Fees paid by Federated Kaufmann with respect to the Class K Shares, after application of the voluntary 1.95% Expense Limitation Cap, had risen to $3,750,728, or approximately 0.107% (10.7 basis points) on year-end assets. If the charge or fee as a percentage of assets necessary to compensate the no-load fund supermarket broker/dealers and other broker/dealers selling Old Kaufmann shares was only 0.067% (6.7 basis points) in 1999, this charge or fee as a percentage of assets should not have risen by approximately 60% to

approximately 0.107% (10.7 basis points) in 2003, when the number of shares outstanding attributable to these pre-existing broker/dealer relationships had declined.

89.    For all of these reasons, the Rule 12b-1 Distribution Fee of 0.50% of assets that is applicable to Class K Shares is and continues to be disproportionate to the services rendered for or on behalf of the Class K Shareholders who were direct purchasers of their shares from Old Kaufmann and such fee is not within the range of what would have been negotiated through arms-length bargaining in good faith between the Board of Trustees of Federated Equity Funds on behalf of Federated Kaufmann Fund and Federated Management in light of all of the surrounding circumstances. Under applicable rules, the use and application of Rule 12b-1 Distribution Fees and the entire arrangement with respect to such fees must be reviewed and renewed annually. As previously alleged in Par. 34 herein, there is insufficient time for and therefore insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on this or any other fee issues specifically involving Federated Kaufmann Fund because of the limited amount of time available in board meetings for consideration of both the routine issues and the special issues involving the numerous, separate mutual funds in the Federated Mutual Fund Complex. Moreover, as alleged in more detail in Paragraph 132 of this Complaint, incorporated herein, the Board of Trustees considers the "totality" of circumstances and the relationships of mutual funds within the Federated Fund Complex, and does not review each fund and its particular, specialized situation at contract renewal time. Accordingly, imposition of and subsequent annual renewal of this Rule 12b-1 Distribution Fee and arrangement with respect to the Class K Shares without sufficient review or good faith bargaining on the part of the Board of Trustees of Federated Equity Funds constitutes a breach of fiduciary duty under Sec. 36(b) of the Investment Company Act on the

part of the Board of Trustees of Federated Equity Funds, and its receipt constitutes a breach of fiduciary duty on the part of FII and/or its various affiliates.

90.    Defendant FSecC and/or another affiliate is the recipient of the Rule 12b-1 Distribution Fees charged with respect to these Class K Shares. In continuing to charge and receive this excessive and inappropriate Rule 12b-1 Distribution Fee, Defendant FSecC as the recipient, and/or another FII affiliate that has received the benefits of these proceeds have breached and continue to breach their statutory fiduciary duty to Federated Kaufmann Fund in violation of Sec. 36(b) of the Investment Company Act.

91.    According to the Federated Disclosure materials, total Rule 12b-1 Distribution Fees generated and accrued with respect to the Class K Shares for the fiscal year ended October 31, 2003 under the applicable formula were $13,982,257, constituting approximately 0.40% of Class K assets (40 basis points) before the voluntary fee waiver and $3,750,728, or approximately 0.107% (10.7 basis points) on year-end assets after the voluntary fee waiver. Pursuant to Sec. 36(b)(3) of the Investment Company Act, Plaintiff seeks on behalf of Federated Kaufmann Fund the "actual damages resulting from their breach of fiduciary duty" by Defendants, up to and including the amount of compensation or payments constituting the Rule 12b-1 Distribution Fees accrued and paid with respect to the Class K shares for the period of time authorized by statute.

**COUNT IV**

**INVESTMENT COMPANY ACT Sec. 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive and Discriminatory Investment Advisory Fees)**

92.    Plaintiff repeats and re-alleges paragraphs 1 through 91, inclusive, of this complaint.

93.    According to the Annual Report of Old Kaufmann for the fiscal year ended December 31, 2000, the last public report for Old Kaufmann prior to the Federated Kaufmann Reorganization in April of 2001, Old Kaufmann had net assets of approximately $3,367,994,000 at that date.  This Fund was the only investment company managed by Edgemont, its investment adviser at that time.  According to the joint Proxy Statement of Kaufmann Fund, Inc. and Federated Kaufmann Fund, dated January 9, 2001 (the "Joint Proxy Statement") sent to shareholders of Old Kaufmann seeking approval of the proposed Federated Kaufmann Reorganization, it was reported that the Federated Fund Complex and FII's private or separately managed accounts had combined total assets of approximately $130 billion, and included approximately 185 other investment companies or mutual funds with over 1.3 million shareholder accounts. FII together with its affiliates ("Federated Management") was portrayed as one of the larger mutual fund investment managers in the United States, with approximately 1,900 employees and more than 4,000 investment professionals.  See Exhibit H.

94.    The Joint Proxy Statement emphasized Federated Management's larger size in comparison with Edgemont in seeking approval from shareholders for the Federated Kaufmann Reorganization. At the outset of the Joint Proxy Statement (in a section entitled "WHY IS THIS REORGANIZATION TAKING PLACE ?"), the response given was that a major consideration was  " ... Edgemont's ability to remain competitive in an environment where the amount of assets under management was becoming more and more important to running a successful mutual fund business".  and "... larger mutual fund companies would be in the best position to offer excellent products and services in the years ahead". It was also stated that ... "Federated Investors with $130 billion of assets under management across a broad product line, is in a good position to provide such high-quality services to Kaufmann Fund shareholders".  See Exhibit I.

95.     Under the proposed Federated Kaufmann Reorganization, Old Kaufmann would become a Series or portfolio of Federated Equity Funds, a common law Massachusetts business trust that would serve as the umbrella entity for the new Federated Kaufmann Fund. The October 31, 2000 Annual Report for the Federated Equity Funds, the latest reporting period prior to the reorganization of Old Kaufmann into Federated Kaufmann Fund, discloses that Federated Equity Funds, the umbrella entity, was then composed of at least seven other publicly offered Series or portfolios of equity funds, all of which had lesser assets and lower investment advisory fees than Old Kaufmann. These Series or portfolios, with their approximate total assets and investment advisory fees, in comparison with Old Kaufmann's approximate total assets and investment advisory fees for its last fiscal year prior to the merger were:

| Name of Series | Approximate Assets (in thousands) | % Investment Advisory Fee | Advisory Fees For Fiscal Year (actual) |
| --- | --- | --- | --- |
| Federated Aggressive Growth Fund | $389,000 | 1.00% | $2,280,883 |
| Federated Capital Appreciation Fund | 945,000 | 0.75% | 4,707,785 |
| Federated Large Cap Growth Fund | 885,000 | 0.75% | 5,195,087 |
| Federal New Economy Fund | 35,000 | 1.25% | 40,280 |
| Federated Small-Cap Strategies Fund | 382,000 | 0.75% | 3,198,116 |
| Federated Growth Strategies Fund | 1,715,000 | 0.75% | 11,655,341 |
| Federated Communications Tech. Fd. | 813,000 | 0.75% | 5,582,883 |
| **Totals (Actual)** | **$5,164,000,000** | | **$32,660,375** |
| **Old Kaufmann Fund** (Year Prior to Merger) | **$3,367,000,000** | 1.50% | **$54,427,000** |

Thus, prior to the Federated Kaufmann Reorganization, Old Kaufmann's assets constituted approximately 65% of the total assets of Federated Equity Funds, the Massachusetts business trust of which it would become a part, while its separate investment advisory fee was approximately 167% of the aggregate investment advisory fees of the other seven series combined, illustrating its much higher investment advisory fee structure.

53

96.    The Joint Proxy Statement sent to Old Kaufmann shareholders seeking approval of the proposed reorganization, while emphasizing Federated Management's much greater size in terms of total assets under management and numbers of personnel, did not disclose that, after the Federated Kaufmann Reorganization, the assets of Old Kaufmann of approximately $3.4 billion would comprise the largest Series or portfolio in the Federated Equity Funds umbrella, and in fact would constitute more than a majority of its total assets; that with an investment advisory fee of 1.425% of assets, Federated Kaufmann Fund would be paying the highest investment advisory fee as a percentage of assets of any other equity fund that was a part of Federated Equity Funds, the umbrella entity that would include Federated Kaufmann Fund; that it would be paying the highest investment advisory fee of any other equity fund managed by Federated Management; that Federated Management would be managing similarly situated "brother/sister" equity mutual funds of Federated Kaufmann Fund in Federated Equity funds as well as other equity mutual funds at lower investment advisory fees even though assets of these mutual funds were far smaller; or that Federated Management, unlike its practice with other pre-existing, similarly situated "brother/sister" funds having lesser assets, would never extend any economies of scale to Federated Kaufmann Fund as the result of increases in its assets because of the excessively high and discriminatory overall fee schedule and expense structure that Federated Management would impose on Federated Kaufmann Fund.

97.    Federated management represented as an enticement for a favorable shareholder vote that the total expense ratio of Federated Kaufmann Fund would not exceed 1.95% of assets because Federated Management, though a "voluntary" expense limitation, would cap the operating expenses at a maximum of 1.95% of assets for at least two years. The 1.95% operating expense ratio was the ratio actually experienced by Old Kaufmann during fiscal 1999, the last

54

fiscal year for which audited financial statements were published before issuance of the Proxy Statement seeking shareholder approval for the Federated Kaufmann Reorganization. Old Kaufmann's expense ratio for fiscal 2000, its last full fiscal year or operations before the reorganization in April of 2001 was 1.89%. However, Federated Management did not inform Old Kaufmann shareholders of this lower actual operating expense ratio before the shareholder vote, nor after this lower operating expense ratio become known did it adopt of its own volition this lower ratio as the on-going expense cap for Federated Kaufmann Fund. The voluntary 1.95% Operating Expense Cap that was adopted can be voided at Federated Management's sole discretion, but was still in effect at October 31, 2003.

98.    After the Kaufmann Fund Reorganization was implemented in April of 2001, Federated Investors embarked on a course of action designed to increase the investment advisory fees being charged several of its other equity mutual funds, using Federated Kaufmann Fund as the catalyst or vehicle for this course of action. Prior to the Kaufmann Fund Reorganization in 2001, Federated Investors operated a pre-existing small-cap fund as another series of Federated Equity Funds. After the original portfolio managers of Old Kaufmann had become employed by Federated Management in April of 2001, they were assigned overall supervision for the pre-existing small-cap fund's portfolio, and the pre-existing small-cap fund was shortly thereafter renamed "Federated Kaufmann Fund Small-Cap Fund". However, the investment advisory fee then being paid by the pre-existing small-cap fund was 0.75% per annum, the investment advisory fee Federated Management charged the majority of its other equity funds, and the sub-advisory fee being charged by FGIMCO was only 0.15% of assets per year.

99.    Federated Management devised a strategy using Federated Kaufmann Fund to increase the 0.75% investment advisory fee for its pre-existing small-cap fund to 1.425%, the fee

being charged Federated Kaufmann Fund, and to increase the sub-advisory fee being charged by FGIMCO from 0.15% to 1.175%. In late 2001, Federated Management proposed a merger of the pre-existing small-cap fund, then re-named Federated Kaufmann Small-Cap Fund, into Federated Kaufmann Fund, which is not classified as a small-cap fund. The Proxy Statement submitted to the Federated Kaufmann Fund Small-Cap Fund shareholders trumpeted the advantages of being a part of the much larger Federated Kaufmann Fund with a different portfolio and a much better performance record. The Proxy Statement also disclosed that Federated Kaufmann Fund had a higher investment advisory fee, but the overall emphasis was on the benefits the shareholders of Federated Kaufmann Small-Cap Fund would receive by becoming a part of the much larger, better performing Federated Kaufmann Fund.

100.    Federated Kaufmann Small-Cap Fund shareholders were allowed to vote on the proposed merger, but Federated Kaufmann Fund shareholders were not extended the opportunity of a shareholder vote on this proposed merger. Ultimately, Federated Kaufmann Fund Small-Cap Fund shareholders approved this merger and reorganization. Before its merger into Federated Kaufmann Fund, the assets of Federated Kaufmann Small-Cap Fund were approximately $235 million, while the assets of Federated Kaufmann Fund were approximately $3.9 billion.

101.    Rather than liquidating Federated Kaufmann Small-Cap Fund's portfolio and transferring cash to Federated Kaufmann Fund to implement the merger after shareholder approval, securities from the portfolio of Federated Kaufmann Small-Cap Fund having been selected using a different investment philosophy, some selected by different portfolio managers, and with a poorer performance record were transferred to (or "dumped into") Federated Kaufmann Fund to implement the merger. The Federated Disclosure Materials indicate that the Board of Trustees determined that the merger would be "beneficial" to shareholders of the

Small-Cap Fund and would not be "dilutive" to Federated Kaufmann Fund. No finding was made that the merger would be "beneficial" to Federated Kaufmann Fund or its shareholders, and nothing was said in any Federated Disclosure Materials about the possible detriment to Federated Kaufmann Fund's existing shareholders of forcing that Fund to absorb portfolio securities of another fund with a different investment philosophy owning securities selected in a different manner by different portfolio managers. The securities transferred had lesser average unrealized appreciation than the average of the securities held in Federated Kaufmann Fund's portfolio, thus potentially diluting the investment performance of Federated Kaufmann Fund and forcing all of its shareholders to absorb the tax impacts and cover the brokerage commissions incurred when shares of portfolio companies of the pre-existing small-cap fund were thereafter sold.

102.    Prior to implementation of this merger of Federated Kaufmann Fund and Federated Kaufmann Small-Cap Fund, Federated Management had filed a registration statement with the SEC for a newly created small-cap fund to be a new Series or portfolio of Federated Equity Funds. This new Series would have a higher investment advisory fee and higher overall fee and expense structure cloning that of Federated Kaufmann Fund. After the merger of the pre-existing Federated Kaufmann Small-Cap Fund into Federated Kaufmann Fund, Federated Management amended that registration statement, which was not yet effective, to re-name the pending, new small-cap Series or portfolio "Federated Kaufmann Fund Small-Cap Fund", the same name formerly used by the pre-existing Small-Cap Fund that had been merged into Federated Kaufmann Fund .

103.    By this course of action, Federated Management had increased the investment advisory fee for the shareholders of the previously existing small-cap fund by merging that fund

into Federated Kaufmann Fund. Federated Management had then created a new Federated Kaufmann Fund Small-Cap Fund with a higher advisory fee and overall fee and expense structure cloning that of Federated Kaufmann Fund, and these fees and expenses would be applicable to new shareholders. An additional benefit to Federated Management of merging or "dumping" the assets of the pre-existing small-cap fund into Federated Kaufmann Fund was the elimination of the poorer investment performance record of the pre-existing small-cap fund, facilitating the marketing of the newly created small-cap fund under the same name without the burden of the poorer performance record of the pre-existing small-cap fund.

104.    Federated has merged two other equity funds having lower investment advisory fees and also having different investment philosophies and  poorer performance records into Federated Kaufmann Fund, thereby increasing the investment advisory fees for those shareholders as well.  There has been no public statement as to how the Board of Trustees of Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, determined that any of these mergers benefited Federated Kaufmann Fund or its shareholders, and as discussed elsewhere herein, the Board's available time to consider complex issues is extremely limited. On information and belief, these mergers conferred no benefits on the shareholders of Federated Kaufmann Fund and had the effect primarily of increasing the investment advisory fees and other profits being realized by Federated Management from Federated Kaufmann Fund and concurrently reducing the expenses of Federated Management in operating and managing as separate entities the much smaller funds merged into Federated Kaufmann Fund.  In addition, a fourth such merger is in process during the last half of the fiscal year ending October 31, 2004, indicating that mergers of smaller equity funds with differing investment objectives and policies into Federated Kaufmann Fund are becoming a pattern or practice. The Federated Disclosure

Materials do not yet contain information on the mechanics and financial effects of this most recent proposed merger on Federated Kaufmann Fund.

105.    Federated Management continues to charge substantially lower investment advisory fees (mostly 0.75%), to the majority of its other equity mutual funds. The Annual Report for the fiscal year ended October 31, 2003 of Federated Equity Funds, the latest audited report for the umbrella entity that includes separate reports for each of the component Series or portfolios, including Federated Kaufman Fund, shows that the umbrella entity was composed at that time of seven Series or portfolios, as follows:

| Name of Series | Approximate Assets (in thousands) | % Investment Advisory Fee | Advisory Fees For Fiscal Year (actual) |
|---|---|---|---|
| Federated Capital Appreciation Fund | $2,900,000 | 0.75% | $17,368,038 |
| Federated Technology Fund | 143,600 | 0.75% | 886,003 |
| Federated Growth Strategies Fund | 702,600 | 0.75% | 4,638,351 |
| Federated Large Cap Growth Fund | 279,700 | 0.75% | 1,986,288 |
| Federated Market Opportunity Fund | 918,600 | 0.75% | 4,636,674 |
| **Federated Kaufman Fund** | **5,800,000** | **1.425%** | **59,532,296** |
| Federated Kaufman Fund Small-Cap Fund | 212,200 | 1.425% | 684,620 |
| **Totals (Actual)** | **$10,956,700,000** | | **$89,047,650** |

106.    As illustrated by a comparison of the tables in Paragraphs 95 and 105, the total assets of Federated Equity Funds, the umbrella entity containing Federated Kaufmann Fund, had more than doubled, increasing from approximately $5.1 billion before the addition of Old Kaufmann's assets in 2001 to almost $11 billion at October 31, 2003, with the growth in assets fueled primarily by the addition of the assets of Old Kaufmann, now Federated Kaufmann Fund, and the other funds merged into it together with the growth of those assets over the intervening period. At October 31, 2003, Federated Kaufmann Fund's assets constituted about 53% of the assets of all seven series of Federated Equity Funds. But considered separately, its investment advisory fee was almost double the aggregate investment advisory fees of all other

Series combined.

107.    As shown in the table in Par. 95, two of the seven Series of Federated Equity

Funds at October 31, 2000 were paying investment advisory fees exceeding 0.75% per annum.

Those two series were Federated Aggressive Growth Fund, with an advisory fee of 1.00% and

Federated New Economy Fund, with an advisory fee of 1.25%. Significantly, at October 31,

2003, these two series no longer existed as separate series. Federated Aggressive Growth Fund

had been merged into Federated Kaufmann Fund, thus increasing the investment advisory fee

applicable to its shareholders from 1.00% to 1.425%, and Federated New Economy Fund no

longer appeared as a separate series.

108.    With the exception of Federated Kaufmann Fund and its new cloned mutual

fund, Federated Kaufmann Small-Cap Fund, created after the "dumping" of the assets of the

pre-existing Federated Kaufmann Small-Cap Fund into Federated Kaufmann Fund, all of the

other series of Federated Equity Funds, each one having lesser assets than Federated Kaufmann

Fund, now all have the lower 0.75% investment advisory fee.

109.    Total investment advisory fees generated by the seven series comprising

Federated Equity Funds had increased from approximately $32.6 million in October of 2000

before the addition of Old Kaufmann's assets to approximately $89.7 million at October 31,

2003, with Federated Kaufmann Fund then contributing approximately 66% of the total

investment advisory fees for all series of the umbrella entity through its higher investment

advisory fee of 1.425%. However, total investment advisory fees attributable to the other six

"brother/sister" funds had declined since October of 2000, partially due to the fact that all now

have advisory fees not exceeding 0.75% of assets. Total assets under management by Federated

Management have increased from approximately $130 billion in 2001, when Federated

Kaufmann Fund was formed, to more than $198 billion at present, presenting opportunities for increased economies of scale that could and should be shared with Federated Kaufmann Fund.

110.   Federated Management has failed to pass on economies of scale to Old Kaufmann Fund shareholders who, as Class K Shareholders, now comprise the largest shareholder class of Federated Kaufmann Fund, the largest Series of Federated Equity Funds. Instead, Federated Management has continued the investment advisory fee for Federated Kaufmann Fund at the higher level of 1.425% of assets while simultaneously charging other similarly situated "brother/sister" equity mutual funds in Federated Equity Funds, the umbrella organization, that have lesser assets and generate fewer economies of scale, an investment advisory fee of 0.75% per annum. In addition, as previously described, Federated Management has used Federated Kaufmann Fund as a vehicle to increase its advisory fees with respect to other funds and other assets under its management and, by merging certain mutual funds with poorer investment performance records into Federated Kaufmann Fund and forcing it to absorb securities not selected under the investment philosophy of Federated Kaufmann Fund, has increased total investment advisory fees for the benefit of Federated Management while potentially diluting the investment results for the shareholders of Federated Kaufmann Fund.

111.   The nature of the investment advisory functions and services Federated Management provides Federated Kaufmann Fund are identical to the nature of the investment advisory functions and services Federated Management provides the other similarly situated "brother/sister" equity Series that are part of the same umbrella entity, Federated Equity Funds, and these investment advisory functions and services when supplied to all funds in the same umbrella entity are all part of the same overall cost structure and are provided and/or are supported by the same staffs of personnel employed by Federated Management. In particular,

61

the investment advisory fees charged the various Series that are a part of Federated Equity Funds are designed to cover the service of providing investment advice, portfolio management, and investment research to the various Series. Federated Management charges the mutual funds that are Series of Federated Equity Funds different or separate fees for other portfolio accounting or administrative services that are provided, including general fund administration and accounting, supervision of and liaison with outside service providers, internal portfolio accounting, portfolio pricing, and internal transfer agent/shareholder account servicing. Thus, the nature of the investment advisory services provided the various Series of Federated Equity Funds, which covers only the service of overall portfolio investment management, is identical for each of these various Series of Federated Equity Funds.

112.    The costs of employing portfolio managers and investment analysts, the costs of investment research, statistical data, and the costs and expenses of operating the physical plants serving the Series that comprise Federated Equity Funds, and the costs of other operational aspects of Federated Management's investment advisory services are supported by the gross investment advisory fees charged all similarly situated "brother/sister" Series or portfolios of Federated Equity Funds, including Federated Kaufmann Fund. The Federated Disclosure Materials indicate that the investment objectives of all of these Series are capital appreciation or capital growth. While the separate investment philosophies or strategies  and the individual portfolio managers of the several Series may differ, the methods, functions and services used in selecting equity investments for all portfolios in the Series under their particular investment philosophies or strategies are the same and such investment advisory and investment research services and functions are supported by the aggregate fees collected from all "brother/sister" Series or portfolios of Federated Equity Funds, including Federated Kaufmann Fund.

Moreover, the principal operating officers of FEMCO, presently the primary investment adviser to Federated Kaufmann Fund, FGIMCO, currently the sub-adviser, and while it served as primary investment adviser to Federated Kaufmann, FIMCO, are or were the same. Thus, Keith Morgan Schappert is President and CEO of all three of these investment advisers, and Stephen Frank Auth is the Executive Vice President – CIO (Chief Investment Officer)–Equity of both FEMCO and FGIMCO, and previously held the same position with FIMCO while it served as primary investment adviser to equity mutual funds.

113.   Even if Federated Kaufmann Fund were to pay an investment advisory fee that was the same percentage of fund assets as the fees charged other similarly situated "brother/sister" Series or portfolios of Federated Equity Funds, 0.75% of assets, Federated Kaufmann Fund's investment advisory fee would nevertheless constitute the largest single investment advisory fee received by Federated Management from any Series of Federated Equity Funds and additionally from any other of its equity mutual fund portfolios because Federated Kaufmann Fund has significantly greater assets than any other equity mutual fund Series or mutual fund portfolio.

114.   Federated Kaufmann Fund's investment advisory fee of 1.425% of assets is more than sufficient to cover the compensation of the portfolio management staff of Federated Kaufmann Fund and its share of support staff and accompanying overhead expenses, and to provide profits that exceed the profits of other similarly situated "brother/sister" funds that are part of Federated Equity Funds, the umbrella entity. On information and belief, the investment advisory fee of 1.425% of assets paid by Federated Kaufmann Fund coupled with its large size, makes this Fund the most profitable of all mutual funds that are a part of Federated Equity Funds, all of which now are charged an investment advisory fee only 0.75% of assets per

63

annum. If these smaller "brother/sister" mutual funds are, in fact, acceptably profitable to Federated Management, then it follows that the much larger Federated Kaufmann Fund's profitability would be arguably excessive. If in fact these other Series of Federated Equity Funds that are charged an investment advisory fee of only 0.75% of assets per annum are not acceptably profitable, their lack of profitability would of necessity be subsidized by the excessive profitability of Federated Kaufmann Fund, constituting a separate form of breach of fiduciary duty on the part of Federated Management. As alleged in Paragraph 132 of this Complaint, incorporated herein, Federated Management admits that the totality of circumstances involving numerous mutual funds may be considered in renewing a particular mutual fund's investment advisory contract and that the annual contract review process does not analyze each mutual fund as though it is the only mutual fund offered by Federated Management, indicating that the fees of certain funds with higher fees may be viewed by Federated Management or the Federated Trustees as subsidizing or justifying lower fees for other mutual funds.

115.    Despite the equivalence of the nature of the investment advisory functions and services that Federated Management provides Federated Kaufmann Fund and the other "brother/sister" Series that are a part of Federated Equity Funds, and the commonality and sharing of the same operational support personnel, the investment advisory fee of 1.425% of assets that Federated Management charges Federated Kaufmann Fund is unreasonably higher than the investment advisory fees calculated at the rate of 0.75% of assets that Federated Management, FIMCO and/or FEMCO charge similarly situated "brother/sister" Series that are part of the same umbrella entity, that have the same basic investment objectives of capital appreciation or capital growth, that are overseen by the same Board of Trustees, that receive the

same type of investment advisory services, and that are served by the same operational support staff. Accordingly, the investment advisory fee of 1.425% is not commensurate with the services provided Federated Kaufmann Fund when compared with the nature of the same services provided other "brother/sister" mutual funds for the substantially lesser investment advisory fee of 0.75%.

116.    As an additional breach of fiduciary duty, the investment advisory fee of 1.425% of assets that Federated Management charges Federated Kaufmann Fund is also unreasonably higher as a percentage of assets managed than the investment advisory fees charged other domestic equity investment companies or mutual funds managed by Federated Management that are separate from Federated Equity Funds, the umbrella entity that includes Federated Kaufmann Fund, all of which receive the same or comparable type of investment advisory functions from Federated Management and share the same operational support structure and staff in the delivery and receipt of such services. The same is true for the sub-advisory fee that FGIMCO, the sub-adviser, charges with respect to certain other Series that are part of Federated Equity Funds.

117.    Per the Federated Disclosure Materials, the investment advisory fee of 1.425% of assets charged Federated Kaufmann Fund is, as a percentage of assets, the highest investment advisory fee that Federated Management charges any other domestic equity mutual fund that it manages, except for the cloned Federated Kaufmann Fund Small-Cap Fund created by using Federated Kaufmann Fund as the recipient of the pre-existing small-cap fund's assets. Moreover, because Federated Kaufmann Fund is the largest single equity mutual fund managed by Federated Management and has the highest investment advisory fee of any domestic equity mutual fund, the actual amount of investment advisory fees generated by Federated Kaufmann

65

Fund as a single entity, $59,532,296 before fee waiver and approximately $53,265,731 after fee waiver, is the largest single investment advisory fee that Federated Management receives from any other single equity mutual fund that it manages.

118.    The investment advisory fee of 1.425% of assets charged Federated Kaufmann Fund is excessive and discriminatory, and is also significant and material. If the investment advisory fee charged Federated Kaufmann Fund were the same 0.75% of assets that Federated Management charges the other Series comprising Federated Equity Funds, the investment advisory fees generated by Federated Kaufmann Fund would have been reduced from $59,532,787 for the last fiscal year to approximately $31.3 million, a difference of approximately $28.2 million, and an obviously significant savings amounting to approximately 0.68% of Fund assets or 68 basis points. Such a reduction should lower the total operating expense ratio for the Class K Shareholders of Federated Kaufmann Fund below the voluntary 1.95% Operating Expense Cap level assiduously maintained by Federated Management and would enable Federated Kaufmann Fund's Class K Shareholders to participate in economies of scale then made possible by Federated Kaufmann Fund's significantly larger size and its continuing increase in assets over time.

119.    FIMCO's and/or FEMCO's delegation of the "daily management" for investment advisory functions for Federated Kaufmann Fund to FGIMC, the affiliated sub-adviser, for a sub-investment advisory fee of 1.175% of assets per annum is, in effect an admission that an investment advisory fee of 1.425% of assets per annum is excessive. As previously alleged in Par. 24, herein, the term "daily management" of the Fund's assets is a phrase substantially similar to the phrase "day to day investment operations" used in the disclosure materials for Old Kaufmann before its acquisition by Federated Management to include all investment

management and investment research operations, and would seem to have the same meaning. If the total investment advisory fees charged Federated Kaufmann Fund were to be reduced to the level of 1.175% per annum on the assumption that this fee is sufficient to cover all "day to day investment operations" (the phrase used by Old Kaufmann to mean all investment management and research operations), the amount received by FGIMC, the affiliated sub-adviser to which the "daily management" of investment functions has been delegated, the total investment advisory fees payable by Federated Kaufmann Fund would have been approximately $49 million rather than the $59.5 million actually generated. An investment advisory fee of 1.175% is still an excessive and discriminatory fee in comparison with the 0.75% investment advisory fees Federated Management charges other equity mutual fund Series of Federated Equity Funds that are receiving comparable investment advisory services of the same nature and quality.

120. A reduction in the investment advisory fee to 1.175% of assets per annum would have resulted in a savings to Federated Kaufmann Fund for the latest fiscal year of approximately $10.5 million, amounting to approximately 0.25% of assets per annum or 25 basis points. Moreover, the sub-investment advisory fee of 1.175% that FGIMCO receives as a sub-adviser for Federated Kaufmann Fund is discriminatory when compared with the sub-advisory fees that FGIMCO charges with respect to other similarly situated equity mutual funds. With respect to Federated Large-Cap Growth Fund, also a Series of Federated Equity Funds, FGIMCO receives a sub-advisory fee of only 0.4875% of assets per annum, where that fund's primary investment advisory fee is only 0.75% of assets per annum. In addition, the pre-existing Federated Kaufmann Small-Cap Fund that had been a Series of Federated Equity Funds before it was merged into Federated Kaufmann Fund to facilitate the creation of a new Federated Kaufmann Small-Cap Fund with a higher fee schedule, paid an investment advisory fee of

0.75%, and FGIMCO charged a sub-advisory fee of only 0.15% of assets per annum during that period. These variances in fees for similar sub-advisory services performed by FGIMCO, ranging from 0.15% to 1.175%, also constitute a form of discrimination that constitutes a breach of fiduciary duty.

121.    The central test for determining whether compensation charged investment companies by affiliated service providers violates Sec. 36(b) was discussed in a series of significant cases decided in the 1980's and early 1990's. The seminal case is *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982). Under *Gartenberg,* the test is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." In order to violate Sec. 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Id at pages 928-929.

122.    In applying this central test, a wide spectrum of pertinent facts must be weighed in determining whether a fee or other compensation is excessive and accordingly violates Sec. 36(b). The decision in *Gartenberg,* followed by courts in other decisions, specifically identified six factors to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered. These factors include but are not limited to: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the investment adviser or manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors in performing their oversight function. The factors set forth in the *Gartenberg* line of cases are discussed in more detail in

Paragraphs 123 through 132, following. It is not necessary that a plaintiff establish that an investment organization is in non-compliance with all six factors in order for there to be a finding that the investment management organization breached its fiduciary duty to a managed mutual fund. And as admitted by Federated Management and discussed in Paragraph 132 of this Complaint, incorporated herein, not all of these factors are even considered in the Federated Trustees deliberations on annual contract renewals. Instead, the Federated Trustees considers the "totality" of circumstances surrounding numerous mutual funds in renewing a particular mutual fund's contract renewal and its relationships with other mutual funds in similar situations and do not review a particular mutual fund as though it is the only mutual fund managed by Federated Management.

123. The Nature and Quality of the Services Rendered. As alleged in Paragraphs 111-116, Federated Management provides the same nature of investment advisory services to all Series of Federated Equity Funds. Additionally, the portfolios of the five Series of Federated Equity Funds having investment advisory fees of 0.75% of assets per annum have combined assets of approximately $4.9 billion and have in excess of 350 separate securities in the aggregate in their five separate portfolios.  These five portfolios are overseen by ten primary portfolio managers, two for each fund. The aggregate investment advisory fees for these five Series for the 12 month period ended October 31, 2003 were approximately $29,510,354. The investment management operations of five separate, smaller mutual funds with five separate portfolios and five separate sets of financial statements are inherently more complex than the investment management operations of a single, much larger mutual fund with only one portfolio of securities and one set of accounting and financial statements, as evidenced by Federated Management's now continuing practice of merging into Federated Kaufmann Fund four smaller

69

mutual funds with differing investment objectives.    Federated Kaufmann Fund considered separately has approximately $5.8 billion in assets and approximately 225 separate companies in its single portfolio, and this single portfolio is overseen by four primary portfolio managers, two of whom are shared with Federated Kaufmann Small-Cap Fund. Yet this single mutual fund generated $59,532,296 in investment advisory fees before fee waivers under the voluntary 1.95% Expense Limitation Cap for the same twelve month period ended October 31, 2003, and approximately $53,265,731 in investment advisory fees after fee waivers. The fee discrimination is apparent. Federated Management is operating five separate and distinct, smaller portfolios with separate portfolio accounting and financial statements and containing far more portfolio securities in the aggregate, using ten primary portfolio managers and providing the same nature of investment advisory services for a combined $29.5 million in investment advisory fees, all calculated at 0.75% per annum. But it is charging the much larger, Federated Kaufmann Fund that has only one set of portfolio accounting and financial statements and has fewer companies in its portfolio than the five separate funds in the aggregate, and has only four primary portfolio managers, two of whom are shared with Federated Kaufmann Small-Cap Fund, the substantially larger investment advisory fee of $59,532,296 before voluntary fee waivers, calculated at 1.425% of assets per annum and reduced to $53,265,731 after fee waivers, for providing the same nature of investment advisory services.

124. Such substantial pricing discrimination cannot be justified on the theory that the quality of investment advisory services is better by arguing that Federated Kaufmann Fund has experienced better investment performance. The Federated Disclosure Materials indicate that at April 30, 2004, the previous six-month and the previous one-year investment performance records beginning in 2001, when Federated Kaufmann Fund was first acquired, are as follows:

<u>Comparative Investment Performance-Class A Shares</u>

| Name of Fund | 6 Months Ended 4/30/04 | 12 Months Ended October 31 | | |
|---|---|---|---|---|
| | | 2003 | 2002 | 2001 |
| Federated Capital Apprec. | 5.14% | 16.89% | (13.10)% | (17.25)% |
| Federated Growth Strategies | 4.34% | 32.18% | (18.51)% | (39.31)% |
| Federated Large Cap Growth | 3.12% | 13.91% | (18.62)% | (40.54)% |
| Federated Market Opporty. | 4.24% | 19.09% | 0.56 % | 15.67% |
| **Federated Kaufmann Fund** | **3.38%** | **38.42%** | ( 8.90)% | ( 2.31)% |
| Federated Kaufmann Small-Cap | 9.90% | 70.70% | — | — |
| Federated Technology | (0.60%) | 48.95% | (30.04%) | (67.95%) |

From these statistics, it is apparent that, although Federated Kaufmann performed well in 2003, it still was only the third highest performer for that twelve-month period among the seven 'brother/sister' funds, and all of the other "brother-sister" funds performed positively and relatively well in comparison with the stock market as a whole and with each other. For the six months ended April 30, 2004, Federated Kaufmann's investment performance was fourth among these seven "brother/sister" Series. If investment performance is an appropriate gage for determining "quality" of the investment management service and the justification for higher investment advisory fees, then perhaps the investment advisory fee of Federated Kaufmann Fund should be half that of Federated Kaufmann Small-Cap Fund, its fee clone with a similar investment advisory fee of 1.425%, because Federated Kaufmann Fund's investment performance has been approximately half that of Federated Kaufmann Small-Cap Fund. Moreover, in 2003, Federated Technology Fund with an investment advisory fee of 0.75% outperformed Federated Kaufmann and in both 2002 and 2001, Federated Market Opportunities Fund, with an investment advisory fee of 0.75%, also outperformed Federated Kaufmann Fund.

125. These statistics demonstrate the fallacy of justifying a particular mutual fund's excessively high investment advisory fee (almost twice that of other "brother-sister" funds, some of which performed better in some periods) through emphasizing good investment performance

in other periods. Investment performance varies in different periods, depending on investment objectives, composition of the portfolio, and the relationship of the contents of the portfolio to movements in the stock market as a whole and to general economic conditions. When all of the mutual funds in a comparable or related group perform relatively well, an excessively high investment advisory fee for one mutual fund cannot be justified by reference to good performance for that particular fund in some periods, or by considering that fund's fee separately or in a vacuum without reference to similarly situated mutual funds. The commonality or similarity of the nature and quality of the investment advisory services provided Federated Kaufmann Fund in comparison with the same services provided other "brother/sister" Series of Federated Equity Funds has not been given adequate consideration by the Federated Trustees.

126. Significantly, Congress has provided a method under which exceptionally good investment performance justifies a higher investment advisory fee schedule by allowing for adoption of a performance fee pursuant to Sec. 205(b)(2) of the Investment Advisers Act of 1940, 15 U.S.C. Sec. 80b-5(b)(2) and the accompanying regulations. Such a performance fee, sometimes referred to as a "fulcrum" fee, rewards a mutual fund manager with a higher percentage fee for exceptionally good investment performance that exceeds a selected benchmark, but also penalizes the manager by a percentage fee reduction for lesser investment performance that falls below the selected benchmark. Federated Management has not adopted such a balanced performance fee schedule for Federated Kaufmann Fund.

127. The Profitability of the Funds to the Investment Adviser or Manager. According to the Annual Report on Form 10-K filed by Federated Investors, Inc. for the fiscal year ended December 31, 2003, FII reported that it managed $22.8 billion in equity mutual fund assets. Accordingly, Federated Kaufmann Fund, with approximately $5.8 billion in assets at that time,

constitutes as a single mutual fund approximately 25% of the total equity mutual fund assets managed by Federated Investors, Inc.  Because of its large size as a single mutual fund, Federated Kaufmann Fund is capable of generating the greatest economies of scale of any other equity mutual fund managed by Federated Management, FIMCO, and/or FEMCO. Yet Federated Kaufmann Fund pays the highest investment advisory fee in both absolute and relative terms of any other Series in Federated Equity Funds and, additionally, of any other domestic equity mutual fund managed by Federated Management, FIMCO, and/or FEMCO. Because of its large size, high fee schedule, and the absence of any break-points in any of its fees as assets grow, coupled with its servicing by exactly the same servicing entities as other Series of Federated Equity Funds using the same cost structures, it is the most profitable domestic equity Series of Federated Equity Funds, the umbrella entity, and additionally in the entire spectrum of domestic equity mutual funds managed by Federated Management. After application of the "voluntary" 1.95% Expense Operating Cap, resulting in an investment advisory fee waiver of $6,266,565 for the fiscal year ended October 31, 2003, the net investment advisory fee paid by Federated Kaufmann Fund of $53,265,731 for that year amounted to approximately 1.27% of assets, and is one of the highest if not the highest investment advisory fee paid by any other domestic equity mutual fund managed by Federated Management. Moreover, the total of the annual service fees charged and received by Federated Management from Federated Kaufmann Fund,  including the investment advisory fee of 1.425%, the fund administration fee of approximately 0.075%, the 12b-1 Distribution Fee that can be as much as 0.50%, the Shareholder Services Fee that can be as much as 0.25%, and the transfer agency fee that can range between 0.12% to 0.17%, all of which when combined with other expenses could total as much or more than 2.40% in the absence of the "voluntary" 1.95% Expense Limitation Cap. For the fiscal year ended October 31, 2003, the

Fund's expense ratio, which includes all operating expenses, was approximately 2.46% before "voluntary" fee waivers under the 1.95% Expense Limitation Cap. Because of its large size and the absence of any fee breakpoints with respect to any of its fees at higher levels of assets, Federated Kaufmann Fund is the most profitable equity mutual fund of all of the Series that comprise Federated Equity Funds, even after application of the voluntary 1.95% Expense Limitation Cap, and additionally is the most profitable equity mutual fund in the Federated Mutual Fund Complex. This degree of profitability has not been adequately considered by the Federated Trustees.

128. <u>Economies of Scale.</u>  Investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management. These economies of scale are created for the management organization through the abilities of a portfolio management staff and an administration and operations staff to manage increasing assets, increasing numbers of mutual funds, and increasing numbers of shareholder accounts through a staff that does not need to increase proportionately or as rapidly as the increases in assets, numbers of funds, and numbers of shareholder accounts. These economies of scale can be passed on to the mutual funds as assets increase if fee breakpoints are installed at higher asset levels for mutual fund fees that are calculated as percentages of assets, or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management. Mutual funds can also realize economies of scale by the fact that relatively fixed mutual fund operating expenses paid by the funds to third parties, such as the fees and expenses of independent accountants, outside lawyers, the independent custodian, insurance premiums, trade association dues, typesetting and printing expenses and other similar types of relatively fixed

74

fees and expenses do not increase proportionately or as rapidly as increases in assets and the number of shareholders.

129. When increases in assets under management occur, generating the ability to realize such economies of scale, the opinions in the *Gartenberg* line of cases indicate that the ability by an investment management organization or one or more mutual funds to generate material economies of scale is a significant factor in determining whether the investment management organization has a fiduciary duty under Sec. 36(b) of the Investment Company Act to share these increased economies of scale with the mutual funds that generate such increased economies of scale. The mutual funds involved in the *Gartenberg* line of cases had fee breakpoints at various levels of assets as assets rose, and the existence of these fee breakpoints was recognized by the courts as a significant factor resulting in the sharing of economies of scale that justified the various fees at issue in these cases. Yet the excessively high investment advisory and overall fee structure imposed on Federated Kaufmann Fund without any fee breakpoints prevents this Fund from realizing any economies of scale generated by its large size. The degree of economies of scale that could be generated by and then extended to Federated Kaufmann Fund through a different fee structure has not been adequately considered by the Federated Trustees.

130. Comparative Fee Structures. The *Gartenberg* line of cases placed little value on fee comparisons showing that a particular mutual fund whose fee is being challenged has a fee that is within the general range of the fees of other, "outside" mutual funds managed by other investment advisers. However, this line of cases does not foreclose such a comparison with "outside" mutual funds where the fees being challenged are dramatically different from or higher than the generally recognized norm. Here, **Morningstar, Inc.,** the preeminent mutual fund rating organization, issued a research analyst's report on June 14, 2004, attached as Exhibit J, which

75

indicates that Federated Kaufmann Fund's s overall fee schedule is out-of-line with that of other non-affiliated mutual funds, stating:

- *"Federated Kaufmann's history of disregard for shareholders makes it one to avoid"*

- *" ... The 1.95% levy for the fun's closed, no-load Class K shares ... is topped by only a handful of its mid-growth peers, all of which are a fraction of this one's size."*

- *"The expense ratio for the successful Kaufmann Fund remains outrageously high .."*

Moreover, the *Gartenberg* line of cases does not foreclose such a fee comparison as between similarly situated mutual funds managed by the same investment adviser. Paragraphs 95 and 105 through 108 herein contain facts demonstrating the discrimination in investment advisory fees charged Federated Kaufmann Fund in comparison with other similarly situated "brother-sister" mutual funds that are part of Federated Equity Funds, the umbrella entity that also includes Federated Kaufmann Fund. Such discrimination can, therefore, constitute grounds for establishing a breach of fiduciary duty by comparing one fund's substantially higher fees with the lower fees of similarly situated mutual funds managed by the same manger where the nature and quality of the services provided are the same. The magnitude and lack of justification of this fee discrimination as a breach of fiduciary duty has not been given adequate attention by the Federated Trustees.

131. Fallout Benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the mutual fund). Federated Management serves the approximately 138 mutual funds in the Federated Fund Complex not only with investment advisory services for which it charges investment advisory fees, but also by providing these mutual funds with numerous other "in-house" operational services for which it charges the managed mutual fund additional service fees. Such fees include but are not limited to general administration fees, portfolio and fund

accounting fees, fees for pricing services, distribution fees, transfer and dividend disbursing agent fees, and shareholder accounting fees. Providing these additional services for Federated Kaufmann Fund and being able to charge these additional service fees would not be possible but for the acquisition by Federated Management of Old Kaufmann in 2001. Such additional miscellaneous service fees provide enormous overhead coverage and can be the basis of additional profits.   The substantial extent of these additional fallout benefits to Federated Investors, Inc., derived from its management of Federated Kaufmann Fund as one of its equity mutual funds, is illustrated by the following statistics. Federated Equity Funds, the umbrella legal entity that includes Federated Kaufmann Fund as a Series, has approximately $10.9 billion in assets, including the assets of Federated Kaufmann Fund, and accordingly constitutes approximately 48% of all equity mutual fund assets managed by Federated Investors, Inc. Within Federated Equity Funds, the additional miscellaneous fee revenues generated by Federated Kaufmann Fund's general administration fees, transfer and dividend disbursing agent fees, portfolio accounting fees, Rule 12b-1 Distribution Fees, and Shareholder Services Fees total approximately $40 million for the fiscal year ended October 31, 2003. These fees are in addition to the investment advisory fee revenues of $59,532,296 before fee waivers and $53,265,731 after fee waivers for 2003, indicating that Federated Kaufmann Fund generates between $90 million to $100 million in total fee revenues for Federated Investors, Inc. The same miscellaneous fee revenues in the aggregate generated by all six of the other Series within Federated Equity Funds were approximately $37 million for 2003. With the addition of investment advisory fees of approximately $29,515,354, total comparable fee revenues for the other six Series combined were approximately $66 million, far less than the $90 million to $100 million in total fee revenues generated by Federated Kaufmann Fund alone. In addition, with a relatively high

portfolio turnover rate of 72% for the fiscal year ended October 31, 2003, Federated Kaufmann

generated a large amount of portfolio securities purchases and sales and accompanying

brokerage commissions, the total amount of which is not disclosed. A portion of these brokerage

transactions could be used by Federated Management as compensation for executing

broker/dealers in payment of research materials in the manner authorized by Sec. 28(e) of the

Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(e). According to the Federated Disclosure

Materials, Federated Kaufmann Fund directed $4,763,608,874 in portfolio securities purchases

and sales to certain selected broker/dealers for execution of portfolio transactions and to obtain

investment research services and paid $14,629,249 in brokerage commissions to such

broker/dealers for the combined services of execution of portfolio transactions and receipt of

such investment research services. As a result, Federated Kaufmann Fund provides substantial

fallout benefits in the form of additional revenues and the ability to outside obtain investment

research services through brokerage commissions that constitute fall-out benefits over and

beyond the investment advisory fees paid to Federated Management and the ultimate parent,

Federated Investors, Inc. In determining appropriate and fair investment advisory fees to be

charged Federated Kaufmann in comparison with the numerous other smaller equity funds within

Federated Equity Funds, the umbrella entity and in the Federated Fund Complex that cannot

generate comparable fall-out benefits, these substantial fallout benefits generated by Federated

Kaufmann Fund should have been considered by the Federated Trustees as being much more

important and thereby qualifying Federated Kaufmann Fund for a more reasonable, less

discriminatory investment advisory fee and overall fee structure.

    132. <u>The Care and Conscientiousness of the Directors (Trustees) in Performing Their</u>

<u>Oversight Function.</u>. Periodic, essentially identical boilerplate discussions in the disclosure

documents of numerous mutual funds in the Federated Fund Complex, including the disclosure materials of Federated Kaufman Fund, have represented that Federated Management and the Federated Trustees who oversee Federated Kaufmann Fund have meticulously discussed and reviewed a large number of factors, generally the factors discussed in the _Gartenberg_ line of cases, in their required annual "in person" deliberations and discussions when the investment advisory agreements and other agreements have been renewed each year, in the manner required by Sec. 15 of the Investment Company Act, 15 USC Sec. 80a-15. See Exhibit K. But as indicated by the Federated Disclosure Documents, neither the Federated Trustees nor Federated Management has satisfied the principles set forth in the _Gartenberg_ line of cases that are applicable to the process necessary for the annual renewal of investment advisory agreements, and the investment advisory agreement involving Federated Kaufmann Fund therefore may not have been renewed in the manner contemplated by and pursuant to the requirements of Sec. 15 of the Investment Company Act, 15 USC 80a-15. As previously alleged in Paragraph 34, herein, there is insufficient time for and therefore insufficient serious, good faith, arms-length bargaining on the part of the Board of Trustees of Federated Equity Funds with Federated Management on this or any other fee issues specifically involving Federated Kaufmann Fund or its Class K Shareholders because of the limited amount of time available in board meetings for consideration of the routine, on-going operational issues together with the special issues on annual renewals involving the approximately 138 separate mutual funds in the Federated Fund Complex. Moreover, Federated Management admits in the required description with respect to the factors considered in the annual contract renewals, as set forth in Federated Kaufmann's SAI, that not all of these factors are considered with respect to each separate mutual fund, and that annual contract renewals for many mutual funds are reviewed in the aggregate rather than in a fund

79

specific manner. The following discussion from the SAI also implies that the overhead coverage and perhaps even the profitability of one or even many mutual funds may be attributed to another fund or funds in order to justify lower fees for some funds.  That discussion on page 93 of Federated Kaufmann's currently effective SAI states:

> "The Board bases its decision to approve an advisory contract on the totality of the circumstances and relevant factors, and with a view to past and future long-term considerations. Not all of the factors and considerations identified above are relevant to every Federated fund, nor does the Board consider any one of them to be determinative. **Because the totality of circumstances includes considering the relationship of each Federated fund, the Board does not approach consideration of every Federated fund's advisory contract as if that were the only Federated fund offered by Federated."**  (Emphasis added)

133.  There is no indication in the Federated Disclosure Materials that Federated Management has provided the Federated Trustees with information about the reasons for the disparity in fees charged Federated Kaufmann Fund in comparison with the fees charged similarly situated "brother/sister" Series of the same umbrella entity, Federated Equity Funds, or that Federated Management provided descriptive and accurate information about the substantially greater profitability created for Federated Management by this disparity. In the absence of such disclosure, and on information and belief, Federated Management has not kept the Federated Trustees fully informed regarding the substantial profitability created by the excessive investment advisory fees charged Federated Kaufmann Fund in comparison with the lesser profitability created by the discrimination in charging lower investment advisory fees to other investment companies or mutual funds under common management, nor have the Federated Trustees demanded such information.

134. Federated Management has not seriously proposed methods of passing along economies of scale to Federated Kaufmann Fund. Instead, as previously alleged in Paragraphs 98 through 104, herein, Federated Management has used Federated Kaufmann Fund as a vehicle to

raise investment advisory fees with respect to other mutual funds by merging such funds into Federated Kaufmann Fund without seeking economies of scale for Federated Kaufmann Fund through such mergers, and the Federated Trustees have allowed such mergers to happen without requiring additional economies of scale. In addition, the Federated Trustees have wholly failed to seek other economies of scale through negotiating lower investment advisory fees as a percentage of assets or by implementing fee breakpoints at higher levels of assets. As a separate and additional breach of fiduciary duty, the Federated Trustees have essentially abdicated to Federated Management their fiduciary duties with respect to overseeing the Fund's total fees and operating expense structure by failing to negotiate a lower operating expense limitation cap that would be contractually binding, instead allowing Federated Management to continue year after year with a "voluntary" 1.95% Expense Limitation Cap that is higher than that applicable to other 'brother/sister" Series in Federated Equity Funds, and is higher than the expense ratio of 1.89% experienced by Old Kaufmann for fiscal 2000, its last year of independent existence. This "voluntary" expense limitation cap can be voided at any time at Federated Management's sole discretion, and such cancellation would result in substantially higher expenses for Federated Kaufmann Fund. For example, in the absence of this "voluntary" 1.95% Expense Limitation Cap, the expense ratio for the fiscal year ended October 31, 2003 would have been approximately 2.46% of assets under the current fee structure.   As a result, the Federated Trustees have not satisfied the test in the *Gartenberg* line of cases with respect to the requisite care and conscientiousness in performing their oversight functions.

135.    The investment advisory fees and the entire fee structure imposed on Federated Kaufmann Fund by Federated Management, FIMCO and FEMCO was originally approved by the Board of Trustees of Federated Equity Funds (the "Federated Trustees") before

the Federated Kaufmann Reorganization that merged Old Kaufmann into Federated Kaufmann

Fund, and this fee structure has thereafter been presented for annual re-approval and renewal to

the same Board of Trustees. As previously alleged, this same Board of Trustees also oversees

the other similarly situated "brother/sister" mutual funds that comprise Federated Equity Funds,

and this same Board of Trustees also oversees essentially all other equity mutual funds and all

other types of mutual funds that are managed by Federated Management and that comprise the

Federated Fund Complex. Because of this all encompassing involvement with all of the mutual

funds in the Federated Fund Complex, all of the Federated Trustees therefore have constructive

as well as actual knowledge of the discriminatory treatment Federated Management, FIMCO

and/or FIMCO have been and are imposing on Federated Kaufmann Fund by charging a higher

investment advisory fee of 1.425% in comparison with the more favorable fees of 0.75% of

assets charged many other similarly situated equity mutual funds and equity accounts served by

Federated Management, all of which have lesser assets and which are less capable of generating

economies of scale. But these Federated Trustees have failed to consider and take into account

the invidious discrimination in charging such excessively high fees to Federated Kaufmann

Fund and denying it the benefits of economies of scale while simultaneously and concurrently

charging much lower fees to smaller "brother/sister" funds less capable of generating economies

of scale. As a result, these Federated Trustees have breached their fiduciary duties to Federated

Kaufmann Fund by failing to negotiate a lower investment advisory fee that would extend

economies of scale to the much larger Federated Kaufmann Fund while simultaneously allowing

Federated Management to charge lower investment advisory fees and extend significant

economies of scale to other, smaller, similarly situated "brother/sister" mutual funds that are

components of the same umbrella entity or to other equity mutual funds that otherwise are under

their common management and oversight. Further, these Federated Trustees have allowed Federated Kaufmann Fund to be used as a vehicle to increase investment advisory fees applied to the assets of other mutual funds merged into Federated Kaufmann Fund, rather than considering how the assets of the merged funds could be used to extend additional economies of scale to Federated Kaufmann Fund.

136.   In each of the opinions in the _Gartenberg_ line of cases, the courts were considering in each case whether a certain general management fees of a single, particular mutual fund (either a money market mutual fund or a mutual fund investing in bonds) was excessive in light of a massive increase in assets without accompanying breakpoints in the general management fees at higher levels of assets. The scope of the general management fees and the breadth of services provided, the quality of the services performed, and the resulting profitability to the management companies were each reviewed. The courts did not allow comparisons of the challenged excessive mutual fund general management fees with comparable management fees charged similarly situated mutual funds, private accounts, or other investment accounts managed by the same investment adviser or entities managed by other investment advisers, because there were no allegations or proof that the challenged fees and the fees of the comparative accounts covered the same services or functions.  As a result, the tests enunciated by the courts were applied in a vacuum to a single general management fee of a particular money market mutual or fixed income fund in circumstances where the fee in question covered a wide range of investment management, general management, and shareholder services, including in some situations not only investment advisory services but also administration and transfer agent services that were embedded within the general management fees being challenged.

137.   In several of those cases, the plaintiffs sought to compare the money market

fund general management fees charged the single mutual fund with the investment advisory fees of privately managed money market accounts managed by the same investment adviser. The courts declined to consider such comparisons in the absence of allegations and/or evidence that the money market mutual funds and the other accounts were comparable in structure, were similarly situated, or that the services and functions being provided both types of accounts under the applicable fee structure were the same. It was noted that the money market mutual funds processed numerous purchases and redemptions each day and the costs of such transactions were covered in the challenged general management fees, while there was no allegation nor evidence that the investment advisory fees paid by the private or separate accounts to which the comparison was being attempted were similar in the scope or nature of the services being provided.

138.    The decisions in the _Gartenberg_ line of cases do not foreclose the issue of considering investment advisory fees as being excessive for the services rendered based upon a comparison of investment advisory fees being charged similarly situated investment companies or mutual funds managed by the same investment advisory organization for rendering the same services where there are allegations and factual indications that the challenged fees create greater profitability for the investment advisory organization than other similarly situated investment companies or mutual funds that are charged lower fees by the same investment advisory organization, prevent the realization of economies of scale, and /or are discriminatory when compared with similarly situated investment companies or mutual funds receiving the same investment advisory services but paying lower investment advisory fees to the same investment advisory organization.   As a result, a meticulous consideration of the factors set forth in the _Gartenberg_ line of cases by the Board of Trustees of Federated Equity Funds, if

84

such occurred,  does not absolve Federated Management, FIMCO, and/ or FEMCO of a breach

of fiduciary duty in charging excessive fees where there are allegations, as here, that the

investment advisory fees are excessive and discriminatory in comparison with similarly

situated investment companies or mutual funds managed by the same investment advisory

organization that is providing the same or comparable nature and qualify of services and

functions, and that such excessive and discriminatory investment advisory fees create greater

profitability and, and prevent the realization of economies of scale in comparison with lesser

fees charged other similarly situated investment companies or mutual funds under the same

management for the performance of the same or comparable services or functions that result in

greater economies of scale and lower profitability.  In fact, as previously set forth in Paragraph

132, the Federated Trustees do not review any particular mutual fund as though it were the only

mutual fund managed by Federated Management.

139. Other domestic equity investment companies or mutual funds managed by

Federated Management with lesser assets that are incapable of generating the same economies

of scale nevertheless pay lower investment advisory fees and because of their smaller size are

less profitable to Federated Management. Federated Management, FIMCO, and/or FEMCO

have breached their  fiduciary duties under Sec. 36(b) of the Investment Company Act by the

failure to supply information to the Board of Trustees of Federated Equity Funds concerning

the excessive and discriminatory fees being charged Federated Kaufmann Fund in comparison

with other similarly situated investment companies or mutual funds, and the Board of Trustees

of Federated Equity Funds has failed to request and consider such information in light of  the

best interests of Federated Kaufmann Fund  and its shareholders, resulting in a failure both by

Federated Management and the Board of Trustees of Federated Equity Funds to consider and

extend economies of scale that are possible and that should be passed along in providing investment advisory functions and other management services to Federated Kaufmann Fund, its largest and most profitable equity fund, in comparison with the economies of scale extended to "brother/sister" mutual funds that are part of the same umbrella entity, and to other domestic equity investment companies or mutual funds.

140.    The investment advisory fees charged Federated Kaufmann Fund by Federated Management, FIMCO, and/or FEMCO for providing equity investment advisory services are and continue to be disproportionate to the services rendered when considered in light of the accompanying higher profitability created for Federated Management in comparison with the lower investment advisory fees charged other similarly situated "brother/sister" equity mutual funds and other similarly situated domestic equity investment companies or mutual funds for the same or comparable equity investment advisory services and the accompanying lesser profitability to Federated Management of such other investment companies or mutual funds.

141.    Federated Management, FIMCO, and/or FIMCO, have received and continue to receive and enjoy excess profits attributable to extraordinary economies of scale from their own management structure and from the growth in assets of all funds in the Federated Fund Complex, including Federated Kaufmann Fund. The benefits of these economies of scale are denied Federated Kaufmann Fund, but are extended to and realized by other, smaller equity funds not capable of generating the same economies of scale. By charging Federated Kaufmann Fund excessive fees and retaining excess profits derived from such economies of scale but denying the benefits of such economies of scale to Federated Kaufmann Fund, while simultaneously extending these economies of scale through lower fees to other, smaller investment companies or mutual funds, Federated Management, FIMCO, and/or FEMCO have

breached and continue to breach their statutory fiduciary duty to Federated Kaufmann Fund in violation of Sec. 36(b) of the Investment Company Act. Approval by the shareholders of Old Kaufmann of this fee structure in 2001 must be given little weight, because as alleged in Pars. 96 and 97 of this Complaint, shareholders of Old Kaufmann who were voting on the proposed reorganization were not provided with complete information about the blatant discrimination they would suffer in comparison with similarly situated mutual funds that were already a part of Federated Equity Funds and other mutual funds in the Federated Fund Complex. Nor can initial approval and subsequent re-adoption of this excessive and discriminatory fee schedule by the Board of Trustees of Federated Equity Funds on behalf of Federated Kaufmann Fund be given much weight in light of the limited amount of time available in formal meetings of the Board of Trustees for the Federated Trustees to consider, understand, discuss, and negotiate the fee schedule imposed by Federated Management on Federated Kaufmann Fund or the Class K Shareholders. Also mitigating against giving annual Board renewals much weight is the admission in the Federated Disclosure Materials that the Board does not consider all of the *Gartenberg* factors at contract renewal time for each separate fund, does not look at each mutual fund individually, and instead considers the "totality" of a variety of circumstances and the relationships of other mutual funds in the Federated Fund Complex in re-approving investment advisory contracts.

142.    For all of these reasons, the investment advisory fee of 1.425% that Federated Management charges Federated Kaufmann Fund is so disproportionately large that it bears no reasonable relationship to the services provided and could not be within the range of what would have been negotiated by the Board of Trustees of Federated Equity Funds at arm's length in light of all the surrounding circumstances.

143.    The Federated Disclosure Materials show that for the fiscal year ended October 31, 2003, the excessive and discriminatory investment advisory fee charged Federated Kaufmann Fund by Federated Management, FIMCO, and/or FEMCO, calculated at 1.425% of assets per annum, totaled $59,532,296 before voluntary fee waivers and $53,265,731 after voluntary fee waivers. If the investment advisory fee charged Federated Kaufmann Fund had been calculated on the basis of the investment advisory fees of 0.75% of assets per annum charged other similarly situated "brother/sister" mutual funds that comprise Federated Equity Funds and other equity funds managed by Federated Management, the investment advisory fee for Federated Kaufmann Fund would have approximated $31.3 million, a savings of approximately $28.2 million. On behalf of Federated Kaufmann Fund, Plaintiff seeks, pursuant to Sec. 36(b)(3) of the Investment Company Act, the "actual damages resulting from the breach of fiduciary duty" by Federated Management, FIMCO and/or FEMCO in charging excessive and discriminatory investment advisory fees to Federated Kaufmann Fund for the period allowed by statute.

**WHEREFORE,** Plaintiff demands judgment as follows:

a.    An order declaring that Defendants have violated and continue to violate Sec. 36(b) of the Investment Company Act through the receipt from the security holders of Federated Kaufmann Fund of excessive and discriminatory Class K Redemption Fees deducted from the redemption proceeds of Class K Shareholders; through the receipt from Federated Kaufmann Fund of excessive Shareholder Services Fees with respect to Class K Shares; through the receipt from Federated Kaufmann Fund of excessive Rule 12b-1 Distribution Fees with respect to Class K Shares; and through the receipt from Federated Kaufmann Fund of excessive and discriminatory investment advisory fees with respect to all classes of shares of Federated

Kaufmann Fund.

     b.     An order preliminarily and permanently enjoining Defendants from further

violations of the Investment Company Act.

     c.     An order awarding damages on behalf of Federated Kaufmann Fund against

Defendants, including all excessive and/or discriminatory fees paid to them by Federated

Kaufmann Fund or its security holders for all periods not precluded by any applicable statutes of

limitation through the date of the trial of this case, together with interest, costs, disbursements,

attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the

maximum extent permitted by law; and

     d.     Such other and further relief as may be just and proper.


Dated  November 12, 2004

Respectfully submitted,


                        **ARMSTRONG ALLEN, PLLC**

                        Jerome A. Broadhurst
                        (Tennessee BPR No. 12529)

                        Charles D. Reaves
                        (Tennessee BPR No. 22550)

                        80 Monroe Avenue, Suite 700
                        Memphis, Tennessee 38103-2467
                        (901) 523-8211
                        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 12$^h$ day of November, 2004, a copy of the foregoing Order

has been served via U.S. Mail, postage prepaid upon:

Sam L. Crain, Jr.
**Burch, Porter & Johnson, PLLC**
130 North Court Avenue
Memphis, TN 38103
Telephone: (901) 524-5000

Thomas L. Allen
Perry A. Napolitano
**Reed Smith LLP**
435 Sixth Avenue
Pittsburgh, PA 15219

Jerome A. Broadhurst

90

# EXHIBIT A

# Part 3 of 3

# EXHIBIT A

Page 23 from Post-Effective Amendment No.45 to the Registration Statement on Form N-1A of The Kaufmann Fund, Inc., ("Old Kaufmann"), dated March 11, 1996 as filed with the U.S. Securities and Exchange Commission, showing a portion of the Prospectus of The Kaufmann Fund, Inc.

Page 15 from Post-Effective Amendment No. 51 to the Registration Statement on Form N-1A of The Kaufmann Fund, Inc., ("Old Kaufmann"), dated April 28, 2000, as filed with the U.S. Securities and Exchange Commission, showing a portion of the Prospectus of The Kaufmann Fund, Inc.

Pages 26 and 27 from Post-Effective Amendment No. 51 to the Registration Statement on Form N-1A of The Kaufmann Fund, Inc., dated April 28, 2000, as filed with the U.S. Securities and Exchange Commission, showing a portion of the Statement of Additional Information of The Kaufmann Fund, Inc.

Edgemont will receive a fee, payable monthly, for the performance of its services at an annual rate of 1-1/2% of the average net assets of the Fund. The fee will be accrued daily for the purpose of determining the offering and redemption price of the Fund's shares. The advisory fee is higher than that charged by most other management investment companies.

The Fund's total expenses for the year ending December 31, 1995, before expense reimbursement were $54,141,619; the net expenses after reimbursement were $50,641,249 or 2.17% of average net assets after expense reimbursement.

### PURCHASE OF FUND SHARES

BY MAIL

ALL PURCHASES MADE BY CHECK SHOULD BE IN U. S. DOLLARS AND MADE PAYABLE TO THE KAUFMANN FUND, INC. OR IN THE CASE OF A RETIREMENT ACCOUNT THE CUSTODIAN. THIRD PARTY CHECKS EXCEPT THOSE PAYABLE TO AN EXISTING SHAREHOLDER WHO IS A NATURAL PERSON (AS OPPOSED TO A CORPORATION OR PARTNERSHIP) AND CHECKS DRAWN ON CREDIT CARD ACCOUNT WILL NOT BE ACCEPTED.

Shares of the Fund may be purchased at the per share net asset value (see p. ___ ) by sending a completed subscription Application (included in the Prospectus or obtainable from the Fund) to the Transfer Agent, accompanied by a check payable to The Kaufmann Fund, Inc. in payment for shares. Subscription Applications sent to the Fund will be forwarded to the Transfer Agent, and will not be effective until received by the Transfer Agent. The price at which the shares will be purchased will be their net asset value as determined after receipt of such subscription by the Transfer Agent. The minimum initial investment by a shareholder is $1,500 ($500 for IRA Accounts and accounts opened under the Automatic Investment Plan) or such lower amount as the Board of Directors of the Fund may, time to time, establish. Subsequent purchases by mail (minimum of $100) may be made by sending to the Transfer Agent the stub from the shareholder statement with the shareholder's full name and account number along with a check payable to The Kaufmann Fund, Inc. The Fund will not accept mail orders without payment enclosed, nor will the Fund accept a conditional purchase order. THE FUND RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO REJECT ANY SUBSCRIPTION.

14

<PAGE>

BY TELEPHONE (ONLY FOR INVESTORS WHO HAVE MADE A WRITTEN ELECTION TO DO SO - SEE "GENERAL" BELOW)

Subsequent investments may be made by telephone by calling the Transfer Agent at (800) 261-0555. Telephone purchase orders from existing shareholders may be placed in an amount ($1,000 minimum or such lower amount as may be established by the Board of Directors) not exceeding $10,000 or seven times the shareholder's then current account balance, whichever is less. Telephone orders will be taken in dollar amounts only, for full and fractional shares. Payment for shares

connection with the sale and distribution of its shares of up to 0.75% of the average daily net assets. Since this fee is paid on an ongoing basis, it may cost more than other types of sales charges over time. The Fund has also adopted a service plan. This plan allows the Fund to reimburse broker-dealers for providing services and maintenance of shareholder accounts. This annual service fee cannot exceed 0.25% of the Fund's average daily net assets.

PORTFOLIO MANAGEMENT
--------------------------------------------------------------------------
THE DAY TO DAY INVESTMENT OPERATIONS OF THE FUND ARE HANDLED BY MR. HANS P. UTSCH, CHAIRMAN OF THE BOARD AND SECRETARY OF EDGEMONT ASSET MANAGEMENT CORP., AND MR. LAWRENCE AURIANA, PRESIDENT AND TREASURER. MR. UTSCH HAS BEEN ENGAGED IN THE SECURITIES BUSINESS SINCE 1962, AND MR. AURIANA SINCE 1965. MESSRS. UTSCH AND AURIANA CO-FOUNDED EDGEMONT IN AUGUST, 1984 AND HAVE MANAGED THE FUND SINCE MARCH 15, 1985.
--------------------------------------------------------------------------

<PAGE>

FINANCIAL HIGHLIGHTS

    The financial highlights will help you understand the Fund's financial performance for the past five years. Certain information reflects financial results for a single Fund share. Total return shows how much your investment in the Fund increased or decreased during each period, assuming you reinvested all dividends and distributions. Sanville & Company, independent auditors, audited this information. Their report is included in the Fund's annual report, which is available upon request.

SELECTED DATA FOR A SHARE OUTSTANDING THROUGHOUT EACH YEAR
<TABLE>
<CAPTION>

|  | YEAR | |
|---|---|---|
|  | 1999 | 1998 |
| <S> | <C> | <C> |
| NET ASSET VALUE, BEGINNING OF YEAR | $  5.68 | $  6.37 |
| Income from Investment Operations: |  |  |
|   Net Investment Income (Loss) | (0.060) | (0.040) |
|   Net Realized and Unrealized Gain (Loss) on Investments | 1.316 | 0.017 |
|  | ---------------- | ---------------- |
| Total Income from Investment Operations | 1.256 | (0.023) |
| Less Distributions: |  |  |
|   From Net Investment Income | -- | -- |
|   From Net Realized Gains | 0.986 | 0.667 |
|  | ---------------- | ---------------- |
| Total Distributions | 0.986 | 0.667 |
| NET ASSET VALUE, END OF YEAR | $  5.95 | $  5.68 |
| TOTAL RETURN (a) | 26.01% | 0.72% |
| RATIOS AND SUPPLEMENTAL DATA: |  |  |
| Net Assets, End of Year (in millions) | $ 3,476 | $ 4,621 |
| Ratio of Expenses (after expense reimbursement) to |  |  |
|   Average Net Assets | 1.95% | 1.96% |
| Ratio of Interest Expense to Average Net Assets | 0.01% | 0.01% |
|  | ---------------- | ---------------- |

| Director | Aggregate Compensation | Retirement Benefits | Tota |
|----------|------------------------|---------------------|------|
| <S> | <C> | <C> | |
| Hans P. Utsch       ......... | $           0 | $           0 | |
| Lawrence E. Auriana ....... | 0 | 0 | |
| Roger E. Clark      ......... | 65,000 | 0 | |
| Pauline Gold        ......... | 56,000 | 0 | |
| Gerald M. Grosof    ......... | 50,000 | 0 | |
| Leon Lebensbaum     ......... | 65,000 | 0 | |

</TABLE>


Code of Ethics

The Fund and its investment advisor each have adopted a Code of Ethics. This
Code permits personnel, subject to the Code, to invest in securities including
those that may be purchased or held by the Fund. However, such personal
investing must be pre-approved by the Fund's compliance officer and is subject
to certain restrictions designed to protect the interests of Fund shareholders.


PRINCIPAL STOCKHOLDERS

At March 31, 2000, Charles Schwab & Co., Inc., 333 Bush Street, San Francisco,
California 94104, and National Financial Services Corp., 82 Devonshire Street,
Boston, Massachusetts 02109, were owners of

10

<PAGE>

more than 5% of the Fund's outstanding shares, owning 16% and 7%, respectively.
These shares were held on behalf of undisclosed investors.

INVESTMENT ADVISORY SERVICES

Edgemont Asset Management Corp., incorporated in New York in August 1984, and
having its principal office at 140 East 45th Street, 43rd Floor, New York, New
York 10017; serves solely as the Fund's investment advisor. Messrs. Utsch and
Auriana are the sole shareholders and control persons of Edgemont.

At a Board of Directors' meeting held in October 1999, the Investment Advisory
Agreement between the Fund and Edgemont was approved for an additional one-year
term. This agreement will continue in effect until October 31, 2000, and for
successive annual periods, provided that such continuance is specifically
approved at least annually. The agreement must be approved by: (a) those
Directors who are not interested persons of the Fund or Edgemont, cast in
person, at a meeting called for the purpose of voting on such approval, or (b)
the vote of a majority of the Fund's outstanding voting shares. The Investment
Advisory Agreement may be terminated at any time, without penalty, upon sixty
days written notice, by the vote of a majority of the Fund's outstanding voting
shares, by the vote of a majority of the Fund's Board of Directors or by
Edgemont. This agreement will automatically terminate in the event of its
assignment.

As investment advisor, Edgemont determines the composition of the Fund's
portfolio, the nature and timing of the changes therein and the manner of
implementing such changes. Also provided are research and other related
services. The advisor performs such duties in accordance with directions
received from the Fund's Board of Directors. Edgemont furnishes to the Fund, at

no extra cost, the services of Edgemont's officers and employees, some who may be duly elected executive officers or directors of the Fund.

Pursuant to the Investment Advisory Agreement, the Fund is obligated to pay Edgemont a management fee equal to 1.5% of the Fund's average daily net assets. Edgemont received management fees from the Fund of $50,896,955, $79,655,324 and $85,089,829 for the years ended 1999, 1998 and 1997, respectively.

The Fund is responsible for effecting sales and redemptions of its shares, for determining the net asset value thereof and for all of its other operations. The Fund pays all administrative and other expenses attributable to its operations and transactions, including; transfer agent fees, custodian fees, legal fees, administrative and clerical services, auditing fees, services rendered, printing, supplies, postage, state blue sky filings, taxes, directors fees and expenses, and interest on bank loans.

In the past, as a condition of qualifying to sell the Fund shares in certain jurisdictions, Edgemont was required to reimburse the Fund for certain annual expenses that exceeded $650,000. Although it is no longer required to do so, Edgemont, has voluntarily agreed to provide this reimbursement and is expected to continue to do so in the future. Edgemont reimbursed Fund expenses in the amounts of $5,168,466, $5,697,251 and $6,589,322 for the years ended 1999, 1998 and 1997, respectively.

The Fund's total expenses for the year ending December 31, 1999, before the expense reimbursement, were $71,335,382; the net expenses after reimbursement were $66,166,916 or 1.95% of average net assets.

11

<PAGE>

## BROKERAGE ALLOCATION

Hans P. Utsch and Lawrence E. Auriana, as portfolio managers, are primarily responsible for placing the portfolio brokerage business of the Fund. In all brokerage orders, the managers seek the most favorable prices and executions. Determining what may constitute the most favorable price and execution in a brokerage order involves a number of factors, including the overall direct net economic result to the Fund (involving both price paid or received and any commissions or other costs paid) and the efficiency with which the transaction is effected. Edgemont also considers the ongoing brokerage and research services (as those terms are defined in Section 28(e) of the Securities Exchange Act of 1934) provided to the Fund. Edgemont is authorized to pay broker-dealers a commission for executing a particular transaction for the Fund, which may be in excess of the amount of commission another broker-dealer would have charged; if Edgemont determines, in good faith, that such commission is reasonable in relation to the value of the brokerage and research services provided by such broker-dealer, viewed in terms of the particular transaction or of the overall benefits to the Fund. For the year ended December 31, 1999, the Fund paid brokerage commissions in the amount of $9,731,633 to brokers that provided Edgemont with research services. These commissions were paid for securities transactions valued at $3,364,151,202.

A person provides brokerage and research services insofar as they: (1) furnish a service, either directly or through publications or writings, as to the value of securities, the advisability of purchasing or selling securities and the availability of purchasers and sellers of securities; (2) furnishes analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts; (3) effects securities

# EXHIBIT B

Page 25 from Post-Effective Amendment No. 65 to the Registration Statement on Form N-1A of Federated Equity Funds, dated January 5, 2004, as filed with the Securities and Exchange Commission, showing a portion of the Prospectus of Federated Kaufmann Fund.

Page 83 from the Annual Report to Shareholders of Federated Equity Funds on Form N-CSR dated October 31, 2003, as filed with the U.S. Securities and Exchange Commission, relating to Federated Kaufmann Fund.

the full price for the Shares and then receive a portion of the price back in the form of a taxable distribution, whether or not you reinvest the distribution in Shares. Therefore, you should consider the tax implications of purchasing Shares shortly before the Fund declares a dividend or capital gain. Contact your investment professional or the Fund for information concerning when dividends and capital gains will be paid.

</R>

## ACCOUNTS WITH LOW BALANCES

Due to the high cost of maintaining accounts with low balances, non-retirement accounts may be closed if redemptions or exchanges cause the account balance to fall below the minimum initial investment amount. Before an account is closed, you will be notified and allowed 30 days to purchase additional Shares to meet the minimum.

## TAX INFORMATION

The Fund sends an annual statement of your account activity to assist you in completing your federal, state and local tax returns. Fund distributions of dividends and capital gains are taxable to you whether paid in cash or reinvested in the Fund. Dividends are taxable as ordinary income; capital gains are taxable at different rates depending upon the length of time the Fund holds its assets.

Fund distributions are expected to be primarily capital gains. Redemptions and exchanges are taxable sales. Please consult your tax adviser regarding your federal, state and local tax liability.

# Who Manages the Fund?

<R>

The Board governs the Fund. The Board selects and oversees the Adviser, Federated Equity Management Company of Pennsylvania. The Adviser manages the Fund's assets, including buying and selling portfolio securities. Federated Advisory Services Company (FASC), an affiliate of the Adviser, provides research, quantitative analysis, equity trading and transaction settlement and certain support services to the Adviser. The fee for these services is paid by the Adviser and not by the Fund.

</R>

<R>

The Adviser has delegated daily management of the Fund to the Sub-Adviser, Federated Global Investment Management Corp., who is paid by the Adviser and not by the Fund. The address of the Adviser and FASC is Federated Investors Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222-3779. Correspondence regarding the Sub-Adviser should be sent in care of the same address.

</R>

<R>

The Adviser, Sub-Adviser and other subsidiaries of Federated advise approximately 138 mutual funds

FEDERATED EQUITY FUNDS

deferral of losses from wash sales, passive foreign investment companies and partnership investments.

At October 31, 2003, the cost of investments for federal tax purposes was $4,867,655,864. The net unrealized appreciation of investments for federal tax purposes was $1,521,427,971. This consists of net unrealized appreciation from investments for those securities having an excess of value over cost of $1,631,634,481 and net unrealized depreciation from investments for those securities having an excess of cost over value of $110,206,510.

At October 31, 2003, the Fund had a capital loss carryforward of $47,057,503, which will reduce the Fund's taxable income arising from future net realized gains on investments, if any, to the extent permitted by the Code and thus will reduce the amount of distributions to shareholders which would otherwise be necessary to relieve the Fund of any liability for federal tax. Pursuant to the Code, such capital loss carryforward will expire as follows:

| Expiration Year | Expiration Amount |
|---|---|
| 2009 | $46,671,390 |
| 2010 | $ 386,113 |

As a result of the tax-free transfer of assets from Riggs Small Company Stock Fund, Federated Kaufmann Small Cap Fund and Federated Aggressive Growth Fund to the Fund, certain capital loss carryforwards listed above may be limited.

## 6. INVESTMENT ADVISER FEE AND OTHER TRANSACTIONS WITH AFFILIATES

### Investment Adviser Fee

Federated Investment Management Company, the Fund's investment adviser (the "Adviser"), receives for its services an annual investment adviser fee equal to 1.425% of the Fund's average daily net assets. The Adviser may voluntarily choose to waive any portion of its fee. The Adviser can modify or terminate this voluntary waiver at any time at its sole discretion.

Pursuant to an Exemptive Order issued by the Securities and Exchange Commission, the Fund may invest in Prime Value Obligations Fund which is managed by the Adviser. The Adviser has agreed to reimburse certain investment adviser fees as a result of these transactions. Income distributions earned by the fund are recorded as income in the accompanying financial statements and totaled $4,893,951 for the period.

Under the terms of a sub-adviser agreement between the Adviser and Federated Global Investment Management Corp. ("FGIMC"), FGMIC receives an annual fee from the Adviser equal to 1.175% of the Fund's average daily net assets. In addition, FGIMC may voluntarily choose to reduce its compensation. For year ended October 31, 2003, FGIMC earned a sub-adviser fee of $43,597,007.

### Administrative Fee

Federated Services Company ("FServ"), under the Administrative Services Agreement ("Agreement"), provided the Fund with administrative personnel and services. The fee paid to FServ is based on the

# EXHIBIT C

Page 21 from the Annual Report to Shareholders of The Kaufmann Fund, Inc. ("Old Kaufmann") on Form N-30D, dated December 31, 2000, as filed with the U.S. Securities and Exchange Commission.



of the Fund. Certain officers and directors of the Fund are affiliated with
Edgemont. Edgemont's investment advisory fee is calculated on an annual
basis at 1.5% of the Fund's average net assets. For the year ended December
31, 2000, the Fund incurred investment advisory fees of $54,426,558.
Edgemont has voluntarily agreed to reimburse the Fund for expenses, to the
extent of the investment advisory fee, if the Fund's annual expenses (other
than brokerage commissions, capital items, interest, taxes, extraordinary
items and other excludable items) are in excess of $650,000. A
reimbursement of $4,500,662 was made for the year ended December 31, 2000.
Edgemont has voluntarily agreed to continue to provide this reimbursement
in the future.

DISTRIBUTION FEE

   The Fund has adopted a Plan pursuant to Rule 12b-1 under the 1940 Act
whereby the Fund or Edgemont may finance activities which are primarily
intended to result in the sale of the Fund's shares, including, but not
limited to: advertising, printing of prospectuses and reports for
prospective shareholders, preparation and distribution of advertising
materials and sales literature, and payments to dealers and shareholder
servicing agents who enter into agreements with the Fund or Edgemont. The
Fund or Edgemont may incur such distribution expenses at the rate of 0.75%
per annum on the Fund's average net assets. For the year ended December 31,
2000, distribution expenses of $13,062,374 were incurred by the Fund,
equivalent to 0.36% per annum of the Fund's average net assets.

REDEMPTION FEE

   The Fund imposes a redemption fee of 0.2% on the redemption price of the
Fund's capital stock shares redeemed, if such shares were purchased after
February 1, 1985. The redemption fee is applied to the Fund's expenses for
providing redemption services, including, but not limited to: transfer
agent fees, postage, printing, telephone and related employment costs. Any
excess fee proceeds are added to the Fund's assets. For the year ended
December 31, 2000, redemption fees of $1,398,147 were allocated to cover
the cost of redemptions. Excess fee proceeds of $12,707 were added to the
Fund's assets.

BROKERAGE COMMISSIONS

   The Fund places a portion of its portfolio transactions with Bowling Green
Securities, Inc. (Bowling Green). During 2000, $20,000 of brokerage
commissions were paid to Bowling Green. Certain officers and directors of
the Fund are affiliated with Bowling Green.

10 COMMITMENTS AND CONTINGENCIES

   In the course of pursuing its investment philosophy, the Fund sometimes
invests in limited partnerships and limited liability companies. These
entities often require the Fund to commit to a total dollar amount to be
invested. The actual investments are usually made in installments over a
period of time. At December 31, 2000, the Fund had total commitments to
limited partnerships and limited liability companies of $39,900,000; of
this amount $21,634,900 was actually invested by the Fund leaving the Fund
contingently liable for additional investments of $18,265,100.

11 PROPOSED AGREEMENT AND PLAN OF ORGANIZATION

   On October 20, 2000, Edgemont, the Fund's investment advisor, reached a
definitive agreement with Federated Investors, Inc. (Federated) for the

# EXHIBIT D

Page 17 from the Annual Report to Shareholders of The Kaufmann Fund, Inc. ("Old Kaufmann") on Form N-30D, dated December 31, 1999, as filed with the U.S. Securities and Exchange Commission.

purchased to cover short sales and the proceeds from securities sold short were $370,820,433 and $132,855,321, respectively. At December 31, 1999, there were no securities sold short.

3  INVESTMENT ADVISORY FEE AND OTHER TRANSACTIONS WITH AFFILIATES

INVESTMENT ADVISORY FEE

Edgemont Asset Management Corporation (Edgemont) is the investment advisor of the Fund. Certain officers and directors of the Fund are affiliated with Edgemont. Edgemont's investment advisory fee is calculated on an annual basis at 1.50% of the Fund's average net assets. For the year ended December 31, 1999, the Fund incurred investment advisory fees of $50,896,955. Edgemont has voluntarily agreed to reimburse the Fund for expenses, to the extent of the investment advisory fee, if the Fund's annual expenses (other than brokerage commissions, capital items, interest, taxes, extraordinary items and other excludable items) are in excess of $650,000. A reimbursement of $5,168,466 was made for the year ended December 31, 1999. Edgemont has voluntarily agreed to continue to provide this reimbursement in the future.

DISTRIBUTION FEE

The Fund has adopted a Plan pursuant to Rule 12b-1 under the 1940 Act whereby the Fund or Edgemont may finance activities which are primarily intended to result in the sale of the Fund's shares, including, but not limited to: advertising, printing of prospectuses and reports for prospective shareholders, preparation and distribution of advertising materials and sales literature, and payments to dealers and shareholder servicing agents who enter into agreements with the Fund or Edgemont. The Fund or Edgemont may incur such distribution expenses at the rate of 0.75% per annum on the Fund's average net assets. For the year ended December 31, 1999, distribution expenses of $12,215,138 were incurred by the Fund, equivalent to 0.36% per annum of the Fund's average net assets.

REDEMPTION FEE

The Fund imposes a redemption fee of 0.2% on the redemption price of the Fund's capital stock shares redeemed, if such shares were purchased after February 1, 1985. The redemption fee is applied to the Fund's expenses for providing redemption services, including, but not limited to: transfer agent fees, postage, printing, telephone and related employment costs. Any excess fee proceeds are added to the Fund's assets. For the year ended December 31, 1999, redemption fees of $1,634,869 were allocated to cover the cost of redemptions. Excess fee proceeds of $2,181,913 were added to the Fund's assets.

BROKERAGE COMMISSIONS

The Fund places a portion of its portfolio transactions with Bowling Green Securities, Inc. During 1999, $50,100 of brokerage commissions were paid to Bowling Green. Certain officers and directors of the Fund are affiliated with Bowling Green.

4  SERVICE FEES

The Fund has an Authorization Agreement for the payment of service fees, not to exceed 0.25% per annum of the Fund's average net assets, to broker-dealers that provide liaison services to investors, such as responding to client inquiries and providing information on investments.

# EXHIBIT E

Pages 79 and 80 from Post-Effective Amendment No. 65 to the Registration Statement on Form N-1A of Federated Equity Funds, dated January 5, 2004, as filed with the Securities and Exchange Commission, showing a portion of the Statement of Additional Information of Federated Kaufmann Fund.

o    following the death or post-purchase disability, as defined in Section 72(m)(7) of the Internal Revenue Code of 1986, of the last surviving shareholder; .

o    representing minimum required distributions from an Individual Retirement Account or other retirement plan to a shareholder who has attained the age of 70 1/2;

o    of Shares that represent a reinvestment within 120 days of a previous redemption;

o    of Shares held by the Trustees, employees, and sales representatives of the Fund, the Adviser, the Distributor and their affiliates; employees of any investment professional that sells Shares according to a sales agreement with the Distributor; and the immediate family members of the above persons;

o    of Shares originally purchased through a bank trust department, a registered investment adviser or retirement plans where the third party administrator has entered into certain arrangements with the Distributor or its affiliates, or any other investment professional, to the extent that no payments were advanced for purchases made through these entities;

o    which are involuntary redemptions processed by the Fund because the accounts do not meet the minimum balance requirements; and

Class B Shares Only

o    which are qualifying redemptions of Class B Shares under a Systematic Withdrawal Program.

To keep the sales charge as low as possible, the Fund redeems your Shares in this order:

o    Shares that are not subject to a CDSC; and

o    Shares held the longest (to determine the number of years your Shares have been held, include the time you held shares of other Federated funds that have been exchanged for Shares of this Fund).

The CDSC is then calculated using the share price at the time of purchase or redemption, whichever is lower.

</R>

SPECIAL REDEMPTION AND EXCHANGE INFORMATION (CLASS K SHARES)

Class K Shares are redeemable at a price equal to 99.8% of the then current NAV per share. This 0.2% reduction, referred to in the prospectus and this SAI as a redemption/exchange fee, directly affects the amount a shareholder who is subject to the reduction receives upon exchange or redemption. It is intended to encourage long-term investment in the Fund, to offset transaction and other expenses caused by redemptions, and to facilitate portfolio management. The fee will be applied to offset expenses incurred or amounts expended in connection with a redemption or exchange of Class K Shares, with any balance paid over to the Fund; the fee is not a deferred sales charge, nor is it paid to the Adviser or its affiliates. The Fund reserves the right to modify the terms of or terminate this fee at any time.

The redemption/exchange fee will be waived for shares purchased through

FEDERATED EQUITY FUNDS

employer-sponsored retirement plans, such as 401(k) plans. However, if shares are purchased for a retirement plan account through a broker, financial institution, or other intermediary maintaining an omnibus account for the shares, the waiver may not apply. (Before purchasing shares, please check with your account representative concerning the availability of the fee waiver.) In addition, this waiver does not apply to individual retirement accounts, such as Traditional, Roth and SEP-IRAs.

HOW IS THE FUND SOLD?

Under the Distributor's Contract with the Fund, the Distributor (Federated Securities Corp.) offers Shares on a continuous, best--efforts basis.

FRONT-END SALES CHARGE REALLOWANCES

<R>

The Distributor receives a front-end sales charge on certain Share sales. The Distributor pays a portion of this charge to investment professionals that are eligible to receive it (the "Dealer Reallowance") and retains any remaining portion of the front-end sales charge.

When an investment professional's customer purchases Shares, the investment professional may receive a Dealer Reallowance as follows:

| Class A Shares Purchase Amount | Dealer Reallowance as a percentage of Public Offering Price |
|---|---|
| Less than $50,000 | 5.00% |
| $50,000 but less than $100,000 | 4.00% |
| $100,000 but less than $250,000 | 3.25% |
| $250,000 but less than $500,000 | 2.25% |
| $500,000 but less than $1 million | 1.80% |
| $1 million or greater | 0.00% |

-----------------------------------------------------------------------

| Class C Shares | Dealer Reallowance as a Percentage of Public Offering Price |
|---|---|
| All Purchase Amounts | 1.00% |

ADVANCE COMMISSIONS

When an investment professional's customer purchases Shares, the investment professional may receive an advance commission as follows:

Class A Shares (for purchases over $1 million)

| Purchase Amount | Advance Commission as a Percentage of Public Offering Price |
|---|---|
| First $1 million - $5 million | 0.75% |
| Next $5 million - $20 million | 0.50% |
| Over $20 million | 0.25% |

Advance commissions are calculated on a year by year basis based on amounts

# EXHIBIT F

Page 85 from the Annual Report to Shareholders of Federated Equity Funds on Form N-CSR dated October 31, 2003, as filed with the U.S. Securities and Exchange Commission, relating to Federated Kaufmann Fund.

For the fiscal year ended October 31, 2003, FSC the principal distributor retained $618,567 in sales charges from the sale of Class A Shares. FSC also retained $41,532 of contingent deferred sales charges relating to redemptions of Class C Shares. See "What Do Shares Cost?" in the Prospectus.

## Shareholder Services Fee

Under the terms of a Shareholder Services Agreement with Federated Shareholder Services Company ("FSSC"), the Fund will pay FSSC up to 0.25% of average daily net assets of the Fund for the period. The fee paid to FSSC is used to finance certain services for shareholders and to maintain shareholder accounts. FSSC may voluntarily choose to waive any portion of its fee. FSSC can modify or terminate this voluntary waiver at any time at its sole discretion.

## Redemption Fee

The Fund's Class K Shares imposes a redemption fee of 0.20% on the redemption price of the Fund's Class K Shares capital stock shares redeemed, if such shares were purchased after February 1, 1985. The redemption fee is applied to the Fund's Class K Shares expenses for providing redemption services, including, but not limited to: transfer agent fees, postage, printing, telephone and related employment costs. Any excess fee proceeds are added to the Fund's assets. For the year ended October 31, 2003, redemption fees of $447,447 were allocated to cover the cost of redemptions.

## Commitments and Contingencies

In the course of pursuing its investment philosophy, the Fund sometimes invests in limited partnerships and limited liability companies. These entities often require the Fund to commit to a total dollar amount to be invested. The actual investments are usually made in installments over a period of time. At October 31, 2003, the Fund had total commitments to limited partnerships and limited liability companies of $48,744,340; of this amount $35,354,879 was actually invested by the Fund leaving the Fund contingently liable for additional investments of $13,389,461.

## Transfer and Dividend Disbursing Agent Fees and Expenses

FServ, through its subsidiary FSSC, serves as transfer and dividend disbursing agent for the Fund. The fee paid to FSSC is based on the size, type and number of accounts and transactions made by shareholders. FSSC may voluntarily choose to waive any portion of its fee. FSSC can modify or terminate this voluntary waiver at any time at its sole discretion.

## Portfolio Accounting Fees

FServ maintains the Fund's accounting records for which it receives a fee. The fee is based on the level of the Fund's average daily net assets for the period, plus out-of-pocket expenses. FServ may voluntarily choose to waive any portion of its fee. FServ can modify or terminate this voluntary waiver at any time at its sole discretion.

## General

Certain of the Officers and Trustees of the Trust are Officers and Directors or Trustees of the above companies.

# EXHIBIT G

Pages 28 and 29 from Post-Effective Amendment No. 51 to the Registration Statement on Form N-1A of The Kaufmann Fund, Inc. ("Old Kaufmann"), dated April 28, 2000, as filed with the U.S. Securities and Exchange Commission, showing a portion of the Statement of Additional Information of The Kaufmann Fund, Inc.

transactions and performs functions incidental thereto (such as clearance, settlement or custody) as required by rules of the Securities and Exchange Commission or the NASD, of which such person is a member or is a person associated with an NASD member firm.

As permitted by Section 17(e) of the Investment Company Act and Rule 17e-1 there under, Bowling Green Securities may act as a broker to the Fund in connection with the sale of various securities traded on an exchange. Bowling Green Securities is an affiliate of Messrs. Utsch and Auriana; Hans P. Utsch is the sole shareholder of Bowling Green and Lawrence Auriana is a registered representative thereof. Pursuant to conditions and procedures adopted by the Board of Directors of the Fund, in accordance with Rule 17e-1, Edgemont must ascertain that any commissions, fees or other remuneration paid to Bowling Green Securities are reasonable and fair compared to those of other brokers in connection with transactions involving similar securities purchased or sold on a securities exchange during a comparable period of time.

Bowling Green Securities is required to provide regular brokerage services to the Fund at competitive rates that are in accordance with Section 11(a) of the Securities Exchange Act of 1934. The Securities and Exchange Commission is authorized to regulate or prohibit broker-dealers such as Bowling Green Securities from effecting transactions in securities owned by an account such as the Fund, over which the principals of Bowling Green Securities have investment discretion. Bowling Green Securities cannot buy or sell portfolio securities as a principal from or to the Fund. The Fund is also permitted to purchase underwritten securities during the existence of an underwriting syndicate of which Bowling Green Securities is a member, subject to restrictions of applicable law and the Fund's policies.

To the extent that portfolio transactions are effected through Bowling Green Securities as broker, any activity will be beneficial to that firm (and its principal shareholder, Mr. Utsch) because of brokerage commissions payable in connection therewith. For 1999, 1998 and 1997, the Fund paid $9,731,633, $12,669,343, and $10,106,929, respectively, in brokerage commissions. Of these amounts $50,100 $27,000 and $45,000, respectively, were paid to Bowling Green Securities. The Board receives quarterly reports, prepared by the Fund's independent public accountants, to review the exchange trades executed by Bowling

12

<PAGE>

Green Securities at the end of each quarter. The Board continues to review the appropriateness of the conditions and procedures on an annual basis.

POTENTIAL CONFLICTS

The affiliations of Hans P. Utsch and Lawrence E. Auriana as (1) a Director and Officer of the Fund; (2) a 50% Shareholder and Officer of Edgemont; and (3) a sole shareholder (Mr. Utsch) and affiliate (Mr. Auriana) of Bowling Green Securities; create, for each of them, an inherent potential conflict of interest. The Fund's Directors, who are not interested persons, are aware of these potential conflicts and do not perceive them as detrimental to the Fund.

DISTRIBUTION PLAN

The Fund has adopted a Distribution Plan, pursuant to Rule 12b-1 under the 1940 Act, whereby the Fund or Edgemont may finance activities that are primarily

intended to result in the sale of Fund shares, including, but not limited to: advertising, printing and mailing of prospectuses and reports for prospective shareholders, printing and distribution of advertising material and sales literature and the compensation of persons primarily engaged in the sale and marketing of the Fund's shares. According to the Plan, the Fund may incur distribution expenses of up to .75% per annum of the Fund's average net assets. For the year ended December 31, 1999, distribution expenses incurred by the Fund were $12,215,138; equivalent to .36% per annum of the Fund's average net assets.

### Distribution Expenses for the year ended December 31, 1999

| | |
|---|---:|
| Advertising-Print | $ 2,801,855 |
| Broker-dealer fees | 2,314,164 |
| Advertising-Broadcast | 1,982,576 |
| Advertising-Internet | 1,532,136 |
| Printing | 1,298,507 |
| Postage | 1,117,716 |
| Professional and other services rendered | 449,430 |
| Employee compensation | 384,117 |
| List Rentals | 257,099 |
| Other | 77,538 |
| Total | $12,215,138 |

The Distribution Plan may not be amended to materially increase the amount the Fund may spend, without shareholder approval. Any material amendments to the Distribution Plan must be approved by the Fund's Board of Directors, including a majority of the directors who are not interested persons, by a vote cast in person at a meeting called for such a purpose. The Board of Directors receives a quarterly report, documenting the amounts and purposes of payments under the Distribution Plan. The Distribution Plan has been approved by the Board of Directors, and will remain in effect until October 31, 2000, unless terminated earlier by a vote of a majority of the Directors, who are not interested persons, or by vote of a majority of the Fund's outstanding shares.

13

<PAGE>

### SPECIAL INVESTOR SERVICES

The Kaufmann/Reserve Fund Money Market Switch Plan
The Fund offers a switch plan that allows shareholders to exchange their Fund shares for shares of equal value of the Reserve Fund, and vice versa. The Fund reserves the right to limit the number of switches made. Either the Fund or the Reserve Fund may terminate the plan at any time. Transfers from the Fund are subject to the redemption fee of .2%.

Automatic Investment Plan (AIP)
Periodic investments in the Fund may be made through an Automatic Investing Plan, for which there is a one-time set-up charge of five dollars. A shareholder may cancel their AIP at any time, without penalty. Since the Fund's shares are subject to fluctuations in both income and market value, investors contemplating an AIP should consider their financial ability to continue such investments and should understand that such a program cannot protect against loss of value in a declining market.

Payroll Deduction Plan
A payroll deduction plan enables an employer to deduct amounts directly from an employee's paycheck for investment into the Fund. Investors should check with their employer for availability of this service.

# EXHIBIT H

Pages 1 and 2 from the joint Prospectus/Proxy Statement of Federated Kaufmann Fund and The Kaufmann Fund, Inc. ("Old Kaufmann") dated January 9, 2001, as filed with the Securities and Exchange Commission as an Exhibit to Form N-SAR for The Kaufmann Fund, Inc. for the period ended June 30, 2001.

```
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>prospectus.txt
<DESCRIPTION>PROSPECTUS
<TEXT>
```

THE KAUFMANN FUND, INC.

140 EAST 45TH STREET
NEW YORK, NEW YORK 10017

Dear Shareholder:

The Board of Directors (the "Board") of The Kaufmann Fund, Inc. (the "Kaufmann Fund") is pleased to submit for your vote a proposal to reorganize the Kaufmann Fund into the Federated Kaufmann Fund, a newly organized series of Federated Equity Funds. The Federated Kaufmann Fund would be advised by Federated Investment Management Company, a subsidiary of Federated Investors, Inc. ("Federated Investors" and, together with its subsidiaries, "Federated"). HANS P. UTSCH AND LAWRENCE AURIANA, THE CURRENT PORTFOLIO MANAGERS OF THE KAUFMANN FUND, WILL CONTINUE AS CO-MANAGERS TO BE RESPONSIBLE FOR THE DAY-TO-DAY PORTFOLIO MANAGEMENT OF THE FEDERATED KAUFMANN FUND UNDER EMPLOYMENT CONTRACTS WITH FEDERATED INVESTORS. THE FEDERATED KAUFMANN FUND WOULD HAVE THE SAME INVESTMENT OBJECTIVE AND STRATEGIES AND SUBSTANTIALLY THE SAME INVESTMENT POLICIES AS THE KAUFMANN FUND.

The Board of the Kaufmann Fund and the management of its investment manager, Edgemont Asset Management Corporation ("Edgemont"), believe this reorganization is in the best interests of Kaufmann Fund shareholders.

As a result of the reorganization, you will receive shares of a mutual fund that is part of the Federated Investors family of funds. Federated Investors was established in 1955 and is one of the largest mutual fund investment managers in the United States. It advises 185 mutual funds and separate accounts, which totaled approximately $130 billion in assets as of September 30, 2000, and maintains over 1.3 million shareholder accounts. The reorganization is being proposed in conjunction with the recent decision by Edgemont to sell its mutual fund advisory business to Federated Investors. If the proposal is approved, the Federated Kaufmann Fund would acquire substantially all of the assets of the Kaufmann Fund and assume certain liabilities of the Kaufmann Fund. In return, you would receive Class K Shares of the Federated Kaufmann Fund equal in number and value to the Kaufmann Fund shares you own at the time of the reorganization, and the Kaufmann Fund would be liquidated. In order to effect the reorganization, the Board submits for your approval an Agreement and Plan of Reorganization.

The Board considered various factors in reviewing this proposal on behalf of Kaufmann Fund shareholders, including the following: First, the Board considered the fact that the new Federated Kaufmann Fund will have the same portfolio management team, investment objective and strategies, and substantially the same investment policies as the Kaufmann Fund. Second, because Federated Investors has a much larger mutual fund business, the Board believes the reorganization will likely provide you with the benefit of improved shareholder services. Third, you will not pay a sales charge or a redemption fee to acquire shares of the Federated Kaufmann Fund through the reorganization, nor will you have to pay any front-end sales charges in the future if you wish to add to your investment in the Federated Kaufmann Fund, or acquire Class A Shares

```
<PAGE>
```

of any other mutual fund advised by Federated Investors, assuming that you meet that fund's minimum investment requirements.* Fourth, the Board believes that access to a much larger family of mutual funds will provide you with a convenient way to make investments in other Federated mutual funds. Fifth, as a condition to the proposed transaction, the Federated Kaufmann Fund and the Kaufmann Fund will receive an opinion of counsel to the effect that neither the Federated Kaufmann Fund or the Kaufmann Fund nor the shareholders of the Kaufmann Fund will recognize any gain or loss as a direct result of the reorganization transaction for federal income tax purposes.

Your vote on the transaction is critical to its success. The reorganization of the Kaufmann Fund will occur only if approved by two-thirds of all the votes entitled to be cast on the matter. Whether or not you plan to attend the meeting, please vote your shares by telephone, by the Internet or by mail. Following this letter is a Q&A summarizing the reorganization and information on how to vote your shares. Please read the entire prospectus/proxy statement carefully before you vote.

THE BOARD BELIEVES THAT THE TRANSACTION IS IN THE BEST INTERESTS OF THE KAUFMANN FUND AND ITS SHAREHOLDERS AND UNANIMOUSLY RECOMMENDS THAT YOU VOTE FOR ITS APPROVAL.

Thank you for your prompt attention and participation.

Sincerely,

/s/ Lawrence E. Auriana
-------------------------------------------
Lawrence E. Auriana
Chairman of the Board and Secretary

/s/ Hans P. Utsch
-------------------------------------------
Hans P. Utsch
President and Treasurer

Dated: January 9, 2001

* If you purchased shares of the Kaufmann Fund after February 1, 1985, the current 0.20% redemption fee will continue to apply to redemptions and exchanges into other funds advised by Federated Investors.

2

<PAGE>

# EXHIBIT I

Pages 3 and 4 from the joint Prospectus/Proxy Statement of Federated Kaufmann Fund and The Kaufmann Fund, Inc. ("Old Kaufmann") dated January 9, 2001, as filed with the Securities and Exchange Commission as an Exhibit to Form N-SAR for The Kaufmann Fund, Inc. for the period ended June 30, 2001.

THE KAUFMANN FUND, INC./FEDERATED KAUFMANN FUND
PROXY Q&A

THE FOLLOWING IS IMPORTANT INFORMATION TO HELP YOU UNDERSTAND THE PROPOSAL ON WHICH YOU ARE BEING ASKED TO VOTE. PLEASE READ THE ENTIRE PROSPECTUS/PROXY STATEMENT.

WHY IS THIS REORGANIZATION TAKING PLACE?

The reorganization described in this Prospectus/Proxy Statement is being proposed in conjunction with the sale by Edgemont Asset Management Corporation ("Edgemont"), investment adviser to The Kaufmann Fund, Inc. ("Kaufmann Fund"), of its mutual fund advisory business to Federated Investors, Inc. ("Federated Investors" or "Federated"). In determining to sell Edgemont's mutual fund advisory business, Hans P. Utsch and Lawrence Auriana, Edgemont's sole shareholders, considered Edgemont's ability to remain competitive in an environment where the amount of assets under management was becoming more and more important to running a successful mutual fund business. After such consideration, Messrs. Utsch and Auriana concluded that larger mutual fund companies would be in the best position to offer excellent products and services in the years ahead. Messrs. Utsch and Auriana found that Federated Investors, with $130 billion of assets under management across a broad product line, is in a good position to provide such high-quality services to Kaufmann Fund shareholders. The Board of Directors of the Kaufmann Fund reached the same conclusion after undertaking its own evaluation of Federated Investors.

UPON REORGANIZATION, WILL THE PORTFOLIO MANAGEMENT OF THE FEDERATED KAUFMANN FUND DIFFER FROM THAT OF THE KAUFMANN FUND?

Federated and Edgemont are making every effort to make the reorganization a seamless transaction for the shareholders. MESSRS. UTSCH AND AURIANA, THE CURRENT PORTFOLIO MANAGERS OF THE KAUFMANN FUND, WILL CONTINUE AS CO-MANAGERS TO BE RESPONSIBLE FOR THE DAY-TO-DAY PORTFOLIO MANAGEMENT OF THE FEDERATED KAUFMANN FUND PURSUANT TO EMPLOYMENT CONTRACTS WITH FEDERATED INVESTORS. As Federated employees, they will have access to a wealth of resources to help them manage the Federated Kaufmann Fund that were not previously available to them. In addition, it is expected that the current team of investment professionals at Edgemont will also continue to serve the Federated Kaufmann Fund as Federated employees. Federated Investment Management Company will serve as the Federated Kaufmann Fund's adviser and Federated Global Investment Management Corporation will serve as the Federated Kaufmann Fund's sub-adviser.

WHEN WILL THIS REORGANIZATION OCCUR?

The reorganization is scheduled to take place shortly after it is approved by Kaufmann Fund shareholders. At that time, you will receive new account information on your new ownership in the Federated Kaufmann Fund.

<PAGE>

WHAT DO I HAVE TO DO TO BECOME A SHAREHOLDER IN THE FEDERATED KAUFMANN FUND?

Shareholders are being asked to approve this reorganization through voting at the Special Meeting of Shareholders, which is scheduled to occur at 2:00 p.m. on April 6, 2001. YOUR VOTE IS VERY IMPORTANT. You have the flexibility to cast your vote either by phone, Internet or mail.

At the time of the reorganization, shareholders' accounts will automatically be transferred to the Federated Kaufmann Fund and shareholders will receive Federated Kaufmann Fund Class K Shares equal in number and value to the Kaufmann Fund shares they owned on the day of the reorganization.

Shareholders who hold certificates for their Kaufmann Fund shares are urged to surrender those certificates BEFORE the reorganization occurs.

**WHAT WILL HAPPEN TO MY KAUFMANN FUND ACCOUNT?**

After the reorganization, shareholders will be assigned a new account with the Federated Kaufmann Fund and Kaufmann Fund accounts will be closed. This process will occur automatically, with no action required by you. Each shareholder's financial interest and number of shares will remain the same immediately before and after the reorganization.

**WILL ALL OF MY CURRENT ACCOUNT OPTIONS SUCH AS SYSTEMATIC PURCHASES AND WITHDRAWAL PLANS TRANSFER OVER TO FEDERATED?**

Account servicing features generally will transfer to new Federated accounts. Shortly after the reorganization, shareholders will receive information that further describes these options and Federated's diversified product line and world-class investment management services.

**WHAT BENEFITS WILL I HAVE AS A FEDERATED SHAREHOLDER?**

With over 45 years of investment management experience, Federated has made a significant commitment to the development of world-class investment management strategies and superior shareholder services. Federated has a diversified product line, strong performance history and competitive fund expenses. Shareholders of record at the time of the reorganization will be allowed to acquire Class A Shares of any other Federated mutual fund in the future without paying any front-end sales charge, assuming shareholders meet that new fund's minimum investment requirement. Shareholders who purchased their Kaufmann Fund shares after February 1, 1985 will be charged a 0.20% redemption fee on redemptions, as well as on any exchanges into another Federated mutual fund.

**WILL I INCUR TAX LIABILITY AS A RESULT OF THIS REORGANIZATION?**

The reorganization will be a TAX-FREE event. Shareholders will not recognize any taxable gains or losses pursuant to the proposed transaction. Furthermore, the cost basis and holding period of each fund investment will remain the same.

Of course, shareholders may recognize taxable gains or losses if they redeem or exchange their Kaufmann Fund shares before the reorganization or redeem or exchange their Federated Kaufmann Fund shares after the reorganization.

2

<PAGE>

Shareholders generally will be liable for any taxes that are associated with periodic distributions that occur prior to or after the reorganization, which distributions may include realized gains from sales of portfolio securities. Please note that retirement plans and accounts are generally exempt from such tax consequences, although distributions from tax qualified plans are not exempt from tax consequences.

**WHERE CAN I GET MORE INFORMATION ABOUT THIS REORGANIZATION?**

## EXHIBIT J

**Analyst Report issued by Morningstar, Inc. dated June 14, 2004, as published on its website, www.Morningstar.com**

Federated Kaufmann K Report (KAUFX) | Analyst Research

 MORNINGSTAR.com

♀ Membership | ⧉ About Us | ☰ Pre

Get a **FREE Sony DVD player**   citi



**Home | Portfolio | Stocks | Funds | ETFs | Markets | Tools | Workshops | Personal Finance | Discuss**    PREMIUM

**Fund Reports**    Enter ticker, name or topic [——]    SEARCH    Morningstar Rates over 1,400

Snapshot

Data Interpreter

▷ **Analyst Research**

Morningstar Rating

Total Returns

Tax Analysis

Risk Measures

Portfolio

Management

Fees & Expenses

Purchase Info

| Fund Report | 🗎 |
| Add to Portfolio | 🗀 |
| Email Alert | 🖹 |
| Print | 🖨 |
| Order Reprints | 🖺 |


Buy stocks for $4
shareBUILDER

→

**Federated Kaufmann K KAUFX**    See Fund Family Data ▶▶    Buy sto for

| Analyst Report | Analyst Report Archive |

**Morningstar's Take | 06-14-2004**
by Greg Carlson

> Federated Kaufmann's history of disregard for
> shareholders makes it one to avoid. ←

We remain troubled that this fund's advisor, Federated
Investors, apparently let favored clients improperly trade its
funds, including this offering. Making matters worse,
Federated has been more tight-lipped about what happened
than most other scandal-tainted fund firms. To top it off, the
firm has instituted precious few reforms since the market-
timing allegations came to light, a response that does little
to suggest that Federated is reaffirming its commitment to
long-term shareholders.

Ethical issues aside, this fund would still not merit our
endorsement. True, lead managers Laurence Auriana and
Hans Utsch are skilled, experienced investors who have
parlayed their strategy--which prizes increasing market
share, accelerating earnings growth, and modest valuations-
-into excellent long-term returns. But the fund comes with
too many negatives, the most glaring of which is its
outrageously high price tag. The 1.95% levy for the fund's
closed, no-load K shares (as well as the open, broker-sold A
shares) is topped by only a handful of its mid-growth peers,
all of which are a fraction of this one's size.

Another issue is the fund's girth. At $6.6 billion, it's bigger
than all but four of its rivals. That greatly limits
management's ability to buy small-cap fare, which had
played a significant role here. In fact, this fund began life at
Auriana and Utsch's former firm as a small-growth offering.
However, it grew by leaps and bounds, a result of their

**Morningstar Rating**
★★★★★

**Kudos**
• Strong long-term recor
• Seasoned managemen

**Risks**
• Federated revealed in
November 2003 that it
allowed a number of it:
offerings, including thi:
to be market-timed by
outside hedge fund Car
Capital as part of a
negotiated arrangemer

• The fund's expense rat
very high, particularly
its size.

• Large asset base limits
management's flexibili
executing its strategy.

**Strategy**

Though they'll consider
companies of any size, F
Utsch and Lawrence Auri
invest primarily in small-
mid-cap growth names,
they generally prefer ind
leaders with easy-to-
understand business mo
Hard assets and accelera
rates of earnings growth
also get the duo's attent

Federated Kaufmann K Report (KAUFX) | Analyst Resources



Buy stocks for $4

- No minimums
- No inactivity fees

shareBUILDER

ceaseless marketing and refusal to close the fund, and management was forced into mid-cap territory. The fact that Auriana and Utsch then sold this offering in 2001 to Federated, a firm not known for shareholder friendliness, is further evidence that investors are held in low esteem here. We suggest investors take the hint and seek greener pastures elsewhere.

### See Previous Analyst Reports

| Year | Total Return (%) | +/- Category |
|------|------------------|--------------|
| YTD | -2.22 | 0.49 |
| 2003 | 45.08 | 8.99 |
| 2002 | -21.41 | 6.02 |
| 2001 | 7.85 | 27.79 |
| 2000 | 10.86 | 15.45 |

Data through 07-31-2004

### Fund Family Score for Domestic Stock: 3.1
### Number of Funds Scored: 17

An internal investigation has discovered trading irregularities among Federated funds, casting a shadow over the shop. Federated has stated that it is fully cooperating with the ongoing investigation by the SEC and the New York Attorney General, though it's difficult to determine what effect these activities have had on its fund investors. The firm's press release only vaguely describes the misconduct and fails to name any individuals or funds involved or the potential estimated cost to shareholders.

Even before the scandal broke, Federated wasn't the most impressive fund shop around. The firm's lineup—dominated by its large-cap offerings—has a few standouts, but most have mediocre or poor records, making it difficult to build a decent, diversified portfolio. Federated isn't exactly a model of shareholder friendliness either. The expense ratio for the successful Kaufmann Fund remains outrageously high, and the family has been less than forthcoming about management changes and strategy shifts.

Given the shop's shortcomings and recent revelations of possible wrongdoings, we recommend that investors avoid sending new monies to Federated's offerings.

### Role in Portfolio
Supporting player.

and only rarely will they in companies that aren't profitable.

**Management**
Seasoned. Lawrence Aur and Hans Utsch have ma this offering since its 198 inception and were joine October 2003 by comana Jonathan Art and Mark Bauknight. The team is supported by a small squ analysts.

**Inside Scoop**
Federated has revealed t allowed favored clients, : as hedge fund Canary Partners, to improperly t its funds, including this offering. Meanwhile, management continues t its strategy, which emph both rising earnings grov and modest valuations.

**Analyst Picks**
See what funds our anal recommend in this categ Mid-Cap Growth

Greg Carlson is a fund analyst with Morningstar.com. He can be reached

# EXHIBIT K

Pages 91-93 of the Statement of Additional Information ("SAI") from Post-Effective Amendment No. 65 to the Registration Statement of Federated Equity Funds dated January 5, 2004, covering Federated Kaufmann Fund.

shares or recommend to shareholder
requiring shareholder approval.

| Audit | |
|---|---|
| Thomas G. Bigley | The Audit Committee reviews and re |
| John T. Conroy, Jr. | full Board the independent auditor |
| Nicholas P. Constantakis | to audit the Fund`s financial stat |
| Charles F. Mansfield, Jr. | with the independent auditors peri |

review the results of the audits a
results to the full Board; evaluat
independence of the auditors, revi
regulatory matters that may have a
on the financial statements, relat
policies and programs, and the rel
received from regulators; reviews
internal audit function; reviews c
the Fund's code of conduct/ethics;
valuation issues; monitors inter-f
transactions; reviews custody serv
and investigates any matters broug
Committee's attention that are wit
its duties.

BOARD OWNERSHIP OF SHARES IN THE FUND AND IN THE FEDERATED FAMILY OF INVESTMENT
COMPANIES AS OF DECEMBER 31, 2002

| Interested Board Member Name | Dollar Range of Shares Owned in Fund | Dollar Shares Federated Investment |
|---|---|---|
| John F. Donahue | Over $100,000 | Over |
| J. Christopher Donahue | Over $100,000 | Over |
| Lawrence D. Ellis, M.D. | $1-$10,000 | Over |
| | | |
| Independent Board Member Name | | |
| Thomas G. Bigley | $10,001-$50,000 | Over |
| John T. Conroy, Jr. | None | Over |
| Nicholas P. Constantakis | $10,001-$50,000 | Over |
| John F. Cunningham | None | Over |
| Peter E. Madden | None | Over |
| Charles F. Mansfield, Jr. | None | $50,001 - |
| John E. Murray, Jr., J.D., S.J.D. | None | Over |
| Marjorie P. Smuts | $10,001-$50,000 | Over |
| John S. Walsh | $10,001-$50,000 | Over |

</R>

INVESTMENT ADVISER

The Adviser conducts investment research and makes investment  decisions for the
Fund.

The Adviser is a wholly owned subsidiary of Federated.

The  Adviser  shall not be liable to the Trust or any Fund  shareholder  for any
losses that may be sustained in the purchase,  holding,  or sale of any security
or for  anything  done  or  omitted  by it,  except  acts or  omissions  involving
willful misfeasance,  bad faith, gross negligence,  or reckless disregard of the
duties imposed upon it by its contract with the Trust.

<R>

As required by the 1940 Act, the Fund's Board has reviewed the Fund's investment advisory contract and subadvisory contract. The Board's decision to approve these contracts reflects the exercise of its business judgment on whether to continue the existing arrangements. During its review of these contracts, the Board considers many factors, among the most material of which are: the Fund's investment objectives and long term performance; the Adviser's and subadviser's management philosophy, personnel, and processes; the preferences and expectations of Fund shareholders and their relative sophistication; the continuing state of competition in the mutual fund industry; comparable fees in the mutual fund industry; the range and quality of services provided to the Fund and its shareholders by the Federated organization in addition to investment advisory services; and the Fund's relationship to the Federated funds.

</R>

In assessing the Adviser's and subadviser's performance of its obligations, the Board also considers whether there has occurred a circumstance or event that would constitute a reason for it to not renew an advisory contract. In this regard, the Board is mindful of the potential disruptions of the Fund's operations and various risks, uncertainties and other effects that could occur as a result of a decision to terminate or not renew an advisory contract. In particular, the Board recognizes that most shareholders have invested in the Fund on the strength of the Adviser's industry standing and reputation and in the expectation that the Adviser will have a continuing role in providing advisory services to the Fund.

The Board also considers the compensation and benefits received by the Adviser and subadviser. This includes fees received for services provided to the Fund by other entities in the Federated organization and research services received by the Adviser from brokers that execute fund trades, as well as advisory fees. In this regard, the Board is aware that various courts have interpreted provisions of the 1940 Act and have indicated in their decisions that the following factors may be relevant to an Adviser's compensation: the nature and quality of the services provided by the Adviser, including the performance of the Fund; the Adviser's cost of providing the services; the extent to which the Adviser may realize "economies of scale" as the Fund grows larger; any indirect benefits that may accrue to the Adviser and its affiliates as a result of the Adviser's relationship with the Fund; performance and expenses of comparable funds; and the extent to which the independent Board members are fully informed about all facts bearing on the Adviser's service and fee. The Fund's Board is aware of these factors and takes them into account in its review of the Fund's advisory contract.

The Board considers and weighs these circumstances in light of its substantial accumulated experience in governing the Fund and working with Federated on matters relating to the Federated funds, and is assisted in its deliberations by the advice of independent legal counsel. In this regard, the Board requests and receives a significant amount of information about the Fund and the Federated organization. Federated provides much of this information at each regular meeting of the Board, and furnishes additional reports in connection with the particular meeting at which the Board's formal review of the advisory contracts occurs. In between regularly scheduled meetings, the Board may receive information on particular matters as the need arises. Thus, the Board's evaluation of an advisory contract is informed by reports covering such matters as: the Adviser's investment philosophy, personnel, and processes; the Fund's short- and long-term performance (in absolute terms as well as in relationship to its particular investment program and certain competitor or "peer group"

funds), and comments on the reasons for performance; the Fund's expenses (including the advisory fee itself and the overall expense structure of the Fund, both in absolute terms and relative to similar and/or competing funds, with due regard for contractual or voluntary expense limitations); the use and allocation of brokerage commissions derived from trading the Fund's portfolio securities; the nature and extent of the advisory and other services provided to the Fund by the Adviser and its affiliates; compliance and audit reports concerning the Federated funds and the Federated companies that service them; and relevant developments in the mutual fund industry and how the Federated funds and/or Federated are responding to them.

The Board also receives financial information about Federated, including reports on the compensation and benefits Federated derives from its relationships with the Federated funds. These reports cover not only the fees under the advisory contracts, but also fees received by Federated's subsidiaries for providing other services to the Federated funds under separate contracts (e.g., for serving as the Federated funds' administrator and transfer agent). The reports also discuss any indirect benefit Federated may derive from its receipt of research services from brokers who execute Federated fund trades.

The Board bases its decision to approve an advisory contract on the totality of the circumstances and relevant factors, and with a view to past and future long-term considerations. Not all of the factors and considerations identified above are relevant to every Federated fund, nor does the Board consider any one of them to be determinative. Because the totality of circumstances includes considering the relationship of each Federated fund, the Board does not approach consideration of every Federated fund's advisory contract as if that were the only Federated fund offered by Federated.

<R>

Services Agreement

Federated Advisory Services Company, an affiliate of the Adviser, provides research, quantitative analysis, equity trading and transaction settlement and certain support services to the Adviser. The fee for these services is paid by the Adviser and not by the Fund.

</R>

Other Related Services

Affiliates of the Adviser may, from time to time, provide certain electronic equipment and software to institutional customers in order to facilitate the purchase of Fund Shares offered by the Distributor.

CODE OF ETHICS RESTRICTIONS ON PERSONAL TRADING

As required by SEC rules, the Fund, its Adviser, and its Distributor have adopted codes of ethics. These codes govern securities trading activities of investment personnel, Fund Trustees, and certain other employees. Although they do permit these people to trade in securities, including those that the Fund could buy, they also contain significant safeguards designed to protect the Fund and its shareholders from abuses in this area, such as requirements to obtain prior approval for, and to report, particular transactions.

<R>

VOTING PROXIES ON FUND PORTFOLIO SECURITIES

```
                              GMW_Database(all).ERC
!$ERR$!: - Parsing Error #14 - Missing closing quote or field separator after closing quote
character - field '@None' - line 1664
-------------------------------------------------------------------------------
------------------------------------------------------------------v
}SKB0483863}|}MET00023953}|}MET00023997}|}METMISC6}|}}|}}|}}|}}|}}|}}|}}|}Responsive}|}Highly
Confidential}|}No
Redactions}|}}|}45}|}}|}}|}}|}}|}}|}}|}}|}}|}YES}|}}|}}|}}|}}|}}|}}|}}|}}|}}|}}|}}|}LAS}|}}|}
```

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 FEB 14  PM 2: 48

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

GRETCHEN W. REAVES, on behalf of    )
and for the benefit of FEDERATED    )
KAUFMANN FUND,                      )
                                    )
           Plaintiff,               )
                                    )
v.                                  )        Case No. 04-2475 D/An
                                    )
FEDERATED INVESTORS, INC.,          )
FEDERATED EQUITY MANAGEMENT         )
COMPANY OF PENNSYLVANIA,            )
FEDERATED SECURITIES CORP.,         )
FEDERATED GLOBAL INVESTMENT         )
MANAGEMENT CORP., FEDERATED         )
INVESTMENT MANAGEMENT COMPANY,      )
FEDERATED SERVICES COMPANY, AND     )
FEDERATED SHAREHOLDER SERVICES      )
COMPANY,                            )
                                    )
           Defendants.              )
                                    )

## ORDER GRANTING MOTION OF DEFENDANTS TO TRANSFER

Before the Court is the motion of Defendants Federated Investors, Inc. ("FII"),
Federated Equity Management Company of Pennsylvania ("FEMCOPA"), Federated
Securities Corporation ("FSC"), Federated Global Investment Management Corporation
("FGIMC"), Federated Investment Management Company ("FIMCO"), Federated
Services Company ("FSERCO"), and Federated Shareholder Services Company
("FSSC") to transfer the action pursuant to 28 U.S.C. § 1404(a). The Court has
jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Court grants
Defendants' motion to transfer this case to the United States District Court for the
Western District of Pennsylvania.

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 2-15-2005

42

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff Gretchen Reaves ("Plaintiff"), a resident of Shelby County, Tennessee, owns Class K Shares of the Federated Kaufmann Fund ("Kaufmann Fund"). On June 25, 2004, Plaintiff filed a complaint against Defendants alleging a claim under § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b). The complaint asserts that Defendants 1) continue to charge the discriminatory and excessive redemption fee of .20% to Class K Shareholders of the Kaufmann Fund; 2) charges unjustified, substantial 12b-1 Distribution Fees and Shareholder Service Fees to the closed, non-marketed Class K Shares; 3) charges the excessive investment advisory fee of 1.425% to the Class K Shareholders of the Kaufmann Fund, as compared to other Federated Equity Funds ("FEF"), which is the registered open-end investment company to which the Kaufmann Fund belongs; and 4) charges the excessive total expense ratio of 1.95%, which is the result of the excessiveness of the 1.425% investment advisory fee and the unjustified 12b-1 Distribution Fees and Shareholder Service Fees assessed to Class K Shares.

A Board of Trustees oversees FEF, which is located in Pittsburgh, Pennsylvania. The FEF Board of Trustees governs the Kaufmann Fund and reviews the Fund's investment advisory contracts and distribution agreements. Seven of the twelve FEF Board of Trustees are located in Pittsburgh.

The defendants in this action consist of 1) FEMCOPA, Kaufmann Fund's current investment advisor; 2) FIMCO, investment advisor for Kaufmann Fund until December 31, 2003; 3) FGIMC, a sub-advisor that provides daily investment management of the

---

[1]The following statements are taken from the pleadings and or the memoranda in support of and in opposition to the motion to transfer. The statements are considered true solely for purposes of the instant motion.

2

Kaufmann Fund's investment assets pursuant to a sub-advisory contract with FEMCOPA; 4) FSC, the principal underwriter and distributor of shares of Kaufmann Fund; 5) and 6) FSERCO and FSSC, service providers that provided transfer agency services and maintained all the records of shareholder accounts for FEF, including the Kaufmann Fund, prior to June 1, 2004; and 7) FII, the parent company of FEMCOPA, FIMCO, FGIMC, FSC, FSERCO, and FSSC. All of the defendants in this action, with the exception, of FGIMC are based in Pittsburgh.[2]  Most of FII's employees, records, and investment advisory and management operations are located in Pittsburgh.

Four other cases against many of these same Defendants are currently pending in the United States District Court for the Western District of Pennsylvania. These cases include Spahn v. Federated Investors, Inc., No. 04-0352 (W.D. Pa); Bauer v. Federated Equity Management Co. of Pennsylvania, No. 04-0702 (W.D. Pa); Fetzer v. Federated Investments, Inc., No. 04-0719 (W.D. Pa); and Brever v. Federated Equity Management Co. of Pennsylvania, No. 04-855 (W.D. Pa). All four of these cases were filed prior to June 25, 2004. Defendant filed the motion to transfer in the instant action to the Western District of Pennsylvania based in part on these four cases.

In Spahn, the plaintiff asserts claims against FII, FIMCO, FGIMC, and various other parties. The plaintiff owns shares of Kaufmann Fund. Among the claims asserted in Spahn is a claim on behalf of Kaufmann Fund and other Federated funds based on § 36(b). Specifically, the plaintiff alleges in part that the defendants violated § 36(b) by charging excessive and improper 12b-1 Distribution Fees and by drawing on fund assets

---

[2] FGMIC is based in New York, New York. Some of the defendants are incorporated in states other than Pennsylvania. Plaintiff does not dispute, however, that all of the parties except FGIMC are based in Pennsylvania.

3

to make undisclosed payments to broker-dealers who market and sell FII mutual funds to the public.

In Bauer, the plaintiff asserts claims against FEMCOPA, FIMCO, and FSC. The plaintiff owns shares of Federated Equity Income Fund ("FEIF") and Federated High Income Bond Fund ("FHIBF"). Among the claims asserted in Bauer is a claim on behalf of FEIF and FHIBF based on § 36(b). The plaintiff alleges in part that the defendants violated § 36(b) by charging and receiving 1) excessive investment advisory/management fees attributable to economies of scale, 2) excessive investment advisory/management fees, and 3) excessive 12b-1 Distribution Fees that extract additional excessive compensation for advisory services.

In Fetzer, the plaintiff asserts claims against FII, FIMCO, FGIMC, and various other parties. The plaintiff owns shares of Federated Capital Appreciation Fund ("FCAF"). The complaint includes a claim on behalf of FCAF, Kaufmann Fund, and other FII funds based on § 36(b). The plaintiff alleges in part that the defendants violated § 36(b) by charging and receiving excessive 12b-1 Distribution Fees and by drawing on fund assets to make undisclosed payments to broker-dealers who market and sell FII mutual funds to the public.

In Brever, the plaintiffs assert claims against FEMCOPA, FIMCO, FSC, FGIMC, and Federated Advisory Services Company. The plaintiffs own shares of the Kaufmann Fund and the Federated Capital Income Fund ("FCIF"). The complaint in Brever includes a claim on behalf of Kaufmann Fund and FCIF based on § 36(b). The plaintiffs allege that the defendants violated § 36(b) by charging and receiving: 1) excessive investment/advisory management fees; 2) excess profits attributable to economies of

4

scale; and 3) excessive 12b-1 Distribution Fees that extract additional compensation for advisory services. The plaintiffs in <u>Brever</u> additionally assert a claim for excessive 12b-1 Distribution Fees based on § 12(b) of the Investment Company Act of 1940.

## II.    ANALYSIS

Defendants move to transfer this case to the Western District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

The party seeking a transfer of venue bears the burden of demonstrating that transfer is appropriate. <u>Blane v. American Investors Corp.</u>, 934 F.Supp. 903, 907 (M.D. Tenn. 1996). To obtain a transfer under § 1404(a), defendants must establish that "(1) the action could have been brought in the proposed transferee court; (2) a transfer would promote the interests of justice; and (3) a transfer would serve the parties' and witnesses' convenience." <u>Thomas v. Home Depot, USA</u>, 131 F.Supp. 2d 934, 936 (E.D. Mich. 2001). As a general rule, the plaintiff's choice of venue should be given deference. <u>Rutherford v. Goodyear Tire & Rubber Co.</u>, 943 F.Supp. 789, 791 (W.D. Ky. 1996) (citing <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947)). The plaintiff's choice of venue, however, should not be the sole determinative factor considered by the court. <u>Roberts Metals, Inc., v. Florida Properties Mktg. Group, Inc.</u>, 138 F.R.D. 89 (N.D. Ohio 1991), <u>affirmed</u>, 22 F.3d 104 (6th Cir. 1994).

To determine whether a transfer will serve the convenience of the parties and promote the interests of justice, a court should consider 1) the residence of the parties, 2)

the location of potential witnesses, 3) the location of the evidence, 4) the location of the events giving rise to the dispute, and 5) and public interest concerns, such as systemic integrity, fairness, and judicial economy.   Forward Air, Inc. v. Dedicated Xpress Services, Inc., 2001 WL 34079306, *4 (E.D. Tenn. 2001); see also Moses v. Business Card Exp., Inc., 929 F.2d 1131, 1137 (6th Cir. 1991); 15 Wright, Miller, & Cooper, Federal Practice & Procedure § 3849 (West 1986).  A district court has broad discretion in determining whether to grant a motion to transfer venue under 28 U.S.C. § 1404. Phelps v. McClellan, 30 F.3d 658, 663 (6th Cir. 1994); see also Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988).  The court may base its decision on almost any grounds, provided that they are reasonable.  See First Michigan Corp. v. Bramlet, 141 F.3d 260, 262 (6th Cir. 1998).

   The parties do not dispute that venue is proper in the Western District of Pennsylvania or that Plaintiff could have filed suit there.  Instead, the parties dispute whether a transfer to the Western District of Pennsylvania better serves the convenience of the parties and witnesses and is in the interest of justice.  Defendants maintain that the four pending cases filed prior to this case against many of the same defendants in the Western District of Pennsylvania make transfer to that venue logical.  In sum, Defendants seek to transfer this case so that they can coordinate their pretrial preparation in order to avoid wasteful and duplicative discovery, other pretrial proceedings, and prejudice due to conflicting judgments.

   The general rule applicable when duplicative lawsuits are pending in separate federal courts is that "the entire action should be decided by the court in which an action was first filed." Smith v. S.E.C., 129 F.3d 356, 361 (6th Cir. 1997).  The first filed rule is

a doctrine of federal comity that promotes judicial efficiency. Plating Resources, Inc. v. UTI Corp., 47 F.Supp.2d 899, 903 (N.D. Ohio 1999). The instant case cannot be deemed to be duplicative of the other four cases because the plaintiffs and defendants vary slightly in each of the five pending cases and each case asserts different claims with varying arguments in support.

Despite the differences in these cases, however, the Court finds it compelling that Spahn, Brever, and the instant case all involve § 36(b) claims brought by shareholders on behalf of the Kaufmann Fund related to the same advisory and distribution fees and based on the same service contracts and fiduciary relationships between the Kaufmann Fund and Defendants. Moreover, Brever and this case claim that FII subsidiaries violated § 36(b) by charging investment advisory fees to the Kaufmann Fund that are higher than those charged to other mutual funds and investment clients for purportedly comparable advisory services. Additionally, both Brever and this case assert that Defendants have not passed on asserted "economies of scale." Based on the § 36(b) claims and the arguments or theories offered in support of those claims in Brever and this case, the Court finds that both cases will require the consideration of 1) the advisory and distribution fees paid and the services received by the Kaufmann Fund, 2) the relevance, existence, and amount of any alleged "economies of scale," and 3) the reasonableness of the fees charged when considered with respect to the nature and quality of the services provided.[3] See Coggins v. Alliance Cap. Mgmt., L.P., 279 F.Supp.2d 228, 232-35

---

[3]Plaintiff asserts that the cases are not the same in that the instant case only involves Class K Shares of the Kaufmann Fund. The Court recognizes that the specific allegations and arguments in support of Plaintiff's claims are not exactly the same as those in the other cases. This does not diminish the likelihood, however, that the claims asserted involve the same discoverable material.

(S.D.N.Y. 2003) (transferring class action against mutual fund and managers to allow for coordination with related class actions and derivative actions based on § 36(a)-(b) involving same fund and managers and similar allegations).  All but one of the defendants are based in Pittsburgh, including FEF the company to which the Kaufmann Fund belongs and whose Board of Trustees oversees the Kaufmann Fund's investment advisory contracts and distribution agreements.  As such, the majority of the records of the investment management activities, including financial records, were prepared and are located in Pittsburgh.  Moreover, the majority of the witnesses and interested parties, such as the Board of Trustees are located in Pittsburgh.

Furthermore, little weight should be given to Plaintiff's choice of venue because, for venue purposes, the action is derivative in nature.  See Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 535, n.11 (1984) (noting that "a § 36(b) action is undeniably derivative in the broad sense of that word" because it consists of a shareholder suing "on behalf of" an investment company to enforce a fiduciary duty owed to the company and seeks relief for the company); see also Nelson v. Aim Advisors, Inc., 2002 WL 442189 (S.D. Ill. 2002) (stating that the plaintiff's choice of forum in a case brought pursuant to 15 U.S.C. § 80a-12b and 80(a)-36(b) is irrelevant).  In fact, Plaintiff concedes as much when she recognizes that various courts have referred to § 36(b) cases as "derivative" because the fund company, and not the representative shareholder, receives relief.  Based on the foregoing, the Court finds that the residence of the parties, the location of potential witnesses, the location of the evidence, and the location of the events giving rise to the dispute all favor a transfer to the Western District of Pennsylvania.

The Court likewise finds that the public interest concerns of systemic integrity, fairness, and judicial economy weigh in favor of transfer. Systemic integrity is served by transferring this case to Pennsylvania because the transfer would ensure that similar claims or arguments would be decided in a consistent manner. The public interest of fairness further suggests that when the parties, evidence, and underlying actions primarily occurred in Pennsylvania and primarily remain located there that Pennsylvania is the proper place in which to litigate the action. This is especially true where, as here, the only connection this case has to the Western District of Tennessee is Plaintiff's residence. Moreover, Plaintiff has indicated her willingness to conduct any depositions of Defendants' directors, officers, and employees and of the FEF Board of Trustees in Pittsburgh. Thus, it would seem that pre-litigation costs are not that burdensome for Plaintiff. Finally, judicial economy is advanced by transferring the case to Pennsylvania given that four cases involving some of the same claims, if not the exact arguments in support thereof, are pending in Pennsylvania. The Court concludes therefore that the factors weigh in favor of transferring this case to the Western District of Pennsylvania.[4]

---

[4] The Court would note that the Western District of Pennsylvania is the logical venue to which to transfer the case, given the location of the evidence and other relevant factors. Plaintiff suggested alternatively that should the Court deem that transfer is appropriate that the case be transferred to the Southern District of New York. The Court finds that, although the Southern District of New York may be a proper venue, the factors to be considered in deciding whether transfer is appropriate do not weigh in favor of a transfer to New York.

9

### III.     CONCLUSION

Based on the aforementioned discussion, the Court grants Defendants' motion to transfer the instant case to the Western District of Pennsylvania.

**IT IS SO ORDERED** this _____*14 th*_____ day of February, 2005.


**BERNICE BOUIE DONALD**
**UNITED STATES DISTRICT COURT**

02/16/2005 10:38 FAX
From U. S. District Court          Tue 15 Feb 2005 10:46:50 PM CST          ☑013
Page 12 of 12

## UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 42 in case 2:04-CV-02475 was distributed by fax, mail, or direct printing on February 15, 2005 to the parties listed.

Jerome A. Broadhurst
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

Samuel L. Crain
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Charles Durham Reaves
ARMSTRONG ALLEN, PLLC
80 Monroe Avenue
Ste. 700
Memphis, TN 38103--246

Honorable Bernice Donald
US DISTRICT COURT

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN M. SPAHN, IRA, Individually and on
behalf of all others similarly situated,

      Plaintiff,

    vs.                             Civil Action No.  04-352

FEDERATED INVESTORS, INC., et al.,

      Defendants.

SUZANNE FETZER, Individually and on behalf
of all others similarly situated,

      Plaintiff,

    vs.                             Civil Action No. 04-719

FEDERATED INVESTORS, INC., et al.,

      Defendants.

GARY M. BAUER, Individually and on behalf of
all others similarly situated,

      Plaintiff,

    vs.                             Civil Action No. 04-702

FEDERATED EQUITY MANAGEMENT
COMPANY OF PENNSYLVANIA, et al.,

      Defendants

RANDAL C. BREVER, for the use and benefit
of the FEDERATED KAUFMANN FUND,

      Plaintiff,

    v.                             Civil Action No. 04-855

FEDERATED EQUITY MANAGEMENT
COMPANY OF PENNSYLVANIA, et al.,

      Defendants

GRETCHEN W. REAVES, for the use and
benefit of the FEDERATED KAUFMANN
FUND,

      Plaintiff,

    v.                             Civil Action No. 05-201

**FEDERATED INVESTORS, INC., et al.,**    )
                )
        **Defendants**       )

## ORDER OF COURT

AND NOW this _31st_ day of March, 2005, plaintiffs in the Spahn and Fetzer actions having amended their original motion to consolidate the above-referenced actions through their March 14, 2005, memorandum, and the court having given the matter due consideration, IT IS ORDERED that the motion to consolidate (Doc. No. 8 in Civil Action No. 04-352 and Docket Entries of 6/04/04 in Civil Action No.s 04-719 & 04-702) be, and the same hereby is, granted as follows: Civil Action No.s 04-352 and 04-719 (Spahn and Fetzer) are consolidated. The Clerk of Court shall close Civil Action No. 04-719 and all further filings shall be only at Civil Action No. 04-352. The consolidated action at Civil No. 04-352 shall be captioned "In re Federated Mutual Funds Excessive Fee Litigation." The motion is denied as moot to the extent it originally sought consolidation of the other above-captioned actions. The court will coordinate the pretrial development of the other above-captioned actions with the consolidated action though this and other appropriate orders;

IT FURTHER IS ORDERED that the motion for appointment of lead and liaison counsel (Doc. No. 10 in Civil Action No. 04-352) be, and the same hereby is, granted as follows: the law firm of Milberg Weiss Bershad and Schulman is appointed lead counsel and the Law Office of Alfred G. Yates, Jr., P.C., is appointed liaison counsel in the consolidated action at Civil Action No. 04-352. The motion is denied as moot to the extent it seeks such appointments in the other above-captioned actions;

IT FURTHER IS ORDERED that upon due consideration of plaintiffs' motion for leave to file a supplemental reply memorandum in further support of their motion for consolidation and motion for appointment of lead counsel (Doc. No. 33 in Civil Action No. 04-352 and Docket Entries of 12/21/04 in Civil Action No.s 04-719, 04-702 & 04-855 ), the motion be, and the same

hereby is, denied as moot;

IT FURTHER IS ORDERED that upon due consideration of plaintiff Gary M. Baur's motion to withdraw his motion to consolidate (Doc. No. 10 in Civil Action No. 702), the motion be, and the same hereby is, denied as moot;

IT FURTHER IS ORDERED that upon due consideration of Porter & Johnson, PLLC & Sam L. Crain, Jr.'s motion to withdraw appearance in Reaves (Doc. No. 45 in Civil Action No. 05-201), the motion be, and the same hereby is, granted. Thomas L. Allen, Esquire, Perry A. Napolitano, Esquire, and Reed Smith LLP are directed to enter their appearance in Reaves without undue delay;

IT FURTHER IS ORDERED that (1) each defendant's obligation to file a responsive pleading to the corresponding complaint shall continue to be stayed until further order of court; and (2) except as authorized by this order, each above-captioned action is stayed until further order of court; and

The court finds that judicial economy and conservation of the parties' resources will best be served by the coordinated pretrial development of the above-captioned cases on a uniformed timetable. Accordingly, counsel for the parties shall confer and submit on or before April 11, 2005, a proposed case management order that can in general be entered in each of the coordinated cases. Counsel shall take into account the need for additional time to file an amended complaint in the consolidated action and the same need in the Brever action in the event the court grants full or partial relief on the pending motion for leave to file an amended complaint and substitute plaintiffs in that action (Doc. No. 39 in Civil Action No. 04-855). Counsel shall also consider appropriate timetables for defendants to (1) file their contemplated motions to dismiss, followed by response and reply briefs, and, in the event those motions are not entirely successful, (2) have all cases progress through further discovery and pretrial development at the same time. To the extent counsel cannot agree on a joint proposed case management order, they may file separate responses demonstrating good cause for the same. Inconvenience and delay from the need to have

-3-

some cases progress to the point of others that were transferred from others districts will not be considered as good cause by the court.

*DS Cercone*

David Stewart Cercone
United States District Judge

cc:    Alfred G. Yates, Jr., Esquire
Gerald L. Rutledge, Esquire
Law Office of Alfred Yates, Jr., P.C.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

Steven G. Schulman, Esquire
Janine L. Pollack, Esquire
Kim E. Levy, Esquire
Peter E. Seidman, Esquire
Milberg Weiss Bershad
    & Schulman LLP
One Pennsylvania Plaza
New York, NY 10119-0165

Charles J. Piven, Esquire
Marshall N. Perkins, Esquire
Law Offices of Charles J. Piven, P.A.
The World Trade Center - Baltimore
Suite 2525
401 East Pratt Street
Baltimore, MD 21202

Thomas L. Allen, Esquire
Perry A. Napolitano, Esquire
Roy W. Arnold, Esquire
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Robert J. Higgins, Esquire
Eric Bensky, Esquire
Dickstein Shapiro Morin & Oshinsky
2101 L Street, NW
Washington, DC 20037-1526

Marc A. Topaz, Esquire
Richard A. Maniskas, Esquire
Schiffrin & Barroway, LLP
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004

Ellen M. Doyle, Esquire
Malakoff, Doyle & Finberg
200 Frick Building
437 Grant Street
Pittsburgh, PA 15219

Guy M. Burns, Esquire
Jonathan S. Coleman, Esquire
Becky Ferrell-Anton, Esquire
Audrey B. Rauchway, Esquire
Johnson,  Pope, Bokor
    Ruppel & Burns, L.L.P.
403 East Madison Street, Suite 400
Tampa, FL 33602

Michael Brickman, Esquire
James C. Bradley, Esquire
Nina H. Fields, Esquire
Richardson, Patrick, Westbrook
    & Brickman LLC
174 E. Bay Street
Charleston, SC 29401

Lynn Lincoln Sarko, Esquire
Michael D. Woerner, Esquire
Gretchen F. Cappio, Esquire
Keller Rohrback, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

Carole S. Katz, Esquire
Morgan Lewis & Bockius LLP
One Oxford Centre, 32nd Floor
301 Grant Street
Pittsburgh, PA 15219

Joshua Pepper, Esquire
Morgan Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178

Christian R. Bartholomew, Esquire
Morgan Lewis & Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004

Charles Durham Reaves, Esquire
Jerome A. Broadhurst, Esquire
Armstrong Allen, PLLC
Brinkley Plaza
80 Monroe Avenue, Suite 700
Memphis, TN 38103-2467

Samuel L. Crain, Jr., Esquire
Burch, Porter & Johnson
130 N. Court Avenue
Memphis, TN 38103

# EXHIBIT D

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEONARD BURRES, JULES COPPER, JAMES MONAHAN, NINA MONAHAN, and WALTER NEIT, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERATED EQUITY MANAGEMENT COMPANY OF PENNSYLVANIA, FEDERATED SECURITIES CORP., FEDERATED ADVISORY SERVICES COMPANY, FEDERATED GLOBAL INVESTMENT MANAGEMENT CORP., PASSPORT RESEARCH II, LTD., and FEDERATED INVESTMENT MANAGEMENT COMPANY <br><br> Defendants. | Case No. 04-C855 <br> Judge David S. Cercone |

### SECOND AMENDED COMPLAINT

Plaintiffs, Leonard H. Burres, Jules Copper, James Monahan, Nina Monahan, and Walter Neit, for the use and benefit of the Federated Kaufmann Fund and the Federated Capital Income Fund, sue Defendants, Federated Equity Management Company of Pennsylvania, Federated Securities Corp., Federated Advisory Services Company, Federated Global Investment Management Corp., Passport Research II, Ltd. and Federated Investment Management Company, and allege:

### I. JURISDICTION AND VENUE

1.     This action is a derivative action brought by Plaintiffs on behalf of the Federated Kaufmann Fund and the Federated Capital Income Fund pursuant to §§ 36(b) and 12(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. §§ 80a-35(b) and 80a-12(b).

2.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

3.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3). Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendants may be found in this district.

4.     All conditions precedent have been performed or have occurred.

## II. BACKGROUND

5.     Plaintiffs are shareholders in an open-end registered investment company, or mutual fund (the "Funds"), created, sold, advised, and managed with other funds as part of a fund family or complex by Defendants (the "Fund Complex"). Defendants, as the underwriters, distributors, advisors, and control persons of the Funds, owe fiduciary and other duties to Plaintiffs and all shareholders of the funds in the Fund Complex.

6.     Plaintiffs and other shareholders of the Funds pay Defendants fees for providing (a) pure investment advisory services and (b) administrative services. These fees are based on a percentage of the net assets of the Funds. Defendants typically charge a combined fee for the pure investment advisory services and the administrative services.

7.     The pure investment advisory services Defendants provide to the Funds are identical to the investment advisory services Defendants or their affiliates provide to other clients, such as institutional clients, and entail identical costs. In fact, the cost of advisors, analysts, research data, the physical plant, and other aspects of Defendants' investment advisory services are shared between the mutual funds and the other clients.

2

8.      Despite the equivalence of the investment advisory services Defendants provide to the Funds and the other clients, the fees Defendants receive from the Funds that are attributable to pure investment advisory services are much higher than the fees Defendants or their affiliates receive from other clients for the identical services.

9.      Defendants also charge distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendants have adopted with respect to the Funds pursuant to Rule 12b-1, 17 C.F.R. § 270.12b-1 (the "Distribution Plans" or the "12b-1 Plans"). The distribution fees are based on a percentage of the net assets of the Funds. Defendants purportedly collect these fees in order to grow or stabilize the assets of the Funds so that the Funds can benefit from economies of scale through reduced advisory fees.

### Section 36(b) of the Investment Company Act of 1940

10.     In 1940, Congress enacted the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors such as Defendants. In the 1960s, it became clear to Congress that investment advisors to equity mutual funds were gouging those funds with excessive fees, particularly by not taking economies of scale into account. As a result, § 36(b), 15 U.S.C., § 80a-35(b), was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty.

11.     Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against

3

such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. . . .

12.    In the past decade, the assets managed by Defendants within the Fund Complex and in the Funds have grown dramatically:

   a.    In 1993, the Fund Complex (exclusive of money market funds) had average net assets of approximately $15 billion and fund shareholders paid $92.4 million, or 62 basis points, in advisory and distribution fees. Ten years later, by 2002, the Fund Complex (exclusive of money market funds) had more than doubled in size, with over $35 billion in average net assets. In spite of this sizeable increase in assets, advisory and distribution fees in 2002 totaled over $290 million, or 83 basis points. For the Fund Complex as a whole, therefore, advisory and distribution fees substantially increased as a percentage of average net assets from 1993 to 2002.

   b.    In 1993, the Federated Kaufmann Fund had $675 million in average net assets; by 2002, the fund had grown to $3.6 billion in average net assets, a more than five fold increase. Advisory fees for the Federated Kaufmann Fund increased from $9 million in 1993 to $46 million in 2002. Effectively no economies of scale or incremental savings were realized by the investor in spite of the Fund's dramatic growth.

13.    While the Funds have grown dramatically in size, the nature of the services rendered by Defendants has changed little, if at all. Indeed, advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b). Nonetheless, the distribution and advisory fees paid to Defendants have grown dramatically. As a result, the advisory fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are disproportionately large in relationship to the services rendered to Plaintiffs.

4

14.    In addition, Defendants, in violation of their fiduciary duties to Plaintiffs, have retained excess profits resulting from economies of scale. These economies of scale are a product of the dramatic growth in assets managed by Defendants, caused in part by marketing programs paid for with the distribution fees charged to Plaintiffs and in part by Defendants' ability to provide the identical investment advisory services they provide Plaintiffs to other clients at little or no additional cost. The excess profits resulting from these economies of scale belong to Plaintiffs and the other shareholders of the Funds.

15.    The fees paid to Defendants are technically approved by the Fund Complex's boards of directors.[1]  A majority of the boards are comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA.  Regardless of whether these presumably "disinterested" directors technically meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the directors in reviewing the advisory and distribution fees paid by each fund in the Fund Complex.  In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiffs and other shareholders of the Funds.  In particular, Defendants do not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

16.    Although the fees challenged in this lawsuit may appear to be very small on a shareholder-by-shareholder basis, they cause a dramatic decrease in Plaintiffs' investment returns

---

[1] While the Funds at issue here are technically governed by a board of trustees rather than directors, the term "directors" is used throughout the complaint and should be read as synonymous with "trustees," as it is under the ICA. *See* 15 U.S.C., § 80a-2(a)(12).

5

over time. Arthur Levin, past Chairman of the Securities and Exchange Commission ("SEC"), was critical of what he called the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns . . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001).

### Rule 12b-1 Distribution Plans

17.    Prior to 1980, the use of fund assets (which are owned by the shareholders) to sell new fund shares was prohibited. The SEC had historically been reluctant to allow fund advisers to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

18.    After intense lobbying by the mutual fund industry, the Commission agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses. In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

19.    Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in advisory fees and other expenses, the Commission tentatively

6

approved Rule 12b-l, 17 C.F.R. § 270.12b-1.  However, numerous conditions were attached to the use of fund assets to pay distribution expenses.  For example, the Commission wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).  Unfortunately, that is precisely what Defendants have done: extracted additional compensation for their retail advisory services by causing Plaintiffs and other shareholders to pay Defendants' marketing expenses to acquire new shareholders so that these new shareholders could pay additional advisory fees to Defendants.  Under this regime, Defendants get the financial benefit, Plaintiffs bear the financial burden.

20.    Defendants have adopted 12b-1 Distribution Plans for all funds in the Fund Complex. These Distribution Plans must be reviewed annually by the Funds' directors.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

21.    Despite the dramatic growth in assets managed by Defendants, the fees charged by Defendants have grown.  Accordingly, the Distribution Plans have produced little or no economies-of-scale benefits to the shareholders of the Funds.  Rather, the Distribution Plans have served only Defendants, just as the Commission feared when it found that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  Bearing of

7

Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC

LEXIS 943 (Aug. 31, 1977). As such, the Distribution Plans violate the intent and purpose of Rule

12b-1 and are entirely a waste of fund assets.

22.    Furthermore, the distribution fees are based on the net asset value of the Funds and

not on the distribution activity, if any, by Defendants, such as number of shares sold. Accordingly,

in addition to failing to benefit Plaintiffs and other shareholders, the Distribution Plans have

extracted additional compensation for advisory services to Defendants, thereby resulting in

excessive fees paid to them. For example, any portion of the fees paid to Defendants that are

derived from market increases in the net asset value of the fund rather than any distribution activity

by Defendants constitutes additional and excessive compensation for advisory services.

23.    Despite the fact that Plaintiffs and the other shareholders of the Funds have enjoyed

no benefits from the Distribution Plans, even though they contributed to the growth of fund assets

by paying distribution fees, and despite the fact that the Distribution Plans have allowed Defendants

to extract additional and excessive compensation from Plaintiffs and the other shareholders of the

Funds, the directors of the Funds have continued to approve, year after year, continuation of the

Distribution Plans in violation of both Rule 12b-1 and § 36(b).

<u>**Nature of Claims**</u>

24.    In this action, Plaintiffs seek to rescind the investment advisory agreements and

Distribution Plans and to recover for the Funds the total fees charged by Defendants or,

alternatively, to recover for the Funds the excess profits resulting from economies of scale

wrongfully retained by Defendants and to recover for the Funds other excessive compensation

received by, or improper payments wrongfully retained by, Defendants in breach of their fiduciary

duty under the ICA § 36(b), 15 U.S.C. § 80a-35(b). Because the conduct complained of herein is

8

continuing in nature, Plaintiffs seek recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

25.    No pre-suit demand on the board of directors of the Federated Kaufmann Fund or the Federated Capital Income Fund is required, as the requirements of Rule 23.1 do not apply to actions under § 36(b) of the ICA. *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984).

### III. PARTIES

26.    Plaintiff Leonard H. Burres is a resident of Goodyear, Arizona. He is a shareholder at all relevant times of the Federated Kaufmann Fund. The Federated Kaufmann Fund is a registered investment company under the Investment Company Act of 1940 and is a diversified portfolio of Federated Equity Funds, a Massachusetts business trust.

27.    Plaintiff Jules Copper is a resident of Largo, Florida. He is a shareholder at all relevant times of the Federated Kaufmann Fund.

28.    Plaintiff James Monahan is a resident of Belleair Bluff, Florida. He is a shareholder at all relevant times of the Federated Kaufmann Fund.

29.    Plaintiff Nina Monahan is a resident of Belleair Bluff, Florida. She is a shareholder at all relevant times of the Federated Kaufmann Fund.

30.    Plaintiff Walter E. Neit is a resident of St. Petersburg, Florida. He is a shareholder at all relevant times of the Federated Capital Income Fund. The Federated Capital Income Fund is a registered investment company under the Investment Company Act of 1940 and a diversified portfolio of the Federated Income Securities Trust, a Massachusetts business trust.

31.    Defendant Federated Equity Management Company of Pennsylvania ("FEMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940. FEMCO is currently the investment adviser to the Federated Kaufmann Fund.

Defendant Passport Research II, Ltd. ("Passport") is a Pennsylvania limited partnership of which FEMCO is the general partner. Passport is registered as an investment adviser under the Investment Advisers Act of 1940, and is the investment adviser to the Federated Capital Income Fund. Defendant Federated Investment Management Company ("FIMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940. FIMCO was the investment adviser to the Federated Kaufmann Fund until December 31, 2003, and is the sub-adviser of the Federated Capital Income Fund. Passport, the adviser, has delegated daily management of the Federated Capital Income Fund to FIMCO, and FIMCO is paid a portion of the fund's advisory fee.

32.     Defendant Federated Securities Corp. ("FSC") is a Delaware corporation and is registered as a broker-dealer under the laws of Florida. FSC is the distributor and principal underwriter of the Federated Kaufmann Fund and the Federated Capital Income Fund.

33.     Defendant Federated Global Investment Management Corp. ("FGIMCO") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940. FGIMCO is the sub-adviser to the Federated Kaufmann Fund. FEMCO, the adviser, has delegated daily management of the fund to FGIMCO, and FGIMCO is paid a portion of the fund's advisory fee.

34.     Defendant Federated Advisory Services Company ("FASC") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940. FASC provides research, quantitative analysis, equity trading and transaction settlement and certain support services to the advisers to the Federated Kaufmann Fund and the Federated Capital Income Fund, and FASC is paid a portion of the funds' advisory fees.

35.     Federated Investment Counseling ("FIC") is a Delaware corporation and is registered as an investment adviser under the Investment Advisers Act of 1940.  FIC is affiliated with the Defendants.  FIC provides investment advisory services to third parties such as institutional investors and sub-advisory services to other mutual funds and, upon information and belief, charges substantially lower fees for providing those services than its affiliates charge for providing similar services to the Funds.

36.     FEMCO, FIMCO, FSC, FGIMCO, FASC, Passport and FIC are all affiliated corporations owned by a common parent, Federated Investors, Inc.

## IV.  GENERAL ALLEGATIONS

37.     The test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).  In order to violate § 36(b), "the advisor-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Id.*

38.     In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b).  The *Gartenberg* court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered.  These factors include: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structures; (5) fallout benefits (i.e. indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the

11

care and conscientiousness of the directors. A review of these factors, and the facts in this case, demonstrates that the fees charged by Defendants to the Funds violate § 36(b).

### The Nature and Quality of the Services Provided to the Funds

39.     The nature of the investment advisory services provided to the Funds is straightforward: Defendants buy and sell, at their discretion, stocks, bonds, and other securities for the Funds. This is precisely the same service provided to Defendants' institutional and other third party clients (albeit at a dramatically lower cost). Upon information and belief, the materials provided by Defendants to the directors of the Funds establish that the nature of these services has remained unchanged despite dramatic growth in the assets of the Funds and advisory revenues.

40.     Despite the fact that the Funds receive identical investment advisory services as Defendants' institutional and other clients, Plaintiffs pay Defendants dramatically higher fees because these fees are not negotiated at arm's length as they are with the institutional and other clients. This disparity in fees evinces Defendants' willingness and determination to prefer their own financial interests to the interests of the Funds and their shareholders.

41.     Defendants repeatedly put their own financial interests ahead of the interests of the Funds and their shareholders by participating in arrangements and schemes that benefit Defendants at the expense of the Funds and their shareholders. The cost of this conflict of interest, which does not exist in arm's-length relationships with institutional clients, manifests not only in higher fees, but in other losses and expenses borne by the Funds and their shareholders. These losses and expenses directly impact the quality of the investment advisory services Defendants provide to the Funds.

42.     Upon information and belief, other examples of Defendants' willingness and determination to prefer their own financial interests to the interests of the Funds and their

12

shareholders is Defendants' involvement in improper uses of fund assets to attract additional business. One example of such improper use of fund assets is where Defendants use 12b-1 fees provided by the retail fund shareholders to attract non-retail clients that benefit from certain considerations (such as fee rebates) at the expense of the retail fund shareholders. Another example is where Defendants uses fund assets, in violation of Rule 12b-1, to participate in pay-to-play schemes. For instance, pursuant to an arrangement commonly referred to as "directed brokerage," Defendants direct the Funds' brokerage business to brokerage firms and pay them above-market rates to promote Defendants' mutual funds over other funds sold by the brokerage firms.

### The Profitability of the Funds to the Adviser/Manager

43.    "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. Corp L. 610, 661 (2001) (the "Freeman & Brown Study") (citing *Gartenberg*) [Ex. 1]. The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services. Profitability can be determined on either an incremental basis or a full-cost basis.

44.    Defendants' incremental costs of providing advisory services to Plaintiffs are nominal while the additional fees received by Defendants are hugely disproportionate given that the nature, quality, and level of the services remain the same.

45.    On information and belief, a review of Defendants' full costs of providing advisory services will also demonstrate the enormous profitability to Defendants of managing the Funds.

### Economies of Scale

46.    The existence of economies of scale in the mutual fund industry has been recently confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted

in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of advisory services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31 [Ex. 2]; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9 [Ex. 3].

47.    In addition, the most significant academic research undertaken since the Wharton School study in the 1960s establishes the existence of economies of scale that are not being passed along to mutual fund shareholders in violation of Defendants' duty to do so under § 36(b) and Rule 12b-1. *See* Freeman & Brown Study" [Ex. 1].  As the Freeman & Brown Study noted:  "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase.  Fund industry investment managers are prone to cite economies of scale as justification for business combinations."  Id. at 620 [Ex. 1].

48.    These economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment advisor's entire scope of operations, including services provided to institutional and other clients. *See* Freeman & Brown Study at 621 n.62 (quoting Victoria E. Schonfeld & Thomas M.J. Kerwin, Organization of a Mutual Fund, 49 Bus. Law 107 (1993)) [Ex. 1].

49.    The clearest example of economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering).  In such instances, as the GAO confirms, it is possible for the advisor to service the additional assets with zero additional costs. See GAO Report at 9 (noting that

14

growth from portfolio appreciation is unaccompanied by costs) [Ex. 3].  In other words, an investment advisor can advise a fund that doubles in size purely because of market forces with no increased costs because the services are unchanged.  *See* GAO Report at 9 [Ex. 3]; Freeman & Brown Study at 619 n.43, 621 (noting that investment advisors have benefited by garnering "increased fees from the general increase in market prices with no commensurate efforts on their part" and also noting that as much as 64% of mutual fund asset growth has come from appreciation of portfolio securities, which, unlike growth from share sales to new investors, is costless) [Ex. 1].

50.     From 1993 through 2003, Defendants' assets under management grew from almost $15 billion to over $35 billion, an increase of 236.5%.  However, this phenomenal growth in mutual fund assets not only produced no economies of scale, but fees actually increased faster than the growth in assets.  Fees went from $92.4 million in 1993 to over $290 million in 2003, an increase of 314.5%.  In addition, fees as a percentage of assets increased from 62 basis points in 1993 to 83 basis points in 2003.  The foregoing figures make a mockery of the concept of economies of scale.

51.     The economies of scale enjoyed by Defendants with respect to the Funds have not been shared with Plaintiffs as required by § 36(b) and Rule 12b-1.  As a result, the fees paid to Defendants for advisory services provided to the Funds are grossly disproportionate to those services, are excessive, and violate § 36(b).

<u>Comparative Fee Structures</u>

52.     The fees advisors receive from mutual funds for investment advisory services are directly comparable to, though much higher than, the fees advisors receive from other clients for the identical services. As the Freeman & Brown Study noted: "None of the leading advisory fee cases involved equity funds, and hence, none of the courts were confronted directly with the strong analogies that can be drawn between equity advisory services in the fund industry as compared to

15

the pension field where prices are notably lower." Freeman & Brown Study at 653 [Ex. 1]. While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." Freeman & Brown Study at 627-28 [Ex. 1]. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." Freeman & Brown Study at 629 n.93 [Ex. 1]. Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." Freeman & Brown Study at 671-72 [Ex. 1].

53.    More recently, New York's Attorney General surveyed two fund complexes and confirmed the existence of massive over-charging of fund advisory fees. Specifically, Mr. Spitzer testified before a Senate Subcommittee on January 27, 2004, as follows:

> Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors. In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services.

> There was a similar disparity in the advisory fees charged by Alliance. Once again, mutual fund investors were charged significantly higher advisory fees than institutional investors. Specifically, Alliance's mutual fund investors paid advisory fees that were twice those paid by institutional investors. In dollar terms, this means that Alliance investors paid more than $200 million more in advisory fees than they would have paid had they been charged the rate given to Alliance's institutional clients.

54.    Upon information and belief, the shareholders of the Funds at issue here are plagued by the same discriminatory over-charging. Upon information and belief, Defendants are charging substantially higher fees to Plaintiffs and the shareholders of the Funds as they charge their institutional advisory clients for rendering similar services.

55.    In addition, a number of relevant comparative fee structures (including Defendants' sub-advisory relationships) clearly establish that Defendants are charging advisory fees to the Funds that are disproportionate to the value of the services rendered.

a.    FIMCO serves as sub-adviser to the Principal Partners LargeCap Blend Fund, Inc., and charges a fee of .35% of the first $75 million of assets, .25% of the next $200 million, .20% of the next $250 million and .15% of assets above $525 million. By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.45%.

b.    FIC serves as sub-advisor to the WRL Federated Growth & Income Portfolio of the AEGON/Transamerica Series Fund, Inc., a mutual fund which underlies a variable annuity product. For the sub-advisory services rendered to that mutual fund, FIC charges a fee equivalent to .50% of the first $30 million in assets, .35% of the next $20 million, and .25% of assets in excess of $50 million. By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.45%.

c.    FIC charges a fee of .25% of the first $200 million in assets and .20% of assets in excess of $200 million for the investment management services it renders to the ASAF Federated High Yield Bond Fund. By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.45%.

d.    FIC charges a fee of .40% of the first $50 million in assets, .25% of the next $200 million in assets, .20% of the next $250 million in assets, and .15% of assets in excess of $500 million for the sub-advisory services it renders to the Nationwide High Income Bond Fund and the Nationwide Equity Income Fund. By contrast, the advisory fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.45%.

e.    FIC charges a fee of .50% of the first $100 million in assets, .45% of the next $300 million in assets, .40% of the next $500 million in assets, and .35% of assets in excess of $900 million, for the sub-advisory services it renders to the AST Federated Aggressive Growth Portfolio. By contrast, the advisory

17

fee paid by the Federated Kaufmann Fund to the Defendants is currently 1.45%.

### Fallout Benefits

56.     Defendants indirectly profit because of the existence of the Funds through fallout benefits. Obvious, but difficult to quantify fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Funds.

57.     Other, easier to quantify, benefits include "soft dollars" payable from broker-dealers. Essentially, "soft dollars" are credits furnished to Defendants from broker-dealers and other securities-industry firms in exchange for routing the Funds' securities transaction orders and other business to paying firms. These soft-dollar credits should be used to purchase research and other goods or services that benefit the shareholders of the Funds. On information and belief, however, the soft-dollar arrangements benefit Defendants and result in increased costs to the shareholders of the Funds with little to no corresponding benefits to the shareholders of the Funds. On information and belief, the soft dollar arrangements are concealed from the shareholders of the Funds in breach of Defendants' fiduciary duty.

58.     On information and belief, Defendants also receive "kickbacks," either directly or indirectly, as transfer agency and custodian fees grow due to increases in the assets of the Funds and the number of shareholders.

59.     On information and belief, Defendants receive further fallout benefits from securities lending arrangements. Essentially, Defendants loan out the securities of the Funds and receive compensation as the lending agents of the Funds.

18

60.    A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the Funds at virtually no additional cost.  Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants.  Without payment by Plaintiffs and other shareholders of the Funds of millions of dollars in advisory and distribution fees (especially distribution fees that are nothing more than a means to extract additional compensation for advisory services), Defendants would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients.  This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business.  However, although Plaintiffs and other shareholders of the Funds pay all of the costs associated with the investment advisory services, Defendants resell these services to third parties without compensating Plaintiffs through reduced fees or in any other way.

61.    On information and belief, Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Funds or to the Funds' directors.  The directors are thus unable to quantify or even meaningfully consider the benefits.  Plaintiffs and other shareholders of the Funds have paid for these benefits and are entitled to compensation in the form of reduced advisory fees and the elimination of distribution fees.

### The Independence and Conscientiousness of the Directors

62.    At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA.  As the GAO Report noted, the structure of most mutual funds embodies a potential conflict of interest between the fund's shareholders and its adviser.  This conflict arises because the fees paid

19

by the shareholders represent revenue to the adviser. The United States Supreme Court has stated that the disinterested-director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

63.    The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the advisory and distribution fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Funds's assets have grown, and the fees charged for similar services. See GAO Report at 14 [Ex. 3]. These responsibilities are intensive, requiring the directors to rely on information provided by Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations. *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

64.    The ICA contains a presumption that the disinterested directors are in fact disinterested. However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Funds, the lack of adequate information provided to the directors in connection with their approvals of the advisory agreements and Distribution Plans, and the control of management over the directors in reviewing the fees paid by the Funds are not presumed but, rather, are important factors recognized in the *Gartenberg* line of cases in determining whether Defendants have breached their fiduciary duties. In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser. For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without

20

receiving the benefit of measures designed to enhance their ability to act independently." Bearing

of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS

444 at *36 (Oct. 28, 1980).

65.    As part of their scheme to receive excessive fees, Defendants did not keep the

directors fully informed regarding all material facts and aspects of their fees and other

compensation, and the directors failed to insist upon adequate information. For example:

a.    On information and belief, Defendants provided virtually no information to the directors regarding the advisory fees charged to pension and other institutional clients or to other mutual funds being advised or sub-advised by Defendants.

b.    On information and belief, Defendants provided virtually no information to the directors regarding the economies of scale enjoyed or fallout benefits received by Defendants.

c.    On information and belief, the profitability data given to the board of directors provides no explanation as to how the board should evaluate economies of scale and does not explain how the shareholders benefit from distribution plans.

d.    On information and belief, the board of directors of the Funds failed to request and evaluate, and Defendants failed to provide, information reasonably necessary to an informed determination of whether the Distribution Plans should have been implemented and whether they should be continued.

e.    On information and belief, the directors rarely, if ever, question any information or recommendations provided by Defendants.

66.    The foregoing assures that the directors do not understand Defendants' true cost

structure and, in particular, the economies of scale enjoyed by them in providing investment

advisory services to the Funds and their institutional and other clients. Nor do the directors

understand the nature of the Distribution Plans and the benefits received by Defendants, and lack

of benefits received by Plaintiffs, from the Distribution Plans.

21

67.     On information and belief, the disinterested directors of the Funds have not receive the benefit of any measures to enhance their ability to act independently, which has caused the directors to be dependent on Defendants and has allowed Defendants to dominate and unduly influence the directors. In addition, the directors' failure to insist on adequate information evinces a lack of care and conscientiousness on their part.

**COUNT I**
**ICA §36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excessive Investment Advisory Fees)**

68.     Plaintiffs repeat and re-allege paragraphs 1 through 64, inclusive, of this complaint.

69.     The fees charged by Defendants for providing advisory services to the Funds are and continue to be disproportionate to the services rendered and are not within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances, including the advisory fees that Defendants charge their other clients.

70.     In charging and receiving excessive or inappropriate compensation, and in failing to put the interests of Plaintiffs and the other shareholders of the Funds ahead of their own interests, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

71.     Plaintiffs seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

**COUNT II**
**ICA § 36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excess Profits from Economies of Scale)**

72.     Plaintiffs repeat and re-allege paragraphs 1 through 64, inclusive, of this complaint.

22

73.    Defendants have received and continue to receive excess profits attributable to extraordinary economies of scale and, ironically, at least in part at Plaintiffs' expense in the form of payment of distribution fees benefiting only Defendants.

74.    By retaining excess profits derived from economies of scale, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

75.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### ICA § 36(b)
### (Excessive Rule 12b-1 Distribution fees and Extraction of Additional Compensation for Advisory Services)

76.    Plaintiffs repeat and re-allege paragraphs 1 through 64, inclusive, of this complaint.

77.    The distribution fees charged and received by Defendants were designed to, and did, extract additional compensation for Defendants' advisory services in violation of Defendants' fiduciary duty under § 36(b). Although the distribution fees may have contributed to the growth in assets of the Funds, the resulting economies of scale benefited only Defendants, and not Plaintiffs or the Funds.

78.    In failing to pass along economies-of-scale benefits from the distribution fees, and in continuing to assess distribution fees pursuant to plans of distribution despite the fact that no benefits inured to Plaintiffs, Defendants have violated, and continue to violate, the ICA and have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

23

79.    Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Funds.

## COUNT IV
## ICA § 12(b)
### (Unlawful Distribution Plans)

80.    Plaintiffs repeat and re-allege paragraphs 1 through 64, inclusive, of this complaint.

81.    Plaintiffs and other shareholders in the Funds each paid service or distribution fees to Defendants

82.    When Defendants first initiated the Distribution Plans, they represented that the distribution fees were being collected in order to, at least in part, grow the assets of the Funds in order to reduce the cost to Plaintiffs of providing advisory services.  Only one of the following alternatives could possibly have occurred:

  a.    The Funds grew as a result of the payment of distribution fees and market forces, in which case economies of scale were generated but not passed on to Plaintiffs or the Funds; or

  b.    The distribution fees did not contribute to economies of scale, produced no other material benefits for Plaintiffs and the other shareholders of the Funds, and should not have been approved or continued.

83.    Either way, Defendants have violated § 12(b) of the ICA and Rule 12b-1, 17 C.F.R. § 270.12b-1, by accepting excessive or inappropriate compensation in violation of the fiduciary duty owed by them to the Funds.  Defendants violation of § 12(b) and Rule 12b-1 is continuing in nature.

84.    Plaintiffs seek damages resulting from the adoption and continuation of these unlawful Distribution Plans.

WHEREFORE, Plaintiffs demand judgment as follows:

24

a.  An order declaring that Defendants have violated and continue to violate § 12, § 36(b), and Rule 12b-1 of the ICA and that any advisory or distribution agreements entered into are void ab initio;

b.  An order preliminarily and permanently enjoining Defendants from further violations of the ICA;

c.  An order awarding damages against Defendants including all fees paid to them by Plaintiffs and the Funds for all periods not precluded by any applicable statutes of limitation through the trial of this case, together with interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law; and

d.  Such other and further relief as may be proper and just.

Dated: February 21st, 2005

By: _Ellen M Doyle_

Ellen M. Doyle, Esquire
MALAKOFF DOYLE & FINBERG PC
The Frick Building, Suite 200
437 Grant Street
Pittsburgh, PA 15219-6003
Telephone: (412) 281-8400
Facsimile:  (412) 281-3262

Guy M. Burns, Esquire
Jonathan S. Coleman, Esquire
Becky Ferrell-Anton, Esquire
Audrey Rauchway, Esquire
JOHNSON, POPE, BOKOR,
RUPPEL & BURNS, L.L.P.
100 N. Tampa St., Suite 1800
Tampa, FL  33601-1100
(813) 225-2500

Michael J. Brickman, Esquire
James C. Bradley, Esquire
Nina H. Fields, Esquire
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
174 East Bay Street
Charleston, SC  29401
(843) 727-6500

25

Lynn Lincoln Sarko, Esquire
Michael D. Woerner, Esquire
Gretchen F. Cappio, Esquire
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052.
(206) 623-1900

*Counsel for Plaintiffs*

26

# EXHIBIT E

FEE PH-W
RCPT# 2980
NO SUMMS
1539



# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

---x

JOHN M. SPAHN, IRA, Individually And On Behalf Of
All Others Similarly Situated,

        Plaintiff,

      vs.

FEDERATED INVESTORS, INC.; FEDERATED
INVESTMENT MANAGEMENT COMPANY;
FEDERATED GLOBAL INVESTMENT
MANAGEMENT CORP.; JOHN F. DONAHUE, J.
CHRISTOPHER DONAHUE; LAWRENCE D. ELLIS;
THOMAS G. BIGLEY; JOHN T. CONROY, JR.;
NICHOLAS P. CONSTANTAKIS; JOHN F.
CUNNINGHAM; PETER E. MADDEN; CHARLES F.
MANSFIELD, JR.; JOHN E. MURRAY, JR.;
MARJORIE P. SMUTS; JOHN S. WALSH and JOHN
DOES 1-100,

        Defendants,

AMERICAN SKANDIA ADVISOR FUNDS INC.-
FEDERATED HIGH YIELD BOND FUND;
FEDERATED ADJUSTABLE RATE US
GOVERNMENT FUND; FEDERATED
ADJUSTABLE RATE SECURITIES FUND;
FEDERATED AGGRESSIVE GROWTH FUND;
FEDERATED ALABAMA MUNICIPAL CASH
TRUST; FEDERATED AMERICAN LEADERS
FUND; FEDERATED ARMS FUND; FEDERATED
ASIA PACIFIC GROWTH FUND; FEDERATED
AUTOMATED CASH MANAGEMENT TRUST;
FEDERATED AUTOMATED GOVERNMENT CASH
RESERVES; FEDERATED AUTOMATED
TREASURY CASH RESERVES; FEDERATED
BOND FUND; FEDERATED BOND INDEX FUND;
FEDERATED CALIFORNIA MUNICIPAL INCOME
FUND; FEDERATED CAPITAL APPRECIATION
FUND; FEDERATED CAPITAL GROWTH FUND;
FEDERATED CAPITAL INCOME FUND;
FEDERATED COMMUNICATIONS TECHNOLOGY

Civil Action No. _____

**04  0352**

**CLASS ACTION COMPLAINT
FOR EXCESSIVE FEES IN
VIOLATION OF SECTIONS
34(b), 36(b) AND 48(a) OF THE
INVESTMENT COMPANY ACT
AND SECTIONS 206 AND 215 OF
THE INVESTMENT ADVISERS
ACT, AND FOR BREACHES OF
FIDUCIARY DUTY**


**JURY TRIAL DEMANDED**

---x

**[Caption continues on next page]**

---------------------------------------------x

FUND; FEDERATED CONNECTICUT MUNICIPAL        :
CASH TRUST; FEDERATED CONSERVATIVE           :
ALLOCATION FUND; FEDERATED EMERGING          :
MARKETS FUND; FEDERATED EQUITY INCOME        :
FUND; FEDERATED EUROPEAN EQUITY FUND;        :
FEDERATED EUROPEAN GROWTH FUND;              :
FEDERATED EXCHANGE FUND; FEDERATED           :
FLORIDA MUNICIPAL CASH TRUST;                :
FEDERATED FUND FOR US GOVERNMENT             :
SECURITIES; FEDERATED GEORGIA MUNICIPAL      :
CASH TRUST; FEDERATED GLOBAL EQUITY          :
FUND; FEDERATED GLOBAL FINANCIAL             :
SERVICES FUND; FEDERATED GLOBAL VALUE        :
FUND; FEDERATED GNMA TRUST; FEDERATED        :
GOVERNMENT FUND; FEDERATED                   :
GOVERNMENT INCOME SECURITIES FUND;           :
FEDERATED GOVERNMENT OBLIGATIONS             :
FUND; FEDERATED GOVERNMENT                   :
OBLIGATIONS TAX-MANAGED FUND;                :
FEDERATED GOVERNMENT ULTRASHORT             :
DURATION FUND; FEDERATED GOVERNMENT          :
ULTRASHORT FUND; FEDERATED GROWTH            :
ALLOCATION FUND; FEDERATED GROWTH            :
STRATEGIES FUND; FEDERATED HIGH INCOME       :
BOND FUND; FEDERATED INCOME TRUST;           :
FEDERATED INSTITUTIONAL HIGH-YIELD          :
BOND FUND; FEDERATED INSTITUTIONAL          :
SHORT DURATION GOVERNMENT FUND;              :
FEDERATED INTERMEDIATE GOVERNMENT            :
FUND; FEDERATED INTERMEDIATE INCOME          :
FUND; FEDERATED INTERMEDIATE MUNICIPAL       :
TRUST; FEDERATED INTERNATIONAL BOND          :
FUND; FEDERATED INTERNATIONAL CAPITAL        :
APPRECIATION FUND; FEDERATED                 :
INTERNATIONAL EQUITY FUND; FEDERATED         :
INTERNATIONAL FUNDS PLC - HIGH INCOME        :
ADVANTAGE FUND; FEDERATED                    :
INTERNATIONAL FUNDS PLC - SHORT-TERM        :
EURO FUND; FEDERATED INTERNATIONAL           :
FUNDS PLC - SHORT- TERM US GOVERNMENT        :
SECURITIES FUND; FEDERATED                   :
INTERNATIONAL FUNDS PLC - SHORT-TERM US     :
PRIME FUND; FEDERATED INTERNATIONAL          :
FUNDS PLC - SHORT-TERM US TREASURY          :

---------------------------------------------x

**[Caption continues on next page]**

———————————————————————————x

SECURITIES FUND; FEDERATED
INTERNATIONAL GROWTH FUND; FEDERATED
INTERNATIONAL HIGH INCOME FUND;
FEDERATED INTERNATIONAL INCOME FUND;
FEDERATED INTERNATIONAL SMALL
COMPANY FUND; FEDERATED INTERNATIONAL
VALUE FUND; FEDERATED KAUFMANN FUND;
FEDERATED KAUFMANN SMALL CAP FUND;
FEDERATED LARGE CAP GROWTH FUND;
FEDERATED LARGE CAP INDEX FUND;
FEDERATED LARGE CAP TECH FUND;
FEDERATED LATIN AMERICAN GROWTH FUND;
FEDERATED LIBERTY FUND; FEDERATED
LIBERTY US GOVERNMENT MONEY MARKET
TRUST; FEDERATED LIMITED DURATION FUND;
FEDERATED LIMITED DURATION
GOVERNMENT FUND; FEDERATED LIMITED
TERM FUND; FEDERATED LIMITED TERM
MUNICIPAL FUND; FEDERATED LIQUID CASH
TRUST; FEDERATED MANAGED AGGRESSIVE
GROWTH FUND; FEDERATED MANAGED
GROWTH & INCOME FUND; FEDERATED
MANAGED GROWTH FUND; FEDERATED
MANAGED INCOME PORTFOLIO; FEDERATED
MARKET OPPORTUNITY FUND; FEDERATED
MARYLAND MUNICIPAL CASH TRUST;
FEDERATED MASTER TRUST; FEDERATED
MAX-CAP FUND; FEDERATED MAX-CAP INDEX
FUND; FEDERATED MICHIGAN INTERMEDIATE
MUNICIPAL TRUST; FEDERATED MID-CAP
FUND; FEDERATED MID-CAP INDEX FUND;
FEDERATED MINI-CAP FUND; FEDERATED
MINI-CAP INDEX FUND; FEDERATED
MINNESOTA MUNICIPAL CASH TRUST;
FEDERATED MODERATE ALLOCATION FUND;
FEDERATED MONEY MARKET TRUST;
FEDERATED MORTGAGE FUND; FEDERATED
MUNI & STOCK ADVANTAGE FUND;
FEDERATED MUNICIPAL OBLIGATIONS FUND;
FEDERATED MUNICIPAL OPPORTUNITIES
FUND; FEDERATED MUNICIPAL SECURITIES
FUND; FEDERATED MUNICIPAL ULTRASHORT
FUND; FEDERATED NEW ECONOMY FUND;

———————————————————————————x

[Caption continues on next page]

———————————————————————x

FEDERATED NEW JERSEY MUNICIPAL CASH :
TRUST; FEDERATED NEW YORK MUNICIPAL
CASH TRUST; FEDERATED NEW YORK :
MUNICIPAL INCOME FUND; FEDERATED NORTH :
CAROLINA MUNICIPAL CASH TRUST; :
FEDERATED NORTH CAROLINA MUNICIPAL
INCOME FUND; FEDERATED OBLIGATION :
FUNDS; FEDERATED OHIO INTERMEDIATE
MUNICIPAL TRUST; FEDERATED OHIO :
MUNICIPAL CASH TRUST; FEDERATED OHIO
MUNICIPAL INCOME FUND; FEDERATED :
PENNSYLVANIA INTERMEDIATE MUNICIPAL
TRUST; FEDERATED PENNSYLVANIA :
MUNICIPAL CASH TRUST; FEDERATED
PENNSYLVANIA MUNICIPAL INCOME FUND; :
FEDERATED PREMIER INTERMEDIATE :
MUNICIPAL INCOME FUND; FEDERATED
PREMIER MUNICIPAL INCOME FUND; :
FEDERATED PRIME CASH OBLIGATIONS FUND; :
FEDERATED PRIME OBLIGATIONS FUND;
FEDERATED PRIME VALUE OBLIGATIONS :
FUND; FEDERATED SHORT-TERM INCOME
FUND; FEDERATED SHORT-TERM MUNICIPAL :
TRUST; FEDERATED SHORT-TERM US
GOVERNMENT TRUST; FEDERATED SMALL CAP :
STRATEGIES FUND; FEDERATED STOCK & :
BOND FUND; FEDERATED STOCK TRUST;
FEDERATED STRATEGIC INCOME FUND; :
FEDERATED TAX-FREE INSTRUMENTS TRUST; :
FEDERATED TAX-FREE OBLIGATIONS FUND; :
FEDERATED TAX-FREE TRUST; FEDERATED
TENNESSEE MUNICIPAL CASH TRUST; :
FEDERATED TOTAL RETURN BOND FUND; :
FEDERATED TOTAL RETURN GOVERNMENT
BOND FUND; FEDERATED TOTAL RETURN :
LIMITED DURATION FUND; FEDERATED
TREASURY OBLIGATIONS FUND; FEDERATED :
ULTRASHORT BOND FUND; FEDERATED US
GOVERNMENT BOND FUND; FEDERATED US :
GOVERNMENT FUND; FEDERATED US
GOVERNMENT SECURITIES FUND: 1-3 YEARS; :
FEDERATED US GOVERNMENT SECURITIES
FUND: 5-10 YEARS; FEDERATED US :
GOVERNMENT SECURITIES FUND: 2-5 YEARS; :
FEDERATED US TREASURY CASH RESERVES; :

———————————————————————x

**[Caption continues on next page]**

FEDERATED UTILITY FUND; FEDERATED
VIRGINIA MUNICIPAL CASH TRUST;
FEDERATED WORLD UTILITY FUND; IDEX
FEDERATED TAX EXEMPT FUND (collectively
known as the "FEDERATED FUNDS"),

        Nominal Defendants.

Plaintiff, by and through his counsel, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media reports, news articles, academic literature, and academic studies. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff brings this action as a class action on behalf of investors in mutual funds belonging to the Federated Investors, Inc., family of mutual funds (the "Federated Funds"), and derivatively on behalf of the Federated Funds, against the Federated Funds investment advisers, their corporate parents and the Federated Funds directors and trustees.

2.     This complaint alleges that the Investment Adviser Defendants (as defined herein) drew upon the assets of the Federated Funds to pay brokers to aggressively push Federated Funds over other funds, and that the Investment Adviser Defendants concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, though payable from fund assets, were not disclosed to investors in the Federated Funds public filings or elsewhere.

3.     Thus Federated Funds investors were induced to purchase Federated Funds by brokers who received undisclosed payments from the Investment Adviser Defendants to push Federated Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in one or more of the Federated Funds, Federated Funds investors were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push Federated Funds to still other brokerage clients.

4.    The Investment Adviser Defendants were motivated to make these secret payments to finance the improper marketing of Federated Funds because their fees were calculated as a percentage of funds under management and, therefore, tended to increase as the number of Federated Funds investors grew. For example, as stated in the Federated Investors, Inc. annual report on Form 10-K filed with the SEC for fiscal year ended December 31, 2002, investment advisory fee revenues were as follows: $380,234,000 in 2000, $422,980,000 in 2001 and $453,600,000 in 2002. This increase in advisory fee revenues was primarily due to a corresponding increase in average managed assets during this period. The Investment Adviser Defendants attempted to justify this conduct on the ground that by increasing the Federated Funds assets they were creating economies of scale that inured to the benefit of investors but, in truth and in fact, Federated Funds investors received none of the benefits of these purported economies of scale. Rather, fees and costs associated with the Federated Funds steadily increased during the Class Period (as defined herein), in large part because the Investment Adviser Defendants continued to skim from the Federated Funds to finance their ongoing marketing campaign. The Federated Funds directors and trustees, who purported to be Federated Funds investor watchdogs, knowingly or recklessly permitted this conduct to occur.

5.    By engaging in this conduct, the Investment Adviser Defendants, and the defendant entities that control them, breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the Investment Company Act of 1940 (the "Investment Company Act") and Section 206 of the Investment Advisers Act of 1940 (the "Investment Advisers Act"), breached their common law fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to their clients. The Investment Adviser Defendants also violated Section 34(b) of the Investment Company Act because, to further their improper course of conduct, they made untrue statements of material fact in fund registration statements, and

2

omitted to disclose material facts, concerning the procedure for determining the amount of fees

payable to the Investment Adviser Defendants and concerning the improper uses to which the

fees were put.  Additionally, the Federated Funds directors and trustees breached their common

law fiduciary duties to the Federated Funds investors by knowingly and/or recklessly allowing

the improper conduct alleged herein to occur and harm Federated Funds investors.

      6.    On January 28, 2004, the *Los Angeles Times* published an article about a Senate

committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming
> operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the
> panel, comparing the scandal-plagued industry to "a $7-trillion
> trough" exploited by fund managers, brokers and other insiders.

## JURISDICTION AND VENUE

      7.    The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and

48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a),

Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, and

common law.

      8.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment

Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

      9.    Many of the acts charged herein, including the preparation and dissemination of

materially false and misleading information, occurred in substantial part in this District.

Defendants conducted other substantial business within this District and many Class members

reside within this District.  Defendant Federated Investors, Inc. is the ultimate parent of

defendants bearing the Federated name, was an active participant in the wrongful conduct

3

alleged herein and is headquartered within this District, at 1001 Liberty Avenue, Pittsburgh, Pennsylvania.

10.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.    Plaintiff John M. Spahn, IRA ("Plaintiff") purchased during the Class Period and continues to own shares or units of the Federated Kaufmann Fund, Federated Equity Income Fund, Federated Investment Services Fund, Federated Capital Appreciation Fund, Federated American Leaders Fund and the Federated Stock & Bond Fund and has been damaged by the conduct alleged herein.

12.    Defendant Federated Investors, Inc., a Pennsylvania corporation, is a provider of investment management products and related financial services.  Together with its subsidiaries, Federal Investors, Inc., sponsors, markets and provides investment-related services to various investment products, including mutual funds.  It is one of the largest mutual fund managers in the United States with $195.4 billion in assets under management as of December 31, 2002. Federated Investors, Inc. is headquartered at 1001 Liberty Avenue, Pittsburgh, Pennsylvania.

13.    Defendant Federated Investment Management Company ("FIM") is registered as an investment adviser under the Investment Advisers Act and managed and advised certain Federated Funds.  FIM, a wholly-owned subsidiary of Federated Investors, Inc., is headquartered in Pittsburgh, Pennsylvania.

14.    Defendant Federated Global Investment Management Corp. ("Global") is registered as an investment adviser under the Investment Advisers Act and managed and advised

4

certain international Federated Funds. Global, a wholly-owned subsidiary of Federated

Investors, Inc., is headquartered in Pittsburgh, Pennsylvania.

15.     Defendants FIM and Global are herein collectively known as the "Investment

Adviser Defendants." Investment management fees payable to the Investment Adviser

Defendants are calculated as a percentage of fund assets under management.

16.     During the Class Period, defendant John F. Donahue ("John Donahue") was a

Chairman and Director or Trustee charged with overseeing all of the 44 investment companies

(comprising 138 portfolios) that make up the Federated fund complex. Additionally, John

Donahue served as Chairman and Director of Federated Investors, Inc. during the Class Period

and was previously a Trustee of FIM. John Donahue's business address is Federated Investors

Tower, 1001 Liberty Avenue, Pittsburgh, PA 15222.

17.     During the Class Period, defendant J. Christopher Donahue ("Christopher

Donahue") was a Director or Trustee of certain of the funds comprising the Federated fund

complex. Additionally, during the Class Period, Christopher Donahue served as Principal

Executive Officer and President of the Federated fund complex and as President, Chief

Executive Officer and Director of Federated Investors, Inc. Christopher Donahue also served

during the Class Period as Chairman and Trustee of FIM and Chairman and Director of Global.

Prior to the Class Period, Christopher Donahue served as President and Chief Executive Officer

of FIM and Global. Christopher Donahue's business address is Federated Investors Tower, 1001

Liberty Avenue, Pittsburgh, PA 15222.

18.     During the Class Period, defendant Lawrence D. Ellis ("Ellis") was a Director or

Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios)

that make up the Federated fund complex. For his service as a Director or Trustee overseeing the

Federated fund complex, Ellis received compensation of $148,500 for the calendar year ended

5

December 31, 2002. Ellis' business address is 3471 Fifth Avenue, Suite 1111, Pittsburgh, PA

15213.

19.    During the Class Period, defendant Thomas G. Bigley ("Bigley") was a Director

or Trustee charged with overseeing all of the 44 investment companies (comprising 138

portfolios) that make up the Federated fund complex. For his service as a Director or Trustee

overseeing the Federated fund complex, Bigley received compensation of $163,350 for the

calendar year ended December 31, 2002. Bigley's business address is 15 Old Timber Trail,

Pittsburgh, PA 15238.

20.    During the Class Period, defendant John T. Conroy, Jr. ("Conroy") was a Director

or Trustee charged with overseeing all of the 44 investment companies (comprising 138

portfolios) that make up the Federated fund complex. For his service as a Director or Trustee

overseeing the Federated fund complex, Conroy received compensation of $163,350 for the

calendar year ended December 31, 2002. Conroy's business address is 3838 Tamiami Trail

North, Naples, FL 34103.

21.    During the Class Period, defendant Nicholas P. Constantakis ("Constantakis")

was a Director or Trustee charged with overseeing all of the 44 investment companies

(comprising 138 portfolios) that make up the Federated fund complex. For his service as a

Director or Trustee overseeing the Federated fund complex, Constantakis received compensation

of $163,350 for the calendar year ended December 31, 2002. Constantakis's business address is

175 Woodshire Drive, Pittsburgh, PA 15215.

22.    During the Class Period, defendant John F. Cunningham ("Cunningham") was a

Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138

portfolios) that make up the Federated fund complex. For his service as a Director or Trustee

overseeing the Federated fund complex, Cunningham received compensation of $148,500 for the

calendar year ended December 31, 2002. Cunningham's business address is 353 El Brillo Way, Palm Beach, FL 33480.

23.    During the Class Period, defendant Peter E. Madden ("Madden") was a Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios) that make up the Federated fund complex. For his service as a Director or Trustee overseeing the Federated fund complex, Madden received compensation of $148,500 for the calendar year ended December 31, 2002. Madden's business address is 100 Royal Palm Way, Palm Beach, FL 33480.

24.    During the Class Period, defendant Charles F. Mansfield, Jr. ("Mansfield") was a Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios) that make up the Federated fund complex. For his service as a Director or Trustee overseeing the Federated fund complex, Mansfield received compensation of $163,350 for the calendar year ended December 31, 2002. Mansfield's business address is 80 South Road, Westhampton Beach, NY 11978.

25.    During the Class Period, defendant John E. Murray, Jr. ("Murray") was a Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios) that make up the Federated fund complex. For his service as a Director or Trustee overseeing the Federated fund complex, Murray received compensation of $178,200 for the calendar year ended December 31, 2002. Murray's business address is Chancellor, Duquesne University, 600 Forbes Avenue, Pittsburgh, PA 15282.

26.    During the Class Period, defendant Marjorie P. Smuts ("Smuts") was a Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios) that make up the Federated fund complex. For her service as a Director or Trustee overseeing the Federated fund complex, Smuts received compensation of $148,500 for the

calendar year ended December 31, 2002. Smuts' address is 4905 Bayard Street, Pittsburgh, PA 15213.

27.    During the Class Period, defendant John S. Walsh ("Walsh") was a Director or Trustee charged with overseeing all of the 44 investment companies (comprising 138 portfolios) that make up the Federated fund complex. For his service as a Director or Trustee overseeing the Federated fund complex, Walsh received compensation of $148,500 for the calendar year ended December 31, 2002. Walsh's business address is 2604 William Drive, Valparaiso, IN 46385.

28.    Defendants John Does 1-100 were Directors or Trustees charged with overseeing the Federated fund complex during the Class Period, and any other wrongdoers later discovered, whose identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsel's ongoing investigation.

29.    Defendants John Donahue, Christopher Donahue, Ellis, Bigley, Conroy, Constantakis, Cunningham, Madden, Mansfield, Murray, Smuts, Walsh and John Does 1-100 are referred to collectively herein as the "Director Defendants."

30.    Nominal defendants the Federated Funds, as identified in the caption of this complaint and on the list annexed hereto as Exhibit A, are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of directors or trustees charged with representing the interests of the shareholders in one or a series of the funds. The Federated Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.    Plaintiff brings certain of these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who

purchased, redeemed or held shares or like interests in any of the Federated Funds between March 8, 1999 and January 9, 2004, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are many thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Federated Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Investment Company Act was violated by defendants' acts as alleged herein;

(b)    whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

(c)    whether the Investment Adviser Defendants breached their common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(d)    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the Federated Funds; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Director Defendants Breached Their
### Fiduciary Duties To Federated Funds Investors

37.    Federated Funds public filings state that the Federated Funds have boards of directors or trustees that are responsible for the management and supervision of each fund. In this regard, the Statement of Additional Information dated May 31, 2003 for funds offered by Federated American Leaders Fund, Inc., which includes various classes of Federated American Leaders Fund (the "Statement of Additional Information"), which is available to the investor upon request, is typical of the Statements of Additional Information available for other Federated Funds. It states that, "[t]he Board is responsible for managing the Fund's business affairs and for exercising all the Fund's powers except those reserved for the shareholders."

10

38.    Moreover, the most recent Form 10-K for Federated Investors, Inc. stated, with

respect to the duties of the directors and trustees vis-à-vis the funds' investment advisers, as

follows:

> *Each of the funds enters into an advisory agreement that is*
> *subject to annual approval by the fund directors or trustees,*
> including a majority of the directors who are not "interested
> persons" of the funds or Federated as defined under the Investment
> Company Act.

[Emphasis added.]  The directors or trustees of each fund are thus responsible for the review and

approval of the advisory and fee agreements between the investment advisers and the Federated

Funds.

39.    The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment managers are approved:

> As required by the 1940 Act, the Fund's Board has reviewed the
> Fund's investment advisory contract. The Board's decision to
> approve the contract reflects the exercise of its business judgment
> on whether to continue the existing arrangements.  During its
> review of the contract, the Board considers many factors, among
> the most material of which are: the Fund's investment objectives
> and long term performance; the Adviser's management
> philosophy, personnel, and processes; the preferences and
> expectations of Fund shareholders and their relative sophistication;
> the continuing state of competition in the mutual fund industry;
> comparable fees in the mutual fund industry; the range and quality
> of services provided to the Fund and its shareholders by the
> Federated organization in addition to investment advisory services;
> and the Fund's relationship to the Federated funds.
>
> *          *          *
>
> *The Board also considers the compensation and benefits received*
> *by the Adviser. This includes fees received for services provided*
> *to the Fund by other entities in the Federated organization and*
> *research services received by the Adviser from brokers that*
> *execute fund trades, as well as advisory fees.*

[Emphasis added.]

11

40.    The Investment Company Institute ("ICI"), of which Federated Investors, Inc. is a member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.
>
> *Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.*
>
> *In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.*

[Emphasis added.][1]

41.    In truth and in fact, the Federated Funds boards of directors, *i.e.* the Director Defendants, were captive to and controlled by Federated Investors, Inc. and the Investment Adviser Defendants, who induced the Director Defendants to breach their statutory and fiduciary duties to manage and supervise the Federated Funds, approve all significant agreements and otherwise take reasonable steps to prevent the Investment Adviser Defendants from skimming Federated Funds assets. In many cases, key Federated Funds directors or trustees were

---

[1]    The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled *Understanding the Role of Mutual Fund Directors,* available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

employees or former employees of Federated Investors, Inc. or the Investment Adviser

Defendants and were beholden for their positions, not to Federated Funds investors, but, rather,

to the Investment Adviser Defendants they were supposed to oversee. The Director Defendants

served for indefinite terms at the pleasure of the Investment Adviser Defendants and formed

supposedly independent committees, charged with responsibility for billions of dollars of fund

assets (much of which were comprised of investors' college and retirement savings).

42.     To ensure that the directors toed the line, the Investment Adviser Defendants

often recruited key fund directors from the ranks of Federated Investors, Inc. or the Investment

Adviser Defendants. For example, during the Class Period, defendant John Donahue was a

Chairman and Director or Trustee charged with overseeing all of the 44 investment companies

(comprising 138 portfolios) that make up the Federated fund complex. Additionally, John

Donahue served as Chairman and Director of Federated Investors, Inc. during the Class Period

and was previously a Trustee of FIM. Similarly, during the Class Period, defendant Christopher

Donahue was a Director or Trustee of certain of the funds comprising the Federated fund

complex. Additionally, during the Class Period, Christopher Donahue served as Principal

Executive Officer and President of the Federated fund complex and as President, Chief

Executive Officer and Director of Federated Investors, Inc. Christopher Donahue also served

during the Class Period as Chairman and Trustee of FIM and Chairman and Director of Global.

Prior to the Class Period, Christopher Donahue served as President and Chief Executive Officer

of FIM and Global.

43.     In exchange for creating and managing the Federated Funds, including the

Federated Kaufmann Fund, Federated Equity Income Fund, Federated Investment Services Fund,

Federated Capital Appreciation Fund, Federated American Leaders Fund and the Federated

Stock & Bond Fund, the Investment Adviser Defendants charged the Federated Funds a variety

of fees, each of which was calculated as a percentage of assets under management. Hence, the more money invested in the funds, the greater the fees paid to Federated Investors, Inc. As stated in the Federated Investors, Inc. annual report on Form 10-K filed with the SEC for fiscal year ended December 31, 2002, "Federated [Investors'] principal source of revenue is investment advisory fee income earned by various subsidiaries of Federated [Investors] pursuant to investment advisory contracts with the investment products. . . . Investment advisers are compensated for their services in the form of investment advisory fees based upon the net assets of the fund."

44.    The success of Federated Investors, Inc. is dependent upon the investment advisory fees paid to its subsidiary investment advisers by the mutual funds they advise. Again, the revenue derived from such fees is dependent upon the amount of assets under management. In this regard, the most recent Form 10-K for Federated Investors, Inc. stated the following:

> *A significant portion of Federated's revenue is derived from investment advisory fees, which are based on the value of Managed Assets* and vary with the type of asset being managed, with higher fees generally earned on equity products than on fixed-income and money market products. *Consequently, significant fluctuations in the prices of securities held by, or the level of redemptions from, the funds or other products advised by Federated may materially affect the amount of Managed Assets and thus Federated's revenue, profitability and ability to grow.*

[Emphasis added.]

45.    In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board. However, as a result of the Director Defendants' dependence on the investment management company, and their failure to properly manage the investment advisers, millions of dollars in Federated Funds assets were transferred through fees

14

payable from Federated Funds assets to the Investment Adviser Defendants that were of no

benefit to fund investors.

46.     As a result of these practices, the mutual fund industry was enormously profitable

*for Federated Investors, Inc.* In this regard, a *Forbes* article, published on September 15, 2003,

stated as follows:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the
> financial industry overall . . . . [f]or the most part, customers do not
> enjoy the benefits of the economies of scale created by having
> larger funds. *Indeed, once a fund reaches a certain critical mass,
> the directors know that there is no discernible benefit from
> having the fund become bigger by drawing in more investors; in
> fact, they know the opposite to be true - once a fund becomes too
> large it loses the ability to trade in and out of positions without
> hurting its investors.*
>
>                    *               *               *
>
> *The [mutual fund] business grew 71-fold (20 fold in real terms)
> in the two decades through 1999, yet costs as a percentage of
> assets somehow managed to go up 29%. . . .* Fund vendors have a
> way of stacking their boards with rubber stamps. As famed
> investor Warren Buffett opines in Berkshire Hathaway's 2002
> annual report: 'Tens of thousands of "independent" directors, over
> more than six decades, have failed miserably.' A genuinely
> independent board would occasionally fire an incompetent or
> overcharging fund advisor. That happens just about never."

[Emphasis added.]

47.     Plaintiff and other members of the Class never knew, nor could they have known,

from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser

Defendants were using so-called 12b-1 fees, Soft Dollars (as defined below) and commissions to

improperly siphon assets from the funds.

15

## The Investment Adviser Defendants Used
## Rule 12b-1 Marketing Fees For Improper Purposes

48.     Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment

Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their

own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule

12b-1 conditions, among others, are that payments for marketing must be made pursuant to a

written plan "describing all material aspects of the proposed financing of distribution;" all

agreements with any person relating to implementation of the plan must be in writing; the plan

must be approved by a vote of the majority of the board of directors; and the board of directors

must review, at least quarterly, "a written report of the amounts so expended and the purposes for

which such expenditures were made." Additionally, the directors "have a duty to request and

evaluate, and any person who is a party to any agreement with such company relating to such

plan shall have a duty to furnish, such information as may reasonably be necessary to an

informed determination of whether the plan should be implemented or continued." The directors

may continue the plan "only if the board of directors who vote to approve such implementation

or continuation conclude, in the exercise of reasonable business judgment, and in light of their

fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the

Act that *there is a reasonable likelihood that the plan will benefit the company and its*

*shareholders."* [Emphasis added.]

49.     The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund

marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things

being equal, should be encouraged because increased investment in mutual funds would

presumably result in economies of scale, the benefits of which would be shifted from fund

managers to investors. During the Class Period, the Director Defendants authorized, and the

16

Investment Adviser Defendants collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

50.    However, the purported Rule 12b-1 fees charged to Federated Funds investors were highly improper because the conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the 12b-1 plans would benefit the company and its shareholders.  On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Federated Funds investors.  Rather, Federated Funds management and other fees steadily increased throughout the Class Period.  This was a red flag that the Director Defendants knowingly or recklessly disregarded.  In truth, the Federated Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Director Defendants reviewed written reports of the amounts expended pursuant to the Federated Funds Rule 12b-1 plans, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plans, on a quarterly basis as required — which seems highly unlikely under the circumstances set forth herein — the Director Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plans, even though such payments not only harmed existing Federated Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Federated Funds investors.

51.    Many of the Federated Funds charging Rule 12b-1 fees charged investors the maximum fees permissible pursuant to the Federated Funds Rule 12b-1 plans.  There was no reasonable likelihood that the Rule 12b-1 fees would benefit the funds or their shareholders because the increased fees charged to shareholders created diminished marginal returns. Therefore, the Rule 12b-1 plans authorizing such fees should have been terminated.

52.    As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excessive commissions, that were not disclosed or authorized by the Federated Funds Rule 12b-1 plans.

### The Investment Adviser Defendants Charged Their Overhead To Federated Funds Investors And Secretly Paid Excessive Commissions To Brokers To Steer Clients To Federated Funds

53.    Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined *in good faith* that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

54.    The Investment Adviser Defendants went far beyond what is permitted by the Section 28(e) safe harbor. The Investment Adviser Defendants used Soft Dollars to pay

18

overhead costs, thus charging Federated Funds investors for costs not covered by the Section

28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, properly

should have been borne by the Investment Adviser Defendants.  The Investment Adviser

Defendants also paid excessive commissions to broker dealers on top of any supposedly

justifiable Soft Dollars to steer their clients to Federated Funds and directed brokerage business

to firms that favored Federated Funds.  Such payments and directed-brokerage payments were

used to fund sales contests and other undisclosed financial incentives to push Federated Funds.

These incentives created an undisclosed conflict of interest and caused brokers to steer clients to

Federated Funds regardless of the funds' investment quality relative to other investment

alternatives and to thereby breach their duties of loyalty.  By paying the excessive brokerage

commissions, the Investment Adviser Defendants also violated Section 12(b) of the Investment

Company Act because such payments were not made pursuant to valid Rule 12b-1 plans.

     55.    The excessive commissions did not fund any services that benefited the Federated

Funds shareholders.  This practice materially harmed Plaintiff and other members of the Class

from whom the Soft Dollars and excessive commissions were taken.

     56.    Additionally, on information and belief, the Federated Funds, similar to other

members of the industry, have a practice of charging lower management fees to institutional

clients than to ordinary mutual fund investors through their mutual fund holdings.  This

discriminatory treatment cannot be justified by any additional services to the ordinary investor

and is a further breach of fiduciary duties.

### The Truth Begins To Emerge

     57.    On January 9, 2004, the *Wall Street Journal* exposed the relationship between the

broker Edward D. Jones & Co. ("Edward Jones") and Federated Investors, Inc., as well as six

other mutual funds companies, where the companies paid Edward Jones substantial amounts to

favor those companies when pitching funds to customers. In the article, the *Wall Street Journal* detailed Edward Jones' wrongdoing based on an investigation that included interviews with 18 former and current Edward Jones brokers.

58.    According to the article, the pressure to sell the preferred funds made it financially foolhardy for Edward Jones brokers to sell non-preferred funds. Quoting brokers who had sold only the preferred funds for years, the article reported as follows:

> Individual brokers have a strong financial incentive to pitch favored funds. The revenue-sharing payments are credited as income to the profit-and-loss statements of brokerage branches. Those statements are a significant factor in determining the size of brokers' bonuses, generally awarded three times a year, according to former brokers. The bonuses can add up to $80,000 or $90,000 for a good producer, and often average about a third of total compensation.
>
> *"I sold no outside funds, says former broker Eddie Hatch, who worked at Jones in North Carolina for 13 years, until he left in 2000 to work for another brokerage firm. You took a reduced payout"* if you sold funds not on the preferred list, he adds.
>
> Jones floods its brokers with literature from its preferred funds, former brokers say. "I didn't take the blinders off for nine years," says Scott Maxwell of Cary, N.C., a broker who left Jones for another firm in March of last year. He switched jobs, he says, largely because he was uncomfortable with the limited fund selection. Mr. Maxwell says he wanted to be freer to offer clients funds with better investment performance and lower fees.
>
> Jeff Davis says he was "young and wet behind the ears" when he was hired at Jones in 1993 after a stint as a White House intern. *Even before he fully understood the financial incentives, he says he sold the seven funds almost exclusively. "I was afraid not to,"* he adds. Mr. Davis, who left Jones in 2001 and started his own business, also says he was uncomfortable with the incentives and wanted more leeway to sell other funds.

[Emphasis added.]

59.    The revenue-sharing arrangements were harmful to investors, who, consistent with Edward Jones' representations, believed they are receiving objective, independent advice.

20

In this regard, the *Wall Street Journal* article quotes a disappointed Edward Jones client who

invested in one of the preferred mutual funds as follows:

> Like many who bought poorly performing [...] mutual funds in
> recent years, Nancy Wessels lost big. [...] What the 80-year old
> widow's broker, Edward D. Jones & Co., never told her was that it
> had a strong incentive to sell [the "preferred"] funds instead of
> rivals that performed better. Jones receives hefty payments – one
> estimate tops $100 million a year – from [the "preferred"] fund
> companies in exchange for favoring those companies' funds at
> Jones's 8,131 U.S. sales offices, the largest brokerage network in
> the nation.
>
> *When training its brokers in fund sales, Jones gives them
> information almost exclusively about the seven "preferred" fund
> companies, according to former Jones brokers.* Bonuses for
> brokers depend in part on selling the preferred funds, and Jones
> generally discourages contact between brokers and sales
> representatives from rival funds. *But while revenue sharing and
> related incentives are familiar to industry insiders, Jones
> typically doesn't tell customers about any of these arrangements.*
>
> *The situation "gives you the feeling of being violated," says Mrs.
> Wessel's son, DuWayne, a Waterloo, Iowa, real-estate broker.*
> He says he found out about the fund-company payments to Jones
> from his mother's new broker when the son moved her $300,000
> account to another firm in 2002.
>
> *The deception is that the broker seems to give objective advice,"
> says Tamar Frankel, a law professor at Boston University who
> specializes in mutual-fund regulation. "In fact, he is paid more
> for pushing only certain funds."*

[Emphasis added.]

60.    The *Wall Street Journal* similarly noted that Edward Jones brokers were steering

customers to Federated mutual funds, although "[j]ust over half of Federated's stock funds, for

example, beat their peers last year, after only 44% did so in 2002, according to Morningstar

[and] [o]nly a quarter topped their peers in 2001."

61.    On January 14, 2004, the *Wall Street Journal* published an article under the

headline, "SEC Readies Cases On Mutual Funds' Deals With Brokers." Citing "a person

21

familiar with the investigation," the article notes that the SEC is "close to filing its first charges

against mutual fund companies related to arrangements that direct trading commissions to

brokerage firms that favor those fund companies' products." The article stated in pertinent part

as follows:

> *The SEC has been probing the business arrangements between
> fund companies and brokerage firms since last spring.* It held a
> news conference yesterday to announce *it has found widespread
> evidence that brokerage firms steered investors to certain mutual
> funds because of payments they received from fund companies or
> their investment advisers as part of sales agreements.*
>
> Officials said the agency has opened investigations into eight
> brokerage firms and a dozen mutual funds that engaged in a
> longstanding practice known as "revenue sharing." Agency
> officials said they expect that number to grow as its probe expands.
> They declined to name either the funds or the brokerage firms.
>
> The SEC said payments varied between 0.05% and 0.04% of sales
> and up to 0.25% of assets that remained invested in the fund.
>
> *    *    *
>
> *People familiar with the investigation say regulators are looking
> into examples of conflict of interest when fund companies use
> shareholder money to cover costs of sales agreements instead of
> paying the sales costs themselves out of the firm's own pockets.
> The boards of funds, too, could be subject to scrutiny for
> allowing shareholders' commission dollars to be used for these
> sales agreements. In other cases, the SEC is probing whether
> funds violated policies that would require costs associated with
> marketing a fund to be included in a fund's so-called 12b-1 plan.*

*Id.* [emphasis added.]

## The Prospectuses Were Materially False And Misleading

62.     Plaintiff and other members of the Class were entitled to, and did receive, one or

more of the prospectuses (the "Prospectuses"), pursuant to which the Federated Funds shares

were offered, each of which contained substantially the same materially false and misleading

statements and omissions regarding 12b-1 fees, commissions and Soft Dollars.

22

63.    The Statement of Additional Information, referred to in certain of the Federated

Funds' prospectuses and available to the investor upon request, stated as follows with respect to

Soft Dollars and directed brokerage:

> *[T]he Adviser may select brokers and dealers based on whether*
> *they also offer research services (as described below).*

> \*    \*    \*

> Research services may include advice as to the advisability of
> investing in securities; security analysis and reports; economic
> studies; industry studies; receipt of quotations for portfolio
> evaluations; and similar services.  Research services may be used
> by the Adviser or by affiliates of Federated in advising other
> accounts.  *To the extent that receipt of these services may replace*
> *services for which the Adviser or its affiliates might otherwise*
> *have paid, it would tend to reduce their expenses.*

> \*    \*    \*

> For the fiscal year ended, March 31, 2003, the Fund's Adviser
> *directed brokerage* transactions to certain brokers due to research
> services they provided.  *The total amount of these transactions*
> *was $1,172,301,925 for which the Fund paid $1,966,872 in*
> *brokerage commissions.*

[Emphasis added.]

64.    The Prospectuses failed to disclose and misrepresented, *inter alia*, the following

material and damaging adverse facts which damaged Plaintiff and other members of the Class:

(a)    that the Investment Adviser Defendants authorized the payment from fund

assets of excessive commissions to broker dealers in exchange for preferential marketing

services and that such payments were in breach of their fiduciary duties, in violation of Section

12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendants directed brokerage payments to

firms that favored Federated Funds, which was a form of marketing that was not disclosed in or

authorized by the Federated Funds Rule 12b-1 plans;

(c)     that the Federated Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

(d)     that by paying brokers to aggressively steer their clients to Federated Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(e)     that any economies of scale achieved by marketing of the Federated Funds to new investors were not passed on to Federated Funds investors; on the contrary, as the Federated Funds grew, fees charged to Federated Funds investors continued to increase;

(f)     that defendants improperly used Soft Dollars and excessive commissions, paid from Federated Funds assets, to pay for overhead expenses the cost of which should have been borne by Federated Investors, Inc. and the Investment Adviser Defendants and not Federated Funds investors; and

(g)     that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that they failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Federated Funds.

## COUNT I

### Against The Investment Adviser Defendants
### For Violations Of Section 34(b) Of The Investment
### Company Act On Behalf Of The Class

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.    This Count is asserted against the Investment Adviser Defendants in their role as investment advisers to the Federated Funds.

67.    The Investment Adviser Defendants made untrue statements of material fact in registration statements and reports filed and disseminated pursuant to the Investment Company Act and omitted to state facts necessary to prevent the statements made therein, in light of the circumstances under which they were made, from being materially false and misleading.  The Investment Adviser Defendants failed to disclose the following:

(a)    that the Investment Adviser Defendants authorized the payment from fund assets of excessive commissions to broker dealers in exchange for preferential marketing services and that such payments were in breach of their fiduciary duties, in violation of Section 12(b) of the Investment Company Act, and unprotected by any "safe harbor";

(b)    that the Investment Adviser Defendants directed brokerage payments to firms that favored Federated Funds, which was a form of marketing that was not disclosed in or authorized by the Federated Funds Rule 12b-1 plans;

(c)    that the Federated Funds Rule 12b-1 plans were not in compliance with Rule 12b-1, and that payments made pursuant to the plans were in violation of Section 12 of the Investment Company Act because, among other reasons, the plans were not properly evaluated by the Director Defendants and there was not a reasonable likelihood that the plans would benefit the company and its shareholders;

25

(d)    that by paying brokers to aggressively steer their clients to Federated Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties, and profiting from the brokers' improper conduct;

(e)    that any economies of scale achieved by marketing of the Federated Funds to new investors were not passed on to Federated Funds investors; on the contrary, as the Federated Funds grew, fees charged to Federated Funds investors continued to increase;

(f)    that defendants improperly used Soft Dollars and excessive commissions, paid from Federated Funds assets, to pay for overhead expenses the cost of which should have been borne by Federated Investors, Inc. and the Investment Adviser Defendants and not Federated Funds investors; and

(g)    that the Director Defendants had abdicated their duties under the Investment Company Act and their common law fiduciary duties, that the Director Defendants failed to monitor and supervise the Investment Adviser Defendants and that, as a consequence, the Investment Adviser Defendants were able to systematically skim millions and millions of dollars from the Federated Funds.

68.    By reason of the conduct described above, the Investment Adviser Defendants violated Section 34(b) of the Investment Company Act.

69.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' violation of Section 34(b) of the Investment Company Act, Federated Funds investors have incurred damages.

70.    Plaintiff and the Class have been specially injured by Defendants' violations of Section 34(b) of the Investment Company Act. Such injuries were suffered directly by the shareholders, rather than by the Federated Funds themselves.

71.   The Investment Adviser Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal such adverse material information.

## COUNT II

### Against The Investment Adviser Defendants Pursuant To Section 36(b) Of The Investment Company Act Derivatively On Behalf Of The Federated Funds

72.   Plaintiff repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

73.   This Count is brought by the Class (as Federated Funds securities holders) on behalf of the Federated Funds against the Investment Adviser Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

74.   The Investment Adviser Defendants had a fiduciary duty to the Federated Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser Defendants.

75.   The Investment Adviser Defendants violated Section 36(b) by improperly charging investors in the Federated Funds purported Rule 12b-1 marketing fees, and by drawing on Federated Funds assets to make undisclosed payments of Soft Dollars and excessive commissions, as defined herein, in violation of Rule 12b-1.

76.   By reason of the conduct described above, the Investment Adviser Defendants violated Section 36(b) of the Investment Company Act.

77.   As a direct, proximate and foreseeable result of the Investment Adviser Defendants' breach of the fiduciary duty of loyalty in their role as investment advisers to

27

Federated Funds investors, the Federated Funds and the Class have incurred millions of dollars in damages.

78.    Plaintiff, in this count, seeks to recover the Rule 12b-1 fees, Soft Dollars, excessive commissions and the management fees charged the Federated Funds by the Investment Adviser Defendants.

## COUNT III

### Against Federated Investors, Inc. (As A Control Person Of The Investment Adviser Defendants) And The Director Defendants (As Control Persons Of The Investment Adviser Defendants) For Violation Of Section 48(a) Of The Investment Company Act By The Class And Derivatively On Behalf Of The Federated Funds

79.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.    This Count is brought pursuant to Section 48(a) of the Investment Company Act against Federated Investors, Inc. as a control person of the Investment Adviser Defendants and the Director Defendants as control persons of the Investment Adviser Defendants, who caused the Investment Adviser Defendants to commit the violations of the Investment Company Act alleged herein.  It is appropriate to treat these defendants as a group for pleading purposes and to presume that the misconduct complained of herein are the collective actions of Federated Investors, Inc. and the Director Defendants.

81.    The Investment Adviser Defendants are liable under Section 34(b) of the Investment Company Act to the Class and under Section 36(b) of the Investment Company Act to the Federated Funds as set forth herein.

82.    Federated Investors, Inc. and the Director Defendants were "control persons" of the Investment Adviser Defendants and caused the violations complained of herein.  By virtue of their positions of operational control and/or authority over the Investment Adviser Defendants,

28

Federated Investors, Inc. and the Director Defendants directly and indirectly, had the power and authority, and exercised the same, to cause the Investment Adviser Defendants to engage in the wrongful conduct complained of herein.

83.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Federated Investors, Inc. and the Director Defendants are liable to Plaintiff to the same extent as are the Investment Adviser Defendants for their primary violations of Sections 34(b) and 36(b) of the Investment Company Act.

84.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages against Federated Investors, Inc. and the Director Defendants.

## COUNT IV

### Against The Investment Adviser Defendants Under Section 215 Of The Investment Advisers Act For Violations Of Section 206 Of The Investment Advisers Act Derivatively On Behalf Of The Federated Funds

85.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.    This Count is based upon Section 215 of the Investment Advisers Act, 15 U.S.C. §80b-15.

87.    The Investment Adviser Defendants served as "investment advisers" to the Federated Funds and other members of the Class pursuant to the Investment Advisers Act.

88.    As fiduciaries pursuant to the Investment Advisers Act, the Investment Adviser Defendants were required to serve the Federated Funds in a manner in accordance with the federal fiduciary standards set forth in Section 206 of the Investment Advisers Act, 15 U.S.C. §80b-6, governing the conduct of investment advisers.

89.    During the Class Period, the Investment Adviser Defendants breached their fiduciary duties to the Federated Funds by engaging in a deceptive contrivance, scheme, practice

29

and course of conduct pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon the Federated Funds. As detailed above, the Investment Adviser Defendants skimmed money from the Federated Funds by charging and collecting fees from the Federated Funds in violation of the Investment Company Act and the Investment Advisers Act. The purpose and effect of said scheme, practice and course of conduct was to enrich the Investment Adviser Defendants, among other defendants, at the expense of the Federated Funds. The Investment Adviser Defendants breached their fiduciary duties owed to the Federated Funds by engaging in the aforesaid transactions, practices and courses of business knowingly or recklessly so as to constitute a deceit and fraud upon the Federated Funds.

90.    The Investment Adviser Defendants are liable as direct participants in the wrongs complained of herein. The Investment Adviser Defendants, because of their position of authority and control over the Federated Funds were able to and did control the fees charged to and collected from the Federated Funds and otherwise control the operations of the Federated Funds.

91.    The Investment Adviser Defendants had a duty to (1) disseminate accurate and truthful information with respect to the Federated Funds; and (2) truthfully and uniformly act in accordance with their stated policies and fiduciary responsibilities to the Federated Funds. The Investment Adviser Defendants participated in the wrongdoing complained of herein in order to prevent the Federated Funds from knowing of the Investment Adviser Defendants' breaches of fiduciary duties including: (1) the charging of the Federated Funds and Federated Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Federated Funds for excessive and improper commission payments to brokers.

92.     As a result of the Investment Advisers' multiple breaches of their fiduciary duties owed to the Federated Funds, the Federated Funds were damaged.

93.     The Federated Funds are entitled to rescind their investment advisory contracts with the Investment Adviser Defendants and recover all fees paid in connection with their enrollment pursuant to such agreements.

## COUNT V

### Breach Of Fiduciary Duty Against
### The Investment Adviser Defendants On Behalf Of The Class

94.     Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

95.     As advisers to the Federated Funds the Investment Adviser Defendants were fiduciaries to the Plaintiff and other members of the Class and were required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.

96.     As set forth above, the Investment Adviser Defendants breached their fiduciary duties to Plaintiff and the Class.

97.     Plaintiff and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

98.     Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

31

## COUNT VI

### Breach Of Fiduciary Duty Against The Director
### Defendants On Behalf Of The Class

99.    Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

100.    As Federated Funds directors and trustees, the Director Defendants had a fiduciary duty to the Federated Funds and Federated Funds investors to supervise and monitor the Investment Adviser Defendants.

101.    The Director Defendants breached their fiduciary duties by reason of the acts alleged herein, including their knowing or reckless failure to prevent the Investment Adviser Defendants from (1) charging the Federated Funds and Federated Funds investors improper Rule 12b-1 marketing fees; (2) making improper undisclosed payments of Soft Dollars; (3) making unauthorized use of "directed brokerage" as a marketing tool; and (4) charging the Federated Funds for excessive and improper commission payments to brokers.

102.    Plaintiff and the Class have been specially injured as a direct, proximate and foreseeable result of such breach on the part of the Investment Adviser Defendants and have suffered substantial damages.

103.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## COUNT VII

### Aiding And Abetting A Breach Of Fiduciary Duty Against
### The Investment Adviser Defendants On Behalf Of The Class

104.    Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

32

105.    At all times herein, the broker dealers that sold Federated Funds had fiduciary duties of loyalty to their clients, including Plaintiff and other members of the Class.

106.    The Investment Adviser Defendants knew or should have known that the broker dealers had these fiduciary duties.

107.    By accepting improper Rule 12b-1 fees, Soft Dollars and excessive commissions in exchange for aggressively pushing Federated Funds, and by failing to disclose the receipt of such fees, the brokerages breached their fiduciary duties to Plaintiff and the other members of the Class.

108.    The Investment Adviser Defendants possessed actual or constructive knowledge that the brokerages were breaching their fiduciary duties, but nonetheless perpetrated the fraudulent scheme alleged herein.

109.    The Investment Adviser Defendants' actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiff and the other members of the class. By participating in, and offering substantial assistance or encouragement to, the brokerages' breaches of fiduciary duties, the Investment Adviser Defendants are liable therefor.

110.    As a direct, proximate and foreseeable result of the Investment Adviser Defendants' knowing participation in the brokerages' breaches of fiduciary duties, Plaintiff and the Class have suffered damages.

111.    Because the Investment Adviser Defendants acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, the Investment Adviser Defendants are liable for punitive damages in an amount to be determined by the jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding punitive damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding the Federated Funds rescission of their contracts with the Investment Adviser Defendants, including recovery of all fees which would otherwise apply, and recovery of all fees paid to the Investment Adviser Defendants;

E.    Ordering an accounting of all Federated Funds-related fees, commissions, and Soft Dollar payments;

F.    Ordering restitution of all unlawfully or discriminatorily obtained fees and charges;

G.    Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the defendants' assets to assure that Plaintiff and the Class have an effective remedy;

H.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

34

I.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2004

LAW OFFICE OF ALFRED G.
   YATES, JR., P.C.

By: _____
      Alfred G. Yates, Jr. (Pa. Id. No. 17419)
      Gerald L. Rutledge (Pa. Id. No. 62027)
429 Forbes Avenue
519 Allegheny Building
Pittsburgh, Pennsylvania  15219
(412) 391-5164

**MILBERG WEISS BERSHAD HYNES
   & LERACH LLP**
Steven G. Schulman
Janine L. Pollack
Kim E. Levy
Peter E. Seidman
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

**Counsel for Plaintiff and the Class**

35

**Exhibit A**

## THE FEDERATED FUNDS

American Skandia Advisor Funds Inc. - Federated High Yield Bond Fund
Federated Adjustable Rate Us Government Fund
Federated Adjustable Rate Securities Fund
Federated Aggressive Growth Fund
Federated Alabama Municipal Cash Trust
Federated American Leaders Fund
Federated Arms Fund
Federated Asia Pacific Growth Fund
Federated Automated Cash Management Trust
Federated Automated Government Cash Reserves
Federated Automated Treasury Cash Reserves
Federated Bond Fund
Federated Bond Index Fund
Federated California Municipal Income Fund
Federated Capital Appreciation Fund
Federated Capital Growth Fund
Federated Capital Income Fund
Federated Communications Technology Fund
Federated Connecticut Municipal Cash Trust
Federated Conservative Allocation Fund
Federated Emerging Markets Fund
Federated Equity Income Fund
Federated European Equity Fund
Federated European Growth Fund
Federated Exchange Fund
Federated Florida Municipal Cash Trust
Federated Fund For US Government Securities
Federated Georgia Municipal Cash Trust
Federated Global Equity Fund
Federated Global Financial Services Fund
Federated Global Value Fund
Federated GNMA Trust
Federated Government Fund
Federated Government Income Securities Fund
Federated Government Obligations Fund
Federated Government Obligations Tax-Managed Fund
Federated Government UltraShort Duration Fund
Federated Government UltraShort Fund
Federated Growth Allocation Fund
Federated Growth Strategies Fund
Federated High Income Bond Fund
Federated Income Trust

Federated Institutional High-Yield Bond Fund
Federated Institutional Short Duration Government Fund
Federated Intermediate Government Fund
Federated Intermediate Income Fund
Federated Intermediate Municipal Trust
Federated International Bond Fund
Federated International Capital Appreciation Fund
Federated International Equity Fund
Federated International Funds Plc - High Income Advantage Fund
Federated International Funds Plc - Short-Term Euro Fund
Federated International Funds Plc - Short- Term US Government Securities Fund
Federated International Funds Plc - Short-Term US Prime Fund
Federated International Funds Plc - Short-Term US Treasury Securities Fund
Federated International Growth Fund
Federated International High Income Fund
Federated International Income Fund
Federated International Small Company Fund
Federated International Value Fund
Federated Kaufmann Fund
Federated Kaufmann Small Cap Fund
Federated Large Cap Growth Fund
Federated Large Cap Index Fund
Federated Large Cap Tech Fund
Federated Latin American Growth Fund
Federated Liberty Fund
Federated Liberty US Government Money Market Trust
Federated Limited Duration Fund
Federated Limited Duration Government Fund
Federated Limited Term Fund
Federated Limited Term Municipal Fund
Federated Liquid Cash Trust
Federated Managed Aggressive Growth Fund
Federated Managed Growth & Income Fund
Federated Managed Growth Fund
Federated Managed Income Portfolio
Federated Market Opportunity Fund
Federated Maryland Municipal Cash Trust
Federated Master Trust
Federated Max-Cap Fund
Federated Max-Cap Index Fund
Federated Michigan Intermediate Municipal Trust
Federated Mid-Cap Fund
Federated Mid-Cap Index Fund
Federated Mini-Cap Fund
Federated Mini-Cap Index Fund
Federated Minnesota Municipal Cash Trust

Federated Moderate Allocation Fund
Federated Money Market Trust
Federated Mortgage Fund
Federated Muni & Stock Advantage Fund
Federated Municipal Obligations Fund
Federated Municipal Opportunities Fund
Federated Municipal Securities Fund
Federated Municipal UltraShort Fund
Federated New Economy Fund
Federated New Jersey Municipal Cash Trust
Federated New York Municipal Cash Trust
Federated New York Municipal Income Fund
Federated North Carolina Municipal Cash Trust
Federated North Carolina Municipal Income Fund
Federated Obligation Funds
Federated Ohio Intermediate Municipal Trust
Federated Ohio Municipal Cash Trust
Federated Ohio Municipal Income Fund
Federated Pennsylvania Intermediate Municipal Trust
Federated Pennsylvania Municipal Cash Trust
Federated Pennsylvania Municipal Income Fund
Federated Premier Intermediate Municipal Income Fund
Federated Premier Municipal Income Fund
Federated Prime Cash Obligations Fund
Federated Prime Obligations Fund
Federated Prime Value Obligations Fund
Federated Short-Term Income Fund
Federated Short-Term Municipal Trust
Federated Short-Term Us Government Trust
Federated Small Cap Strategies Fund
Federated Stock & Bond Fund
Federated Stock Trust
Federated Strategic Income Fund
Federated Tax-Free Instruments Trust
Federated Tax-Free Obligations Fund
Federated Tax-Free Trust
Federated Tennessee Municipal Cash Trust
Federated Total Return Bond Fund
Federated Total Return Government Bond Fund
Federated Total Return Limited Duration Fund
Federated Treasury Obligations Fund
Federated UltraShort Bond Fund
Federated US Government Bond Fund
Federated US Government Fund
Federated US Government Securities Fund: 1-3 Years
Federated US Government Securities Fund: 5-10 Years

Federated US Government Securities Fund: 2-5 Years
Federated US Treasury Cash Reserves
Federated Utility Fund
Federated Virginia Municipal Cash Trust
Federated World Utility Fund
IDEX Federated Tax Exempt Fund

# EXHIBIT F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA



|  |  |
|---|---|
| GARY M. BAUER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FEDERATED EQUITY | ) |
| MANAGEMENT COMPANY OF | ) |
| PENNSYLVANIA, FEDERATED | ) |
| INVESTMENT MANAGEMENT | ) |
| COMPANY and FEDERATED | ) |
| SECURITIES CORP., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No:

04   0702

**COMPLAINT**

**FILED**

MAY 1 0 2004

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

Plaintiff, Gary M. Bauer, files this Complaint against Defendants Federated

Equity Management Company of Pennsylvania, Federated Investment Management

Company and Federated Securities Corp. (collectively "Federated" or the "Defendants")

and alleges as follows:

## I.    INTRODUCTION

1.    Section 36(b) of the Investment Company Act of 1940 (the "ICA")

imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with

respect to their receipt of compensation.  Defendants provide investment management

and other services to the Plaintiff and other shareholders throughout the country who

invest in the Federated family of mutual funds.  In receiving excessive compensation

from those funds, Defendants have breached their fiduciary (and other) duties.

2.    The Plaintiff is a shareholder in the Federated Equity Income Fund and the

Federated High Income Bond Fund mutual funds (technically known as open-end registered investment companies) as identified on Exhibit 1 (the "Funds"). The Funds were formed, and are distributed, advised and managed, by the Defendants.

3. The Funds have a board of directors (or trustees) that purportedly include a majority of disinterested directors. These disinterested directors live throughout the United States, including Palm Beach, Florida, Westhampton Beach, New York and Valparaiso, Indiana. Documents relied upon by these directors, and relevant to these claims, were (and are) distributed by Defendants throughout the country by courier and electronic (internet) delivery means and are easily discoverable in this district.

4. Plaintiff seeks to recover all damages available pursuant to Section 36(b) of the ICA, including all compensation received by the Defendants, directly or indirectly, from the Funds for the period beginning one year prior to the filing of this Complaint through the date of trial. The present case does not seek class action status and is not subject to transfer to any multidistrict litigation proceedings currently pending, including those in the District of Maryland captioned In Re Mutual Funds Investment Litigation, MDL-1586. The Judicial Panel's basis for coordinating and consolidating the various individual actions that comprise MDL-1586 is that they "involve common questions of fact concerning allegations of market timing and/or late trading in the mutual fund industry." By contrast, this action does not involve allegations that Defendants or their affiliates have engaged in unlawful market timing, late trading, manipulation of closing net asset values, or similar conduct. This matter is brought solely under Section 36(b) of the ICA, and addresses Defendants' breach of their fiduciary duties imposed by that Section through their receipt of excessive fees.

5.　　　　Defendants Federated Equity Management Company of Pennsylvania ("FEMCO") and Federated Investment Management Company ("FIMCO") manage the Funds pursuant to management agreements and receives substantial fees. In percentage terms, those fees may at first look benign. However, in dollar terms, and in comparison to fees received by Federated for managing other virtually identical institutional portfolios, the fees received from the Funds are staggering and excessive. For example, the Defendants received over $12 million dollars in 2003 - a single year - for portfolio selection services for, and distributing shares of, the Federated High Income Bond Fund - a single portfolio - when they would have received less than $3.4 million dollars if they had received the same compensation they found agreeable in managing or subadvising virtually identical portfolios for other institutional clients. [See Exhibit 9].

6.　　　　Defendants' management activities include selecting and trading securities for the Funds to buy, sell or hold (the "Portfolio Selection Services") and providing administrative services. It receives a management fee from the Funds for these activities that is calculated as a percentage of total assets under management. That portion of the management fee that is for only Portfolio Selection Services shall be referred to as the "Portfolio Selection Fee."

7.　　　　All mutual funds, including the Funds, create economies of scale as assets under management increase. The larger a portfolio, the greater the benefits from economies of scale and the less it costs to provide investment advisory services for each additional dollar of assets under management. Eventually, when portfolios become as large as the Funds, the cost of providing Portfolio Selection Services for each additional dollar of assets under management approaches zero.

8.     Defendants (directly or through their affiliates) also provide Portfolio Selection Services to other institutional portfolios.  The contracts for those services confirm the excessive nature of the fees received by Defendants from the Funds.  The Portfolio Selection Services that Defendants provide to the Funds are identical to the portfolio selection services they provide to other institutional clients, including through their affiliate "Federated Investment Counseling" or "FIC".  However, unlike the advisory contracts between Defendants and the Funds, the contracts that FIC negotiates with other institutional clients are the product of arms' length negotiations.

9.     The fees received from the Funds by Defendants for Portfolio Selection Services are several times larger on a percentage basis (and even larger in total dollars) than the fees received from the other institutional clients for the same services, even though the portfolios of other institutional clients are much smaller and do not offer the same economies of scale as the Funds.  The much higher Portfolio Selection Fees that FIMCO receives from the Funds could not have resulted from arms' length negotiations.

10.     In addition to the management fees received by FIMCO, the Defendants (including through their affiliate Federated Securities Corp. ("FSC")) also receive fees ("Distribution Fees") pursuant to share distribution plans adopted under Rule 12b-1, 17 C.F.R. § 270.12b-1 ("Distribution Plans").  Like the Portfolio Selection Fees, the 12b-1 Distribution Fees are based on a percentage of the net assets of the funds in the Federated Fund Complex, including the Funds.

11.     A large portion of 12b-1 Distribution Fees received by Defendants are properly payable *only* if the Funds' boards of directors find that there is a reasonable likelihood that the Plaintiff and other holders of Fund shares would benefit from

economies of scale through reduced advisory fees. These fees (the challenged portion of total Distribution Fees) shall be referred to as "Promotional Distribution Fees" (some portion of 12b-1 Distribution Fees are used for other purposes, such as paying contingent deferred sales commissions to broker-dealers who sell Federated funds).

12.    Although assets held by the Funds have indeed increased significantly over time, Defendants have failed to share the resulting economies of scale with Plaintiff or other shareholders of the Funds. Instead, as assets increased, Defendants simply continued to receive from the Funds ever greater fees.

13.    The receipt by Defendants of the Portfolio Selection Fees from the Funds constitutes a breach of their fiduciary and other duties to the Funds. The receipt by Defendants of the Promotional Distribution Fees also constitutes a breach of their fiduciary and other duties to the Funds.

14.    Plaintiff seeks to (a) recover all fees and compensation received by the Defendants and their affiliates from the Funds in violation of Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b), including all Portfolio Selection Fees and all Promotional Distribution Fees, (b) recover all other or further benefits resulting from the economies of scale created by the Funds but wrongfully retained by the Defendants, (c) rescind the management agreements between Defendants and the Funds and, finally,  (d) rescind the Distribution Plan because it was not approved as required by the ICA and receipt by Defendants of payments pursuant to that plan also breaches Section 36(b).

## II.     PARTIES

15.     Plaintiff Gary M. Bauer ("Bauer") is a resident of Belleville, St. Clair County, Illinois and is a shareholder in the Federated Equity Income Fund and the Federated High Income Bond Fund.

16.     Defendant Federated Equity Management Company of Pennsylvania ("FEMCO") is a Delaware corporation with its primary place of business in Pittsburgh, Pennsylvania.  It is registered in Pennsylvania as an investment adviser under Pennsylvania law and the Investment Advisers Act of 1940.  FEMCO is currently the investment adviser to the Federated Equity Income Fund.

17.     Defendant Federated Investment Management Company ("FIMCO") is a Delaware corporation and is registered in Pennsylvania as an investment adviser under Pennsylvania law and the Investment Advisers Act of 1940.  FIMCO was the investment adviser to the Federated Equity Income Fund until December 31, 2003 and is the current investment adviser to the Federated High Income Bond Fund.

18.     Defendant Federated Securities Corp. ("FSC") is a Delaware corporation and is registered as a broker/dealer in Pennsylvania and throughout the United States.  FSC is the distributor and principal underwriter of the Funds.

19.     Although not a party, Defendants' affiliate Federated Advisory Services Company ("FASC") is a Delaware corporation and is registered as an investment adviser in Pennsylvania under the Investment Advisers Act of 1940.  FASC provides research, quantitative analysis, equity trading and transaction settlement and certain support

services to Defendants as adviser to the Funds, and FASC receives a portion of the

Funds' advisory fee. Similarly, and also not a party, Defendants' affiliate Federated

Investment Counseling ("FIC") is a Delaware corporation and is registered in

Pennsylvania as an investment adviser under the Investment Advisers Act of 1940. FIC

(and perhaps other affiliates of Defendants) provides investment advisory services to

institutional investors (including subadvisory services to other mutual funds) in exchange

for arms' length negotiated fees that are substantially lower than those charged (but not

negotiated at arms' length) for virtually identical services to the Funds.

### III.    JURISDICTION AND VENUE

20.      This action is brought pursuant to § 36(b) of the Investment Company Act

of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b) and § 80a-12(b).

21.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43,

15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

22.      Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and

28 U.S.C. § 1391(b)(1).

### IV.    GENERAL ALLEGATIONS

#### The Investment Company Act of 1940

23.      In 1940, Congress enacted the Investment Company Act of 1940, 15

U.S.C. § 80a-1 et seq. (the "ICA"). The ICA was designed to regulate and curb abuses in

the mutual fund industry and to create standards of care applicable to investment advisers

such as Defendants. In the 1960s, it became clear to Congress that investment advisers to

equity mutual funds were gouging those funds with excessive fees. As a result, § 36(b)

was added to the ICA in 1970 (primarily to remedy excessive fees charged by mutual

funds such as those owned by Plaintiff) and created a federal cause of action for breach of

fiduciary duty by investment advisers and their affiliates such as Defendants.

24.    Section 36(b) provides in pertinent part:

> [T]he investment adviser of a registered investment company
> shall be deemed to have a fiduciary duty with respect to the
> receipt of compensation for services, or of payments of a
> material nature, paid by such registered investment company,
> or by the security holders thereof, to such investment adviser or
> any affiliated person of such investment adviser. An action may
> be brought under this subsection by the Commission, or by a
> security holder of such registered investment company on
> behalf of such company, against such investment advisers, or
> an affiliated person of such investment adviser, or any other
> person enumerated in subsection (a) of this section who has a
> fiduciary duty concerning such compensation or payments, for
> breach of fiduciary duty in respect to such compensation or
> payments paid by such registered investment company or by
> the security holders thereof to such investment adviser or
> person . . . .

**The Portfolio Selection Fees**

25.    Defendants receive a "management" fee from each of the Funds as

compensation for Portfolio Selection Services and certain limited "administrative"

expenses (the bulk of administrative costs are received outside of and separately from the

management fee).

26.    Although the Portfolio Selection Fees challenged may appear to be very

small on a shareholder-by-shareholder basis, they are huge in absolute terms and, even on

a shareholder-by-shareholder basis, cause a dramatic decrease in shareholders' investment

returns over time. Arthur Levitt, past Chairman of the SEC, has observed this and is

critical of what he calls the "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know
> how seemingly small fees can, over time, create such drastic
> erosion in returns. . . .In the years ahead, what will mutual fund

investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001) [Exhibit 3].

27. The management fees received by Defendants are paid as a varying percentage of assets under management. The fees vary based on the amount of assets under management and should be (but are not) reduced as the total amount of assets under management increase. Known as "breakpoints," such a fee structure implicitly recognizes the existence of economies of scale. Defendants have failed to implement *any* breakpoints in the Funds, however, thereby depriving the Plaintiff and the Funds of the benefits of the economies of scale created by the contribution of *their* capital to the Funds. This failure to implement breakpoints is a breach of Defendants' fiduciary duties under the Investment Company Act and Section 36(b).

28. As Fund portfolios grow, they quickly create economies of scale and eventually the cost of servicing additional assets approaches zero. Breakpoints recognize these economies but, as stated, Defendants have failed to implement breakpoints in order to benefit themselves rather than the Funds.

29. A flat Portfolio Selection Fee (in dollars, not percentages) or a breakpoint approaching zero for very large portfolios such as those of the Funds would allow the Funds to capture economies of scale that belong to them under Section 36(b), while also allowing Defendants to earn a fair and competitive profit for its services.

30. The total management fee received by Defendants from each Fund consists

of a pure Portfolio Selection Fee component and a much smaller administrative services component (subtracting the administrative services component from the total management fee for each Fund leaves the Portfolio Selection Fee for each Fund).

31.     The portion of the management fee paid by the Funds to Defendants that is attributable to administrative costs is no more than 0.1% (10 basis points) of total Fund assets (mutual funds from fund complexes other than Federated, of comparable size and investment objectives, incur administrative costs of less than 0.1% (10 basis points)).  In all likelihood, the administrative portion of the total management fee paid by the Funds is probably close to zero because Defendants, unlike many investment advisors to mutual funds, separately charges the Funds for all or most other administrative expenses.

32.     Furthermore, economies of scale also exist with respect to the administrative costs component of the management fee.  For example, the American Funds' Washington Mutual Fund pays an administrative cost fee as low as 0.04% (4 basis points) of net assets under management.  Thus, the administrative costs component of a mutual funds' management fee declines as assets increase, thereby establishing by comparison that the administrative costs portion of the management fee charged by Defendants to the Funds is less than 0.1% (10 basis points) of total net assets.

33.     The chart at Exhibit 5 sets forth the amount of the Portfolio Selection Fee received by Defendants during the most recent reported periods allowing a generous 0.1% of total net assets as the maximum administrative cost portion of the management fee.

34.     The Portfolio Selection Fees received by Defendants from the Funds are excessive.

35.     Defendants' receipt and acceptance of the Portfolio Selection Fees for pure

Portfolio Selection Services was (and continues to be) in breach of its fiduciary and other duties.

### The Funds' Rule 12b-1 Distribution Plans and Fees

36.    "12b-1" Distribution Fees are named for the SEC rule that allows and regulates their payment, 17 C.F.R. § 270.12b-1. Rule 12b-1 permits a fund to market and sell its shares with shareholder funds (Distribution Fees) out of fund assets *only* in strict compliance with the rule.

37.    Prior to 1980, the use of shareholder funds to market and sell fund shares was prohibited. The SEC had historically been reluctant to allow fund advisers to charge their shareholders for selling shares to others:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

38.    After intense lobbying by the mutual fund industry, the SEC agreed to consider tempering its objections to allow current fund shareholders to pay distribution expenses. In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued (correctly) that adding assets in an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

39.    Accepting the mutual fund industry's argument that a growth in assets would lead to a *quid pro quo* reduction in advisory fees and other expenses, the SEC

tentatively approved Rule 12b-1, 17 C.F.R. § 270.12b-1. However, numerous conditions

were attached to the use of shareholder funds to pay distribution expenses. For example,

the SEC wanted to be certain that investment advisers would not "extract additional

compensation for advisory services by excessive distributions under a 12b-1 plan."

*Meyer v. Oppenheimer Management Corporation*, 895 F.2d 861, 866 (2d Cir. 1990).

    40.       Defendants have done just what the SEC feared: extracted additional

compensation for their retail advisory services by causing Plaintiff and other shareholders

to pay Defendants' marketing expenses to retain and acquire new shareholders so that

these shareholders will pay additional advisory fees that benefit them rather than the

Plaintiff and the Funds.

    41.       12b-1 Distribution Plans must be reviewed annually by the Funds' board

of trustees. In particular, the board must "request and evaluate . . . such information as

may reasonably be necessary to an informed decision of whether such plan should be

implemented or continued." 17 C.F.R. § 270.12b-1(d). Defendants are required to furnish

this information. 17 C.F.R. § 270-12b-1(d). In addition, minutes must be maintained to

record all aspects of the boards' deliberation. On an annual basis, the board must

conclude "in light of their fiduciary duties under state law and under Sections 36(a) and

(b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit

the company and its shareholders." 17 C.F.R. § 270.12b-1(e).

    42.       The Funds' Distribution Plans have not been adopted in accordance with

these rules. The board did not find that the Distribution Plans in general or the

Promotional Distribution Fees in particular benefit the Funds or its shareholders by

generating savings from economies of scale in excess of the cost of the plan. In fact,

despite the dramatic growth in total assets held by the Funds, both the management fee (including the Portfolio Selection Fee) and total 12b-1 Distribution Fees (including Promotional Distribution Fees) received by Defendants have grown over time, thus depriving the Funds of the benefit of these economies of scale in breach of Defendants' fiduciary and other duties.

43.    For example, the Federated High Income Bond Fund's shareholders paid less than $100,000 in 12b-1 Distribution Fees in 1994.  12b-1 Distribution Fees have since grown to over $7.5 million.

44.    Over that same time, total management fees for the Federated High Income Bond Fund soared from $3.4 million to $12.6 million, of which nearly $10 million is for pure Portfolio Selection Services.

45.    The Promotional Distribution Fee portion of these fees increased along with total 12b-1 Distribution Fees.  These fees have produced no benefits to Fund shareholders; rather, they have served only Defendants, just as the SEC feared when it found that:

> "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."

Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).

As such, the Funds' Distribution Plans violate the intent and purpose of Rule 12b-1, the Distribution Fees are entirely a waste of fund assets and their receipt by Defendants violates Section 36(b).

46.    Furthermore, as the purpose of Promotional Distribution Fees is to increase the assets held by the Funds, as assets have increased, the Promotional Distribution Fees should decline as assets increase, especially when caused by a generally rising market. This has not happened. In fact, much of the increase in Promotional Distribution Fees is due to a rising equity market, and not due to any promotional activities of Defendants. The Dow Jones Industrial Average (the "Dow") rose from 2753 in 1990 to over 10,000 today. This market expansion alone greatly increased 12b-1 Promotional Distribution Fees with no additional work or effort on behalf of Defendants.

47.    Despite the fact that Plaintiff and the other Fund shareholders have enjoyed no benefits from the Promotional Distribution Fees, and despite the fact that the Funds' Distribution Plan allowed Defendants to extract additional and excessive compensation from the Funds, the directors of the Funds approved, year after year, continuation of the Plan in violation of both Rule 12b-1 and § 36(b).

48.    Plaintiff, on behalf of the Funds, is entitled to recover the Promotional Distribution Fees received (and continuing to be received) by Defendants.

### The Gartenberg Test

49.    As set forth in *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923 (2d Cir. 1982) (decided long before today's computer and internet capabilities existed and before the in-depth studies by the GAO and SEC), the test for determining whether compensation paid to Defendants violates § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in the light of all of the surrounding circumstances." *Id.* at 928. Stated differently, "the adviser-manager must charge a fee that is so disproportionately large that

it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargain." *Id.*

50.      The Defendants' receipt of fees from the Funds for Portfolio Selection Services breaches their fiduciary duties under § 36(b) because they are excessive. The Portfolio Selection Fees negotiated with other institutional clients (*i.e.*, clients other than the Funds or other Federated funds) for managing *smaller* portfolios are substantially *less* than the Portfolio Selection Fees received from the Funds. That is because the Funds' fee schedule does *not* "represent a charge within the range of what would have been negotiated at arms-length." In fact, the fees charged to the Funds have never been within or near such a range. Moreover, this information has either been withheld by Defendants from the Funds' board of trustees (and also from the shareholders), or the board has failed to properly consider the information.

51.      Similarly, the Promotional Distribution Fees do not "represent a charge within the range of what would have been negotiated at arm's-length." Indeed, when an arms length negotiation takes place, the result is that *no* 12b-1 Distribution Fees are paid. When institutional investors wish to retain Defendants to manage their assets, they purchase shares through separate accounts (that pay no Distribution Fees and have significantly lower Portfolio Selection Fees).

52.      In applying this test, all pertinent facts must be weighed in determining whether a fee or other compensation violates § 36(b). The *Gartenberg* court specifically identified six factors (a portion of "all pertinent facts") to be considered in determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been negotiated at arms' length. Each demonstrates

that receipt of the Portfolio Selection and Promotional Distribution Fees by the Defendants violated (and continues to violate) § 36(b):

    **(1)    Economies of Scale**

53.    Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services (including Portfolio Selection Services) to clients such as the Funds. Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets. At some point (a point exceeded by the Funds), the additional cost to advise each additional dollar in the Funds (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches zero.

54.    For example, the cost of providing Portfolio Selection Services to the Funds may be $X for the first $100 million of assets under management but the cost for providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's portfolio investment objectives are set forth in their offering documents and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities. In addition, when assets under management increase in value over time as markets rise or existing shareholders purchase additional shares (with no change in the composition of the Funds' portfolios or number of shareholders), there are no additional Portfolio Selection Service costs incurred by Defendants.

55.    The benefits created by these economies of scale belong to the Funds and the Plaintiff, not the Defendants or their affiliates.

56.    Technology has lowered the costs to Defendants of providing the Portfolio

Selection Services.  For example, it has become far easier and less expensive to obtain research about potential investments, and to communicate with the Funds and their shareholders, than regulators and courts in the early days of Section 36(b) could ever have imagined. Defendants benefit from the widespread use of computers with exponentially greater computing power today than those of 20 years ago, company and stock research is readily and instantly available on the Internet, and Defendants are able to transact business with current and potential shareholders on the Internet.  All of this dramatically lowers Defendants' costs and should have resulted in significantly lower Portfolio Selection Fees over time.  Instead, those fees (in both percentage and dollar terms) have not declined as they should have but increased because of Defendants' violation of their fiduciary duties.

57.      These economies of scale exist at the individual fund level (including the Funds) and at the complex or family of funds level (meaning all funds advised by the Defendants considered together).  They also exist on a more comprehensive basis, encompassing the Defendants' entire scope of operations, including administrative expenses and advisory services provided to other institutional clients.

58.      Notable academic research confirms the long-standing existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders.  See, John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest, 26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study") [Exhibit 6].

59.      Furthermore, both the Securities and Exchange Commission (the "SEC") and the Government Accounting Office (the "GAO") also confirmed, in June of 2000,

that economies of scale exist in the provision of Portfolio Selection Services. See SEC

Report at 30-31 [Exhibit 7]; Government Accounting Office, Report on Mutual Fund

Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the

Ranking Member, Committee on Commerce, House of Representatives (June 2000)

("GAO Report"), at 9 [Exhibit 8].

60.    Courts have also found that these economies of scale exist. See, Migdal v.

Rowe Price Fleming Int'l, Inc., 248 F.3d 321, 326-27 (4th Cir. 2001). Even the mutual

fund industry's lobbying arm, the Investment Company Institute ("ICI"), admits that

mutual funds exhibit economies of scale. Thus, it cannot be disputed that extensive and

significant economies of scale exist in the provision of investment advisory services, in

particular Portfolio Selection Services, by advisers or affiliates such as Defendants to

mutual funds such as the Funds.

61.    One simple example of economies of scale is when total assets under

management increase due purely to market forces. In that event, it is possible for the

Defendants to service the additional assets at zero additional variable cost: there is no

change in the securities held in the portfolios or the number of shareholders in the Funds.

62.    The Defendants have benefited from economies of scale resulting from

pure market appreciation. On January 1, 1990, the Dow Jones Industrial Average was at

2753. When the decade closed on December 31, 1999, the Dow was at 11,497 (more

than a four-fold increase). If a mutual fund merely held the stocks that comprise the

Dow, and did nothing, the Portfolio Selection Fees and Promotional Distribution Fees

would have nearly quadrupled absent meaningful breakpoints (an absence suffered by the

funds) or unless the advisers dramatically reduced their fees (also not the case here).

63.     Today, even following three years of a turbulent market, the Dow Jones Industrial Average remains over 10,000, representing a three-and-one-half times increase from the levels of 1990. This growth has created enormous "free" economies of scale for the Funds, the benefits of which were wrongfully retained by the Defendants who incurred no additional costs in providing Portfolio Selection Services for the additional assets generated in the Funds by such market growth.

64.     Another simple example of benefits arising through no effort on the part of the Defendants yet creating considerable economies of scale occurs when the Funds' assets under management grow because of additional investments by current shareholders. Once again, no additional client relationship is established (or related costs incurred) and economies of scale are created by the shareholders of the Funds, the benefits of which must be shared with the Funds. Still, Defendants have failed to meaningfully reduce the Portfolio Selection Fees in either percentage or dollar terms.

65.     These facts regarding economies produced by market appreciation are confirmed by the GAO and by the Freeman and Brown Study. *See* GAO Report at 9 (noting that growth from portfolio appreciation is unaccompanied by a growth in costs) [Exhibit 8]; Freeman & Brown Study. [Exhibit 6 at p. 619-21].

66.     The assets in the Funds have grown dramatically over the past dozen years along with the growth generally in the stock market and Defendants have benefited greatly from this growth as their receipt of fees exploded. For example:

    a.      For the fiscal year ended March 31, 1994, the Federated Equity Income Fund had approximately $130 million in assets under management. Defendants received approximately $400,000 in management fees and its

affiliates received approximately $85,000 in total 12b-1 fees. By November 30, 2003, fund assets had increased to over $1.3 billion while management fees received by Defendants jumped to approximately $5.4 million and 12b-1 Distribution Fees soared to over $3.4 million.

b.    For the fiscal year ended March 31, 1994, the Federated High Income Bond Fund had approximately $470 million in assets under management. Defendants took in approximately $3.4 million in management fees and $85,000 in total 12b-1 Distribution Fees. By March 31, 2003, fund assets had increased to nearly $2 billion, management fees received by Defendants soared to over $12.6 million and 12b-1 Distribution Fees exploded to over $7.5 million.

c.    During this same period, despite explosive growth in assets, the fees paid by Plaintiff and the Funds did *not* decrease as would have been the case had Defendants not breached their duties to the funds by wrongfully retaining the scale benefits created by Plaintiff and other shareholders in the Funds.

67.    While the size of the Funds has grown dramatically, the nature and quality of the Portfolio Selection Services rendered by Defendants has not changed. Despite this, the Portfolio Selection Fees and the Promotional Distribution Fees received by Defendants have grown dramatically, increasing in proportion with the increase in Fund assets, capturing all benefits from economies of scale and paying no heed to the actual cost of providing those services.

68.    The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) resulted in Portfolio Selection Fees that were (and remain) (a) grossly disproportionate to the Portfolio Selection Services, (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

69.    The retention by Defendants of the benefits resulting from economies of scale (benefits that are owned by, and should have been paid to, the Funds) also resulted in Promotional Distribution Fees that were (and remain) (a) grossly disproportionate to any actual or potential benefit they could have created,  (b) excessive, (c) could not have been the product of an arms' length bargain, and (d) violate § 36(b).

70.    Acceptance of the excessive Portfolio Selection Fees and the Promotional Distribution Fees by Defendants was (and remains) a breach of their fiduciary and other duties to the Funds.

**(2)    Comparative Fee Structures**

71.    A mutual fund is a single investment portfolio for Defendants, as with any other institutional portfolio.  Accordingly, with respect to the Portfolio Selection Services and the Portfolio Selection Fees, a mutual fund is no different than any other institutional investor.

72.    Other institutional investors do not pay Promotional Distribution Fees. Instead, the cost of any distribution activities are paid by Defendants from the management fees received from those institutional investors.  In contrast, the Defendants receive enormous Promotional Distribution Fees from the Funds.  Therefore, the great

discrepancy between the management fees that Defendants receive from other

institutional investors as compared to those received from the Funds is actually

understated because the management fees received from other institutional investors

includes all costs of marketing and distribution.

    73.      Defendants and their affiliates provide advisory services to other

institutional clients for substantially lower fees.  These fees clearly establish that they

receive Portfolio Selection Fees from the Funds that are excessive and disproportionate to

the value of the services rendered and are properly compared to those same fees received

by Defendants from the Funds for Portfolio Selection Services. The Freeman & Brown

Study explains:

> Strong analogies . . . can be drawn between equity advisory
> services in the fund industry as compared to the pension field
> where prices are notably lower.  [Exhibit 6 at 653].

* * *

> [A] mutual fund, as an entity, actually is an institutional
> investor. When it comes to fee discrepancies, the difference
> between funds and other institutional investors does not turn on
> 'institutional status,' it turns on self-dealing and conflict of
> interest." [Exhibit 6 at 629 n. 93].

    74.      The Freeman and Brown study accurately explains the similarity between

the provision of Portfolio Selection Services to a mutual fund, like the Funds, and other

institutional investors with similar investment objectives.

    75.      Similarly, the respected mutual fund analyst firm *Morningstar* has

concluded that there should be no difference between management fees charged to mutual

funds (retail products) and other institutional clients:

> Fees for a firm's retail products should not be materially
> different from management fees for a firm's institutional
> offerings.  Though we appreciate the added costs of

> servicing small accounts, those expenses needn't show up
> in the management fees.

Kunal Kapoor, *The Standards That We Expect Funds to Meet*, Morningstar, December 8, 2003.

76.     The added administrative costs to Defendants of servicing small retail mutual fund accounts are recovered through administrative costs separate from the Portfolio Selection Fee. In addition to the management fee in fiscal 2003, the Funds paid separately for "shareholder services fees" (amounting to $4.1 million for the High Income Bond Fund), compensation of trustees, administrative personnel and services fees, auditing fees, portfolio accounting fees, legal fees, registration costs, printing and postage costs, insurance premiums, taxes and 12b-1 distribution fees, including Promotional Distribution Fees.

77.     A number of relevant comparative fee structures (including Defendants' sub-advisory relationships) clearly establish that Defendants are charging advisory fees to the Funds that are excessive and could not have resulted from arms' length negotiations.

    a.      FIMCO serves as sub-adviser to the Principal Partners LargeCap Blend Fund, Inc., and charges a fee of .35% of the first $75 million of assets, .25% of the next $200 million, .20% of the next $250 million and .15% of assets above $525 million. By contrast, the advisory fee paid by the Federated Equity Income Fund to the Defendants is currently .60% -- with *no* breakpoints.

    b.      FIC serves as sub-advisor to the WRL Federated Growth & Income Portfolio of the AEGON/Transamerica Series Fund, Inc., a mutual fund

which underlies a variable annuity product. For the sub-advisory services rendered to that mutual fund, FIC charges a fee equivalent to .50% of the first $30 million in assets, .35% of the next $20 million, and .25% of assets in excess of $50 million. By contrast, the advisory fee paid by the Federated Equity Income Fund to the Defendants is currently .60% -- with *no* breakpoints.

c.    FIC charges a fee of .25% of the first $200 million in assets and .20% of assets in excess of $200 million for the investment management services it renders to the ASAF Federated High Yield Bond Fund. By contrast, the advisory fee paid by the Federated High Income Bond Fund to the Defendants is currently .75% -- with *no* breakpoints.

d.    FIC charges a fee of .40% of the first $50 million in assets, .25% of the next $200 million in assets, .20% of the next $250 million in assets, and .15% of assets in excess of $500 million for the sub-advisory services it renders to the Nationwide High Income Bond Fund and the Nationwide Equity Income Fund. By contrast, the advisory fee paid by the Federated High Income Bond Fund to the Defendants is currently .75% -- with *no* breakpoints.

78.    Defendants also provide investment advisory services to other institutional clients throughout the country. In those advisory agreements, the fee received by Defendants *includes* all administrative and distribution expenses; as a result, the portion of the fee received from other institutional clients for pure Portfolio Selection Services is actually *less* than the amounts received by Defendants, thereby understating the amount

of Defendants' excessive fees charged to the Funds and underscoring Defendants' violation of 36(b). By comparison, the *total* expense burden (*i.e.*, including all administrative and 12b-1 expenses) for the Federated Equity Income Fund's Class A shares is 1.18% (118 basis points) and for the Federated High Income Bond Fund A shares is 1.23% (123 basis points).

79.    In short, the Portfolio Selection Fees (as a percentage of assets) received by Defendants are at least *double,* frequently *triple*, and, at certain breakpoints, *quadruple* those received from much *smaller* institutional clients for the very same advisory services. When considered in dollar terms (rather than as a percentage), the Portfolio Selection Fees received by Defendants from the Funds are even more excessive in comparison to those paid by institutional clients with smaller portfolios invested in the same or similar securities.

80.    There is no legitimate basis for this marked disparity in fees received by Defendants from the Funds when compared to fees received by them or their affiliates from other institutional clients. The Defendants recover the additional administrative costs associated with large numbers of shareholders through separate fees received from the Funds, and therefore the different identity of the owner of the pool of funds invested has no impact on Portfolio Selection Services or Fees. As noted by Freeman and Brown, while a fund manager may:

> encounter different levels of fixed and variable research costs
> depending on the type of the portfolio, . . . the fundamental
> management process is essentially the same for large and small
> portfolios, as well as for pension funds and mutual funds. The
> portfolio owner's identity (pension fund versus mutual fund)
> should not logically provide a reason for portfolio management
> costs being higher or lower.

Freeman & Brown Study at 627-28 [Exhibit 6]. The "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id.* at 671-72 [Exhibit 6].

81.     The significant economies of scale created solely by virtue of the Plaintiff's and other shareholders' investment dollars in the Funds have been unlawfully retained by the Defendants, and Promotional Distribution Fees have been received by Defendants despite a lack of benefit to the Funds or their shareholders, in violation of Section 36(b).

(3)     **Fallout Benefits (Indirect Profits) Attributable to the Funds**

82.     Defendants also indirectly profit because of "fallout benefits" attributable to the Funds. These profits are above and beyond those received through Portfolio Selection Fees and other fees.

83.     Fallout benefits include the attraction of new customers for other funds or products offered by Defendants, cross selling Defendants' other funds and services to current Fund shareholders, and other benefits associated generally with the development of goodwill and the creation and growth of a client base for Defendants.

84.     Another profitable fallout benefit received and retained by Defendants is "soft dollar" payments. Essentially, "soft dollars" are credits from broker-dealers and other securities industry firms in exchange for Defendants' routing securities transaction orders and other business to the broker-dealers. While the existence of such arrangements has been known, details of the increased costs to the Funds and the concomitant benefits received and retained by Defendants have not been disclosed.

85.     In breach of their fiduciary duties owed to the Funds, Defendants direct the

payment of excessive commissions to securities broker-dealers to execute trades for the

Funds in exchange for which they receives and retain soft-dollars (a form of rebate or

kickback). These soft-dollars are paid for by the Funds and the Plaintiff in the form of

higher commissions (depriving the Funds of the best execution of trades), yet benefit

Defendants.

86.     These soft-dollars can amount to payments surpassing the total Portfolio

Selection Fees and 12b-1 Distribution Fees paid to the Defendants. If Defendants had

sought and obtained the best execution for these trades without the soft-dollar kickbacks,

the Funds and the Plaintiff would likely have saved millions of dollars - money that was

improperly retained by Defendants at the Funds' expense.

87.     Soft-dollar and other fallout benefits are either not quantified and shared

with the Funds' board of trustees (even though the board cannot determine the fairness of

any fee without having this information), or the board of trustees fails to properly

consider fallout benefits when evaluating the fees paid to Defendants.

88.     According to the SEC, "[s]oft-dollar arrangements create incentives for

fund advisers to (i) direct fund brokerage based on the research provided to the adviser

rather than the quality of execution provided to the fund, (ii) forego opportunities to

recapture brokerage costs for the benefit of the fund, and (iii) cause the fund to overtrade

its portfolio to fulfill the adviser's soft-dollar commitments to brokers." Memorandum

from Paul F. Roye, director of the SEC Division of Investment Management, June 2003.

89.     As noted by the SEC, institutional investors other than mutual funds that

negotiate at arms' length often negotiate "soft dollar" or commission recapture programs

and directly participate in the benefits wrongfully taken by Defendants from the Funds

and the Plaintiff. The Funds and their board of trustees could, but do not, negotiate such arrangements and, instead, Defendants have usurped that opportunity for their exclusive benefit.

90.        Defendants and their affiliates also receive other benefits or "kickbacks," either directly or indirectly, such as transfer agency fees. These fees automatically increase as the assets under management and the number of shareholders in the Funds increase. Transfer fees alone add up annually to just under 12 basis points (0.12%) for Federated Equity Income Fund and 10 basis points (0.10%) for Federated High Income Bond Fund in *additional* revenue for Defendants and their affiliate, Federated Services Company. Comparable fees paid by other institutional investors are either included in the overall management fee negotiated at arms' length or cost far less through Defendants or competitive third party providers.

91.        Defendants also benefit from securities lending arrangements where they "loan" out securities owned by the Funds (*e.g.*, to short sellers) for a fee. Defendants retain those benefits even though the securities loaned belong not to them but to the Funds.

92.        These and other fallout benefits are required to be disclosed to the Funds' board of trustees as part of the total mix of information necessary to determine the reasonableness of the Portfolio Selection Fee and the reasons for a 12b-1 Distribution Plan and the related Promotional Distribution Fees. Even without considering the fallout benefits, the Portfolio Selection and Promotional Distribution Fees are excessive in both percentage and dollar terms. After considering the fallout benefits, these fees are obscene and their receipt by Defendants violates § 36(b) of the Investment Company Act of 1940.

**(4) The Nature and Quality of the Services Provided to the Funds'**

**Shareholders**

93.     The nature of the Portfolio Selection Services provided to the Funds is

straightforward: Defendants select (buy, sell or hold) and trades, at its discretion, stocks,

bonds, and other securities for the Funds. This is precisely the same service provided to

Defendants' other institutional clients even though the Funds are charged a dramatically

higher Portfolio Selection Fee as a percentage of assets under management and in dollar

terms.

94.     The quality of the Portfolio Selection Services provided to the Funds by

Defendants is also precisely the same (because the services are the same) as the quality of

the Portfolio Selection Services provided to the other institutional clients.  However,

Plaintiff pays Defendants dramatically higher fees (in percentage and absolute dollar

terms) because the Portfolio Selection Fees are not even close to the range of fees

produced by the arms' length negotiations with Defendants' other institutional clients

(even before considering the enormous additional fallout benefits received by

Defendants).

95.     The nature of services provided for the Promotional Distribution Fee is

also straightforward:  Defendants take money from current Fund shareholders in an effort

to attract new shareholders to the Funds so that all shareholders can enjoy cost savings

from economies of scale.  The Funds' Distribution Plans use of Promotional Distribution

Fees have never achieved the desired cost savings, should never have been approved (or

continued) by the Funds' board of trustees and violates Section 36(b) of the ICA.

**(5)     The Profitability of the Funds to the Adviser-Manager**

96.     The profitability to Defendants of managing the Funds is a factor that this Court may consider.  Intuitively, it is obvious that the fees charged to others in arms' length negotiations is the best indicator of profitability to Defendants; those negotiations must result in profitable relationships or investment managers (such as Defendants) intending to stay in business would be required to charge a higher fee.  Therefore, managing the Funds (and receiving much higher Portfolio Selection Fees and Promotional Distribution Fees than from other institutional clients) is highly profitable to Defendants.

97.     For example, Defendants received approximately $12.6 million in management fees from Federated High Income Bond Fund during its most recent fiscal year.  Of that, approximately $10 million is for pure Portfolio Selection Services.  In 1994, the *total* management fee, including all expenses and pure Portfolio Selection Services, amounted to less than $6 million.  The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Defendants manage comparable (but much smaller) portfolios for a much smaller fee is in breach of Defendants' fiduciary and other duties to the Funds.

98.     Defendants received almost $5.4 million in management fees from the Federated Equity Income Fund during its most recent fiscal year.  Of that, over $4 million was for pure Portfolio Selection Services.  In 1994, the *total* management fee, including all expenses and pure Portfolio Selection Services, amounted to just over $1.3 million.  The receipt of such a dramatic increase in fees for pure Portfolio Selection Services (in the face of dramatic economies of scale) while Federated manages comparable (but much smaller) portfolios for a much smaller fee is a breach of Defendants' fiduciary and other

duties to the Funds.

99.     Furthermore, each dollar of Promotional Distribution Fees received by Defendants directly increases Defendants' profitability in an equal amount. These fees, by definition, are received by Defendants to cover their expenses, not those of the Funds (under the theory that those expenses would ultimately save the Plaintiff and the Funds money). The amount of these fees has been steadily increasing. For the year ending March 31, 1994, the Federated High Income Bond Fund paid less than $86,000 in 12b-1 Distribution Fees. For the year ending March 31, 2003, that fund paid 12b-1 Distribution Fees of $7.7 million. Similarly, in 1994, the Federated Equity Income Fund paid $4.5 million in 12b-1 fees. For the year ending November 30, 2003, that fund paid 12b-1 Distribution Fees of over $3.5 million. The amount of Promotional Distribution Fees increased proportionately with total 12b-1 Distribution Fees for these and all of the Funds.

100.    As discussed above under "comparative fee structures," Defendants and their affiliates have entered into other advisory agreements where the agreed Portfolio Selection Fees quickly step down to as low as 15 basis points (0.15%) for managing portfolios that are smaller than those of the Funds. On information and belief, Defendants have entered into similar agreements with other institutional clients with similar fees that also *include* all other administrative and distribution expenses. Even on the conservative assumption that *all* of such other institutional clients' fees are for Portfolio Selection Services (which, as noted, is not the case), those fees would still be dramatically smaller in percentage terms (and in dollar terms) than the same fees received from the comparably sized or significantly larger Funds, and are not within the range

established by Defendants with its other customers when negotiating at arms' length.

101.    Defendants would not agree to provide advisory services for a fee of as low as 15 basis points (or less) if it were not profitable to do so. Therefore, the immense profitability of the Funds' management for the same services is self-evident.

(6)    **The Independence and Conscientiousness of the Trustees (or Directors)**

102.    As the GAO Report noted, the "external management" structure of most mutual funds (including the Funds) creates a potential conflict of interest between a fund's shareholders and its adviser. [Exhibit 8]. The United States Supreme Court has stated that the disinterested director requirement is "the cornerstone of the ICA's efforts to control" this conflict of interest. *Burks v. Lasker*, 441 U.S. 471 (1979).

103.    The disinterested directors (or trustees) are supposed to serve as "watchdogs" for the shareholders of the Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all agreements with Defendants and reviewing the reasonableness of the Portfolio Selection Fees and Promotional Distribution Fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the adviser's costs, whether fees have been reduced when the Funds' assets have grown, and the fees charged for similar services. *See* GAO Report at 14 [Exhibit 8]. These responsibilities necessarily require the directors to rely on information provided by Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations.

104.    In considering whether to approve advisory agreements between the

Defendants and the Funds, the trustees are required to review and consider specific factors, and to make certain comparisons, to ensure that any agreement is in the best interests of the Fund and its shareholders (rather than just the Defendants). The SEC has recognized that this inquiry includes the following specific factors:

> (1) the nature, extent, and quality of the services to be provided by the investment adviser; (2) the investment performance of the fund and the investment adviser; (3) the costs of the services to be provided and profits to be realized by the investment adviser and its affiliates from the relationship with the fund; (4) the extent to which economies of scale would be realized as the fund grows; and (5) whether fee levels reflect these economies of scale for the benefit of fund investors.

105.     In addition, the SEC has recognized that a fund's trustees must compare the fees and services to be provided by the adviser in any proposed contract with a fund with those in other investment advisory contracts, such as contracts between the same (and other) investment advisers with other investment companies (*i.e.*, mutual funds) or other types of clients (*e.g.*, pension funds and other institutional investors). On information and belief, Defendants failed to provide this information to the Funds' trustees who in turn failed to make or consider this comparison.

106.     A majority of the Funds' directors must be "disinterested" as defined in § 10 of the Investment Company Act. The ICA contains a presumption that the disinterested directors are in fact disinterested. However, even in connection with so-called disinterested directors, the lack of conscientiousness in reviewing the fees paid to the Defendants, and/or lack of adequate information provided by the Defendants to the directors in connection with their approvals of the advisory agreements, and the control of management over the board in reviewing the fees are *not* presumed. Rather, they are all relevant factors in determining whether the Defendants have breached their fiduciary duties to the Funds and to the Plaintiff.

107.     Despite the structural protections of independent directors envisioned by the Investment Company Act, the Funds' trustees have been subverted by Defendants and no longer serve in their "watchdog" role.

108.     Either the Defendants have failed to satisfy their fiduciary duty under the Investment Company Act to provide the Funds' directors with all information reasonably necessary for them to do their jobs, including determining the fairness of the Portfolio Selection Fee and the Promotional Distribution Fee, or that information has not been properly considered by the directors.

109.     Jack Bogle, founder of the Vanguard Group, one of the largest mutual fund complexes in the world, commented during an interview on the failure of mutual fund boards of directors to meet their duties under the Act:

> Q:  We've talked about how the [mutual fund] industry could do a better job. How about the fund directors?
>
> A:  Well, fund directors are, or at least to a very major extent, sort of a bad joke. They've watched industry fees go up year after year, they've added 12b-1 fees. I think they've forgotten, maybe they've never been told, that the law, the Investment Company Act, says they're required to put the interest of the fund shareholders ahead of the interest of the fund adviser. It's simply impossible for me to see how they could have ever measured up to that mandate, or are measuring up to it.

*Morningstar Interviews…Jack Bogle, Founder of the Vanguard Group,*
Kathryn Haines and Russ Kinnel, ᵂᵂᵂ. ᵐᵒʳⁿⁱⁿᵍˢᵗᵃʳ, posted June 5, 1998.

110.     Similarly, a United States District Court Judge recently quoted Warren Buffet, the "legendary investor and chairman of the Berkshire Hathaway Group," on the lack of independence and diligence of mutual fund boards of directors:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for

independent directors on the theory that they would be the watchdogs for all these people pooling their money. The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management - whether management was good, bad or indifferent. Not negotiate for fee reductions and so on. A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans. I'd say they found a lot of Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F.Supp.2d 373, 383 (S.D.N.Y. 2002)(citation omitted).

111.     The dependence of the Funds' disinterested directors on the Defendants, and the domination and undue influence exerted on the directors by the Defendants, is evidenced by the following facts:

a.     Each of the Funds is governed by a common and interlocking board of directors initially selected (and constantly dominated by) the Defendants.

b.     All 138 different Federated portfolios are "overseen" by *one common board* of 12 directors, 9 of whom are considered "disinterested." The directors are paid from $148,500 to $178,200 each year for their part-time services. The Defendants have *de facto* control over directors' compensation and the nature and duration of director meetings and other aspects of the Funds' corporate governance, thereby depriving the Funds of the independence owed to them by the trustees.

c.     Each of the Funds, and all funds within the Federated Fund Complex, share common fiduciary advisers (*i.e.,* the Defendants or their affiliates). The Defendants created these relationships and continue to dominate in their execution.

d.     Each of the Funds, and all funds within the Federated Fund Complex,

share a common distributor affiliated with the Defendants (*i.e.*, the Funds' shares are sold by an affiliate of the Defendants).

e.  Trustees in the mutual fund industry almost without exception rely wholly on the fund manager to provide them with what is known in the industry as a "15c Report" (also called a "Lipper Package"). The 15c Report includes information about what other mutual fund investment advisors charge their mutual fund clients but does not include data about Defendants' or other advisors' other institutional clients (as that data is withheld by fund managers from the trustees). Fund managers use the data in the 15c Report to ensure that their fees fall within the range of fees charged by their "competitors," an industry of price gougers, rather than to ensure that the Portfolio Selection Fees received by Defendants are independently fair to the Funds. Here, either Defendants have followed this industry practice and failed to provide the correct information to the trustees, or the trustees have failed to consider properly the information provided.

f.  Each of the Funds, and all funds within the Federated Fund Complex, have access to a common line of credit arranged by the Defendants to assist in managing money flows in the Funds (*e.g.*, to meet shareholder redemptions). The fees pertaining to such credit facility are shared equally by the Funds and all other funds within the Federated Fund Complex (thereby also again demonstrating benefits from economies of scale).

**COUNT I**
**ICA § 36(b) BREACH OF FIDUCIARY DUTY**
**(Excessive Fees from Economies of Scale)**

112.     The Plaintiff repeats and realleges paragraphs 1 through 110, inclusive, of this complaint.

113.     Defendants have received, and continue to receive, excessive Portfolio Selection Fees attributable to the extraordinary economies of scale created by the Plaintiff and the Funds.

114.     Defendants have breached, and continue to breach, their ICA § 36(b) fiduciary duty to the Funds by receiving and retaining these excessive fees.

115.     Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including the "amount of compensation or payments received from" the Funds.

## COUNT II
## ICA § 36(b) BREACH OF FIDUCIARY DUTY
### (Excessive Investment Advisory Fees)

116.     Plaintiff repeats and realleges paragraphs 1 through 110, inclusive, of this complaint.

117.     The Portfolio Selection Fees received by Defendants are and continue to be disproportionate to the services rendered and not within the range of what would have been negotiated at arms' length in light of all the surrounding circumstances (or the range of what has been negotiated at arms' length with the Defendants' other institutional clients). Instead, they are dramatically higher than those negotiated or that would be negotiated in any arms' length negotiation.

118.     In receiving excessive advisory fees, and failing to put the interests of the Funds, the Plaintiff, and the Funds' other shareholders ahead of their own interests,

Defendants breached their statutory fiduciary duties to the Funds and the Plaintiff.

119.    Defendants have breached, and continue to breach, those statutory ICA § 36(b) fiduciary duties to the Funds by accepting excessive and inappropriate compensation. Plaintiff and the Funds seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Funds.

### COUNT III
### ICA § 36(b) BREACH OF FIDUCIARY DUTY
**(Excess Rule 12b-1 Promotional Distribution Fees and Extraction of Additional Excessive Compensation for Advisory Services)**

120.    Plaintiff repeats and realleges paragraphs 1 through 110, inclusive, of this complaint.

121.    The Promotional Distribution Fee extracts additional compensation for advisory services in violation of Defendants' fiduciary duty under § 36(b). Although the assets of the Funds have grown considerably, the resulting economies of scale benefited only Defendants, and not Plaintiff or the Funds, precisely as feared by the SEC.

122.    In failing to pass along economy of scale benefits from the Promotional Distribution Fees, and in continuing to authorize, assess and collect Promotional Distribution Fees pursuant to the Funds' 12b-1 Distribution Plan, despite the fact that no benefits inured to Plaintiff or the Funds, Defendants violated their ICA § 36(b) fiduciary duty by receiving excessive and inappropriate compensation. Plaintiff seeks, pursuant to § 36(b) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, including all Promotional Distribution Fees and any further "amount of payments received from" the Funds.

**WHEREFORE**, Plaintiff and the Funds demand judgment as follows:

a.  Declaring that the Defendants violated and continue to violate § 36(b) of the ICA and that any advisory agreements and Distribution Plans entered into between them and the Funds are void *ab initio*;

b.  Preliminarily and permanently enjoining the Defendants from further violations of the ICA;

c.  Awarding damages against the Defendants in an amount including all Portfolio Selection Fees and Promotional Distribution Fees paid to them by Plaintiff and the Funds for all periods not precluded by any applicable statutes of limitation and continuing through the trial of this case;

d.  Awarding any further "actual damages resulting from [Defendants'] breach of fiduciary duty," including any further "amount of payments received from" the Funds;

e.  Awarding interest, costs, disbursements, attorneys' fees, and such other items as may be allowed to the maximum extent permitted by law;

f.  Awarding prospective relief in the form of reduced Portfolio Selection Fees and Promotional Distribution Fees in the future based not simply upon a percentage of assets formula, but also based upon the reasonableness of those fees in absolute dollar terms when considering the assets under management in the Funds;  and

g.  Such other and further relief as may be proper and just.

Dated: May 7, 2004

Respectfully submitted,

By: _____

Thomas C. Cooper  (Pa. ID 1182)
COOPER & ZIEGLER
100 Ross Street
Pittsburgh, PA 15219
Telephone: (412) 281-6770
Facsimile: (412) 391-7397


George A. Zelcs
KOREIN TILLERY LLC
Three First National Plaza
70 West Madison, Suite 660
Chicago, Illinois 60602
Telephone: (312) 641-9750
Facsimile: (312) 641-9751
E-mail: gzelcs@koreintillery.com


Steven A. Katz - 06204543
Douglas R. Sprong - 6202898
KOREIN TILLERY LLC
Gateway One on the Mall
701 Market Street, Ste. 300
St. Louis, MO 63101-1820
Telephone:  (314) 241-4844
Facsimile:  (314) 588-7036

*Attorneys for Plaintiffs*

# EXHIBIT G

Not Reported in F.Supp.2d                                                              Page   1
Not Reported in F.Supp.2d, 2004 WL 413266 (D.Mass.)
(Cite as: 2004 WL 413266 (D.Mass.))
c

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
**REEBOK INTERNATIONAL LTD., Plaintiff**
v.
**DUNKADELIC, INC. and Derrick E. Vaughan,**
**Defendants**
No. Civ.A. 03-CV-11471-G.

March 2, 2004.
Shepard Davidson, Burns & Levinson, Boston,
MA, for Plaintiff.

Mardic A. Marashian, Bonin & Marashian, Boston,
MA, Richard W. Evans, McCarthy Wilson,
Rockville, MD, for Defendants.

*MEMORANDUM AND ORDER*

OTOOLE, J.

**\*1** The plaintiff, Reebok International Ltd.,
brought this action seeking a declaratory judgment
that it has not engaged in unfair trade practices and
has not infringed trademark rights that are allegedly
owned by the defendants, Dunkadelic, Inc. and
Derrick Vaughan. The defendants have moved to
dismiss the action, arguing that venue is improper,
or alternatively to transfer the action, arguing that
the United States District Court for the District of
Maryland is a more convenient venue. For the
reasons set forth below, the defendants' motion is
denied in both respects.

I. *Summary of facts*

In late 2002, Reebok introduced a new line of
basketball shoes and apparel bearing the name
"Dunkadelic." Vaughan, owner of Dunkadelic, Inc.,
claims to own the rights to the "Dunkadelic"
trademark.

On April 14, 2003, counsel for Vaughan sent
Reebok a letter threatening litigation and demanding
that it cease and desist from using the "Dunkadelic"
mark. On April 22, counsel for Reebok responded
and requested that Vaughan provide additional

information to support his claimed trademark rights.
On May 22, counsel for Vaughan sent Reebok a
supplemental cease and desist letter, provided
additional information, and again threatened
litigation. On May 30, Reebok responded and again
requested that Vaughan provide additional
information to support his claim. Reebok stated that
without such information it considered Vaughan's
claim to be without merit and invited Vaughan to
make a settlement proposal for what it called a claim
with only "token nuisance value." On June 6,
Vaughan sent a letter demanding $7.5 million plus a
10% royalty on all Reebok sales of Dunkadelic
products. Vaughan requested that Reebok respond
by June 13 or Vaughan would file suit. On June 13,
Reebok made a counteroffer of $5,000.

Reebok's June 13 letter did not mention that on
June 12 Reebok had filed this action in the
Massachusetts Superior Court, seeking a declaratory
judgment that Reebok was not infringing the
defendants' trademark rights and had not engaged in
unfair trade practices. On July 11, before being
served with Reebok's complaint, the defendants
filed a complaint against Reebok in the United States
District Court for the District of Maryland alleging
Lanham Act violations and state law claims. On July
15, Reebok served the Norfolk complaint on the
defendants via certified mail.

On August 8, the defendants removed the Norfolk
action to this Court. On November 5, the defendants
moved to dismiss this action for improper venue or
to transfer this action to the District of Maryland.
The defendants finally served their Maryland
complaint on November 7. Reebok has filed in the
District of Maryland a motion to dismiss or transfer
that action to this Court. On February 4, 2004, a
hearing was held on the defendants' motion.

II. *Discussion*

A. *Motion to dismiss*

At the hearing, I expressed doubt as to the merits of
the defendants' motion to dismiss for improper
venue, and I now deny the motion.

**\*2** Section 1391(b) of Title 28 of the United States
Code provides, in relevant part, that venue is proper

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 413266, *2 (D.Mass.))

"only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated...." Because the defendants reside in Maryland, venue is proper here only if "a substantial part of the events or omissions giving rise to the claim occurred" in Massachusetts.

In considering the defendants' motion to dismiss, it is only necessary to determine whether Massachusetts is a proper venue, notwithstanding that there may be other proper venues or indeed better venues. See *Uffner v. La Reunion Francaise,* 244 F.3d 38, 42 (1st Cir.2001) (many circuits have recognized that "when the events underlying a claim have taken place in different places, venue may be proper in any number of districts"). To determine if Massachusetts is a proper venue, a court should look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim." *Id.* The relevant events for determining venue "need not be a point of dispute between the parties"; venue may be proper where a single event in the forum "was one part of the historical predicate for the instant suit," even though that single event was "not related to the principal question for decision." *Id.* at 42-43.

In a trademark infringement case venue is proper in a jurisdiction where the infringement is alleged to have occurred. *E .g., Woodke v. Dahm,* 70 F.3d 983, 985 (8th Cir.1995) (in trademark case the venue inquiry should "focus on relevant activities of the defendant [alleged infringer], not of the plaintiff"); *Pilates, Inc. v. Pilates Inst., Inc.,* 891 F.Supp. 175, 182 (S.D.N.Y.1995) ("in trademark infringement claims, courts have held that venue may be proper in each jurisdiction where infringement is properly alleged to have occurred").

Here, venue is proper in Massachusetts because substantial events giving rise to this action, including the alleged infringement, occurred in Massachusetts. Reebok's senior counsel, Keith Wexelblatt, submitted an affidavit that states, "[t]he allegedly infringing activities by Reebok complained of by Defendants, namely Reebok's decision to use the Dunkadelic mark, the nature and extent of its use of that mark, and its revenues and profits derived therefrom, all occurred, or were directed from,

Reebok's sole United States operations facility and headquarters in Canton, Massachusetts ." Wexelblatt Aff. at ¶ 4. Reebok also asserted that "no one can dispute that Massachusetts-based Reebok advertises and sells its ATR Dunkadelic basketball shoes in substantial quantities in and from Massachusetts." Pl.'s Opp'n at 3-4. In fact, the defendants have presented no evidence to the contrary. The defendants, instead, stated in their memorandum in support of their motion to dismiss that "[t]he instant action arises out of Defendants' allegations of federal trademark infringement by Reebok through the national/international marketing and sales campaign of its ATR-Dunkadelic basketball shoe." Defs.' Mem. at 7. That statement suggests that the allegedly infringing activity occurred throughout the country and undermines the defendants' argument that venue is improper in Massachusetts.

**B. *Motion to transfer***

*3 The defendants alternatively argue that even if venue is proper in Massachusetts the case should be transferred to the United States District Court for the District of Maryland where their later-filed coercive action is currently pending. Section 1404(a) of Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

A defendant seeking transfer to a forum that it claims is more convenient has the burden of proving that transfer is warranted. *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 719 (1st Cir.1996). The factors the Court should consider include "the convenience of parties and witnesses, ... the availability of documents; the possibility of consolidation; and the order in which the district court obtained jurisdiction." *Coady v. Ashcraft & Gerel,* 223 F.3d 1, 11 (1st Cir.2000). "Where identical actions are proceeding concurrently in two federal courts, entailing duplicative litigation and a waste of judicial resources, the first filed action is generally preferred in a choice-of-venue decision." *Cianbro Corp. v. Curran-Lavoie, Inc.,* 814 F.2d 7, 11 (1st Cir.1987); *see also Nowak,* 94 F.3d at 719 ("We have emphasized that the doctrine of *forum non conveniens* is used to avoid 'serious unfairness' and that plaintiff's choice of a forum will be disturbed only rarely.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

**(Cite as: 2004 WL 413266, \*3 (D.Mass.))**

In fleshing out the factors to consider, the First Circuit has also quoted the following from the Supreme Court:

"[The plaintiff] should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative or legal problems."

*Nowak,* 94 F.3d at 720 (quoting *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)).

Some courts in this District have found that "the preference for the first-filed action may be overcome where (1) there are special circumstances justifying a transfer or (2) convenience favors the later-filed action." *Holmes Group, Inc. v. Hamilton Beach/ Proctor Silex, Inc.,* 249 F.Supp.2d 12, 16 (D.Mass.2002) (citing *Veryfine Prods., Inc. v. Phlo Corp.,* 124 F.Supp.2d 16, 22-25 (D.Mass.2000) and *Kleinerman v. Luxtron Corp.,* 107 F.Supp.2d 122,124 (D.Mass.2000)). Special circumstances might arise "[w]here, for example, a plaintiff (1) misleads the defendant into foregoing litigation in order to negotiate a settlement and then files suit or (2) reacts to a defendant's notice of imminent filing by 'literally sprinting to the courthouse the same day'...." *Holmes Group,* 249 F.Supp.2d at 16 (citation omitted).

**\*4** In intellectual property cases, the "fact that [plaintiff's] action is for declaratory relief does not bar the application of the first-filed presumption." *GSI Lumonics, Inc. v. BioDiscovery, Inc. .,* 112 F.Supp.2d 99, 105 (D.Mass.2000) (denying motion to transfer copyright infringement case); *see also Holmes Group,* 249 F.Supp.2d at 16-18 (denying motion to transfer patent infringement case). Other courts have declined to follow the first-filed rule in such circumstances. *See Kleinerman,* 107 F.Supp.2d at 124-25 (refusing to transfer second-filed patent case to California because plaintiff in California action "pounce[d] preemptively" as negotiations reached an impasse); *Davox Corp. v. Digital Sys. Int'l,* 846 F.Supp. 144, 148 (D.Mass.1993) (granting motion to transfer patent case; "[plaintiff] should not be permitted to take advantage of the fact

that [defendant] responsibly deferred filing potentially protracted and expensive litigation and, indeed, was perhaps misled into believing it would not be prejudiced by doing so by [plaintiff's] responses to its letters").

It is evident from these cases that no single presumption or factor will always control, and instead, the result will depend on factual nuances. Here, the defendants have not overcome the presumption in favor of Reebok's first-filed action and its choice of forum.

First, Reebok's action in bringing this suit in Massachusetts was not vexatious or oppressive. Reebok filed the suit in its home state, not some remote forum with little or no connection to the parties or events. *E.g., Holmes Group,* 249 F.Supp.2d at 17 ("Where a plaintiff chooses his home forum, such a choice usually represents considerations of convenience rather than harassment of the defendant."). Reebok also did not race to the courthouse on the day that the defendants threatened litigation. Further, Reebok never promised to forego litigation, and its conduct during the exchange of letters does not appear to have been designed to lull the defendants into a false sense of security while Reebok prepared its declaratory judgment complaint.

Second, the defendants have not demonstrated that Maryland would be a more convenient forum. The availability of witnesses and documents is a neutral factor as between Massachusetts and Maryland because each party intends to rely on documents and witnesses in its home state. Therefore, transferring the action to Maryland would simply shift, rather than eliminate, the inconvenience. *E.g., Holmes Group,* 249 F.Supp.2d at 18 ("Transfer of venue is inappropriate, however, where its effect merely shifts the inconvenience from one party to another.").

Finally, the defendants argued that litigating in Massachusetts would impose an "overwhelming financial burden on Defendants" and that Reebok could easily absorb the cost of litigating in Maryland. In support of their argument, the defendants cite *Kleinerman,* 107 F.Supp.2d at 124-25, where Judge Gorton found that the first-filed presumption was rebutted by evidence that (1) the defendant had "pounce[d] preemptively" in filing its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 413266, *4 (D.Mass.))

Page    4

declaratory judgment action when it realized that
negotiations had reached an impasse, and (2) the
balance of conveniences favored the plaintiff
because "[i]f the Court were to transfer this case to
California, the costs of litigation may become
prohibitive to Kleinerman, thereby denying him his
right to pursue a judicial remedy." *Id.* At the
hearing on the their motion, the defendants also
cited *Symbol Techs., Inc. v. Quantum Assocs., Inc.*,
No. CIV. A. 01-10983-GAO, 2002 WL 225934
(D.Mass. Jan.30, 2002), where I granted a motion
to transfer based in part on consideration of the
parties' financial resources. First, *Symbol Techs.* is
easily distinguished because the outcome was
influenced by facts not present here. Second,
disparate financial resources is only one factor
among many I may consider in resolving a motion to
transfer. Here, that factor does not tip the balance in
the defendants' favor.

III. *Conclusion*

**5** The defendants' motion to dismiss for improper
venue or alternatively to transfer to the United States
District Court for the District of Maryland is
DENIED.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 413266
(D.Mass.)

Motions, Pleadings and Filings (Back to top)

. 1:03cv11471 (Docket) (Aug. 08, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT H

Not Reported in F.Supp.2d                                                              Page    1

Not Reported in F.Supp.2d, 2002 WL 442189 (S.D.Ill.), Fed. Sec. L. Rep. P 91,725
(Cite as: 2002 WL 442189 (S.D.Ill.))

c

Motions, Pleadings and Filings

United States District Court, S.D. Illinois.
Richard NELSON, Dorothy Nelson, Kenneth A.
Gilley, Judith Gilley, Anne Marie
Kern-Taylor, Franklin H. Meyers, Lois Meyers,
Jo Ellen Brady, Paul Quigley,
Melvin W. Scharf, Jodee Favre, Gregory C.
Stepp, Wilma J. Gaston, Barbara Erb,
Dan McGinnis, Pamela McGinnis, Louis Taylor,
as Trustee for Bergmann-Taylor
Profit Sharing Plan Doloros Epping, John
Smetana, Steven G. Wicks, Stephen
Stovey, Plaintiffs,
v.
AIM ADVISORS, INC., Aim Distributors Inc.,
American Express Financial Corp.,
American Express Financial Advisors Inc., Davis
Selected Advisers LP, Davis
Distributors LLC, Delaware Management Co .,
Delaware Distributors LP, Dreyfus
Corp., Dreyfus Service Corp., Evergreen
Investment Management Co. LLC,
Evergreen Investment Services Inc., Franklin
Advisers Inc., Franklin Templeton
Distributors Inc., Goldman Sachs Asset
Management, Goldman Sachs & Co. Inc.,
Invesco Funds Group Inc., Invesco Distributors
Inc., John Hancock Funds Inc.,
Lord Abbett & Company, Lord Abbett
Distributor LLC, New York Life Investment
Management LLC, Nylife Distributors Inc., Fund
Asset Management LP, Fam
Distributors Inc., Massachusetts Financial
Services Company, MFS Fund
Distributors Inc., Morgan Stanley Dean Witter
Advisors Inc., Morgan Stanley
Dean Witter Distributors Inc., Oppenheimer
Funds Inc., Oppenheimer Funds
Distributor Inc., Pimco Advisors, Pimco Funds
Distributor LLC, Prudential
Investments Fund Management LLC, Prudential
Investment Management Services,
Putnam Investment Management LLC, Putnam
Retail Management LP, J. and W.
Seligman & Co Inc., Seligman Advisors Inc.,
Smith Barney Fund Management LLC,
Salomon Smith Barney Inc., Sunamerica Asset
Management Corp., Sunamerica
Capital Services Inc., Templeton Global Advisors

Limited, Van Kampen Asset
Management, and Van Kampen Funds Inc.
Defendants.
No. 01-CV-0282-MJR.

March 8, 2002.

MEMORANDUM AND ORDER

REAGAN, District J.

I. *Introduction*

*1 On May 7, 2001, Plaintiffs filed a complaint in
this Court on behalf of themselves and those
similarly situated. Named plaintiffs are 21 Illinois
residents who are investors and shareholders in 51
various mutual funds sold and distributed by 48
investment advisor and fund distributor Defendants
(or 24 sets of advisor/distributor pairs). Although no
formal motion has been filed yet, Plaintiffs seek
certification of a nationwide class consisting of
millions of mutual fund shareholders; specifically 24
classes of all shareholders in all funds found in each
of 24 fund "families" or "complexes" into which
1,206 mutual funds have been broken down.

In summary, Plaintiffs allege Defendants engaged
in unlawful control of the directors of the funds
(who are required to be independent), entered into
unlawful distribution plans and agreements, and
charged and received unlawful and excessive
distribution and advisory fees from the fund.
Specifically, Plaintiffs allege violations of the
Investment Company Act of 1940 ("ICA Act"), 15
U.S.C. § 80a-12(b) and § 80(a)-36(b) in Counts I
and II and breach of common law fiduciary duty in
Count III. Plaintiffs seek recovery of all investment
advisory fees and all distribution fees paid by the
1,206 mutual funds since May 1, 1991, punitive
damages, declaratory relief, future specific
performance, costs, interest, and attorneys' fees.

Now pending before the Court are 14 motions to
sever and 17 motions to transfer pursuant to 28
U.S.C. § 1404(a) filed by various Defendant
groups. The Court held a hearing on these motions
on December 10, 2001, took the matter under
advisement, and imposed a stay in the case until
resolution of the severance and transfer issues. For
the reasons stated herein, the Court lifts the stay,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 442189, *1 (S.D.Ill.))

grants Defendants' motions, and severs and transfers accordingly.

## II. *Defendants' Motions to Sever*

Defendants' motions to sever pursuant to FEDERAL RULE OF CIVIL PROCEDURE 21 raise the same basic argument--that Plaintiffs' second amended complaint fails to satisfy the requirements of Rule 20(a) for permissive joinder of multiple defendants.

Rule 20(a) contains two requirements: (1) that the claims for relief against each defendant are "in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences" *and* (2) that a "question of law or fact common to all these persons will arise in the action." *Mosley v. GMC,* 497 F.2d 1330, 1334 (8th Cir.1974). However, this does not require that *every* question of law or fact be common to all. *Id.* If claims have been "misjoined," the court is authorized under Rule 21 to sever the claims against the different defendants and proceed with them separately. The trial judge has broad discretion in determining when severance is appropriate. *Thompson v. Boggs,* 33 F.3d 847, 858 (7th Cir.1994).

Defendants argue that Plaintiffs' claims for relief do not arise out of the same transaction or occurrence because each mutual fund enters into *separate* contracts with its own advisor and distributor which set forth the nature of the services to be provided by that particular advisor and distributor and the specific fees to be paid for such service. In other words, none of the Defendant pairs have a relationship, contractual or otherwise, with any other pair of Defendants. Each pair advises and manages the funds involved inside its own complex and does not manage or advise any of the funds of other complexes. As such, each Defendant pair makes their own separate and different decisions in running the fund.

*2 Defendants further point out that since none of the contracts applies to funds in more than one complex, Plaintiffs could not and did not allege any factual connection between the contract agreements, fees, or directors in the different complexes, and no evidence regarding fees or services would be admissible against any other Defendant. Therefore, each fund will have to be analyzed separately to determine whether the fees were excessive.

Accordingly, Defendants' contend Plaintiffs' claims for "control over the directors" and claims for "excessive fees" do not share a common question of law or fact and do not satisfy the first requirement under Rule 20(a).

Defendants also argue that Plaintiffs' claims do not involve a question of law or fact common to all Plaintiffs. Defendants assert that although Plaintiffs pursue similar theories under the ICA against each group of Defendants, this does not create a common issue of law or fact because different contracts apply to each pair of Defendant advisor and distributor. Therefore, Plaintiffs have not satisfied the second requirement under Rule 20(a).

In short, Defendants argue that the only common factor among the claims brought against the numerous Defendant groups in this case is that they are each investment advisors or distributors of mutual funds. Therefore, there is no basis for joining them as Defendants in a single "mega-lawsuit" and severance is proper under Rule 21. The Court agrees.

The spirit underlying the permissive joinder doctrine is to promote efficiency, convenience, consistency, and fundamental fairness. *Intercon v. Research, Etc. v. Dresser Industries,* 696 F.2d 53, 57-58 (7th Cir.1994). These principles, not a bright-line rule, should govern whether the "same transaction" requirement imposed by Rule 20 has been satisfied. *See* 4 James Wm. Moore et al., *Moore's Federal Practice* § 20.05(1) (3rd ed.1999). Therefore, courts should evaluate this issue on a case-by-case basis rather than developing a single test. *See* 7 C. Wright et al., *Federal Practice and Procedure* § 1653 at 382 (2nd ed.1986).

Although this Court chooses to evaluate this issue in an independent manner keeping these principles in mind, the Court finds guidance from a fellow district court within the Seventh Circuit which examined the issue of joinder within the context of securities fraud lawsuits which this Court finds are analogous to the case at bar.
Problems associated with the "same transaction" requirement have arisen often in the context of securities fraud lawsuits involving multiple plaintiffs. The general consensus that emerges from these cases is that Rule 20 demands *more than the bare allegation that all plaintiffs are victims of a*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

*fraudulent scheme perpetrated by one or more defendants; there must be some indication that each plaintiff has been induced to act by the same misrepresentation. Compare Nor-Tex Agencies, Inc. v. Jones,* 482 F.2d 1093, 1100 (5th Cir.1973) (addition of second plaintiff in securities fraud lawsuit satisfied Rule 20(a) because claims of each plaintiff were based on series of false statements made by same defendant to both plaintiffs so that facts of claims "were inextricably woven together") with *Papagiannis v. Pontikis,* 108 F.R.D. 177, 179 (N.D.Ill.1985) (two plaintiffs could not be joined in same securities action against same defendant even though both claims involved scheme to sell interest in unprofitable oil wells; defendant implemented scheme in separate encounters, each of which necessarily controlled by individualized proof) and *McLernon v. Source International, Inc.,* 701 F.Supp. 1422, 1425-26 (E.D.Wis.1988) (several hundred individual plaintiffs fraudulently induced into purchasing unregistered securities could not join in same action without amending their complaint to identify a specific fraudulent statement or statements that had reached all plaintiffs; misrepresentations set forth in original complaint emanated from many different sources).

*3 *Insolia v. Philip Morris Incorp.,* 186 F.R.D. 547, 549 (W.D.Wis.1999)(emphasis added).

With these principles in mind, the Court finds that Plaintiffs' claims do not arise out of the same "transaction, occurrence, or series of transactions or occurrences" as required under Rule 20. Although Plaintiffs' claims against all Defendants are pled under the same legal theory, it is only in this abstract sense that Plaintiffs' claims share anything in common. On the immediate and practical level which governs the application of Rule 20, Plaintiffs' claims against each Defendant pair are based upon contracts specific to that pair and no other. Therefore, each contract and the duties imposed upon each Defendant pair must be analyzed separately. The fact that Plaintiffs have made claims against each Defendant under identical federal statutory provisions does not mean that there are common issues of law and fact sufficient to satisfy Rule 20(a). *Randleel v. Pizza Hut of America, Inc.,* 182 F.R.D. 542, 543 (N.D.Ill.1998).

Furthermore, the practical implications of allowing these claims to go forward suggest that joinder would not serve the policies underlying Rule 20. In order to eliminate prejudice, avoid massive confusion, and to promote judicial efficiency and order, this Court exercises its discretion under Rule 21 and severs Plaintiffs' claims against the various Defendant pairs as Defendants' motions request. *See Randleel,* 182 F.R.D. at 545.

### III. *Defendants' Motions to Transfer*

Defendants next move for the transfer of their cases to other, more appropriate, jurisdictions pursuant to 28 U.S.C. § 1404(a).

28 U.S.C. § 1404(a) provides:

For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

To prevail on a § 1404(a) motion, the movant must demonstrate: (1) that venue is proper in the transferor district; (2) that venue *and* jurisdiction are proper in the transferee district; and (3) that the transfer will serve the convenience of the parties and witnesses and promote the interest of justice. *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 219 (7th Cir.1986). The weight to be accorded each of these factors lies in the discretion of the trial judge. *Wysnoski v. Millet,* 759 F.Supp. 439, 444 (N.D.Ill.1991).

The moving party bears the burden of persuading the transferor court that the transferee court is more convenient and that the interest of justice favors a transfer. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989); *General Electric Capital Auto v. Phil Smith Chrysler Plymouth, Jeep Eagle,* --F. Supp.2d -, 2000 WL 1471615 (N.D.Ill. Oct. 2, 2000); *Goodin v. Burlington Northern Railroad Co.,* 698 F.Supp. 157, 158 (S.D.Ill.1988).

Other principles guide a court's consideration of a § 1404(a) transfer motion as well. For instance, in determining whether to grant § 1404(a) transfer, the court must seek to promote the efficient administration of justice and not merely the private interests of the parties. *Bryant v. ITT Corp.,* 48 F.Supp.2d 829, 832 (N.D.Ill.1999). Additionally, as a general rule, a plaintiff's choice of forum is entitled to substantial deference. However, where a plaintiff alleges a nationwide class action, "plaintiff's home forum is irrelevant." *Koster v. Lumbersmen Mut. Cas. Co.,* 330 U.S. 518, 524

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 4
(Cite as: 2002 WL 442189, *3 (S.D.Ill.))

(1947); *Georgouses v. NaTec Res., Inc.,* 963 F.Supp. 728, 730 (N.D.Ill.1997).

*4 In the case at bar, all parties agree that the first element required for a § 1404(a) transfer has been satisfied--that venue is proper in this district, the transferor district.

In determining whether "venue and jurisdiction are proper in the transferee district," this Court must examine: a) the plaintiffs' choice of forum; b) the situs of material events; c) the relative ease of access to sources of proof in each forum, including the court's power to compel the appearance of unwilling witnesses at trial and the costs of obtaining the attendance of witnesses, and d) the convenience to the parties--specifically, their respective residence and abilities to bear the expenses of trial in a particular forum. *Von Holdt v. Husky Injection Molding Sys.,* 887 F.Supp. 185, 188 (N.D.Ill.1995)
.

As stated above, the Court finds Plaintiffs' choice of forum to be irrelevant. Therefore, the Court focuses on the remaining three elements in determining whether venue and jurisdiction are proper in each of the transferee districts to which the various Defendants seek transfer.

With one exception addressed later, each Defendant seeks transfer to the district in which they are headquartered and in which they manage the mutual funds at issue in this case. In support of these motions for transfer, each Defendant has demonstrated by Affidavit that: (1) all material facts surrounding the management of the various mutual funds occurred in the district to which they seek transfer; (2) that all of the numerous potential witnesses live in or within close proximity to the district to which they seek transfer; (3) that all of the documents relevant to the litigation are in or within close proximity to the district to which they seek transfer, and (4) since there has been no allegation that any individual Plaintiff interacted with any of the Defendant advisors or distributors in any direct way, that no material witnesses live or reside in the Southern District of Illinois.

Defendants have also sufficiently proven that there is relative ease of access to sources of proof in the various districts to which they seek transfer, but no ease of access to such documents in the Southern

District of Illinois. Again, since all documentation regarding these mutual funds and the way they are run is kept at and around the various Defendant headquarters, there would be no access to such documents within this district. Moreover, requiring Defendants to produce such documentation in this district would be very costly and impose undue hardship.

Furthermore, it is clear that the courts to which Defendants seek transfer have infinitely more power than this Court to compel the appearance of unwilling witnesses at trial since all of the witnesses reside in or within close proximity to the transferee districts. Moreover, the costs of compelling the attendance of witnesses would be less since the witnesses reside in or are closer to the transferee districts. All in all, it would simply be much more convenient for the witnesses to be heard in the transferee districts.

*5 Based upon these factors, it is clear that venue and jurisdiction are proper in the transferee districts and that Defendants have satisfied the second factor required for a § 1401(a) transfer.

The evidence regarding the second factor under § 1401(a) dovetails with the evidence regarding the third factor--that transfer will serve the convenience of the parties and witnesses and promote the interest of justice or the "clearly more convenient" standard. *Coffey,* 796 F.2d at 220. There is no question that Defendants have proven that the transferee district would be more convenient for the majority, if not all, of the witnesses. Although transfer may require Plaintiffs to travel to the transferee district, it is "clearly more convenient" for any of the individual plaintiffs to travel from this district to the transferee district, than for a plethora of witnesses to travel to the Southern District of Illinois on each individual Plaintiff's case.

Analysis under this final § 1404(a) factor also requires the Court to consider certain other elements relating to public interest. These include: (a) the relation of the community to the occurrence at issue in the litigation and the desirability of resolving controversies in their locale; (b) the court's familiarity with applicable law; and (c) the congestion of the respective court dockets and the prospect for earlier trial. *Georgouses,* 963 F.Supp. at 730. In undertaking this analysis, the Court finds

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 442189, *5 (S.D.Ill.))

Page   5

that although there are certainly putative class members in the Southern District of Illinois, as there are nationwide, there is no special relation between this community and the alleged occurrences. Therefore, there is no specific desire or need to resolve this controversy in this district as compared to the clearly more convenient transferee districts.

Similarly, the Court finds that any district court would be as familiar as this Court is with the applicable law governing this case.

The Court also finds that no delay would result from transferring these cases to the various transferee districts. For example, the median number of months from filing to disposition is better in the Southern District of New York, to which the majority of Defendants seek transfer, than it is in the Southern District of Illinois. *See www.uscourts.gov* (2000)(5.2 months in the S.D.N.Y versus 8 months in the S.D.IL.). [FN1]

> FN1. Plaintiffs' cited statistics regarding this Court's caseload, but were cautioned at oral argument that their numbers were stale. According to the latest official statistics released on January 31, 2002, this Court had 859 assigned pending cases.

Based upon all of these considerations, the Court finds it is "clearly more convenient" for the various cases to be transferred than to be heard in this district. Given the fact that the overwhelming number of witnesses and documents are located in the transferee district, as well as the fact that Plaintiffs have offered no reason why Defendants should bear the greater legal cost of transporting documents, counsel, and witnesses to the Southern District of Illinois in order to defend against Plaintiffs' as yet unproven allegations, this Court finds that Defendants have sustained their burden of demonstrating that transfer of these cases is appropriate and warranted under § 1404(a). *See Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 621 F.Supp. 780 (N.D.Ill.1985).

*6 The only exception to this ruling relates to the motion for transfer to the Southern District of New York filed by Defendants, Aim Advisors, Inc., Aim Distributors, Inc., Franklin Advisors, Inc., Franklin Templeton, Templeton Global Advisors, Invesco Funds Group, Inc., and Invesco Distributors, Inc. (a portion of Doc. 48). As the motion relates *to these*

*Defendants only,* the motion is *granted in part and denied in part.* [FN2]

> FN2. The motion is *granted in its entirety* as it relates to Defendants, J. & W. Seligman and Seligman Advisors, since these Defendants have demonstrated that they are headquartered in New York City, the material events giving rise to the claims against them occurred in New York City, and virtually all of the relevant witnesses and documents are in New York City.

Although the Court finds that transfer from this district is appropriate, the Court will not transfer the cases against Defendants, Aim Advisors, Inc., Aim Distributors, Inc., Franklin Advisors, Inc., Franklin Templeton, Templeton Global Advisors, Invesco Funds Group, Inc., and Invesco Distributors, Inc., to the Southern District of New York as they have requested. To do so would only accomplish having the cases against these Defendants tried in another district as disconnected to the litigation as this one. Regardless of these Defendants' willingness to travel to the Southern District of New York, the Court will transfer these cases to the districts where each Defendant is headquartered, where the corporate witnesses reside, and where the corporate documents are.

Accordingly, the Court *transfers* Defendants Aim Advisors, Inc. and Aim Distributors, Inc. to the Southern District of Texas where they are headquartered; *see www.aimfunds.com/aboutus/ index.html;* Defendants Franklin Advisors, Inc., Franklin Templeton, and Templeton Global Advisors to the Northern District of California where they are headquartered; *see www.franklintempleton.com;* and Defendants Invesco Funds Group, Inc. and Invesco Distributors, Inc. to the District of Colorado where they are headquartered; *see www.invescofunds.com/ AboutINVESCO/WhoWeAre.asp.*

### IV. Conclusion

For the reasons stated herein, the Court LIFTS THE STAY, GRANTS Defendants' motions to sever (Docs. 39, 46, 67-1, 71-1, 75-1, 79-1, 83-1, 87-1, 90, 107, 125, 131, 136, & 155) and GRANTS Defendants' motions to transfer (Docs. 41, 44, 50, 67-2, 71-2, 75-2, 79-2, 83-2, 87-2, 92, 94, 105, 127, 133, 138, & 156) EXCEPT Defendants Aim Advisors Inc., Aim Distributors Inc., Franklin

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 442189, *6 (S.D.Ill.))

Page   6

Advisors. Inc., Franklin Templeton, Templeton
Global Advisors, Invesco Funds Group, Inc., and
Invesco Distributors, Inc.'s motion to transfer which
is GRANTED IN PART and DENIED IN PART as
explained above (Doc. 48). Defendants J. and W.
Seligman and Seligman Advisors' part of the motion
(Doc. 48) is GRANTED IN ITS ENTIRETY.
Accordingly, the Court TRANSFERS the cases
against the various Defendants as follows:

. to the Southern District of New York:
-- Dreyfus Corp.,
-- Dreyfus Service Corp.,
-- Smith Barney Fund,
-- Salomon Smith Barney,
-- SunAmerica Asset Mgt.,
-- SunAmerica Capital (Doc. 41),
-- J. and W. Seligman,
-- Seligman Advisors (Doc. 48),
-NY Life Distributor, Inc.
-NY Life Investment Mgt. LLC (Doc. 87-2)
-Morgan Stanley Dean Witter Advisors, Inc.
*7 -Morgan Stanley Dean Witter Distributors, Inc.
(Doc. 133)
-Goldman Sachs & Co., Inc.,
-Goldman Sachs Asset Mgt. (Doc. 156)

. to the District of New Jersey:
-Fund Asset Mgt. LP,
-FAM Distributors, Inc.,
-Prudential Investment,
-Prudential Investment Mgt. (Doc. 44)
-Lord Abbett Distributor LLC
-Lord Abbett & Co. (Doc. 79-2)

. to the District of Massachusetts:
-Putnam Investment
-Putnam Retail Mgt. (Doc. 50)
-Evergreen Investment Services
-Evergreen Investment Mgt. Co., LLC (Doc. 71-2)

-John Hancock Funds, Inc.
-John Hancock Advisors, Inc. (Doc. 75-2)
-MFS Fund Distributors, Inc.
-Massachusetts Financial Services Co. (Doc. 83-2)

. to the District of Arizona:
-Davis Distributors, LLC
-Davis Selected Advisors, LP (Doc. 67-2)

. to the District of Minnesota:
-American Express Financial Corp.

-American Express Financial Advisors, Inc. (Doc.
92)

. to the Central District of California:
-PIMCO Advisors
-PIMCO Funds Distributor LLC (Doc. 94)

. to the Northern District of California:
-- Franklin Advisors. Inc.,
-- Franklin Templeton,
-- Templeton Global Advisors (Doc. 48)

. to the Eastern District of Pennsylvania:
-Delaware Distributors, LP
-Delaware Mgt. Co. (Doc. 105)

. to the District of Colorado:
-Oppenheimer Funds Distributor, Inc.
-Oppenheimer Funds, Inc. (Doc. 127)
-- Invesco Funds Group, Inc.,
-- Invesco Distributors, Inc. (Doc. 48)

. to the Northern District of Illinois:
-Van Kampen Asset Mgt.
-Van Kampen Funds, Inc. (Doc. 138)

. to the Southern District of Texas:
-- Aim Advisors Inc.,
-- Aim Distributors Inc.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 442189
(S.D.Ill.), Fed. Sec. L. Rep. P 91,725

Motions, Pleadings and Filings (Back to top)

. 3:01CV00282 (Docket) (May. 07, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

# EXHIBIT I

380 F.Supp.2d 222                               **Page 1**
380 F.Supp.2d 222, 2005 WL 1813001 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,523
(Cite as: 380 F.Supp.2d 222, 2005 WL 1813001 (S.D.N.Y.))
c

United States District Court,
S.D. New York.
**In re EATON VANCE MUTUAL FUNDS FEE
LITIGATION,**
No. 04 CIV 1144 (JGK).

Aug. 1, 2005.

**Background:** Shareholders of mutual funds brought
putative class action against trustees and investment
advisors, alleging violations of federal and state
laws. Defendants moved to dismiss.

**Holdings:** The District Court, Koeltl, J., held
that:
(1) there was no private right of action to enforce
Investment Company Act (ICA) provisions
prohibiting destruction or falsification of records,
breach of fiduciary duty, or control person liability;
(2) mismanagement claims under ICA were
required to be brought derivatively;
(3) breach of duty through receipt of excessive
fees, in violation of ICA, was not shown;
(4) failure to make demand on trustees precluded
suit against advisers under Investment Advisor Act
(IAA);
(5) Securities Litigation Uniform Standards Act
(SLUSA) preempted state law claims against trustees
and advisers; and
(6) leave to amend would not be granted.
Complaint dismissed; case closed.

West Headnotes

**[1] Securities Regulation ☞ 218**
349Bk218 Most Cited Cases
There was no private right of action, for
enforcement of Investment Company Act (ICA)
provisions prohibiting destruction or falsification of
records, breach of fiduciary duty, or control person
liability; there was no rights creating language in
those sections of ICA, there was alternative method
of enforcement, and there was explicit right of
action in another provision of ICA. Investment
Company Act of 1940, §§ 34(b), 36(a, b), 42,
48(a), 15 U.S.C.A. §§ 80a-33(b), 80a-35(a, b),
80a-41, 80a-47(a).

**[2] Securities Regulation ☞ 219.1**
349Bk219.1 Most Cited Cases

In determining whether claims under Investment
Company Act were required to be brought
derivatively, court is to apply law of state in which
investment company is incorporated. Investment
Company Act of 1940, § 1 et seq., 15 U.S.C.A. §
80a-1 et seq.

**[3] Corporations ☞ 320(4)**
101k320(4) Most Cited Cases

**[3] Securities Regulation ☞ 218**
349Bk218 Most Cited Cases
Claims of mutual funds mismanagement, in
violation of Investment Company Act, were required
to be brought derivately, under Massachusetts law,
rather than directly by holders of shares of funds;
alleged mismanagement reduced asset value of
funds, affecting holders in their capacities as such,
rather than individually. Investment Company Act
of 1940, § 1 et seq., 15 U.S.C.A. § 80a-1 et seq.

**[4] Securities Regulation ☞ 215**
349Bk215 Most Cited Cases
In determining whether investment advisers
breached their fiduciary duties to mutual funds
shareholders, by receiving excessive fees, in
violation of Investment Company Act, courts are to
consider (1) nature and quality of services provided
by advisers to fund shareholders, (2) profitability of
mutual fund to adviser, (3) "fall-out" benefits, (4)
economies of scale achieved by mutual fund and
whether savings resulting from economies were
passed on to shareholders, (5) comparative fee
structures with other similar funds, and (6)
independence and conscientiousness of mutual
fund's outside trustees. Investment Company Act of
1940, § 36(a), 15 U.S.C.A. § 80a-35(a).

**[5] Securities Regulation ☞ 215**
349Bk215 Most Cited Cases
Shareholders of mutual funds failed to establish that
trustees and investment advisers breached their
fiduciary duties, in violation of Investment Act
(ICA), by charging excessive fees, some of which
were allegedly improperly paid over to brokers
making fund investments, there was no showing that
amounts were excessive, and in any event ICA
provision in question applied only to recipients of
improper fees, for which trustees and advisers were
merely conduits. Investment Company Act of 1940,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222                                                                    **Page  2**
(Cite as: 380 F.Supp.2d 222, 2005 WL 1813001 (S.D.N.Y.))

§ 36(a), 15 U.S.C.A. § 80a-35(a).

**[6] Securities Regulation** &#9758; **223**
349Bk223 Most Cited Cases
Failure to make demand upon trustees of mutual
funds, to sue on behalf of funds, as required under
Massachusetts law, precluded suit against advisers
under Investment Advisor Act (IAA), despite claim
that trustees were interested parties and demand
would be futile. Investment Company Act of 1940,
§§ 206, 215, 15 U.S.C.A. §§ 80b-6, 80b-15;
Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

**[7] Consumer Protection** &#9758; **6**
92Hk6 Most Cited Cases
New York consumer protection statute does not
apply to securities transactions. N.Y.McKinney's
General Business Law § 349.

**[8] Securities Regulation** &#9758; **278**
349Bk278 Most Cited Cases

**[8] States** &#9758; **18.77**
360k18.77 Most Cited Cases
Putative class action against trustees and investment
advisers of mutual funds, under state law, was
preempted by Securities Litigation Uniform
Standards Act (SLUSA); SLUSA directly applied to
putative class members purchasing shares in mutual
funds in question during class period, and since
persons who merely held shares throughout period,
arguably not covered by SLUSA, were not
differentiated from others, suit was entirely
preempted. Securities Exchange Act of 1933, §
16(b), 15 U.S.C.A. § 77p(b); Securities Exchange
Act of 1934, § 28(f)(1), 15 U.S.C.A. § 78bb(f)(1).

**[9] Federal Civil Procedure** &#9758; **1838**
170Ak1838 Most Cited Cases
Shareholders of mutual fund would be denied
opportunity to submit third amended complaint,
following dismissal, in putative class action suit
against trustees and investment advisers claiming
violations of federal and New York law; claims
were deficiently pleaded, claims were barred by
need to be brought derivately, and claims could not
be brought as private actions. Fed.Rules
Civ.Proc.Rule 15(a), 28 U.S.C.A.

**\*224 OPINION & ORDER**

KOELTL, District Judge.

**\*\*1** This document relates to: ALL ACTIONS

The plaintiffs bring this action under the Investment
Company Act of 1940, 15 U.S.C. § 80a-1 et seq.
(the "ICA"), New York General Business Law §
349 ("N.Y.Gen.Bus.L. § 349"), and under state
common law for unjust enrichment and for breach of
fiduciary duty. The plaintiffs bring these claims
against nominal defendants the Eaton Vance Funds,
and against defendants Eaton Vance, its wholly
owned subsidiary Eaton Vance, Inc. ("EV"), and
Lloyd George Management (B.V.I.) Limited
("LGML"). The plaintiffs also bring these claims
against Eaton Vance Management ("EVM"), Boston
Management and Research ("BMR"), OrbiMed
Advisors LLC ("OrbiMed"), and Lloyd George
Investment Management (Bermuda) Limited
("LGM") (collectively, the "Investment Adviser
Defendants"), and against Eaton Vance Distributors,
Inc. ("EVD"), John Doe defendants, and the
directors, officers, and trustees of the Eaton Vance
Funds. The plaintiffs seek to bring these claims as a
class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3), on behalf of a class
consisting of all persons or entities who held shares,
units, or like interests in any of the Eaton Vance
Funds between January 30, 1999, and November
17, 2003, inclusive (the "class period"), and who
were allegedly damaged thereby. No class has yet
been certified.

The plaintiffs also bring a derivative claim against
the Investment Adviser Defendants on behalf of the
Eaton Vance Funds for violation of the Investment
Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.
(the "IAA").

The defendants move to dismiss all claims pursuant
to Federal Rules of Civil Procedure 8(a), 9(b),
12(b)(6), and 23.1. Nominal defendants the Eaton
Vance Funds move to dismiss the plaintiffs' first,
second, fourth, seventh, ninth, and tenth causes of
action pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure on the grounds that these
causes of actions should have been brought as
derivative claims, and move to dismiss the
plaintiffs' fifth cause of action for failure to comply
with Federal Rule of Civil Procedure 23.1.

The plaintiffs move to strike material in the papers
supporting the defendants' motions to dismiss that
the defendants did not previously raise in their pre-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



motion letters.

### I.

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). In deciding a motion to dismiss, all reasonable inferences are drawn in the plaintiffs' favor. *See Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *see also Marcus v. Frome,* 329 F.Supp.2d 464, 468 (S.D.N.Y.2004).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, the defendants' motion to dismiss for failure to state a claim should only be granted if it appears that the plaintiffs can prove no set of facts in support of his claim that would entitle *225 him to relief. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513-14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Grandon,* 147 F.3d at 188; *Goldman,* 754 F.2d at 1065. In deciding the motion, the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Marcus,* 329 F.Supp.2d at 468; *VTech Holdings Ltd. v. Lucent Techs., Inc.,* 172 F.Supp.2d 435, 437 (S.D.N.Y.2001).

### II.

**2 Nominal defendants, the Eaton Vance Funds, are a series of various Eaton Vance business trusts organized under Massachusetts law. (Second Amended Complaint, filed Aug. 26, 2004 ("SAC") ¶ 21.) Each trust has a board of trustees responsible for the trust's administration. (*Id.*) Each of the Eaton Vance Funds is a mutual fund in which investors contribute cash for the purpose of creating a pool of assets with which to invest and purchase securities. (*Id.*) Shares of the Eaton Vance Funds are issued to investors pursuant to prospectuses that

must comply with federal securities law. (*Id.*) During the class period, the Eaton Vance Funds used a system in which funds with substantially identical investment objectives ("Feeder Funds") pooled their assets by investing in common portfolios (the "Master Funds" or "Eaton Vance Portfolios"). (*Id.* ¶ 22.)

Each Master Fund, with the exception of funds managed by LGM or OrbiMed, entered into an investment advisory agreement with defendants EVM or BMR. (*Id.*) The investment adviser for each Eaton Vance Portfolio, with the aid of the Portfolio Manager, invests the Portfolio's assets in securities consistent with the investment goals of the individual Eaton Vance Fund. (*Id.*) For most Eaton Vance Funds, each Fund invests its shareholders' assets in a single, corresponding Eaton Vance Portfolio. (*Id.,* ¶ 24.) Each Eaton Vance Portfolio has a board of trustees charged with the overall management and supervision of the Portfolio, and often shares trustees with its corresponding Eaton Vance Fund. (*Id.,* ¶ 23.) All Eaton Vance Funds share EVM, BMR, OrbiMed, or LGML as their investment adviser and share EVD as their principal underwriter and distributor. (*Id.,* ¶ 26.) Moreover, defendant Eaton Vance pools together the fees collected from Eaton Vance Funds investors, resulting in the Eaton Vance Funds sharing expenses. (*Id.*) During the class period, the defendants used a series of combined prospectuses (the "Prospectuses") whereby several Eaton Vance Funds were reported in one Prospectus. (*Id.* ¶ 109.)

Defendant Eaton Vance is the parent company of the Investment Advisers EVM and BMR, defendants EV and EVD, and all of the Eaton Vance Funds. (*Id.,* ¶ 28.) Defendant EV served as trustee of the Eaton Vance Funds and the investment advisers EVM and BMR. Eaton Vance also owns a significant interest in defendant LGML, the parent company of defendant LGM. (*Id.,* ¶¶ 29, 30.)

The Investment Adviser Defendants, EVM, BMR, OrbiMed, and LGM, are registered investment advisers under the IAA. (*Id.,* ¶¶ 31-34.) EVM and BMR managed and advised all of the Eaton Vance Funds except those managed by OrbiMed and LGM. (*Id.,* ¶¶ 31-32.) However, pursuant to agreements with OrbiMed and LGM, EVM and BMR, as investment *226 advisers to the Eaton Vance Funds, provided overall investment management services to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

each of the Master Funds, subject to the supervision of each Fund's board of trustees. (*Id.*) EVM and BMR also served as administrators or managers to all of the Easton Eaton Funds, and were responsible for managing the business affairs of all Eaton Vance Funds, subject to the oversight of each Fund's board of trustees. (*Id.*)

**3 The Investment Adviser Defendants had the ultimate responsibility for overseeing the day-to-day management of the Eaton Vance Funds. (*Id.* ¶ 35.) Pursuant to their advisory agreements with the Eaton Vance Portfolios, the Investment Adviser Defendants provide the Eaton Vance Portfolios with research, advice, and supervision with respect to investment. (*Id.* ¶ 36.) The Investment Adviser Defendants are also responsible for selecting the broker-dealers through which the Eaton Vance Portfolios will execute their securities transactions, and for negotiating the terms of the agreements with those broker-dealers. (*Id.*) Fees payable to the Investment Adviser Defendants are calculated as a percentage of assets under management. (*Id.* ¶ 35.)

The Second Amended Complaint (the "SAC") names as defendants twenty-one directors, officers, and trustees of the Eaton Vance Funds (the "Trustee Defendants"). (*Id.*, ¶¶ 37-58.) The Trustee Defendants were charged with overseeing Eaton Vance Portfolios, including both the Master Funds and corresponding Eaton Vance Funds. (*Id.*)

Defendant EVD is EVM's wholly-owned broker-dealer, and is registered under the Securities Exchange Act of 1934 (the "Exchange Act"). (*Id.*, ¶ 59.) During the class period, EVD marketed and sold the Eaton Vance Funds as the Funds' principal underwriter, and promoted and provided information regarding the portfolio management services of the Investment Adviser Defendants to unaffiliated third-party broker-dealer firms. (*Id.*) EVD also implemented Rule 12b-1 distribution plans, described below, between EVD and the Eaton Vance Funds. (*Id.*)

The plaintiffs held shares or units of Eaton Vance Funds during the class period and allege that they were damaged by the defendants' allegedly improper conduct. (*Id.* ¶¶ 14-20.) The plaintiffs bring all but one of their claims as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class "consisting of all

persons or entities who held shares, units, or like interests in any of the Eaton Vance Funds between January 30, 1999, and November 17, 2003, inclusive, and who were damaged thereby (the "Class")." (*Id.* ¶ 120.) The defendants, members of their immediate families, their legal representatives, heirs, successors, or assigns, and any entity in which the defendants have or had a controlling interest, are excluded from the Class. (*Id.*)

The plaintiffs allege that the defendants used improper means to acquire "shelf-space" at brokerage firms. The plaintiffs allege that Eaton Vance used the assets of its mutual fund investors to pay excessive commissions to brokers to induce the brokers to market aggressively Eaton Vance mutual funds to new investors. (*Id.* ¶¶ 61-65.) For example, through a program with Morgan Stanley (the "Partner Program"), Morgan Stanley adopted a broker "Incentive Compensation" payout grid that provided up to 3% greater compensation for "asset-based products" such as Eaton Vance funds, as opposed to "transaction based products," funds that were not part of the Partner Program. (*Id.* ¶ 65.) Morgan Stanley management also gave Eaton Vance Funds priority placement in the review *227 of fund materials to be distributed to Morgan Stanley brokers, gave Eaton Vance access to Morgan Stanley brokers, and invited Eaton Vance to participate in programs broadcast to brokers over Morgan Stanley's internal systems. (*Id.*) Morgan Stanley has since been fined and censured by the Securities and Exchange Commission (the "SEC") and the National Association of Securities Dealers, Inc. (the "NASD") and has agreed to pay fines totaling $50 million. (*Id.* ¶ 75-77.)

**4 The plaintiffs allege that, according to a former Eaton Vance senior manager who worked at Eaton Vance during the class period, Eaton Vance entered into "revenue sharing" arrangements through which Eaton Vance made payments to brokerage houses in order to induce brokers to direct investors to invest in Eaton Vance Funds. (*Id.* ¶ 69.) The revenue sharing plan required Eaton Vance to pay an additional ten to twenty-five basis points override on gross sales to brokerage houses in return for the brokerages encouraging investors to invest in Eaton Vance Funds. (*Id.* ¶ 70.) The plaintiffs also allege that Eaton Vance issued improper payments to brokerage houses labeled as "meeting support" or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222                                                                                    Page 5
(Cite as: 380 F.Supp.2d 222, *227, 2005 WL 1813001, **4 (S.D.N.Y.))

"meeting fees" in return for the brokerage houses encouraging investors to invest in Eaton Vance funds. (*Id.* ¶ 71.) The plaintiffs allege that this meeting support or meeting fees payments came in the form of payments as high as $60,000 to brokerage firms and luxury outings for brokers, and often required that the Eaton Vance home office grant permission for the payments. (*Id.* ¶¶ 71-72.)

Eaton Vance funds also had plans for distributing or marketing their own shares ("Rule 12b-1 plans") pursuant to Rule 12b-1. Rule 12b-1, which was promulgated by the SEC pursuant to the ICA, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions are met. *See* 17 C.F.R. § 270.12b-1 (1999) ( "Rule 12b-1"). These conditions require, among other things, that: payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution"; all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Rule 12b-1(b).

Rule 12b-1 also provides that, in considering whether a registered open-end management investment company should implement or continue a plan, "the directors of such company shall have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued...." Rule 12b-1(d). The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) of the [ICA] that there is a reasonable likelihood that the plan will benefit the company and its shareholders." Rule 12b-1(e).

During the class period the net assets for the Eaton Vance World Wide Health Sciences Fund increased from $418 million to $985 million. (SAC ¶ 91.) The net asset value per share of the fund decreased

by more than 24%, falling from $12.33 per share at the end of the fiscal year 2000 to $9.36 per share at the end of *228 the fiscal year 2003. (*Id.*) During this period, the ratio of expenses to net assets increased from 1.79% in 2000 to 1.81% in 2003, and the total fees, including management fees, collected by Eaton Vance for all of the Funds during the class period increased 37% from $173 million to over $237 million. (*Id.*) At no point during the class period were the 12b-1 fees reduced as the assets of the funds increased. (*Id.* ¶ 92.) These reductions, known as "breakpoints," may be implemented because, as fund assets increase, certain fixed costs remain the same, reducing the overall costs per shareholder. (*Id.*)

**5 While financial advisers generally owe fiduciary duties to their clients that require that they obtain the best possible execution price for their trades, the Section 28(e) "safe harbor" provision of the Exchange Act carves out an exception to this rule. 15 U.S.C. § 78bb(e). Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a ... broker ... in excess of the amount of commission another ... broker ... would have charged for effecting the transaction, if such person determined in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such ... broker...." 15 U.S.C. § 78bb(e)(1). This provision allows funds to include in their commissions payment for specified services in addition to the purchase and sales execution, including "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." (SAC ¶ 98.) The commission amounts that brokerages charge investment advisers in excess of the purchase and sales charges are known as "soft dollars." (*Id.*) The Investment Adviser Defendants paid soft dollars to brokerages in the form of commissions and overhead costs for items such as computer hardware and software. (*Id.* ¶ 99.)

The plaintiffs initiated this action by filing five separate complaints. (Complaint, filed Feb. 11, 2004; Complaint filed Feb. 26, 2004; Complaint filed Mar. 1, 2004; Complaint filed Mar. 3, 2004; Complaint filed April 12, 2004.) On April 27, 2004, the Court issued an Order directing the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

plaintiffs to file a consolidated amended complaint (the "Consolidated Amended Complaint"), and directing the defendants to outline their objections to the Consolidated Amended Complaint in letters to the plaintiffs' counsel. (Order dated Apr. 27, 2004, at 5.) The Order stated that the plaintiffs, within thirty days of receiving these letters, should either file a second amended complaint or inform defense counsel that it intended to stand on its Consolidated Amended Complaint. (Id.) The plaintiffs filed the Consolidated Amended Complaint on June 9, 2004, and the plaintiffs submitted letters in response to the Consolidated Amended Complaint on July 12, 2004. (Memorandum of Law in Support of Plaintiffs' Motion to Strike Material Not Previously Raised in Defendants' Pre-Motion Letters, filed Jan. 12, 2005 ("Strike Mem."); Memorandum of Law in Opposition to Plaintiff's Motion to Strike Material Not Previously Raised in Defendants' Pre-Motion Letters, filed Mar. 8, 2005 ("Opp. to Strike") at 1.) After reviewing the letters, the plaintiffs filed the SAC on August 26, 2004. (SAC.)

The SAC's first cause of action (Count One) is brought against the Investment Adviser Defendants and Trustee Defendants on behalf of the Class for violation for § 34(b) of the ICA (" § 34(b)"), 15 U.S.C. § 80a-33(b), alleging that the Investment Adviser Defendants and Trustee Defendants made misrepresentations and omissions of material facts in registration *229 statements and reports filed and disseminated pursuant to the ICA. Count One alleges that the Investment Adviser Defendants and Trustee Defendants failed to disclose: the nature and extent of the payments that the Investment Adviser Defendants authorized in the form of excessive commissions to brokers; that such payments violated Rule 12b-1; "that the Investment Adviser Defendants and/or the Distributor Defendant compensated themselves out of investor assets for any payment made pursuant to revenue sharing agreements"; that the Eaton Vance Funds Rule 12b-1 Plans violated the requirements of Rule 12b-1; that by paying brokers to steer clients to Eaton Vance Funds, the Investment Adviser Defendants were knowingly aiding and abetting a breach of fiduciary duties and profiting from the brokers' improper conduct; that any economies of scale achieved by marketing the Eaton Vance Funds to new investors were not passed on to Eaton Vance Funds investors; that the defendants improperly used soft dollars and excessive commissions, paid

from Eaton Vance Funds assets, to pay for overhead expenses "the cost of which should have been borne by Eaton Vance and not Eaton Vance investors"; that the Trustee Defendants failed to monitor and supervise the Investment Adviser Defendants as they were required to under the ICA and their common law fiduciary duties; and that, as a result, the Investment Adviser Defendants were able to "skim millions of dollars from the Eaton Vance Funds investors." (SAC ¶¶ 127-33.)

**6 The plaintiffs bring the second and third causes of action ("Count Two" and "Count Three," respectively), on behalf of the Class, against the EVD, the Investment Adviser Defendants and the Trustee Defendants for violation of §§ 36(a) and (b) of the ICA (" § 36(a)" and " § 36(b)"), 15 U.S.C. § § 80a-35(a) and (b), respectively. (Id. ¶¶ 134-48.) Counts Two and Three allege that EVD, the Investment Adviser Defendants, and the Trustee Defendants breached their fiduciary duties as defined by §§ 36(a) and (b) by improperly charging investors in the Eaton Vance Funds purported 12b-1 marketing fees, and by drawing on the assets of the Eaton Vance Fund investors to make undisclosed payments of soft dollars and excessive commissions, in violation of Rule 12b-1. (Id.) Count Two seeks to enjoin the defendants from engaging in such practices in the future and Counts Two and Three seek to recover improper Rule 12b-1 fees, soft dollars, excessive commissions, and the management fees that EVD, the Investment Adviser Defendants, and the Trustee Defendants charged the Eaton Vance Funds. (Id. ¶¶ 140, 148.)

The plaintiffs brings the fourth cause of action ("Count Four"), on behalf of the Class, against Eaton Vance, EV, EVM, and LGML for violation of § 48(a) of the ICA (" § 48(a)"), 15 U.S.C. § 80a-47(a), alleging that these defendants caused the Investment Adviser Defendants to violate §§ 34(b) and 36(a) and (b) of the ICA as set forth under Counts One, Two, and Three. (Id. ¶¶ 149-55.)

The fifth cause of action ("Count Five") is a derivative action brought on behalf of the Eaton Vance Fund against the Investment Adviser Defendants under § 215 of the IAA (" § 215"), 15 U.S.C. § 80b-15, for a violation of § 206 of the IAA (" § 206"), 15 U.S.C. § 80b-6. (Id. ¶¶ 156-63.) Count Five alleges that the Investment Adviser Defendants breached their fiduciary duties to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222
(Cite as: 380 F.Supp.2d 222, *229, 2005 WL 1813001, **6 (S.D.N.Y.))

Eaton Vance Portfolios and the Eaton Vance Funds by "engaging in a deceptive contrivance" through which they "knowingly and/or recklessly engaged in acts ... which operated as a fraud upon the Eaton Vance Portfolios and Eaton Vance Funds" by engaging *230 in the actions alleged in Counts One through Three. (*Id.* ¶¶ 159-61.) Count Five seeks to rescind the investment adviser contracts between the Investment Adviser Defendants and the Eaton Vance Portfolios and Eaton Vance Funds, and to recover all fees paid by the Eaton Vance Funds in connection with the contracts. (*Id.* ¶ 163.)

The sixth cause of action ("Count Six") is brought against all defendants on behalf of the Class for violation of N.Y. Gen. Bus. L. § 349. (*Id.* ¶ 165.) Count Six alleges that the defendants made misrepresentations or omissions to the plaintiffs and the Class that were unfair and deceptive when made, and that were made with the intent to, and did, deceive the plaintiffs and the Class and induce them to hold the Funds and to pay excessive and undisclosed fees in violation of N.Y. Gen. Bus. L. § 349. (*Id.* ¶¶ 164- 68.)

**7 The seventh, eight, and ninth causes of action ("Count Seven," "Count Eight," and "Count Nine," respectively) are brought by the plaintiffs on behalf of the Class for breach of fiduciary duties under common law. (*Id.* ¶¶ 169- 88.) Count Seven is brought against the Investment Adviser Defendants, Count Eight is brought against the Trustee Defendants, and Count Nine, for aiding and abetting breaches of fiduciary duties, is brought against all defendants. (*Id.*) The tenth cause of action ("Count Ten") is brought against all defendants on behalf of the Class alleging unjust enrichment under common law. (*Id.* ¶¶ 187-88.)

### III.

The plaintiffs move to strike material in the defendants' memoranda in support of their motions to dismiss that was not previously raised in the defendants' pre-motion letters submitted in response to the Consolidated Amended Complaint.

The Motion to Strike is without merit. The procedure by which the Court required the defendants to issue their objections to the Consolidated Amended Complaint was adopted to allow the plaintiffs to file the Second Amended Complaint and avoid a situation in which, had they

been aware of the arguments made in the plaintiffs' letters, they would have amended their Consolidated Amended Complaint. The plaintiffs concede that many of the arguments raised in the defendants' motions to dismiss were raised as objections to the Consolidated Amended Complaint, but argue that these objections were too vague to provide them with notice of the defendants' current arguments. (Reply Memorandum in Further Support of Plaintiffs' Motion to Strike Material Not Previously Raised in Defendants' Pre-Motion Letters, filed Mar. 22, 2005 ("Strike Reply") at 2-4.) However, the Order directing the defendants to submit their objections to the Consolidated Amended Complaint did not require the defendants to provide exhaustive arguments as to why the causes of action asserted against them were deficient, or to provide all details supporting the arguments submitted. (Order dated Apr. 27, 2004.) In any event, the plaintiffs have not demonstrated how they would have cured the legal problems alleged in the defendants' current motions to dismiss. Moreover, the plaintiffs do not dispute that they have had the full opportunity to brief all of the issues in the motion to dismiss. (Transcript of oral argument held July 8, 2005 ("Tr.") at 57.) The motion to strike is therefore denied.

### IV.

#### A.

[1] The defendants argue that Counts One, Two, and Four must be dismissed because there are no private rights of action *231 under §§ 34(b), 36(a), or 48(a). In *Olmsted v. Pruco Life Insurance Co.,* 283 F.3d 429 (2d Cir.2002), the Court of Appeals for the Second Circuit held that there was no private right of action under §§ 26(f) and 27(i) of the ICA, 15 U.S.C. §§ 80a-25(f) and 80a-26(i). *Olmsted,* 283 F.3d at 433. The Court of Appeals found that Congress did not intend to create such a private right of action, particularly in view of the absence of an explicit private right of action in those sections and the provision in § 42 of the ICA, 15 U.S.C. § 80a-41, for enforcement of all ICA provisions by the SEC through investigations and civil suits for injunctions and penalties. *Id.* at 432-33. While the Court of Appeals has not indicated whether its decision in *Olmsted* precludes private rights of action under §§ 34(b), 36(a), and 48(a), the reasoning of that decision dictates that there are no private rights of action under those sections of the ICA.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**8 Relying on the reasoning in the Supreme Court's opinion in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Court of Appeals in *Olmsted* outlined the following factors it found determinative in whether a private right of action existed under the provisions of the ICA:  1) whether the provision explicitly provides a private right of action;  2) whether the provision contains "rights-creating language" for those protected under the statute;  3) whether the statute has provided an alternative method of enforcement; and 4) whether Congress provided a private right of action for enforcement of any other section of the statute.  *Olmsted,* 283 F.3d at 432- 34.

These factors indicate that Congress did not intend to create a private right of action for the enforcement of §§ 34(b), 36(a), and 48(a) for a violation of §§ 34(b) and 36(a).  None of these sections explicitly provides for a private right of action. [FN1]  *232 Moreover, the sections do not contain "rights-creating language"--rather, they describe prohibited actions and, in the case of § 36(a), specifically authorize the SEC to take action to enforce the provision.  Moreover, the statute provides an alternative method of enforcement for these provisions through § 42 of the ICA, which authorizes the SEC to enforce all provisions of the ICA.  Thus, the *Olmsted* Court's reasoning that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others" is equally applicable to §§ 34(b), 36(a), and 48(a) of the ICA. *See Olmsted,* 283 F.3d at 433 (quoting *Alexander,* 532 U.S. at 290, 121 S.Ct. 1511).  Moreover, Congress provided a private right of action for enforcement of § 36(b) of the statute,  [FN2] supporting the argument that, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional."  *Id.* at 433, 121 S.Ct. 1511.

FN1. Section 34(b) of the ICA provides that:  "It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this subchapter or the keeping of which is required pursuant to section 80a-30(a) of this title.  It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein

any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.  For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document."  15 U.S.C.A. § 80a-33(b).

Section 36(a) of the ICA provides that:  "The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts--

(1) as officer, director, member of any advisory board, investment adviser, or depositor; or

(2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.

If such allegations are established, the court may enjoin such persons from acting in any or all such capacities either permanently or temporarily and award such injunctive or other relief against such person as may be reasonable and appropriate in the circumstances, having due regard to the protection of investors and to the effectuation of the policies declared in section 80(a)-1b of this title."  15 U.S.C.A. § 80a-35(a).

Section 48(a) of the ICA provides that:  "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder."  15 U.S.C.A. § 80a-47(a).

FN2. Section 36(b) provides, in relevant part: "For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person."  15 U.S.C. § 80a-35(b).

The absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates the strong presumption that Congress did not intend to create private rights of action under §§ 34(b), 36(a), or 48(a).    See *Chamberlain v. Aberdeen Asset Management Ltd.*, No. 02 Civ. 5870, 2005 WL 195520, at *2-*4 (E.D.N.Y. Jan.21, 2005) (applying *Olmsted* to § 36(a) and finding no private right of action) (vacated pursuant to settlement); *In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 272 F.Supp.2d 243, 255-59 (S.D.N.Y.2003) (applying *Olmsted* to § 34(b) and finding no private right of action).

The plaintiffs cite various decisions that are not dispositive.  In *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 136 n. 4 (2d Cir.2004), the Court of Appeals expressly declined to reach the question of whether § 36(a) creates a private right of action.  The Court of Appeals decision in *Strougo v. Bassini*, 282 F.3d 162 (2d Cir.2002) was issued shortly before its decision in *Olmsted* and, while it finds that the plaintiffs could pursue claims under §§ 36(a), 36(b), and 48, it appears to assume without discussion that such private rights of action exist under §§ 36(a) and 48. [FN3]  *See Chamberlain*, 2005 WL 195520 at *4 (noting tension between *Strougo* and *Olmsted* but finding later issued opinion in *Olmsted* to be dispositive).

> FN3. There is an explicit private right of action under § 36(b).

**9 Two earlier opinions of the Court of Appeals are also not dispositive.  In *Fogel *233 v. Chestnutt*, 533 F.2d 731 (2d Cir.1975), the Court of Appeals assumed that there was a private right of action against investment advisers and directors of the advisers under the ICA for breach of fiduciary duty, and remanded the case for a computation of damages.      In a subsequent appeal, after a computation of damages, the Court of Appeals concluded that its prior assumption was the law of the case, despite the new argument that there was no private right of action under the ICA for such violations.      The Court of Appeals concluded: "While we recognize that the question of the existence of a private cause of action under the ICA has become more debatable than we or the defendants thought in 1975, we thus perceive no justification for departure from the law of the case." *Fogel v. Chestnutt*, 668 F.2d 100, 112 (2d Cir.1981).  Over twenty years later, *Olmsted*, the Court of Appeals cast some doubt even on the assumptions in *Fogel*:   "[I]n *Fogel* we merely assumed that when Congress added § 36(b) of the ICA in 1970 it did not intend to overrule previous decisions recognizing implied rights of action in the statute....  We express no opinion on the current validity of our assumption in *Fogel*." *Olmsted*, 283 F.3d at 433 n. 3.

Most significantly, the *Olmsted* decision addressed the "long line of decisions recognizing implied private rights of action" under the ICA, noting that they were decided when "courts had more latitude to weigh statutory policy and other considerations than they do now." *Olmsted*, 283 F.3d at 433-34.  Following the *Olmsted* decision, the parties have pointed to no opinion in this Circuit that has considered *Olmsted* and found that Congress intended to create a private right of action under §§ 34(b), 36(a), or 48(a).   Moreover, two well-reasoned decisions from district courts in this Circuit, citing *Olmsted*, have rejected the argument that Congress intended to create a private right of action under §§ 34(b) and 36(a). *See Chamberlain*, 2005 WL 195520, at *2-*3; *Merrill Lynch*, 272 F.Supp.2d at 255-59.  The reasoning of *Olmsted* dictates that there is no private right of action under §§ 34(b), 36(a), and 48(a).

Therefore, Counts One, Two, and Four are dismissed for failure to state a claim upon which relief can be granted.

B.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222                                                                Page 10
(Cite as: 380 F.Supp.2d 222, *233, 2005 WL 1813001, **9 (S.D.N.Y.))

The defendants and nominal defendants also move to dismiss Counts One, Two, Four, Seven, Eight, Nine, and Ten pursuant to Rule 12(b)(6) on the ground that the claims should have been brought as derivative actions.

[2] Under Massachusetts law, [FN4] to determine whether a claim should be brought through a derivative suit, a court must determine whether the plaintiff has alleged "an injury distinct from that suffered by shareholders generally or a wrong involving one of his or her contractual rights as *234 a shareholder, such as the right to vote." *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir.2000) (applying Massachusetts law); *see also Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D.Ill.1999) ("To determine whether a claim belongs to the corporation, a court must inquire whether the shareholder's injury is distinct from the injury suffered generally by the shareholders as owners of corporate stock.") (applying Massachusetts law); *see Jackson v. Stuhlfire*, 28 Mass.App.Ct. 924, 547 N.E.2d 1146, 1148 (Mass.App.Ct.1990). If the wrong underlying the claim adversely affects the plaintiffs "merely as they are the owners of the corporate stock," then the injury to the shareholder is considered indirect, and the suit must be brought as a derivative action because "only the corporation itself suffers the direct wrong." *Jackson*, 547 N.E.2d at 1148 (internal quotation marks and citations omitted).

> FN4. Counts One, Two, and Four are brought pursuant to the ICA. Therefore, in determining whether the claims are properly brought as derivative or direct, the Court looks to the law of the state in which the investment company is incorporated. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Here, the Eaton Vance Funds are organized under Massachusetts law, and thus this Court looks to Massachusetts law. The parties do not dispute that Massachusetts law should also be applied to determine whether Counts Seven, Eight, Nine, and Ten, which are asserted under state common law, must be brought as derivative claims, and the Court can accept the agreement of the parties. *See Hannex Corporation v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d Cir.1998); *Bhandari v. Trustees of Columbia University*, No. 00 Civ. 1735, 2000 WL 310344, at *5 n. 1 (S.D.N.Y. Mar.27, 2000).

**10 [3] Here, Counts Two, Four, Seven, Eight, Nine, and Ten must be brought as derivative claims. All of these claims assert that the defendants improperly managed the Eaton Vance Funds, using assets and fees paid to the Funds improperly. In general, a "complaint alleging mismanagement or wrongdoing on the part of corporate officers or directors normally states a claim of wrong to the corporation: the action, therefore, is properly derivative." *Id.* (internal quotation marks and citations omitted).

Moreover, the injury asserted--the misuse of Eaton Vance Funds' assets to provide excessive compensation to brokers, improper 12b-1 plans, and soft dollar compensation to brokers--is an injury to the Eaton Vance Funds that adversely affects the plaintiffs only indirectly through their status as investors in the Eaton Vance Funds. The plaintiffs are damaged indirectly because the assets of the Funds are reduced. Although the Complaint claims that "the Investment Advisers and/or the Distributor Defendant compensated themselves out of investor assets," that the defendants used Eaton Vance Funds assets to pay for expenses that "should have been paid for by Eaton Vance and not the Eaton Vance investors," and that the Investment Adviser Defendants "skim[med] millions of dollars from the Eaton Vance investors," (Compl.¶ 129.), these claims are really allegations that the defendants used fees that were paid from Eaton Vance Fund Assets to compensate brokers for steering more investors toward the Funds, and that the Investment Adviser defendants benefited from the resulting increase in the Funds' net assets because their fees are calculated as a proportion of Fund assets. (Tr. at 71, 73, 76-78.) The shareholders therefore did not pay the fees at issue directly, but were affected indirectly because the fees were paid out of Fund assets. (*Id.*) Therefore, any claim resulting from these alleged actions belongs to the Eaton Vance Funds, and must be brought through a derivative action. *See Lapidus*, 232 F.3d at 683 (applying Massachusetts law); *Green*, 186 F.R.D. at 490 (finding that, under Massachusetts law, claim against fund adviser under §§ 8(e), 34(b), and 36(a) of the ICA could not be brought as class action and must be brought derivatively); *Jackson*, 547 N.E.2d at 1148. Therefore, Counts Two, Four, Seven, Eight, Nine, and Ten fail to state a claim upon which relief can be granted and must be dismissed pursuant to Rule 12(b)(6).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222                                                                      Page 11
(Cite as: 380 F.Supp.2d 222, *234, 2005 WL 1813001, **10 (S.D.N.Y.))

The plaintiffs argue that these claims are properly brought as direct claims because they involve duties owed directly to the plaintiffs as opposed as to the Eaton Vance Funds. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed Jan. 12, 2005 ("Opp.Mem."), at 17-25.) The plaintiffs **235** argue that, in order to determine whether a claim is derivative or direct, Massachusetts law requires that courts determine whether the duty allegedly breached was owed to the corporation or to the shareholder, rather than whether the shareholder's injury is separate and distinct from the injury to the corporation. (*Id.* at 17-23.) However, the plaintiffs provide no cases under Massachusetts law that reject the indirect injury test.

**11** The cases under Massachusetts law that the plaintiffs cite to support their argument that the derivative or direct nature of a claim depends on a determination of to whom the duty at issue is owed, *Blasberg v. Oxbow Power Corporation* and *Branch v. Ernst & Young,* are consistent with the indirect injury test because in both cases the courts recognized that a breach of a duty owed to a corporation must be addressed through a derivative claim rather than a direct claim because "the harm to the investor flows through the corporation," and thus the injury to the investor is only indirect. *See Blasberg v. Oxbow Power Corp.,* 934 F.Supp. 21, 26 (D.Mass.1996) (internal quotation marks and citation omitted); *Branch v. Ernst & Young,* No. Civ. A. 93-10024-RGS, 1995 WL 791941, at *4 (D.Mass.1995). Moreover, in *Blasberg,* the court noted that "if a plaintiff alleges mismanagement of funds ... or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor [because the] plaintiff's injury would accrue due to his role as investor in the corporation, in the form of a loss in investment value." *Blasberg,* 934 F.Supp. at 26. In any event, even under the test advocated by the plaintiffs, Counts Two, Four, Seven, Eight, Nine, and Ten, must still be brought as derivative claims because these Counts allege breaches of fiduciary duties owed to the plaintiffs only through their status as investors. *See Blasberg,* 934 F.Supp. at 26 (noting that direct claim must be result of right that "flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or

creditor of the corporation") (citing *Branch,* 1995 WL 791941 at *4). [FN5]

FN5. Although in their papers, the defendants argue that Count One also should have been brought as a derivative claim, at oral argument, counsel for the defendants Eaton Vance, EV, EVM, BMR, EVD, James B. Hawkes, LGML, LGM, Thomas E. Faust, Jr., Thomas J. Fetter, Michael R. Mach, Judith A. Saryan, Cynthia A. Clemson, Robert B. MacIntosh, Duncan W. Richardson, William H. Ahern, Jr., Scott H. Page, Michael W. Weilheimer, Payson F. Swaffield, and Edward E. Smiley, Jr. understandably conceded that Count One is properly brought as a direct claim. (Tr. at 9.) Counsel for the statutorily non-interested trustee defendants (the "Independent Trustee Defendants") do not concede this point. (*Id.* at 38, 42.) The Independent Trustee Defendants' argument that Count One must be brought as a derivative suit is unavailing. Count One alleges that the defendants made material misrepresentations or omissions regarding their management of the Eaton Vance Funds. (SAC ¶¶ 127-33.) Count One alleges an injury directly to the investors who, based on the alleged misrepresentations and omissions, continued to invest in the Eaton Vance Funds and were thereby injured. Count One alleges an injury to the investors separate and distinct from any injury to the Eaton Vance Funds and it is properly brought as a direct claim rather than a derivative claim. *See Jackson,* 547 N.E.2d at 1148. However, as explained above, Count One is dismissed on separate grounds.

The plaintiffs also argue that these claims are properly asserted as direct claims because they are specific to certain classes of shareholders; while the 12b-1 fees are paid out of Fund assets, the resulting loss to Fund assets is allocated differently among the various classes of shares rather than pro rata according to the number of shares held. (Tr. at 94-95.) **236** However, Counts Two, Four, Seven, Eight, Nine, and Ten allege only that all shareholders who held shares during the class period were damaged as a result of the excessive and improper fees charged to the Eaton Vance Funds, and make no effort to distinguish or assert claims particular to any group of shareholders who might have suffered a separate injury due to their status as members of a particular group of shareholders. (SAC ¶¶ 120-126, 134-40, 149-55, 169-88.) Moreover, Counts Two, Four, Seven, Eight, Nine, and Ten allege that all holders of Eaton Vance

380 F.Supp.2d 222
(Cite as: 380 F.Supp.2d 222, *236, 2005 WL 1813001, **11 (S.D.N.Y.))

Page   12

Funds during the class period suffered injury through the misuse of Eaton Vance assets. For the reasons explained above, this injury is indirect through their status as shareholders of the Funds, and therefore Counts Two, Four, Seven, Eight, Nine, and Ten must be asserted derivatively. *See Lapidus,* 232 F.3d at 683 (shareholders in one series of fund shares had no direct claim and claim must be brought derivatively because only injury to those shareholders was indirect).

**12 Counts Seven, Eight, Nine, and Ten are therefore dismissed. Moreover, although Counts Two and Four are dismissed for the reasons explained above, the plaintiffs' failure to bring these claims as derivative claims provides additional reasons for the dismissal of Counts Two and Four.

### C.

The defendants argue that Count Three should be dismissed for failure to state a claim because it concerns payments that are outside the scope of § 36(b), the excessive fees alleged were received by the brokers and therefore cannot be the basis of a § 36(b) claim against the Investment Adviser Defendants and the Trustee Defendants, and the complaint does not adequately allege excessive fees.

Section 36(b) provides, in relevant part, that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a-35(b). An advisory fee violates § 36(b) if it "is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,* 694 F.2d 923, 928 (2d Cir.1982).

The defendants argue that Count Three should be dismissed because the payments alleged in Count Three are outside the scope of § 36(b). The defendants argue that § 36(b) pertains only to excessive advisory fees, and that 12b-1 fees, soft dollar payments, and excessive broker commissions are not within the scope of § 36(b) because they are properly categorized as distribution fees rather than advisory fees.

The plaintiffs argue that the Court of Appeals for the Second Circuit has found that distribution fees may be the basis of a § 36(b) claim. In *Meyer v. Oppenheimer Management Corporation,* the Court of Appeals rejected the argument that § 36(b) has no application to Rule 12b-1 payments because § 36(b) deals only with advisory payments. *Meyer v. Oppenheimer Mgmt. Corp.,* 764 F.2d 76, 82 (2d Cir.1985). The Court of Appeals found that, "section 36(b) expressly applies to payments made to any affiliated person of the investment adviser," and that, because the brokerage defendants were affiliated persons, § 36(b) applied to 12b-1 fees that were paid to the brokerage defendants even though they were not advisory fees. *237 Id.; see Meyer v. Oppenheimer Mgmt., Corp.,* 895 F.2d 861, 866 (2d Cir.1990) (reiterating that excessive 12b-1 payments paid to investment adviser affiliates were subject to review under § 36(b)); *Pfeiffer v. Bjurman,* No. 03 Civ. 9741, 2004 WL 1903075, at *4 (S.D.N.Y. Aug.26, 2004); *see also ING Principal Protection Funds Derivative Litigation,* 369 F.Supp.2d 163, 167-69 (D.Mass.2005).

[4] However, Count Three must be dismissed because it fails to allege that the defendants charged excessive fees. Pursuant to Rule 8 of the Federal Rules of Civil Procedure, the plaintiffs must plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," that gives "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted); *see also Pfeiffer,* 2004 WL 1903075 at *3 (applying Rule 8 and finding some claims sufficient under § 36(b)); *Yampolsky v. Morgan Stanley Investment,* No. 03 Civ. 5710, 2004 WL 1065533, at *2 (May 12, 2004) (applying Rule 8 and dismissing claim under § 36(b)). In order to state a claim under § 36(b), the plaintiffs must allege that the defendant violated its fiduciary duty under § 36(b) by receiving fees that were "so disproportionately large" that they bore "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Meyer,* 895 F.2d at 866 (internal citation omitted); *see also ING,* 369 F.Supp.2d at 168; *In re Nuveen Fund Litig.,* No. 94 C 360, 1996 WL 328006, at *14-*15 (N.D.Ill. Jun.11, 1996). To make this determination, the Court should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consider all pertinent facts, including: (1) the nature and quality of the services provided by the advisers to the shareholders;  (2) the profitability of the mutual fund to the adviser-manager; (3) "fall-out" benefits; (4) the economies of scale achieved by the mutual fund and whether such savings were passed on to the shareholders;  (5) comparative fee structures with other similar funds;  and (6) the independence and conscientiousness of the mutual fund's outside trustees.  *Gartenberg*, 694 F.2d at 929-30;  *ING*, 369 F.Supp.2d at 168;  *Yampolsky*, 2004 WL 1065533, at *1.

**13 [5] Here, the plaintiffs do not allege any facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered.  Instead, Count Three states only that the defendants improperly charged certain distribution fees.  (SAC ¶¶ 141-48.)  Indeed, at argument of the motions, the plaintiffs' counsel conceded that their argument that the fees were excessive was based on their argument that the fees were used for improper purposes.  (Tr. at 63-64.)  The allegations that the defendants authorized improper 12b-1 fees, soft dollar payments, and commissions to brokers are insufficient to allege a claim under 36(b), which addresses only the negotiation and enforcement of payment arrangements between investment advisers and funds, not whether investment advisers acted improperly in the use of the funds.  *See, e.g.*, *Meyer*, 895 F.2d at 866;  *Gartenberg*, 694 F.2d at 928-29.  Because the allegations in the SAC contain no specific facts that would provide a factual basis for an allegation that the fees were "so disproportionately large" that the bore "no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining," the plaintiffs have failed to state a claim under 36(b).  *See Gartenberg*, 694 F.2d at 928;  *Yampolsky*, 2004 WL 1065533, at *2;  *ING*, 369 F.Supp.2d at 167-69;  *Nuveen*, 1996 WL 328006 at *14-*15.  Therefore, Count *238 Three is dismissed for failure to state a claim upon which relief can be granted.

Count Three must also be dismissed against the Investment Adviser Defendants and the Trustee Defendants because, § 36(b)(3) provides that claims may only be brought under § 36(b) against the recipient of the allegedly excessive fees.  *See* 15 U.S.C. 80a-35(b)(3);  *Halligan v. Standard &*

*Poor's/Intercapital, Inc.*, 434 F.Supp. 1082, 1083-84 (E.D.N.Y.1977);  *Nuveen*, 1996 WL 328006 at * 13-*15.  Although the plaintiffs may bring claims under § 36(b) for excessive distribution fees, those claims must be brought against the recipients of the fees.  *See, e.g.*, *Meyer*, 764 F.2d 76 (refusing to dismiss action brought under 36(b) for excessive advisory and distribution fees brought against brokers and advisors who received fees at issue);  *Meyer*, 895 F.2d at 866;  *Pfeiffer*, 2004 WL 1903075, at *4 (refusing to dismiss § 36(b) claim for distribution fees paid to defendant).

At oral argument, the counsel for the defendants acknowledged that, were Count Three properly pleaded, it could be brought against EVD as a recipient of the 12b-1 fees, but argued that Count Three was not properly brought against the Investment Adviser Defendants and the Trustee Defendants because they were not recipients of the allegedly improper fees.  (Tr. at 24.)  EVD received 12b-1 fees and unaffiliated brokers allegedly received improper payments.  The plaintiffs argue that the Investment Adviser Defendants and the Trustee Defendants benefited from the distribution fees indirectly, because the fees were used to increase the assets under management and therefore increase the size of the fees payable to the Investment Adviser Defendants, which are calculated as a percentage of assets under management.  (Opp. Mem. at 35-46.)  However, by its terms § 36(b)(3) limits § 36(b) claims to the recipients of the compensation or payments.  It thereby excludes claims that are brought against investment advisers for alleged breaches of fiduciary duties that indirectly resulted in higher fees for the investment advisers.  *See, e.g.*, *Fogel*, 668 F.2d at 112 (finding that action for breach of fiduciary duty for nondisclosure to independent directors of opportunities available to Fund did not fall under § 36(b) "even though a motivation for and the effect of the nondisclosure were to increase the gross fees by stimulating growth of the Fund and the net fees both by this and by obtaining from brokers 'research' services which the Adviser would otherwise have had to supply at its own cost").  Therefore, in addition to the reasons explained above, Count Three is dismissed against the Investment Adviser Defendants and the Trustee Defendants because they were not the alleged recipients of the disputed payments.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

380 F.Supp.2d 222                                                                                          Page 14
(Cite as: 380 F.Supp.2d 222, *238, 2005 WL 1813001, **13 (S.D.N.Y.))

### D.

**\*\*14 [6]** The defendants and nominal defendants argue that Count Five should be dismissed because the plaintiffs have failed to comply with Rule 23.1 of the Federal Rules of Civil Procedure ("Rule 23.1 "). [FN6]  Count Five is a derivative claim on behalf of the Eaton Vance Funds against the Investment Adviser Defendants under § 215 of the IAA for violations of § 206 of the IAA. It seeks to rescind the investment advisory contracts with the Investment *239 Adviser Defendants and to recover past fees paid.

> FN6. The nominal defendants also argue that there is an irreconcilable conflict of interest between the plaintiffs'-derivative claims and the plaintiffs' direct claims. (Memorandum of Law in Support of Motion of Nominal Defendants to Dismiss Derivative Claims of Second Amended Complaint, filed Oct. 26, 2004, at 10-11.) Because the Court is dismissing the non-derivative claims, it is unnecessary to reach this argument.

Rule 23.1 requires that the complaint in a derivative suit "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23.1. The Supreme Court has recognized that the demand requirements for a derivative suit are determined by the law of the state of incorporation. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98-101, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (finding that substantive corporation law of state of incorporation determines whether or not demand requirements of Rule 23.1 have been met);  *see also In re Polymedica Corp.*, No. 01-3446, 2002 WL 1809095, at *7 (Mass.Super. July 16, 2002).

Under Massachusetts law, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that ... all available means to obtain relief through the corporation itself are exhausted by making demand on the corporation's board of directors to prosecute the litigation." *See Harhen v. Brown,* 431 Mass. 838, 730 N.E.2d 859, 865 (2000) (internal citation omitted). A plaintiff may seek to have the demand requirement excused as futile "if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested." *Id.;  see also, Cote v. Levine,* 52 Mass.App.Ct. 435, 754 N.E.2d 127, 131-32 (2001) ;  *Polymedica,* 2002 WL 1809095 at *7;  *ING,* 369 F.Supp.2d at 171-72. Under Massachusetts law, "[a] trustee of a trust who with respect to the trust is not an interested person, as defined in [the ICA] shall be deemed to be independent and disinterested when making any determination or taking any action as a trustee." Mass Gen. Laws ch. 182, § 2B;  *see also ING,* 369 F.Supp.2d at 171-72 (applying Mass. Gen. Laws ch. 182, § 2B to determine if demand was excused in derivative case brought on behalf of mutual funds). The ICA, in relevant part, provides that a trustee is an interested person if the trustee is an "affiliated person"--that is, if the trustee is "controlled by" by the investment adviser. *See* 15 U.S.C. § 80a-2(a)(3), (19). The ICA defines "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position with such company," and provides that, "[a] natural person shall be presumed not to be a controlled person within the meaning of this subchapter." *See* 15 U.S.C. § 80a-2(a)(9).

**\*\*15** The plaintiffs allege that the trustees are interested because each of the trustees was appointed by the Investment Adviser Defendants and is therefore "beholden to the Investment Adviser Defendants for his/her position and substantial compensation as a Trustee." (SAC ¶ 101.) The plaintiffs allege that, "[b]ecause of their lack of independence from the Investment Adviser Defendants, Trustee Defendants wrongfully approved the adviser fees, 12b-1 fees, Soft Dollars and the materially misleading disclosures in the Eaton Vance Fund Prospectuses in each of the years they served as Directors." (SAC ¶ 102.) The plaintiffs also allege that the trustees are incapable of making an independent decision with regard to whether the bring this derivative claim because "the Trustee Defendants would be required to sue themselves and their fellow Trustees with whom they have had close business relationships for nearly 20 years." (SAC ¶ 108.)

These allegations are insufficient to excuse the demand requirement under Massachusetts *240 law. The fact that a defendant appointed a board member is insufficient to establish that the board member is interested, even if the position provides the board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



380 F.Supp.2d 222
(Cite as: 380 F.Supp.2d 222, *240, 2005 WL 1813001, **15 (S.D.N.Y.))

member with compensation. *See Demoulas v. Demoulas Super Markets, Inc.,* No. 033741BLS, 2004 WL 1895052, at *15 (Mass.Super.Aug.2, 2004). Moreover, the threat of personal liability for approving a transaction and the possibility of being sued individually is insufficient to demonstrate that a board is interested for the purposes of excusing the demand requirement. *See Heit v. Baird,* 567 F.2d 1157, 1162 (1st Cir.1977); *In re Kauffman Mut. Fund Actions,* 479 F.2d 257, 265 (1st Cir.1973) ("Where mere approval of the corporate action, absent self-interest or other indication of bias, is the sole basis for establishing the directors' 'wrongdoing' and hence for excusing demand on them, plaintiff's suit should ordinarily be dismissed."); *ING,* 369 F.Supp.2d at 171-72.

The plaintiffs acknowledge these arguments, but respond that this is a rare case in which a transaction "may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson v. Lewis,* 473 A.2d 805, 815 (Del.1984). To demonstrate such a situation under Massachusetts law, a complaint must demonstrate that the transaction alleged was "completely undirected to a corporate purpose" such that "the nature of the misconduct acquiesced in impeached the [trustees'] motives." *Heit,* 567 F.2d at 1160- 61 (citing *Kauffman,* 479 F.2d at 265). The plaintiffs attempt to meet this requirement by alleging that "[g]rowth of a mutual fund is one of the keys to its survival," and that, if the mutual fund disbanded, the board members would lose their positions on the board. (SAC ¶ 105.)

The plaintiffs' argument is without merit. The alleged transaction may have served any entirely proper corporate purpose--indeed, the plaintiffs admit in the SAC that the growth of a mutual fund is "one of the keys to its survival." (SAC ¶ 105.) Because the transaction cannot be said to be "completely undirected to a corporate purpose," it cannot support an allegation that the trustees that approved it were interested for the purposes of excusing the demand requirement. *See Heit,* 567 F.2d at 1161; *Kauffman,* 479 F.2d at 257. Because the plaintiffs have failed to plead with particularity why demand was excused, Count Five is dismissed.

E.

**16 [7] Count Six must be dismissed on the

grounds that N.Y. Gen. Bus. L. § 349 does not apply to securities transactions, even when those actions are brought as claims by "holders" of shares. *See In re Motel 6 Litigation,* 93 Civ. 2183, 1995 WL 431326, at *6-*7 (S.D.N.Y. July 20, 1995) (dismissing N.Y. Gen. Bus. L. § 349 claim brought by holders of call options against participants in alleged insider trading scheme); *Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 689 (S.D.N.Y.1991), *aff'd, Yaeger v. Nat'l Westminster,* 962 F.2d 1 (2d Cir.1992).

F.

[8] As explained above, Count Six is dismissed because N.Y. Gen. Bus. L. § 349 does not apply to securities transactions, and Counts Seven, Eight, Nine, and Ten are dismissed because they should have been brought as derivative claims. However, these claims must also be dismissed because they are preempted.

The defendants argue that the plaintiffs' state law claims are preempted by the Securities Litigation Uniform Standards *241 Act ("SLUSA"). SLUSA provides that a state law claim must be dismissed as completely preempted if: 1) the lawsuit is a "covered class action"; 2) the claim is based upon state law; 3) the claim concerns a "covered security"; and 4) the plaintiff alleges either a misrepresentation or omission of a material fact or a manipulative or deceptive device or contrivance that is "in connection with the purchase or sale of a covered security." 15 U.S.C. §§ 77p(b), 78bb(f)(1) . The plaintiffs dispute that the fourth criterion is met, arguing that the claims have not been brought "in connection with the purchase or sale of a covered security" because the plaintiffs have brought claims as holders of a security. (Opp. Mem. at 53- 59.)

In *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* the Court of Appeals for the Second Circuit held that the phrase "in connection with the purchase or sale of a covered security" should be interpreted in the context of SLUSA to have the same meaning as in § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). *See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 28 (2d Cir.2005). The Supreme Court interpreted the phrase "in connection with the purchase or sale" of a security in the context of § 10(b) of the Exchange Act to exclude claims that alleged a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



380 F.Supp.2d 222                                                                      Page  16
(Cite as: 380 F.Supp.2d 222, *241, 2005 WL 1813001, **16 (S.D.N.Y.))

misrepresentation that caused a shareholder simply to hold stock, rather than to buy or sell shares. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Accordingly, the *Dabit* Court held that, in order to be preempted by SLUSA, "an action must allege a purchase or sale of covered securities made by the plaintiff or members of the alleged class...." *Dabit*, 395 F.3d at 43-44; *see also Atencio v. Smith Barney*, No. 04 Civ. 5653, 2005 WL 267556, at *4 (S.D.N.Y. Feb.2, 2005).

The *Dabit* Court also found that, where a plaintiff alleges that the plaintiff purchased and retained stock as a result of the alleged misrepresentation or omission, the claim satisfies the standard set forth in *Blue Chip* and falls within the preemptive scope of SLUSA. *See Dabit*, 395 F.3d at 44-45; *see also Atencio*, 2005 WL 267556 at *4. Such claims are preempted even where the plaintiff "forswears *damages* from the purchase and seeks only 'holding damages' " because SLUSA "preempts claims 'alleging' fraud in connection with the purchase or sale, and not merely claims seeking damages specifically traceable to the initial purchase." *Dabit*, 395 F.3d at 45; *see also Atencio*, 2005 WL 267556 at *4. Moreover, where "the complaint does not include sufficient information to permit the court to identify and separate the preempted and non-preempted subclasses, ... the proper approach will ordinarily be to dismiss the entire claim pursuant to SLUSA." *Dabit*, 395 F.3d at 46; *see also Atencio*, 2005 WL 267556 at *5.

**17 Here, the proposed Class fails to distinguish between members whose claims are preempted under SLUSA and those whose claims are not preempted under *Dabit*. The proposed Class consists of persons who "held" shares of the Funds at any time during the class period. (SAC ¶ 120.) Although the plaintiffs disavow claims based on the purchase or sale of shares, the class definition makes no attempt to exclude class members who have purchased or sold shares during that time period. Because the SAC alleges that the actions of the defendants that are the subject of the plaintiffs' claims steered purchasers into buying shares of the Fund, the claims of class members who purchased shares during the class period are inextricably related to their purchases of shares of those funds and are preempted by SLUSA. *See Dabit*, 395 F.3d at 45-46; *242 Atencio*, 2005 WL 267556 at *5-*6.

Because the complaint does not include sufficient information to permit the court to identify and separate preempted and non-preempted subclasses, the plaintiffs' state law claims must be dismissed. *See Dabit*, 395 F.3d at 46; *Atencio*, 2005 WL 267556 at *5-*6 (finding that state law claims of class defined as "all persons and entities who held shares" of funds during class period and specifically excluded claims based on the purchase or sale of shares of funds during class period nonetheless were preempted by SLUSA). In this case, the alleged class is not even as restricted as the purported class in *Atencio*. It plainly includes persons who purchased during the class period and then held the shares. Thus, these claims must be dismissed under SLUSA as interpreted in *Dabit*.

Therefore, in addition to the reasons stated above, Counts Seven, Eight, Nine, and Ten are dismissed because, as pleaded, they are preempted by SLUSA.

### V.

[9] In their Reply to the defendants' Opposition to the plaintiffs' Motion to Strike, the plaintiffs ask for leave to amend the SAC (Reply to Strike at 7 n. 3). Generally, leave to amend should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). However, "a motion to amend should be denied if there is an 'apparent or declared reason--such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.' " *See Dluhos v. Floating and Abandoned Vessel, known as New York*, 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Here, the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint. In particular, the plaintiffs were on notice that the pleading requirements for Count Three were not met in their Consolidated Amended Complaint before the plaintiffs submitted the SAC. (Strike Reply at 4.) Moreover, there is a strong argument that amendment would be futile. Counts One, Two, and Four are dismissed because there is no private right of action under §§ 34(b), 36(a), and 48(a) of the ICA, and Count Five is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



dismissed for failure to make a demand, which cannot be cured by making a demand after a derivative suit has been initiated. *Shlensky v. Dorsey,* 574 F.2d 131, 141-42 (3d Cir.1978).

**18 The remaining state law claims are dismissed for independent reasons. Count Six fails to state a claim under N.Y. Gen. Bus. L. § 349. Counts Seven through Ten were improperly pleaded as direct rather than derivative claims and all of the state law claims are preempted under SLUSA. Moreover, because all of the federal claims are dismissed, the Court would not exercise supplemental jurisdiction over purely state law claims. *See* 28 U.S.C. § 1367(c)(3); *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 304-06 (2d Cir.2003).

The plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects. The motion to amend is therefore denied because of the plaintiffs' failure to cure deficiencies despite the opportunities to do so, and the failure to show how any amended complaint could cure the deficiencies. *See Dluhos,* 162 F.3d at 69.

*243 CONCLUSION
For the reasons stated above, the plaintiffs' second amended complaint is dismissed in its entirety. [FN7] The Clerk is directed to enter judgment and to close this case.

> FN7. Because the Court dismisses all claims, it is unnecessary to reach the additional arguments put forth by the defendants, the independent trustee defendants, defendant OrbiMed, and defendant Jessica M. Bibliowicz.

**SO ORDERED.**

380 F.Supp.2d 222, 2005 WL 1813001 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,523

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.